**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, SONY MUSIC ENTERTAINMENT, ARISTA MUSIC, ARISTA RECORDS LLC, ATLANTIC RECORDING CORPORATION, RHINO ENTERTAINMENT COMPANY, WARNER MUSIC INC., WARNER MUSIC INTERNATIONAL SERVICES LIMITED, WARNER RECORDS INC., WARNER RECORDS LLC, and WARNER RECORDS/SIRE VENTURES LLC,<br><br>                 Plaintiffs,<br><br>     v.<br><br>UNCHARTED LABS, INC., d/b/a Udio.com, and JOHN DOES 1-10,<br><br>                 Defendant. | Case No. 1:24-cv-04777-AKH<br><br>Hon. Alvin K. Hellerstein |

## ANSWER OF DEFENDANT UNCHARTED LABS, INC. TO COMPLAINT

Defendant Uncharted Labs, Inc., d/b/a Udio.com ("Udio"), by and through its undersigned counsel, hereby answers the complaint filed on June 25, 2024 (the "Complaint") by plaintiffs UMG Recordings, Inc., Capitol Records, LLC, Sony Music Entertainment, Arista Music, Arista Records LLC, Atlantic Recording Corporation, Rhino Entertainment Company, Warner Music Inc., Warner Music International Services Limited, Warner Records Inc., Warner Records LLC, and Warner Records/SIRE Ventures LLC (collectively, "Plaintiffs").

## PRELIMINARY STATEMENT

Anyone is free to create a new song using the basic building blocks of music. Udio's technology makes that possible for everyone. Its artificial intelligence-powered service allows more people than ever—trained musicians and everyday music lovers alike—to translate the ideas in their minds into high-quality, great-sounding, never-before-heard music.

This lawsuit seeks to put a stop to all that. Plaintiffs are the largest record labels in the world, who collectively dominate the music industry. The premise of their case is that musical styles—the characteristic sounds of opera, or jazz, or rap music—are somehow *proprietary*. Entire genres of music, the idea goes, are effectively owned by the corporations that acquired rights to recordings made by the generations of musicians who pioneered, developed, and honed those styles, each building off of others' innovations and creativity to push the progress of the arts incrementally forward.

That premise is fundamentally wrong. Udio will prevail in this litigation because decades of judicial precedent establishes that no company controls a genre or style of music. Helping people generate new artistic expression is what copyright law is designed to encourage, not prohibit. Under longstanding doctrine, what Udio has done—use existing sound recordings as data to mine and analyze for the purpose of identifying patterns in the sounds of various musical

styles, all to enable people to make their own new creations—is a quintessential "fair use" under copyright law.

## A.  What Udio Is And How It Works

Udio is a tool for making new music.  It allows people to use plain English descriptions of genres, styles, and other musical elements to create novel instances of artistic expression.  For example, a prompt to Udio to generate a song in the style of early 1980s "new wave" synth-pop, with an upbeat tempo but a somber feel, will in fact—with some iterative refinements from the user—yield an audio file with the characteristic instrumentation, timbres, and overall gestalt of the category described.  Users can also instruct the tool to incorporate their own original song lyrics, or new lyrics generated by a different artificial intelligence platform, into the auditory output.

Though Udio was released to the public only several months ago, people are already using it to express their own unique ideas in countless ways.  One user created a song[1] to propose to his fiancé (she said yes).[2]  Thanks to Udio, a user who was formerly a musician but lost the use of his hands is now able to create music again.[3]  And comedian King Willonius created[4] a now viral song called "BBL Drizzy,"[5] which was sampled by the producer Metro Boomin.[6]  Hundreds of people—including superstar Drake[7]—have created tracks on top of this sample.[8]  Other Udio users have

---

[1] https://www.udio.com/songs/rzMfjXGqg4Ne3EeCJHBhs6.

[2] https://www.reddit.com/r/udiomusic/comments/1deioeu/an_honest_thank_you_to_udio_and_its_creators_i_am/.

[3] https://www.reddit.com/r/udiomusic/comments/1dke91w/comment/l9kdah0/?utm_source=share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button.

[4] https://twitter.com/udiomusic/status/1787571045806887266.

[5] https://www.youtube.com/watch?v=1uW_AUwEv-0.

[6] https://w.soundcloud.com/player/?url=https%3A%2F%2Fapi.soundcloud.com%2Ftracks%2F1814779140&auto_play=false&show_artwork=true&visual=true&origin=twitter.

[7] https://www.youtube.com/watch?v=z-64IudmQuA.

[8] Connor Murray, *Drake Raps Over 'BBL Drizzy': Trolls Critics—But Not Kendrick Lamar Directly*, Forbes (May 24, 2024) available at https://www.forbes.com/sites/conormurray/2024/05/24/drake-raps-over-bbl-drizzy-trolls-critics-but-not-kendrick-lamar-directly/.

been contacted by record labels that used the platform to identify new talent in the songwriting and music production worlds.

The technological foundation of this surge in democratized creativity is an underlying model of how music works. The model is a type of computer program known as a "neural network." It was constructed by showing the program many instances of different kinds of recordings. From analyzing their constitutive elements, the model derived a staggeringly complex collection of statistical insights about the auditory characteristics of those recordings—what types of sounds tend to appear in which kinds of music; what the shape of a pop song tends to look like; how the drum beat typically varies from country to rock to hip-hop; what the guitar tone tends to sound like in those different genres; and so on.

Through extensive further refinements, Udio's engineers developed a tool for virtually anyone to harness the power of that model in the service of generating new music. To be clear, the model underpinning Udio's service is not a library of pre-existing content, outputting a collage of "samples" stitched together from existing recordings. The model does not store copies of any sound recordings. Instead, it is a vast store of information *about* what various musical styles consist of, used to generate altogether new auditory renditions of creations in those styles.

Udio seeks and has consistently sought a cooperative and mutually beneficial relationship with the creative community. It has implemented technical measures to prevent user prompts that contain pre-existing copyrighted lyrics. It released the product only after developing filters to block outputs that sound too similar to an existing artist's voice. It has demonstrated the product to musicians and producers across the music industry, many of whom are excited to use Udio in their production workflow to make songs and albums. It has set up advisory partnerships with

leading artists and producers.  The list of existing symbiotic relationships with key stakeholders in the industry goes on, and of potential ones is effectively limitless.

**B.  Plaintiffs' Sole Claim—That Copies Used In The Training Process, Never Seen Or Heard By Anyone, Are Infringing—And Why The Law Will Ultimately Preclude It**

Plaintiffs are a set of record labels that likely controls well over 75% of the recordings that U.S. consumers tend to listen to today.  Although Plaintiffs contend that Udio is liable for copyright infringement, the only act that Plaintiffs maintain was unlawful is Udio's allegedly having made a copy of sound recordings as part of the process of "training" the model.  *See* Compl. ¶ 51.  The Complaint explicitly disavows any contention that any output ever generated by Udio has infringed their rights.  *Id*.  While it includes a variety of examples of outputs that allegedly resemble certain pre-existing songs, *id*. ¶¶ 52–68, the Complaint goes out of its way to say that it is *not* alleging that those outputs constitute actionable copyright infringement, *id*. ¶ 51 ("Plaintiffs are not . . . alleging that these outputs themselves infringe the Copyrighted Recordings").

As a matter of law, that key point makes all the difference.  Under longstanding precedent, it is fair use to make a copy of a protected work as part of a back-end technological process, invisible to the public, in the service of creating an ultimately non-infringing new product.  Congress enacted the first copyright law in this country in 1791.  In the 233 years since, no case has ever—not one single time—reached a contrary conclusion.  Each time the question has been presented—and it has been presented over and over and over again—the ultimate conclusion has been that making an "intermediate" copy of a protected work, in the service of generating non-infringing outputs, is permissible, not actionable.  *See*, *e.g.*, *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) (fair use to copy all of the books in numerous university libraries in order to create a commercial, full-text searchable index of the assembled corpus); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) (fair use to copy essentially all of the images on the open

internet and show thumbnail versions to users, in the service of creating image-search functionality); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009) (fair use to copy student papers into a plagiarism detection tool). The outcome has been no different when the copying has been done in the service of creating an ultimate output that *competes* with the plaintiff copyright owner's own product. *See, e.g.*, *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) (fair use to copy copyrighted operating system to create unauthorized but non-infringing video game in direct competition with proprietor's own games); *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021) (fair use to copy protected aspects of copyrighted computer software to create a directly competing product).

This lawsuit thus seeks a genuinely unprecedented result: a ruling that it is actionable copyright infringement, not fair use, to have copied Plaintiffs' works as part of the process of developing a new technology, *even though* the ultimate outputs of that new technology are themselves non-infringing.

### C.  Why Plaintiffs Can't Contend The Outputs Are Infringing

It is not out of charity that Plaintiffs have chosen not to allege that outputs generated by Udio infringe their copyrights. They cannot as a matter of law. The copyright statute speaks to this issue with clarity. It says:

> The exclusive rights of the owner of copyright in a sound recording . . . do not extend to the making or duplication of another sound recording that consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording.[9]

---

[9] 17 U.S.C. § 114(b).  This is, famously, the provision of the Copyright Act that allowed Taylor Swift to re-record her old albums even though someone else owned the rights in the originals.

Even to the extent that Udio's outputs "imitate or simulate" sounds in the Plaintiffs' recordings, Congress made the public policy choice to immunize such new creations from copyright infringement liability, so long as they do not themselves contain actual snippets of pre-existing recordings.  Which they do not.

Interestingly, the very reason this statutory provision exists is because the record labels wanted it.

Today, there are two different copyrighted works embodied in the recording of a new song—one comprising the notes, chords, and lyrics, which is known as the "musical work" or "musical composition"; and a separate one in the particular recorded rendition of that song captured in an audio format, which is known as the "sound recording."  So when a songwriter today writes a new piece, and it is recorded by two different bands, three copyrights arise: one in the song itself, and another one in each of the recordings.  (As a general matter, the copyrights in musical works are owned or administered by *music publishers*, and the copyrights in sound recordings are owned or administered by *record labels*.)

But for the first half of the 20th century, sound recordings were not among the creative works protected by federal copyright law.  The record industry lobbied successfully in the 1950s and 1960s to change that state of affairs, leading to a statutory revision in 1971 that would newly subject recordings to federal copyright protection going forward.[10]  But along the way, the proponents of expanding federal copyright protection to cover sound recordings had to confront a recurring challenge: what the legislative record describes as a "great deal of confusion" as to whether that protection would, as a practical matter, foreclose "imitation or mimicry of a general

---

[10] *See* Pub. L. No. 92-140, 85 Stat. 391 (1971).

style or manner of performance."[11]  Essentially, the recording industry very much wanted it to be copyright infringement to make copies of a record and sell them out of the trunk of a car; but many of the same stakeholders had concerns about the prospect of copyright infringement claims arising from a new record in the same general style as a pre-existing one.  Ambiguity around what it would mean for one band's record to sound too much like another band's would subject the industry to a cloud of legal uncertainty that might chill creative expression.

To address those concerns, Congress embraced a compromise.  The 1971 law establishing copyright protection for sound recordings created new exclusive rights to control their reproduction and distribution (subject, of course, to all of the standard limitations and exceptions of copyright law, such as fair use).[12]  But it included a unique restriction on the scope of those rights—one with no analog in any other part of copyright law.  While the rights in a photograph might be infringed by another photograph that simply resembles the original too closely, irrespective of whether the infringing photo actually constitutes an identical image of the same captured moment in time, the rights in sound recordings, specifically, would be more narrowly circumscribed.  In the words of the original statute:

> [T]he exclusive right of the owner of a copyright in a sound recording to reproduce it is limited to the right to duplicate the sound recording in a tangible form that directly or indirectly recaptures the actual sounds fixed in the recording.  *Provided further*, That this right does not extend to the making or duplication of another sound recording that is an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording.[13]

---

[11] *See* Barbara A. Ringer, *The Unauthorized Duplication of Sound Recordings* at 37 & n.354, Copyright Office Study No. 26, 86th Cong. 2d Sess. (1957).

[12] Pub. L. No. 92-140 (1971) at Section (a).

[13] *Id.*

The point, as a contemporaneous commenter noted, was to make it illegal to copy and sell existing records, but at the same time to spare "courts . . . the delicate task of comparing the styles, arrangements and tones of one performer with those of another."[14]  Several years later, that provision was recodified, in modestly slimmed-down form but without substantive alteration, in 17 U.S.C. § 114(b), where it remains in full force and effect today.[15]

Fast-forward to 2024 and the age of generative AI.  The effect of this legislative compromise is that the outputs of tools like Udio, which do not reprise "the actual sounds fixed" in any "recording" owned by any record label, are not and cannot be even *prima facie* copyright infringements.  The outputs generated by Udio are *new* sounds, informed precisely by the "styles, arrangements and tones" of previous ones.  They are *per se* lawful.

### D.  What Udio Was Trained On

The many recordings that Udio's model was trained on presumably included recordings whose rights are owned by the Plaintiffs in this case.  As paragraph 9 of the Complaint itself recognizes, an AI tool designed to generate new instances of creative expression in long-established artistic genres must, in its training phase, have encountered and identified common patterns from prior examples.  Plaintiffs presumably own the rights, as far as they go, in recordings that embody those patterns.

The Complaint describes elaborate efforts by Plaintiffs to show that the "Copyrighted Recordings"—a term defined to refer to the asserted works-in-suit—were specifically included in the data set that Udio used as the raw material from which its neural network extracted insights regarding how music works.  *See* Compl. ¶ 52.  For example, Plaintiffs evidently inputted the lyrics

---

[14] *See* Comment, *Performers' Rights and Copyright: The Protection of Sound Recordings from Modern Pirates*, 59 Calif. L. Rev. 548, 571 (1971).

[15] *See* Pub. L. No. 94-553, 90 Stat. 2541, 2560 (1976).

from the Frank Sinatra song "My Way," along with the prompt, "jazz frank Jacques sinatra Revaux my way ballad 1969," and found that the output contains "melodic similarities to the Sinatra original throughout [the output]." *Id.* ¶ 61. "[T]hose similarities," Plaintiffs contend, "betray that the model was trained on the Copyrighted Recordings." *Id.* ¶ 52.

But that conclusion actually does not follow from the investigation that supposedly preceded it. In fact, even a cursory search on Spotify reveals literally hundreds of different recordings of "My Way" (to say nothing of countless other recordings of similar songs in the same style). Consequently, Plaintiffs' argument betrays a profound misunderstanding of the technology at issue by suggesting that UMG's particular version must have been in the training set because Udio allegedly generated an output that contains "melodic similarities to the Sinatra original throughout." So too do countless other recordings of the song. And to be clear, these are largely features of the *musical composition* "My Way"—the rights to which are apparently owned not by any of the Plaintiffs here, but by two unrelated music publishers.[16] So when Plaintiffs' lawyers prompted Udio with the lyrics to "My Way," *see id.* ¶ 61, they flagrantly violated Udio's Terms of Service—which are designed to ensure that the product is used to generate *new* artistic expression.[17]

More importantly, however, this case is not a "whodunnit." Irrespective of whether UMG's particular version of "My Way" was in Udio's training data, many other UMG recordings

---

[16] Specifically, BMG Rights Management (US) LLC, and Concord Music Publishing LLC, according to publicly available sources.

[17] *See generally* Udio's Terms of Service, https://www.udio.com/terms-of-service ("By submitting any Input Content through the Services, you represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to submit and use (and allow us to use) such Input Content in and in connection with the Services, including for the purpose of generating Output. You represent and warrant that your submission of an Input Content in connection with your use of the Services, including to generate Output, will not violate any law or any third party's rights, terms and conditions associated with such Input Content, and no other licenses, permissions, consents or authorizations must be obtained from or payments made to any other person or entity by us (or any third party deriving any rights or obligations from us) arising out of or related to our use of Input Content, including to create Output and/or train, develop, fine-tune or otherwise improve the Services.").

probably were.  Plaintiffs will have ample opportunity to comb through the relevant data, all of which has been preserved, once discovery commences.  And when the facts come out, this litigation—or more precisely, the portion of this litigation concerning Udio's conduct, as opposed to the portion of this litigation concerning the record labels' actions—will be about why the law has always permitted comparable uses of copyrighted works, and why this time should be no different.

### E.  The Major Labels' Aversion To Competition

A healthy portion of the Complaint is dedicated to describing Plaintiffs' concern that the outputs of Udio's service will compete with their catalogs of sound recordings.  *See*, *e.g.*, Compl. ¶ 12 (complaining of the danger of "overrunning the market with AI-generated music"); *id*. ¶ 4 (warning that Udio's "musical outputs could saturate the market with machine-generated content that will directly compete with, cheapen, and ultimately drown out . . . genuine sound recordings"). That is a familiar refrain from incumbents in the music industry.

When records first began to gain commercial traction in the 1930s, musicians aggressively lobbied against their use, warning that replacing orchestras with pre-recorded performances would leave real musicians "on the 'human scrap heap.'"[18]  When synthesizers began to gain popularity in the 1960s, leaders of the American Federation of Musicians passed a resolution banning use of the technology for fear that it would be "used to replace instrumentalists."[19]  In the 1980s, a branch of the U.K. Musicians' Union passed a motion to ban drum machines "in all recording and live

---

[18] *See* Marc Coleman, *Playback: From the Victrola to MP3, 100 Years of Music, Machines, and Money*, New York, Da Capo Press (2003), at 40–41 (quoted in Chris R. Rasmussen, "Lonely Sounds: Recorded Popular Music and American Society, 1949-1979" (2008) at 25, Dissertations, Theses, & Student Research, Department of History, University of Nebraska (available at https://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1015&context =historydiss).

[19] *See* "An AFM Ban on the Moog Synthesizer?" *Rolling Stone* (Apr. 19, 1969), at 10.

work, arguing that such automatons are doing the musicians out of work."[20]  Domestically, the Recording Industry Association of America went so far as to back efforts to enjoin the distribution of the VCR because of its potential for unauthorized recording.  *See* Brief for Recording Industry Association of America, Inc., *Sony Corp. of Am. v. Universal City Studios, Inc.*, No. 81-1687, Dkt. 66, 464 U.S. 417 (1984).

More recently, the major record labels have made a standard practice of seeking to thwart competition from smaller, independent labels—using complex contractual constraints to prevent streaming services from leaning more heavily on smaller labels willing to license at lower rates.[21] Both independently and collectively, the major record labels wield massive market power.[22]  And they have not hesitated to exploit it in fundamentally anticompetitive ways.[23]  This is not speculation—these issues have been adjudicated in regulatory proceedings.

In the AI space, the labels have been even more brazen.  On information and belief, they have sought to impose deal terms on a broad array of licensees effectively requiring an across-the-board "no AI" policy—essentially trying to leverage their exclusive rights under copyright law to strong-arm music users into categorically avoiding artificial intelligence products.  With respect to music AI start-ups, specifically, the relevant facts have not yet come fully to light—but there are certainly indications that the labels, through their trade group the Recording Industry

---

[20] *See* "Robots 2, Unions 0," *The Globe and Mail* (June 4, 1982), at E5.

[21] *See* Copyright Royalty Board, *Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV)*, 81 Fed. Reg. 26316, 26373 ("the Majors commonly include anti-steering or MFN clauses in their agreements with the services").

[22] *See Web IV*, 81 Fed. Reg. at 26368 (holding that "the Majors could utilize their combined market power to prevent price competition among them by virtue of their complementary oligopoly power").

[23] *See Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 382 (D.C. Cir. 2020) (finding that the major labels "have considerable market power vis-à-vis [licensees], and they have leveraged that power to extract excessive royalties").

Association of America, may have responded to outreach from potential commercial counterparties by engaging in one or more concerted refusals to deal.

This behavior is not just atmospherically relevant to this case. It goes directly to Plaintiffs' longstanding practice of misusing their aggregated copyrights to gain unfair advantage in the marketplace, well beyond what copyright law itself allows. The defense of copyright misuse "is often applied when a defendant can prove either (1) a violation of the antitrust laws; (2) that the copyright owner otherwise illegally extended its monopoly; or (3) that the copyright owner violated the public policies underlying the copyright laws." *Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 700 (9th Cir. 2015) (Wardlaw, J., concurring). The effect of a finding of copyright misuse is to preclude enforcement of the copyright or copyrights at issue during the period of misuse. *Prac. Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520 n.9 (9th Cir. 1997). "[T]he defense of copyright misuse is available even if the defendants themselves have not been injured by the misuse." *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 979 (4th Cir. 1990). With the benefit of discovery, Udio will show that even setting the fair use issue aside, Plaintiffs' pervasive copyright misuse bars their claims altogether.

### F. Conclusion

No one owns musical styles.[24] Developing a tool to empower many more people to create music, by analyzing on a massive scale the relationships among notes and rhythms and tones to ascertain the building blocks of different musical styles, is a quintessential fair use under longstanding and unbroken copyright doctrine. Plaintiffs' contrary vision is fundamentally inconsistent with the law and its underlying values.

---

[24] *See, e.g.*, *Cortes v. Universal Music Latino*, 477 F. Supp. 3d 1290, 1301 (S.D. Fla. 2020) (rejecting claim of protection "for the musical genre of 'Reggaeton'"); *Peters v. West*, 692 F.3d 629, 636 (7th Cir. 2012) ("[N]o poet can claim copyright protection in the form of a sonnet or a limerick.").

## RESPONSES TO SPECIFIC ALLEGATIONS

## NATURE OF THE ACTION[25]

1.      Udio admits that artificial intelligence ("AI") and machine learning are the next frontier of technological development and present significant future opportunities.  Udio denies the remaining allegations of this paragraph.

2.      Udio admits that AI companies, like all other enterprises, must abide by the laws that protect human creativity and ingenuity.  The remaining allegations in this paragraph contain legal conclusions to which no response is required.[26]  Udio denies that this lawsuit seeks to enforce any valid claim under applicable law.

3.      Udio admits that generative AI tools assist humans in creating new and innovative music.  The remaining allegations in this paragraph contain legal conclusions to which no response is required.

4.      Udio admits that its generative AI tool allows users to generate, among other things, digital music files in response to basic inputs.  Udio admits that its model was constructed by showing the program a vast amount of different kinds of sound recordings in order to derive statistical insights about those recordings.  Udio denies the remaining allegations of this paragraph.

5.      The allegations in this paragraph contain legal conclusions to which no response is required.

6.      Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

---

[25] The various headings and subheadings of the Complaint are not allegations and thus do not require a response.  Udio reproduces them in this Answer solely for convenience.  To the extent a response is required, Udio denies any allegations contained in the headings and subheadings of the Complaint.

[26] To the extent a response to any legal conclusion herein is required, Udio denies the allegation.

7. Udio admits that it offers a generative AI tool that creates digital music files within seconds of receiving a user's prompts. Udio further admits that constructing its generative AI tool required showing the program massive amounts of data in order to derive statistical insights about that data. Udio also admits that it charges many of its users monthly fees to use its product and produce digital files. Udio denies any remaining allegations of this paragraph.

8. Udio admits that constructing its generative AI tool required showing the program many different kinds of recordings in order to derive statistical insights about them. Udio admits that some of the quoted language appears in Sharon Goldman, *AI Music May Be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024), available at https://fortune.com/2024/05/17/ai-music-training-scraped/. To the extent the allegations in this paragraph characterize or are inconsistent with the full text, Udio denies those allegations. Udio denies any remaining allegations of this paragraph.

9. Udio admits that constructing its generative AI tool required showing the program many instances of different kinds of recordings sources in order to derive statistical insights about them. Udio lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis denies them.

10. Udio admits that the selectively quoted language appears in a pre-litigation correspondence between Udio and Plaintiffs, the full text of which speaks for itself. Udio also admits that it stated in that correspondence that "assuming without admitting that" the RIAA's "factual suppositions" about the "the content of Udio's training data" "are correct," then "[a]n unbroken line of cases establishes that the use of a copyrighted work as part of a technological process to create a non-infringing final product is quintessential fair use." To the extent the allegations in this paragraph characterize or are inconsistent with the full text of Udio's

correspondence, Udio denies those allegations.  To the extent that the allegations in this paragraph contain legal conclusions, no response is required.  Udio denies any remaining allegations of this paragraph.

11.    To the extent the allegations in this paragraph contain legal conclusions, no response is required.  To the extent a response is required, Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

12.    To the extent the allegations in this paragraph contain legal conclusions, no response is required.  To the extent the allegations in this paragraph purport to quote from portions of a publicly available comment, the full text of the comment speaks for itself.  To the extent the allegation in this paragraph is referring to Tim Ingham's article, *The Train Has Left the Station: AI Music Platform Udio Is Already Spitting Out 10 Songs a Second*, Music Business Worldwide (May 13, 2024), available at https://www.musicbusinessworldwide.com/the-train-has-left-the-station-ai-music-platform-udio-is-already-spitting/, Udio admits that the article asserts that the Udio tool outputs 10 music files per second.  Udio lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis denies them.

13.    Udio admits that it offers a subscription plan, "Pro," available for $30 per month.  Udio further admits that it has been successful in its fundraising efforts and that it has raised millions of dollars in funding, including from prominent investors.  Udio denies the remaining allegations of this paragraph.

14.    The allegations in this paragraph contain legal conclusions to which no response is required.  Udio denies the remaining allegations of this paragraph.

15.    The allegations in this paragraph contain legal conclusions to which no response is required.  Udio denies the remaining allegations of this paragraph.

16.    The allegations in this paragraph contain legal conclusions to which no response is required.

## **THE PARTIES**

17.    Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

18.    Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

19.    Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

20.    Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

21.    Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

22.    Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

23.    Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

24.    Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

25.    Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

26.     Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

27.     Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

28.     Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

29.     Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

30.     To the extent the allegations in this paragraph contain legal conclusions, no response is required.  To the extent a response is required, Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

31.     Udio admits that Uncharted Labs, Inc. d/b/a Udio is a Delaware corporation with its current principal place of business at 750 Lexington Avenue, Floor 9, New York, New York 10022.

32.     The allegations of this paragraph are directed at unknown parties, and Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph about the unknown parties, and on that basis denies them.  The remaining allegations against Udio are legal conclusions to which no response is required.

## JURISDICTION AND VENUE

33.     For purposes of this action, Udio does not contest subject matter jurisdiction.  The paragraph otherwise contains legal conclusions to which no response is required.

34.     For purposes of this action, Udio does not contest personal jurisdiction.  The paragraph otherwise contains legal conclusions to which no response is required.

35.    For purposes of this action, Udio does not contest venue.  The paragraph otherwise contains legal conclusions to which no response is required.

## **FACTUAL BACKGROUND**

36.    To the extent the allegations in this paragraph contain legal conclusions, no response is required.  To the extent a response is required, Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

37.    To the extent the allegations in this paragraph contain legal conclusions, no response is required.  To the extent a response is required, Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

38.    Udio admits that a public beta version of its AI music generation tool was launched on April 10, 2024.  Udio further admits that the quoted language appears in Udio, *Former Google Deepmind Researchers Assemble Luminaries Across Music And Tech To Launch Udio, A New AI-Powered App That Allows Anyone To Create Extraordinary Music In An Instant*, PR Newswire (Apr. 10, 2024), available at https://www.prnewswire.com/news-releases/former-google-deepmind-researchers-assemble-luminaries-across-music-and-tech-to-launch-udio-a-new-ai-powered-app-that-allows-anyone-to-create-extraordinary-music-in-an-instant-302113166.html. Udio also admits that the quoted language appears in Stuart Dredge, *AI Music Startup Udio Launches Backed By Artists and Instagram's Co-Founder*, Music Ally (Apr. 10, 2024), available at https://musically.com/2024/04/10/ai-music-startup-udio-launches-backed-by-artists-and-instagrams-co-founder.

39.    Udio admits that its product allows users to enter text prompts or audio files to generate digital music files.  Udio further admits that users can prompt Udio's tool with a

description of the music they want to generate, which can include specifying the genre, lyrics, story direction, and themes to serve as inspiration. Udio also admits that paid subscribers can also prompt Udio's tool by uploading a sound recording. Udio admits that the quoted language appears in a June 5, 2024 post from the @udiomusic X account, available at https://x.com/udiomusic/status/1798369297758077066. To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with it, Udio denies those allegations. Udio further admits that its tool can process a user's prompt and generate two digital music files within seconds. Udio also admits that once the files have been generated, users can further edit them through Udio's "remix" feature. Udio denies the remaining allegations of this paragraph.

40. Udio admits that its product was originally free to users, with a limit of 600 music files per month. Udio further admits that on May 8, 2024, Udio introduced subscription tiers, with options ranging from $10 a month for 1,200 credits (which equates to 1,200 30-second clips per month), to $30 a month for 4,800 credits (which equates to 4,800 30-second clips per month). Udio also admits that it also allows users to create full length tracks that can be remixed without limit. Udio admits that its more expensive subscription tiers provide more credits to users per month. Udio denies the remaining allegations of this paragraph.

41. Udio admits that its model is based on a machine learning model. Udio further admits that its model produces audio. Udio also admits that its model is a type of computer program known as a "neural network," which was constructed by showing the program many instances of different kinds of recordings gathered from publicly available sources. By analyzing their constitutive elements, the model derived a complex collection of statistical insights about the auditory characteristics of those recordings. Udio admits that its training process includes

additional further technical refinements.  Udio lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis denies them.

42.    Udio admits that some of the quoted language appears in Comments of a16z in Response to Notice of Inquiry on Artificial Intelligence & Copyright 5 (Oct. 30, 2023).  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with it, Udio denies those allegations.  Udio lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis denies them.[27]

43.    Udio admits that its model is a type of computer program known as a "neural network," which was constructed by showing the program many instances of different kinds of recordings gathered from publicly available sources.  By analyzing their constitutive elements, the model derived a complex collection of statistical insights about the auditory characteristics of those recordings.  Udio admits that its training process includes additional further technical refinements. Udio denies the remaining allegations of this paragraph.

44.    Udio admits its model generates new music in existing musical styles using a complex collection of statistical insights regarding those styles that it has derived from many sound recordings.  Udio denies the remaining allegations of this paragraph.

45.    Udio denies the allegations of this paragraph.

46.    Udio admits that constructing its generative AI tool required showing the program many instances of different kinds of recordings in order to derive statistical insights about them.

---

[27] Plaintiffs fail to accurately quote Comments of a16z in Response to Notice of Inquiry on Artificial Intelligence & Copyright 5 (Oct. 30, 2023) in their Complaint. ("First, the only practical way generative AI models can exist is if they can be trained on an almost unimaginably *massive* amount of content, much of which (because of the ease with which copyright protection can be obtained) will be subject to copyright." (emphasis added)).

Udio lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis denies them.

47.    Udio admits that the quoted language appears in Stuart Dredge, *AI Music Startup Udio Launches Backed By Artists and Instagram's Co-Founder*, Music Ally (Apr. 10, 2024), available at https://musically.com/2024/04/10/ai-music-startup-udio-launches-backed-by-artists-and-instagrams-co-founder/.  Udio further admits that the quoted language appears in Sharon Goldman, *AI Music May Be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024), available at https://fortune.com/2024/05/17/ai-music-training-scraped/. Udio also admits that the quoted language appears in Kristin Robinson, *Metro Boomin's 'BBL Drizzy' Is More Than a Joke – It Could Signal the Future of Sampling*, Billboard (May 15, 2024), https://www.billboard.com/business/tech/metro-boomin-bbl-drizzy-future-ai-sampling-1235682587/.  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the quoted language, Udio denies those allegations.

48.    To the extent the allegations in this paragraph contain legal conclusions, no response is required.  To the extent a response is required, Udio denies the allegations of this paragraph.

49.    The allegations in this paragraph contain legal conclusions to which no response is required.  Udio also lacks knowledge or information sufficient to admit or deny the allegations of this paragraph about "casual observers," and on that basis denies them.

- Udio admits that the quoted language appears in Brian Hiatt, *AI-Music Arms Race: Meet Udio, the Other ChatGPT for Music*, Rolling Stone (Apr. 10, 2024).  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the quoted language, Udio denies those allegations.

- Udio admits that the quoted language appears in Ed Newton-Rex, *Yes… Udio's Output Resembles Copyrighted Music, Too*, Music Business Worldwide (Apr. 18, 2024).  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the quoted language, Udio denies those allegations.

- Udio admits that the quoted language appears in Anthony Fantano, *Disgusting AI Music App*, YouTube (May 3, 2024).  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the quoted language, Udio denies those allegations.

- Udio admits that the quoted language appears in Sync My Music, *Is Udio Reproducing Copyrighted Songs? (Audio Examples)*, YouTube (May 15, 2024). To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the quoted language, Udio denies those allegations.

- Udio admits that the quoted language appears in Kristin Robinson, *Metro Boomin's 'BBL Drizzy' Is More Than a Joke – It Could Signal the Future of Sampling*, Billboard (May 15, 2024).  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the quoted language, Udio denies those allegations.

- Udio admits that the quoted language appears in Sharon Goldman, *AI Music May be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024).  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the quoted language, Udio denies those allegations.

50.    Udio admits that the selectively quoted language appears in pre-litigation correspondence between Udio and Plaintiffs, the full text of which speaks for itself.  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the full text of that correspondence, Udio denies those allegations.

51.    Udio admits that Plaintiffs do not appear to be alleging that the outputs of Udio's model "infringe the Copyrighted Recordings."  Consistent with its Preliminary Statement, Udio denies the allegation that "the fact that Udio's product generates digital music files that mimic readily identifiable features of the Copyrighted Recordings supports the conclusion that Udio is using the Copyrighted Recordings in training its AI model."

52.    Consistent with its Preliminary Statement, Udio denies that any alleged similarities between model output and Plaintiffs' Copyrighted Recordings "betray that the model was trained on Copyrighted Recordings."  Udio lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis denies them.

53.    Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph regarding Plaintiffs' "test," and on that basis denies them. Consistent with its Preliminary Statement, Udio denies that the results of that "test" "confirm that Udio has copied for training purposes the Copyrighted Recordings, because this degree of similarity in output would be impossible if Udio were not training on the Copyrighted Recordings."

54.    Udio denies this allegation.

55.    Udio denies that any alleged similarities between model output and Plaintiffs' Copyrighted Recordings "are only possible because Udio copied the Copyrighted Recordings that contain these musical elements."  Udio lacks knowledge or information sufficient to form a belief

as to the truth of the remaining allegations in this paragraph and footnote 10, including with respect to Plaintiff UMG's copyright ownership, and on that basis denies them.

56.    Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, including with respect to Plaintiff Warner Records Inc.'s copyright ownership, and on that basis denies them.

57.    Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, including with respect to Plaintiff Warner Records Inc.'s copyright ownership, and on that basis denies them.

58.    Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, including with respect to Plaintiff SME's copyright ownership, and on that basis denies them.

59.    Udio admits that the quoted language appears in Sync My Music, *Is Udio Reproducing Copyrighted Songs?* (Audio Examples), YouTube (May 15, 2024) at 5:23–8:00, available at https://www.youtube.com/watch?v=FTiVr986yuk.  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the quoted language, Udio denies those allegations.  Udio lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, including with respect to Plaintiff SME's copyright ownership, and on that basis denies them.

60.    Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and Exhibit B, including concerning Plaintiffs UMG and SME's copyright ownership, and on that basis denies them.

61.     Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, including concerning Plaintiff UMG's copyright ownership, and on that basis denies them.

62.     Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, including concerning Plaintiff SME's license relationship with third parties, and on that basis denies them.

63.     Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, including concerning Plaintiff Capitol Records' copyright ownership, and on that basis denies them.

64.     Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, including concerning Plaintiff UMG's copyright ownership, and on that basis denies them.

65.     Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, including concerning Plaintiff Atlantic's exclusive control of sound recordings, and on that basis denies them.

66.     Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis denies them.

67.     Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, including concerning Plaintiff SME's license relationship with third parties, and on that basis denies them.

68.     Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and Exhibit C, and on that basis denies them.

69.     Udio lacks knowledge or information sufficient to admit or deny the allegations of this paragraph about "users," and on that basis denies them.  The remaining allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio denies the allegations of this paragraph.

70.     To the extent the allegations in this paragraph purport to reference portions of a video posted on April 17, 2024 on X by @ezralaeux, which is no longer available, the full video speaks for itself.  Udio otherwise lacks knowledge or information sufficient to admit or deny the allegations of this paragraph about "users," and on that basis denies them.

71.     To the extent the allegations in this paragraph purport to reference portions of a video posted on April 17, 2024 on X by @ezralaeux, which is no longer available, the full video speaks for itself.  Udio otherwise lacks knowledge or information sufficient to admit or deny the allegations of this paragraph about "users," and on that basis denies them.

72.     To the extent the allegations in this paragraph purport to reference portions of a video posted on April 17, 2024 on X by @ezralaeux, which is no longer available, the full video speaks for itself.  To the extent the allegations in this paragraph purport to reference portions of a publicly available video posted on April 17, 2024 on X by @dcibabyyy, the full video speaks for itself.  Udio otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis denies them.

73.     Udio admits that it temporarily shut down its Manual Mode on or around April 17, 2024.  Udio lacks knowledge or information sufficient to admit or deny the allegations of this paragraph about "users," and on that basis denies them.  Udio otherwise denies the allegations of this paragraph.

74.    Udio lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph or Exhibit B, and on that basis denies them.

75.    Udio admits that the parties engaged in correspondence prior to Plaintiffs filing this lawsuit, the full text of which speaks for itself.   Udio also admits that it stated in that correspondence that "assuming without admitting that" the RIAA's "factual suppositions" about the "the content of Udio's training data" "are correct," then "[a]n unbroken line of cases establishes that the use of a copyrighted work as part of a technological process to create a non-infringing final product is quintessential fair use."   The remaining allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio denies the allegations of this paragraph.

76.    The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio denies the allegations of this paragraph.

77.    The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio denies the allegations of this paragraph.

78.    The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio denies the allegations of this paragraph.

79.    The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio denies the allegations of this paragraph.

80.    Udio admits that the quoted language appears in Stuart Dredge, *AI Music Startup Udio Launches Backed By Artists and Instagram's Co-Founder*, Music Ally (Apr. 10, 2024), available at https://musically.com/2024/04/10/ai-music-startup-udio-launches-backed-by-artists-and-instagrams-co-founder/.  To the extent the screenshot in this paragraph purports to reference portions of a publicly available comment posted on May 15, 2024 on X by @DavidDingAI, the

full post speaks for itself.  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with either source, Udio denies those allegations.  Udio admits that constructing its generative AI tool required showing the program many instances of different kinds of recordings sources in order to derive statistical insights about them.  Udio lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis denies them.

81.    The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio denies the allegations of this paragraph.

82.    The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio denies the allegations of this paragraph.

83.    The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio denies the allegations of this paragraph.

84.    The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio denies the allegations of this paragraph.

85.    Udio admits that the assertion the Udio tool outputs 10 music files per second appears in Tim Ingham's article, *The Train Has Left the Station: AI Music Platform Udio Is Already Spitting Out 10 Songs a Second*, Music Business Worldwide (May 13, 2024), available at https://www.musicbusinessworldwide.com/the-train-has-left-the-station-ai-music-platform-udio-is-already-spitting/.  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the article, the full text of the article speaks for itself.  Udio further admits that the quoted language appears in Udio, Terms of Service § 6.3.1, available at https://www.udio.com/terms-of-service.  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the quoted language, Udio denies those

allegations.  The remaining allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted recordings, and on that basis denies those allegations.

86.    Udio admits that the quoted language appears in Stuart Dredge, *AI Music Startup Udio Launches Backed By Artists and Instagram's Co-Founder*, Music Ally (Apr. 10, 2024), available at https://musically.com/2024/04/10/ai-music-startup-udio-launches-backed-by-artists-and-instagrams-co-founder/.  Udio further admits that the quoted language appears in Sharon Goldman, *AI Music May Be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024), available at https://fortune.com/2024/05/17/ai-music-training-scraped/.  Udio also admits that the quoted language appears in Kristin Robinson, *Metro Boomin's 'BBL Drizzy' Is More Than a Joke – It Could Signal the Future of Sampling*, Billboard (May 15, 2024), https://www.billboard.com/business/tech/metro-boomin-bbl-drizzy-future-ai-sampling-1235682587/.  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with the quoted language, Udio denies those allegations.

87.    To the extent the allegations in this paragraph purport to quote from portions of a publicly available document, the full text of that document speaks for itself.  To the extent the allegations in this paragraph purport to summarize or characterize or are inconsistent with it, Udio denies those allegations.  The remaining allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio denies the remaining allegations.

88.    Udio admits that the quoted language appears in the letter available at https://artistrightsnow.medium.com/200-artists-urge-tech-platforms-stop-devaluing-music-

559fb109bbac.  The remaining allegations of this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio denies the remaining allegations.

89.    The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio denies these allegations.

90.    Udio admits that there is room for AI and human creators to forge a sustainable, complementary relationship that promotes human creativity and facilitates the human creations that shape culture, excite the public, and resonate with consumers.  The remaining allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio denies these allegations.

91.    The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio denies these allegations.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Direct Copyright Infringement of Post-1972 Copyrighted Recordings)

92.    Udio incorporates by reference its responses to all allegations set forth in paragraphs 1–91 as if fully set forth herein.

93.    The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations.  Udio otherwise denies the remaining allegations of this paragraph.

94.    The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound

recordings, and on that basis denies those allegations. Udio otherwise denies the remaining allegations of this paragraph.

95.     The allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Udio lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations. Udio otherwise denies the remaining allegations of this paragraph.

96.     The allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Udio lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations. Udio otherwise denies the remaining allegations of this paragraph.

97.     The allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Udio lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations. Udio otherwise denies the remaining allegations of this paragraph.

98.     The allegations in this paragraph contain legal conclusions to which no response is required. To the extent a response is required, Udio lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations. Udio otherwise denies the remaining allegations of this paragraph.

99.     The allegations in this paragraph contain legal conclusions to which no response is required.

100.    The allegations in this paragraph contain legal conclusions to which no response is required.

## SECOND CAUSE OF ACTION

### (Direct Copyright Infringement of Pre-1972 Copyrighted Recordings)

101.    Udio incorporates by reference its responses to all allegations set forth in paragraphs 1–91 as if fully set forth herein.

102.    The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations.  Udio otherwise denies the remaining allegations of this paragraph.

103.    The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations.  Udio otherwise denies the remaining allegations of this paragraph.

104.    To the extent that the allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations.  Udio otherwise denies the remaining allegations of this paragraph.

105.    The allegations in this paragraph contain legal conclusions to which no response is required.

106.    The allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations.  Udio otherwise denies the remaining allegations of this paragraph.

107.    To the extent that the allegations in this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, Udio lacks knowledge or information sufficient to admit or deny the allegations of this paragraph concerning Plaintiffs' copyrighted sound recordings, and on that basis denies those allegations.  Udio otherwise denies the remaining allegations of this paragraph.

108.    The allegations in this paragraph contain legal conclusions to which no response is required.

109.    The allegations in this paragraph contain legal conclusions to which no response is required.

## PRAYER FOR RELIEF

In response to the Prayer for Relief, Udio denies that Plaintiffs are entitled to the requested relief, or to any relief whatsoever.

A.    In response to the Prayer for Relief, Udio denies that Plaintiffs are entitled to the requested relief, or to any relief whatsoever.

B.    In response to the Prayer for Relief, Udio denies that Plaintiffs are entitled to the requested relief, or to any relief whatsoever.

C.     In response to the Prayer for Relief, Udio denies that Plaintiffs are entitled to the requested relief, or to any relief whatsoever.

D.     In response to the Prayer for Relief, Udio denies that Plaintiffs are entitled to the requested relief, or to any relief whatsoever.

E.     In response to the Prayer for Relief, Udio denies that Plaintiffs are entitled to the requested relief, or to any relief whatsoever.

F.     In response to the Prayer for Relief, Udio denies that Plaintiffs are entitled to the requested relief, or to any relief whatsoever.

## JURY DEMAND

With respect to the jury demand contained in Plaintiffs' Complaint, Udio states that no response is required.  To the extent a response is deemed required, Udio denies that all of Plaintiffs' claims are properly triable to a jury.

## AFFIRMATIVE DEFENSES

In further answer to the allegations made by Plaintiffs in the Complaint, Udio asserts the following affirmative defenses, incorporating by reference all of the preceding material, including without limitation the Preliminary Statement above.  Udio does not concede that it has the burden of proof on the defenses listed below.

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs' Complaint, and each and every claim alleged therein, fails to state facts sufficient to constitute a cause of action upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

To the extent there is copying of copyrightable expression, that copying constitutes fair use pursuant to 17 U.S.C. § 107.  Udio's AI tool uses a back-end technological process, invisible to

the public, in the service of creating an ultimately non-infringing new product. This is quintessential fair use.

**THIRD AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred, in whole or in part, by the doctrines of copyright misuse and unclean hands. The defense of copyright misuse applies when a defendant can prove one of the following: (1) a violation of the antitrust laws; (2) that the copyright owner otherwise illegally extended its monopoly; or (3) that the copyright owner violated the public policies underlying the copyright laws. The effect of a finding of copyright misuse is to preclude enforcement of the copyright or copyrights at issue during the period of misuse, and the defense is available even if the defendant has not itself been injured by the misuse. On information and belief, Plaintiffs have engaged in anticompetitive activities that extend an unlawful monopoly over the production and commercialization of music, which by itself and/or in connection with other conduct satisfies each of the three alternative prongs above.

**FOURTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred, in whole or in part, by one or more other equitable doctrines, such as waiver, estoppel, and laches.

**FIFTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims fail in whole or in part because the complained-of use was validly licensed by express or implied license.

**SIXTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs do not own or hold exclusive rights under 17 U.S.C. § 106 or any copyright law over each work that was allegedly infringed by Udio, including because some or all of the material over which Plaintiffs claim copyright is not protectable and/or is in the public domain.

## SEVENTH AFFIRMATIVE DEFENSE

To the extent there is copying of copyrightable expression, that copying is de minimis.

## EIGHTH AFFIRMATIVE DEFENSE

To the extent Plaintiffs establish any act of infringement, that infringement was innocent, allowing for the Court to reduce any award of statutory damages to an amount as low as $200 per work infringed.  17 U.S.C. § 504(c)(2).

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs' remedies are barred at least in part by the applicable statutes of limitations.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have suffered no provable injury as a result of Udio's alleged copying.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims for injunctive relief are barred, in whole or in part, because Plaintiffs have failed to state facts sufficient to support a claim for injunctive relief, and there is an adequate remedy at law.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the copyright registrations purporting to cover some or all of the works in dispute are invalid and do not satisfy the requirements of 17 U.S.C. §§ 411–412.

## ADDITIONAL AFFIRMATIVE DEFENSES

Udio has not knowingly or intentionally waived any applicable defenses and reserves the right to assert and rely on other applicable defenses as may become available or apparent during discovery in this matter.  Udio reserves the right to amend this Answer and/or its affirmative defenses.

## <u>REQUEST FOR RELIEF</u>

Therefore, Udio respectfully requests that this Court:

1. Enter judgment in Udio's favor and against Plaintiffs;

2. Dismiss all claim by Plaintiffs with prejudice;

3. Award Udio its attorneys' fees and costs to the extent permitted by law; and

4. Grant Udio such other and further relief as this Court deems just and proper.

Dated: August 1, 2024
      New York, New York

Respectfully submitted,

*/s/ Steven N. Feldman*
Steven N. Feldman
Nathan Taylor
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
steve.feldman@lw.com
nathan.taylor@lw.com

Andrew M. Gass (*pro hac vice* pending)
Brittany N. Lovejoy (*pro hac vice* pending)
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
andrew.gass@lw.com
brittany.lovejoy@lw.com

Sarang V. Damle
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
sy.damle@lw.com

*Counsel for Defendant Uncharted Labs, Inc.,
d/b/a Udio.com*

Dated: August 1, 2024                Respectfully submitted,
       New York, New York

                                     _/s/ Alex Spiro_
                                     Alex Spiro
                                     Andrew H. Schapiro
                                     Jessica A. Rose
                                     QUINN EMANUEL URQUHART &
                                     SULLIVAN, LLP
                                     51 Madison Avenue, 22nd Floor
                                     New York, NY 10010
                                     Telephone: (212) 849-7000
                                     Facsimile: (212) 849-7100
                                     alexspiro@quinnemanuel.com
                                     andrewschapiro@quinnemanuel.com
                                     jessicarose@quinnemanuel.com

                                     *Counsel for Defendant Uncharted Labs, Inc.,*
                                     *d/b/a Udio.com*