O8LDUmgC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UMG RECORDINGS, INC., ET AL.,

4                 Plaintiffs,

5            v.                          24 CV 04777

6   UNCHARTED LABS, INC., ET AL.,

7                 Defendants.
                                         Argument
8   ------------------------------x
                                         New York, N.Y.
9                                        August 21, 2024
                                         11:00 a.m.
10
    Before:
11
                         HON. ALVIN K. HELLERSTEIN,
12
                                         District Judge
13

14                          APPEARANCES

15  HUESTON HENNIGAN, LLP
         Attorneys for Plaintiffs
16  BY:  MOEZ M. KABA
         ALEX PERRY
17       MARIAH RIVERA

18  LATHAN & WATKINS
         Attorney for Defendants
19  BY:  ANDREW GASS

20  QUINN EMANUEL
         Attorney for Defendants
21  BY:  TODD STEVEN ANTEN

22

23

24

25

O8LDUmgC

```
1              (Case called.)
2              THE DEPUTY CLERK:  Counsel, please state your
3    appearances for the record.
4              MR. KABA:  Good morning, your Honor.  Moez Kaba, of
5    Hueston Hennigan, and I'm joined by my colleagues Mariah Rivera
6    and Alex Perry on behalf of plaintiffs.
7              THE COURT:  How do you do?
8              MR. GASS:  Good morning, your Honor.  Andy Gass from
9    Latham & Watkins on behalf of defendants.  I'm here with
10   co-counsel from Quinn Emanuel, Todd Anten.  And I'd like to
11   introduce your Honor to Andrew Sanchez, one of the co-founders
12   of Udio and its chief operating officer here in the front row.
13             THE COURT:  How do you do?
14             Checking on your lawyers?
15             MR. SANCHEZ:  Yes, indeed.
16             THE COURT:  So we begin.  Why don't you tell me about
17   the case, Mr. Kaba.
18             MR. KABA:  Sure, your Honor.
19             THE COURT:  If you don't mind going to the podium,
20   that would be good.
21             MR. KABA:  Yes.  Absolutely.
22             Your Honor, the defendant, Uncharted Labs, or what's
23   more commonly referred to as Udio, is an artificial
24   intelligence company that, in a nutshell, you can go onto, type
25   a prompt or a command, and it will spit out a song recording
```

O8LDUmgC

1  that Uncharted Labs or Udio then allows users, who -- some of

2  whom get this service for free, some of whom pay, to use and to

3  put out in the marketplace we allege as a competitor to our

4  clients.

5      THE COURT:  One can create a song instructing

6  artificial intelligence.

7      MR. KABA:  That's exactly right, with a prompt:

8  Folksy, love song.

9      THE COURT:  What kind of prompt do you have to give

10  it?

11      MR. KABA:  As I'm describing now.  So you would be

12  able to go in and type in, I want a folksy love song, teenage

13  angst, roughly.  You can get more specific.  You can get less

14  specific.  You could, in some instances, as we were able to

15  determine from our complaint, you could actually have very

16  specific requests for a particular type of vocal presentation,

17  which we allege and, frankly, we may end up talking about,

18  defendants effectively have admitted already, the way they have

19  trained their model to be able to spit out these recordings,

20  these sound recordings -- so a little bit unlike OpenAI, where

21  it's a text response, this is actually sound recordings and

22  corresponding lyrics that gets spat out from Udio upon the

23  entry of this prompt.

24      THE COURT:  Let's say you want a love song, unrequited

25  love, suitable for a late teenager.  Is that enough of an

O8LDUmgC

1   instruction or do you have to do more?

2          MR. KABA:  That may be enough of an instruction to get

3   something, and you could refine it and add more detail or less

4   detail to it.

5          THE COURT:  For example, in the style of Frank

6   Sinatra.

7          MR. KABA:  Exactly.  Yes.  That you would be able to

8   get even a more specific output.

9          At this point in the case, though, your Honor, it's an

10  important I think framing point.  My clients are some of the

11  largest record and music companies in the world that own the

12  copyrights to a vast library of songs.  Udio has trained its

13  model using our copyrighted songs.

14         THE COURT:  How do you know that?

15         MR. KABA:  Because, one, they've said as much in their

16  response to this complaint.  They have said -- I can quote for

17  the Court.  It's docket 26.  They said, "the many recordings

18  that Udio's model was trained on presumably included recordings

19  whose rights are owned by the plaintiffs in this case."  That's

20  on page 8.

21         They go on to say on pages 9 and 10, "irrespective of

22  whether UMG, one of the plaintiffs in this case, particular

23  version of "My Way" was in Udio's training data, many other UMG

24  recordings probably were."

25         And then in our complaint, your Honor, we actually lay

O8LDUmgC

1    out in quite painstaking detail a number of tests that we did,

2    where we went on, we got these prompts, we used these prompts,

3    and we got sound recordings that sound -- and we've even

4    provided the Court with a thumb drive of the actual recordings

5    that are indistinguishable, indistinguishable from popular

6    well-known recording artists and popular less known recording

7    artists.

8            An example we have in our complaint at page 56 -- I'm

9    sorry, paragraph 56, is Green Day's version of "American

10   Idiot."  At paragraph 55, it's the Temptations version of "My

11   Girl."  And the Court can hear the record --

12           THE COURT:  What?

13           MR. KABA:  The Temptations, "My Girl."  That's another

14   example that was -- where we can determine that the output from

15   Udio is almost identical to the copyrighted recordings,

16   including in the vocal match of the artificial intelligence

17   singer.

18           So we lay out in painstaking detail how we can

19   determine that they were trained on our copyrighted sound

20   recordings in their answer to our complaint, and that's what's

21   happened here.  They've answered -- they have not moved.  As I

22   just quoted, they effectively admit that they copied and used

23   our recordings for purposes of training their model.

24           And so their argument, at least as we understand it,

25   is in large part -- I understand they believe they have other

O8LDUmgC

```
1    arguments as well, in large part that this is fair use.  That

2    is, the way that they have trained their models to mimic and

3    learn from and then use our copyrighted works was fair use, and

4    the Court need look no further than, again, their answering

5    statement.  The very -- the preliminary statement says, "under

6    long-standing doctrine, what Udio has done, use existing sound

7    recordings as data to mine and analyze for the purpose of

8    identifying patterns and the sound of various musical styles,

9    all to enable people to make their own creations is

10   quintessential fair use under copyright law."

11           And so --

12           THE COURT:  So your notion is fair use is the real and

13   central issue of this case?

14           MR. KABA:  Your Honor, my notion and I think affirmed

15   by their answer were --

16           THE COURT:  I mean, we're not arguing that.

17           MR. KABA:  Yeah.

18           THE COURT:  I think I have enough of an understanding

19   from what you said.  Let me hear from defendants' perspective.

20           Mr. Gass.

21           MR. GASS:  Thank you, your Honor.

22           Mr. Kaba's articulation of what the technology is and

23   how it works was partially correct.  Let me clarify and correct

24   a few elements of it.

25           First of all, it is not intended to allow anyone to go
```

O8LDUmgC

1    on and generate a rendition of "My Girl" from the Temptations'

2    version.  There is no reason anyone would do that.  You can

3    perfectly well go listen to "My Girl" on hundreds of places on

4    the internet.

5          What Udio is is a tool to allow people to create new

6    musical creations.  No one would invest the time or energy to

7    do what this company does to create some sort of on demand

8    library of recordings that could more easily be gotten

9    elsewhere.  What people actually do with the tool, what it's

10   intended for is to allow you to go on and say, I'm going to

11   make a bespoke love song for my wife in the style of a crooner

12   or something like that, or for a professional musician to go on

13   and have some prompts to aid them in their own process.

14         Contrary to Mr. Kaba's suggestion, you can't ask it,

15   in a way that it will respond to directly, to create a Frank

16   Sinatra version of it.  The product has specifically been built

17   to say, no, we're not going to give you Frank Sinatra's voice.

18   We'll try to give you something that's broadly in the same

19   style, because a style, the sound of a 1960s crooner, the sound

20   of punk music, the sound of rap music is not something anyone

21   owns the rights in.  These are part of our shared cultural

22   heritage.  And fundamentally what Udio does --

23         THE COURT:  That means you agree with Mr. Kaba that

24   fair use is going to be the central issue of the case?

25         MR. GASS:  It is one central issue in the case.

O8LDUmgC

```
1                 THE COURT:  What's another?

2                 MR. GASS:  Another central issue in the case is the

3      plaintiffs' own efforts to hobble this technology before it can

4      get out of the starting gate, and that is --

5                 THE COURT:  Plaintiffs' efforts to what?

6                 MR. GASS:  Hobble this technology before it gets out

7      of the starting gate.

8                 THE COURT:  How do you hobble technology?

9                 MR. GASS:  They have been going around to licensees of

10     theirs in other areas and saying, if you want the rights to my

11     catalog of sound recordings, you may not have anything to do

12     with AI companies at all.  They, we believe, have, in lieu of

13     engaging in commercial discussions with AI companies like --

14                THE COURT:  So you think this is misuse?

15                MR. GASS:  Correct.  And moreover, your Honor,

16     importantly --

17                THE COURT:  Do you agree that there's copying?

18                MR. GASS:  Yes, your Honor, there was -- the way that

19     the technology was developed -- you can't look at two

20     recordings or six recordings or a thousand recordings.  In

21     order to study the constitutive elements of what a recording in

22     a given genre sounds like, you need millions of these

23     recordings.

24                So we agree it is quite likely, as we were forthright

25     in our answer, that of the millions of recordings that were
```

O8LDUmgC

1   used, presumably the plaintiffs at least purport to own some of

2   them.  There is, I will add, a novel issue of ownership that

3   plaintiffs' allied that I want to focus your Honor's attention

4   on.

5           THE COURT:  So you are synthesizing copyrighted and

6   uncopyrighted work?

7           MR. GASS:  Correct.  Exactly.

8           THE COURT:  If there is an infringement, how does one

9   fix damages?

10          MR. GASS:  How does one fix damages?  I'm going to

11  take issue for a moment with the suggestion of synthesis,

12  because what is happening here is not --

13          THE COURT:  Not synthesis --

14          MR. GASS:  Not that Udio takes a snippet --

15          THE COURT:  I'll get a word that you will like.

16  Transformation.

17          MR. GASS:  Right.  So if there is infringement, then

18  the work is infringing and damages are available.

19          THE COURT:  If I were to try to limit the scope of

20  discovery, what issues would you like to have discovered?

21          MR. GASS:  There are two principal issues that we

22  would like discovery into:  One, are the plaintiffs' licensing

23  practices, and both vis-a-vis other parties against whom they

24  have said, you may not deal with AI companies if you want to

25  have our catalog, and with respect to startups like Udio, who

O8LDUmgC

1    have approached them to discuss commercial transactions -- so

2    we would like to understand what have they done.  Have they

3    agreed with each other not to engage?  That's topic one.

4            Topic two, we would like discovery particularly for

5    the older recordings in suit into whether the plaintiffs can

6    actually prove they owned these works.  Those works are

7    governed by a different regime, not the standard copyright

8    regime.

9            THE COURT:  Tell me about that.

10           MR. GASS:  Until very recently, sound recordings made

11   before year 1972 were governed not by federal law but by state

12   law.  In 2018, Congress --

13           THE COURT:  Why was that?

14           MR. GASS:  Ah.  Great question, your Honor.

15           So, historically, there was no federal copyright

16   protection for sound recordings at all.  You could get

17   protection for the underlying notes and lyrics, but from the

18   early days of the technology, Edison and onward, Congress

19   didn't recognize the recorded rendition of a song as something

20   that independent America --

21           THE COURT:  So the composer and possibly the arranger

22   would have a copyright, but not the artist --

23           MR. GASS:  Correct, but the performing artist would

24   not.  So for many decades, the performing artists went to

25   Congress and said, this is an outrage; every time the song gets

O8LDUmgC

1    played on the radio, the song writer gets paid but I do not.

2    Congress, you need to fix this.

3            THE COURT:  So Rudy Vallee never got any copyright

4    income.

5            MR. GASS:  Correct, he didn't, at the time.

6            THE COURT:  Early Sinatra, also not --

7            MR. GASS:  Exactly.  Those recordings were protected,

8    if at all, under state law, not federal law.  In 1971 of all

9    years --

10            THE COURT:  Unfair competition laws.

11            MR. GASS:  Correct, unfair competition laws.  And even

12    state copyright laws.  There was a tremendous litigation about

13    those laws about four or five years ago.  That's been resolved

14    now.

15            In 1971, Congress brokered a compromise and agreed

16    that going forward, for all sound recordings made, believe it

17    or not, on or after February 15, 1972, there would be federal

18    copyright protection for those going forward, subject to a

19    variety of caveats and restrictions, one of which Mr. Kaba

20    failed to mention, which is that the copyright protection for

21    sound recordings is unique in all of copyright law in that you

22    can only infringe the right in a sound recording but actually

23    reprizing the actual sounds of the recording and duplicating

24    it.

25            So the idea was to get a record --

O8LDUmgC

1          THE COURT:  The notion having been fixed, is that it?

2          MR. GASS:  Yes.  Exactly.  You can only infringe the

3    rights in recordings by reprizing the actually sounds that were

4    fixed.  Your Honor is exactly right.  That's the word.

5          You cannot infringe the rights and recording --

6          THE COURT:  So is it the charge and your admission

7    that lots of these fixed recordings that are subject to

8    copyright protection are in your library?

9          MR. GASS:  It's not a library, your Honor.  Here's

10   what it is.  Many fixed recordings were used as part of a back

11   end training process, invisible to the public, to teach the

12   artificial intelligence what the sounds of music consist of.

13   When an output is generated, it does not include any of the

14   sounds of any of the works in that library, and, as a rule,

15   100 percent of those outputs are non-infringing.  And that is

16   an essential element of this case.

17         THE COURT:  Is there any law on this?

18         MR. GASS:  On which piece, your Honor?

19         THE COURT:  On whether you can incorporate multiple

20   copyrighted renditions as a base for teaching or creating a

21   system of AI generation of music?

22         MR. GASS:  There are about three dozen copyright

23   infringement lawsuits currently pending in the federal courts

24   throughout the United States.  None of them has yet proceeded

25   even to a summary judgment motion.  And that, your Honor, is

O8LDUmgC

```
 1    part of --
 2           THE COURT:  Does the Google case have anything to do
 3    with making a library of every printed word, copyrighted and
 4    not copyrighted, a precedent --
 5           MR. GASS:  The Google case is highly relevant, because
 6    that case, along with countless others, stands for the
 7    proposition that it has never once in the history of copyright
 8    law in the United States been deemed actual infringement rather
 9    than fair use to use a copyrighted work as part of the back end
10    technological process of creating something new, different, and
11    non-infringing.  It has never happened.
12           THE COURT:  So Google stands for the proposition that
13    it's fair use?
14           MR. GASS:  Correct.
15           THE COURT:  I take it that Mr. Kaba would say
16    something different?
17           MR. GASS:  One imagines.
18           THE COURT:  What would you say?
19           You can say it from there.  You can sit down.
20           MR. KABA:  Your Honor, I would say Google does not --
21    Google may have stood for the proposition that it was fair use
22    with respect to that particular set of facts.  Here, if you
23    analyze the four fair use factors, we have something quite
24    different happening.  But ultimately, your Honor, sort of to
25    take it back to the point that we originally talked about, even
```

O8LDUmgC

1    as we're discussing this now, I think what we are circling in

2    on is the issue of fair use is going to be the threshold if not

3    dispositive issue in the case, and should we not, in the

4    interest of efficiency, get to --

5              THE COURT:  Tell me what the relevance of *Google* is.

6              MR. KABA:  Your Honor, I think *Google* stands for the

7    proposition that within that context, in the way that Google

8    was providing the service that it was providing, that that use

9    may not have been infringing.  Here, of course, we have a

10    plainly commercial application of plainly commercial

11    application of -- plainly commercial use of our works.  That's

12    just fair use factor number one.  We have --

13              THE COURT:  So let me understand it.

14              MR. KABA:  Yes.

15              THE COURT:  In order for me to reach the issue of fair

16    use, do I have to understand the entire mechanics of this

17    business?

18              MR. KABA:  Is that directed to me, your Honor?

19              THE COURT:  Yes.

20              MR. KABA:  I think you have to understand some of the

21    mechanics of this business certainly.  I think the way that

22    they are using the works --

23              THE COURT:  You're saying that -- I can foresee that

24    if I do what you want me to do and limit discovery to fair use,

25    I'd have to make rulings every other day.

O8LDUmgC

1          MR. KABA:  I don't believe that's true, your Honor.

2          THE COURT:  I do, and so I won't do it.

3          MR. KABA:  I understand your position.  Obviously if

4     the Court's mind is set on it, then so be it.

5          THE COURT:  I'm not set on anything.  I've never had

6     this experience before, but I have tried to limit the scope of

7     discovery to my regret.  In the 9/11 cases, there was an

8     overriding issue having to do with whether there was a safe

9     zone for the way that workers were working in the recovery.

10          MR. KABA:  I recall that.

11          THE COURT:  Whether that was a protectable warranty

12     for example.  Not -- warranty is a bad word, but protectable

13     scope.  We limited discovery to that.  I was making rulings

14     every other day in what was permissible and what was not.  It's

15     not a good use of time.  It's not efficient.  In order for me

16     to make any intelligent rulings, I'll need a longer perspective

17     than just an abstract issue of fair use.

18          So we're not going to have a limitation in discovery.

19          MR. KABA:  I understand.  And just so -- your Honor,

20     our proposal was not to cut off discovery forever, but to try

21     to stagger it.  But I understand the Court's position that it's

22     hard to delineate the lines between fair use for the Court or

23     not, or at least -- the Court will be dragged into discovery

24     disputes on whether the parties agree --

25          THE COURT:  Let me put another question to you.  If

O8LDUmgC

1    you want to prove infringement, do you have to prove each and

2    every song that may have been used as a basis for training?

3           MR. KABA:  I think the infringement would be

4    established for each song.  We don't know each and every song

5    yet.  That's information that Udio possesses.

6           THE COURT:  That will be the result of endless

7    discovery.  What compass can we put on this case?

8           MR. KABA:  Well, I guess, your Honor, I'm struggling a

9    little bit about -- I mean, part of why we were trying to

10   establish the legal principle that both sides seem to be

11   debating is you can make the determination based on the more

12   limited set of information about the fact that they are using

13   copyrighted sound recording to train, they are using it for

14   commercial purposes knowingly --

15          THE COURT:  I would need to know just how that

16   happens.

17          MR. KABA:  I think that articulation of the way that

18   their model works is not going to be -- I don't think it's

19   going to require endless amounts of discovery.  They have a

20   model.  They know how it works.  They know what they put into

21   it.  They know how different copyrighted sound recordings are

22   weighted in their model.  And I think those sorts of things

23   could probably be determined by a pretty limited set of

24   discovery and likely one or two depositions on just -- to

25   answer your Honor's point.

O8LDUmgC

1          THE COURT:  Experience teaches me not to trust that

2     mode of operation.

3          MR. KABA:  I understand and respect that, your Honor.

4          THE COURT:  But let's say I find that fair use is not

5     appropriate, and I go on to the issue of infringement.  What is

6     infringed?

7          MR. KABA:  It is going to be the specific works that

8     are being used in their model.

9          THE COURT:  Well, they're telling me that everything

10    that they could digest is being used, that there's no limit to

11    what they want to put into their teaching library.

12         MR. KABA:  Yeah.  So we don't know exactly what

13    they're doing yet, your Honor, but --

14         THE COURT:  We're going to have to find out.  But

15    let's say that's the case.  Let's say that we find that there's

16    10,000 copyrighted works in their library of teaching

17    materials.  What then?

18         Do you amend to include each and every one?  Do you

19    have to amend to include the songs that are infringed?  What

20    kind of complaint would you have?

21         MR. KABA:  Well, the current complaint we have lists

22    many of the recordings, and, yes, we would include -- for

23    purposes of obtaining damages, your Honor, we would include

24    every one of the sound recordings that we contend infringed, so

25    that we could get appropriate damages on it.

O8LDUmgC

1        THE COURT:  Let's suppose there are 10,000.

2        MR. KABA:  Presumably, your Honor, we could serve a

3   discovery response identifying our ownership in those 10,000

4   recordings.

5        THE COURT:  Yes.  With a lot of effort, you could

6   probably do that.  But then let's suppose that one detected

7   song is used just a tiny bit, and another one goes through

8   several bars.  I don't know the musical terms, but extensively,

9   one minutely, another extensively, there's a difference in

10  infringement damages.  So I don't know how to think of this

11  complaint.

12       MR. KABA:  Well, I'm not going to sort of beat the

13  dead horse, your Honor, but if the Court determines that there

14  is no fair use, there is a real problem here with Udio's model

15  and the way they're approaching things.

16       And, yes, your Honor I think is pointing out that the

17  extent of the infringement for a particular recording may, in

18  fact, impact the damages, not the propriety of their using it,

19  but the damages to which we would be entitled for its use.  But

20  of course, your Honor, we don't yet know the answer to that.

21  We don't know how their model spits -- how their model weighs

22  the different copyrighted recordings.  It may be in one

23  instance, you're right, they would only take a portion of a

24  copyrighted song recording.  In another instance, responsive to

25  another prompt, it may be a much larger portion.  And that kind

O8LDUmgC

1    of understanding of their model is something, unfortunately, I

2    can't speak to yet, but --

3            THE COURT:  It's different, song to song.

4            MR. KABA:  It very well may, your Honor, because it

5    depends on how it's trained, how its model is trained.

6            THE COURT:  Creating a case that is impossible.

7            MR. KABA:  I don't think it's going to be im --

8            THE COURT:  Unless it's an injunction case.  I could

9    see a case in equity, but I don't understand how this could be

10   a case in damages that any single judge could deal with.

11           MR. KABA:  Well, your Honor, I think certainly our

12   case seeks both injunction to prevent this infringement and,

13   again, which is why we were trying to advance what we thought

14   was a threshold issue early, and then move on to the more

15   involved potentially portion of the case where we are seeking

16   damages, but --

17           THE COURT:  We have one case.  It depends how you

18   frame the case.  The way you're framing the case now is a case

19   for damages.  You're asking for a jury trial.

20           MR. KABA:  We're asking for both injunctive relief and

21   damages.

22           THE COURT:  Which makes it a jury trial.

23           MR. KABA:  Yes, your Honor.  I understand that.  But

24   we believe under the law we're entitled, of course, to the

25   equitable relief and the damages.

O8LDUmgC

1          THE COURT:  I understand that.  I'm not trying to

2     think through what I -- what a result should be.  I don't know

3     what a result should be.  I'm just imagining the types of

4     difficulties that I'll be confronted with in this case.

5          Why do you want to amend the complaint?  Why do you

6     want leave to amend the complaint?

7          MR. KABA:  For a couple of purposes, your Honor.  One,

8     we -- as the Court has already identified, we don't know the

9     full scope of their use.  What they have admitted is they do

10    use --

11         THE COURT:  So potentially you're going to amend to

12    include every song that's protected?

13         MR. KABA:  If we're able to ascertain that, we may.

14         THE COURT:  Are you only Universal or you're Warner,

15    also?  How many companies are you --

16         MR. KABA:  We've categorized them into three primary

17    groups of affiliated record labels within each group.

18         THE COURT:  Just take the name of the overall group.

19         MR. KABA:  UMG, Sony and Warner.

20         THE COURT:  How many records, for want of a better

21    word, are included?  I mean, we couldn't count them.

22         MR. KABA:  Certainly my clients own a substantial

23    portion, if not the vast majority of the rights to sound

24    recordings that we believe the defendant is copying.

25         THE COURT:  In discovery, Mr. Gass, there's going to

O8LDUmgC

| 1 | be a discovery to understand your method. |

2                Is there sensitivity from a competitive point of view?

3                MR. GASS:  There is heavy sensitivity, your Honor.

4                THE COURT:  Tell me about that.

5                MR. GASS:  Well, there are quite a few AI companies

6    out there, and each of them use their own proprietary approach

7    to developing their model, even selecting what data to use to

8    train on.

9                THE COURT:  What kind of protective order would we

10   need?

11               MR. GASS:  I think, your Honor, probably a two-tier

12   approach makes sense, one for confidential information

13   accessible to the other side and one for highly confidential

14   attorneys eyes only.  That's what we would suggest.

15               THE COURT:  I'm sure the inside counsel of Sony,

16   Universal, and Warner would want to.

17               MR. GASS:  An appropriate representative or two from

18   each would be fine of course.

19               THE COURT:  Would be appropriate?

20               MR. GASS:  Yes.

21               THE COURT:  Yes.  I should tell you that over 25 years

22   ago when I was a lawyer I represented Warner in some matters.

23               MR. GASS:  Was it a positive experience, your Honor?

24               THE COURT:  Yes.  They're a very good client.

25               MR. GASS:  I trust that that will not --

O8LDUmgC

1           THE COURT:  They were satisfied with my services and

2     they paid their bills on time.

3           MR. KABA:  Well, I'm hoping for the same, your Honor.

4           MR. GASS:  But, your Honor, I trust that that will not

5     taint your perspective on this occasion.

6           THE COURT:  No, it will not.  I don't think anybody's

7     around who I worked with.  I'll disclose in a letter.

8           Okay.  So let's see if we can muddle through, break

9     this down first.

10          Are there going to be any motions?

11          MR. GASS:  No motions on the pleading I don't believe.

12          THE COURT:  Mr. Kaba?

13          MR. KABA:  We're not anticipating -- I mean, they've

14    answered.

15          THE COURT:  First question, if there's no limit, no

16    scope limit, how much time do you think you will need for

17    discovery, Mr. Kaba?

18          MR. KABA:  Your Honor, we will propose -- if you'd

19    give me just a moment to reflect a little bit.

20          THE COURT:  Let me soften the question.  Written

21    discovery, Rule 33 and 34.  You have a lot to produce, both

22    sides.  You're going to be overwhelming each other with

23    production.

24          MR. KABA:  So plaintiffs -- obviously we propose an

25    earlier schedule.  Defendants propose April 10th for --

O8LDUmgC

1          THE COURT:  Well, that was all -- these are both

2     fictitious dates, so let try to break this down.  First I want

3     to get agreement on the ground rules.  So you should get

4     agreement on the ground rules, and I should put in a date for a

5     conference, so I can resolve disputes.  Then you'll know how

6     long you'll need for your written discovery and we'll assign a

7     date.  So this is not a case I think that's suitable for a case

8     management plan.  I think it needs intensive conferencing on my

9     part, so we can move as expeditiously as possible with as few

10    disputes as possible.

11          MR. KABA:  What would the Court like to see in the

12    parties' --

13          THE COURT:  I'd want to react to you.  The two of you,

14    why don't you huddle and come up with a date that would be

15    designed to get a protective order, get all the search

16    definitions that you need, and then you can propose dates for

17    exchange and so on.

18          If I gave you a month to do this, is that sufficient?

19          MR. GASS:  Yes, your Honor.

20          THE COURT:  Is that reasonable?

21          MR. KABA:  Yes, your Honor.

22          We'll attempt to get you a protective order draft and

23    ESI protocol as quickly as we can, certainly within a month.

24          THE COURT:  Well, I have a conference and -- well, I

25    guess there could be agreement, but let's --

O8LDUmgC

```
 1              MR. KABA:  Hope springs eternal.

 2              THE COURT:  How about in the afternoon of

 3     September 25?  Anybody have vacation schedules that will --

 4              MR. GASS:  No vacation, your Honor.  I have a

 5     mediation scheduled in another matter with --

 6              THE COURT:  Let's go off the record while we play

 7     around with dates.

 8              (Discussion off the record.)

 9              THE COURT:  Let's go back on the record now, please.

10              What's the pace of the other cases?

11              MR. GASS:  There are many of them.

12              THE COURT:  Are you involved in all of them?

13              MR. GASS:  Many of them, yes.

14              MR. KABA:  So our clients -- there's two of these

15     music generating AI companies.  Mr. Gass represents both of

16     them, Udio in this case and *Suno*, which is another case pending

17     in the District of Massachusetts.  So we have brought this case

18     in the Southern District, and then the case against Suno in the

19     District of Massachusetts, both filed on the same day.  We

20     expect they will both proceed hopefully fairly promptly, and it

21     is --

22              THE COURT:  Do we need to take into consideration the

23     discovery in the other case?

24              MR. GASS:  No, your Honor.  These are different

25     defendants, different companies, wholly different situations.
```

O8LDUmgC

1   I took your Honor to be asking about the other cases involving

2   generative AI companies --

3           THE COURT:  I don't know what questions to ask --

4           MR. GASS:  -- OpenAI, Anthropic, things like that.

5   There's a large case here pending before Judge Stein where the

6   New York Times has sued OpenAI.  And those cases are proceeding

7   slowly.  There the schedules were originally set to do fact

8   discovery in something like nine months, but the parties just

9   stipulated to extend it 90 days because it was proving

10  unworkable.  So I think the approach here makes a lot of sense.

11          THE COURT:  Thank you very much.

12          MR. KABA:  Thank you for your time, your Honor.

13          THE COURT:  Have a good rest of the summer.

14          MR. GASS:  You as well.

15          (Adjourned)

16

17

18

19

20

21

22

23

24

25