**MOEZ M. KABA**

mkaba@hueston.com
D: 213 788 4543
T: 646 930 4046
F: 888 775 0898

1 Little W 12th Street, 2nd Floor
New York, NY 10014

# HUESTON HENNIGAN LLP

February 18, 2025

**VIA ECF**

Hon. Alvin K. Hellerstein
Room 1050
United States Courthouse
500 Pearl Street
New York, New York 10007
Fax: (212) 805-7942

Re:   *UMG Recordings, Inc. et al. v. Uncharted Labs, Inc. et al.*, No. 1:24-cv-04777 (AKH)

Dear Judge Hellerstein:

Pursuant to Rule 2(E) of this Court's Individual Rules, the parties jointly write to bring to the Court's attention several disputes related to Plaintiffs' first sets of discovery requests.

Plaintiffs served their First Set of Requests for Production, First Set of Requests for Admission, and First Set of Interrogatories on Udio on August 16, 2024.  Udio served its Responses and Objections for each set of discovery on September 20, 2024.  Udio served its First Set of Requests for Production on September 16, 2024.  Plaintiffs served their Responses and Objections on October 16, 2024.  The parties have met and conferred at length over the subsequent months.[1]  While the parties were able to reach agreement on the scope of many of the discovery requests, disputes remain.

I.   **Preliminary Statement**

A.   **Plaintiffs' Statement**

Plaintiffs are a group of record companies that collectively own or exclusively control copyrights in many of the most historically important and commercially valuable sound recordings in the world.  Defendant Uncharted Labs, Inc. ("Defendant" or "Udio") operates an AI-powered music generation service that permits users to generate audio files using, for example, text prompts that describe various aspects of the desired musical output in plain English.  Plaintiffs filed this suit because, in order to develop its AI model, Udio copied

---

[1] The parties met and conferred via videoconference on October 2, 2024, for approximately two hours.  Rajan Trehan, Mariah Rivera, and Alexander Perry attended on behalf of Plaintiffs, and Brittany Lovejoy, Lydia Franzek, and Grace McLaughlin attended on behalf of Udio.  Over the subsequent weeks, the parties continued to confer via email.  The parties held an additional meet and confer via videoconference on November 26, 2024.  The parties met and conferred via videoconference again on October 22, 2024.  Brittany Lovejoy, Grace McLaughlin, and Lydia Franzek attended on behalf of Udio, and Rajan Trehan and Alexander Perry attended on behalf of Plaintiffs.  The parties held an additional meet and confer via videoconference on November 26, 2024.  Thereafter, the parties continued to confer via email but were unable to resolve the below-listed disputes.

# HUESTON HENNIGAN LLP

untold numbers of Plaintiffs' copyrighted sound recordings without authorization for the purpose of creating a product designed to output audio files that directly compete with the sound recordings on which it trained.

Consistent with the allegations in the Complaint, Plaintiffs have propounded discovery requests to determine the extent to which Udio built its business on copying Plaintiffs' copyrighted sound recordings. Plaintiffs' discovery requests are also intended to explore, among other things, the basis for Udio's fair use defense, which Udio has already asserted as its principal defense to Plaintiffs' claims. *See* Answer at 1-2 ("Under longstanding doctrine, what Udio has done … is a quintessential 'fair use' under copyright law.").

In response to Plaintiffs' first sets of discovery requests, Udio served initial Responses and Objections, which refused to produce even *a single* document and offered only to meet and confer with respect to a few limited requests.[2]

Despite having now agreed to make productions in response to certain of Plaintiffs' requests, Udio continues to resist producing critical categories of information that bear directly on its use of Plaintiffs' copyrighted sound recordings and are essential to a fair inquiry into the scope of Udio's unauthorized copying and the basic merits of this case. In particular, Udio purports to limit disclosure of information concerning: (1) AI models Udio created using Plaintiffs' sound recordings; (2) the data on which Udio trained its AI models, including how Udio accessed and obtained the sound recordings on which it trained; (3) outputs from Udio's AI music generation service; (4) Udio's investors, the information disclosed to investors regarding Udio's legal, financial, and business risks, and the manner and extent to which Udio has profited from its exploitation of Plaintiffs' copyrighted sound recordings to build its AI music generation service; and (5) whether Udio intends to assert that outputs from its music generation service are copyrightable.

A party accused of widespread copyright infringement cannot obstruct discovery concerning the breadth of its misconduct or withhold information about how it has leveraged its infringement to build a multimillion-dollar business. The discovery rules do not allow Udio to selectively pick and choose the categories of discovery it will reveal or to withhold relevant information based on its own contrived confusion. Because Plaintiffs' requests are relevant—indeed, essential—to the issues presented and proportional to the needs of the case, the Court should compel Udio to produce information fully responsive to the following requests.

## B.    Udio's Statement

Udio is a generative AI tool created by Uncharted Labs, Inc. for making new music using plain English descriptions of genres, styles, and other musical elements. The technological foundation is a type of computer program known as a "neural network." It was constructed by showing the program many instances of different kinds of recordings. From analyzing their constitutive elements, the model derived a

---

[2] Udio attempts to excuse its patently unreasonable initial response to Plaintiffs' first set of discovery requests by feigning confusion with respect to certain discovery requests that are not presently disputed. For instance, Udio claims that Plaintiffs' RFP 20 is indecipherable because it seeks documents and communications related to Udio's efforts to "create Outputs that copy, imitate, simulate, or resemble music created by humans." But this request closely tracks a statement from one of Udio's co-founders, who proclaimed that the vision for Udio is to create "music that sounds indistinguishable from music that's created by professional human producers." Complaint ¶ 38 (quoting Stuart Dredge, *AI Music Startup Udio Launches Backed By Artists and Instagram's Co-Founder*, Music Ally (Apr. 10, 2024)). Udio's claim to be confused by Plaintiffs' definition of "Copyrighted Sound Recordings" is equally puzzling, given that Plaintiffs clearly defined this term to refer to the enumerated list of Asserted Works found in Exhibit A to the Complaint.

# HUESTON HENNIGAN LLP

staggeringly complex collection of statistical insights about the auditory characteristics of those recordings—what types of sounds tend to appear in which kinds of music; what the shape of a pop song tends to look like; how the drum beat typically varies from country to rock to hip-hop; what the guitar tone tends to sound like in those different genres; and so on.  Through extensive further refinements, Udio's engineers developed a tool for virtually anyone to harness the power of that model in the service of generating new music.

The model underpinning Udio's service is not a library of pre-existing content, outputting a collage of "samples" stitched together from existing recordings.  Instead, it is a vast store of information about what various musical styles consist of, used to generate altogether new auditory renditions of creations in those styles.  Plaintiffs are a set of record labels that likely controls well over 75% of the recordings that U.S. consumers tend to listen to today.  Although Plaintiffs contend that Udio is liable for copyright infringement, the only act that Plaintiffs maintain was unlawful is Udio's allegedly having made copies of Plaintiffs' sound recordings as part of the process of "training" the model.  Plaintiffs do not claim that any output ever generated by Udio has infringed their rights.

Udio has not "obstructed" discovery in this case.  Rather, Udio has attempted to work collaboratively with Plaintiffs (guided by the Special Master) to provide primary-source access to the materials most informative of what Udio's model was trained on, and how it works—namely, its model training data and source code.[3]  These sources also happen to be Udio's most commercially-sensitive materials. Plaintiffs' expert team conducted an initial inspection of Udio's source code in January, with additional inspection likely to follow.  In addition, with the assistance of the Special Master, the parties have been negotiating the details of the protocol under which Plaintiffs will inspect Udio's training data. The parties have also reached tentative agreement on a number of document search strings.  And Udio has offered (though Plaintiffs have not accepted) additional document discovery related to its training process.  Nonetheless, Plaintiffs have continued to demand yet additional discovery that goes well beyond the needs of the case, including:  (1) discovery into *every* AI model Udio ever developed, including internal research-only models that are not the subject of Plaintiffs' Complaint; (2) the production of "all documents and communications concerning the contents of [Udio's] AI model or relating to the manner in which [Udio] trained [its] AI model"—highly-complex technical matters better understood through alternative forms of discovery rather than ad hoc emails between engineers; (3) discovery into output removed from Udio's service for reasons *other* than copyright infringement concerns; (4) intrusive discovery into the identity of Udio's investors and Udio's communications with them; and (5) Udio's position on *legal* issues unrelated to the claims at bar.  In contrast, Plaintiffs have refused to produce even the copyright registrations for the works they asserted in this case until some unidentified later date.

Given the impending close of fact discovery, Udio respectfully suggests that the parties focus their efforts on discovery proportional to the claims Plaintiffs have actually *brought*, rather than those they had no Rule 11 basis to bring.  Fed. R. Civ. P. 26, Adv. Comm. Note to Subdivision (b)(1) (noting that a party

---

[3] Udio could not immediately agree to produce responsive documents because of the "AI MODEL" definitional disputes briefed herein and other over-broad and confusing requests.  For example, Plaintiffs requested ""ALL DOCUMENTS and COMMUNICATIONS RELATING TO [Udio's] efforts to enable [its] AI SERVICE to create OUTPUTS that . . . , simulate, or resemble music created by humans."  Ex. A, RFP No. 20.  The entire purpose of Udio is to create music. As an additional example, Plaintiffs imported a legal conclusion into their definitions by defining the works in suit (i.e., the sound recordings listed in Exhibit A of Plaintiffs' Complaint) as "COPYRIGHTED SOUND RECORDINGS."  *See* Ex. A, Pls.' Definition No. 10.

# HUESTON HENNIGAN LLP

has "no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings").

## II.    Plaintiffs' Requests for Production

### A.    Definition of "AI Models" and "AI Service"

#### 1.    Plaintiffs' Position

Udio's decision to make unauthorized copies of Plaintiffs' copyrighted sound recordings to train AI models is the core of this case.  Yet, Udio seeks to restrict discovery into the full scope of its infringing conduct by purporting to limit discovery only to those AI models "made available to the public." That limitation represents a unilaterally selected subset of the AI models Udio trained on copyrighted sound recordings. Udio claims this proposal is intended to cabin the burden associated with producing discovery into other of its AI models, yet Udio repeatedly declined to provide any information during the conferral process that would allow Plaintiffs to assess such burden.[4]  Unauthorized copying represents copyright infringement, regardless of whether the fruits of the infringement are "made available to the public," and infringers cannot conceal the scope of their infringement by hiding behind claims of burden or proportionality.  Udio's position is self-serving and inconsistent with the decisions from other courts that have ruled on markedly similar attempts by AI defendants to limit discovery into the full extent of their infringing conduct.  *See, e.g.*, *Concord Music Grp. Inc. v. Anthropic PBC*, No. 24-cv-03811-EKL (SVK), Dkt. 273 at 1-2 (N.D. Cal. Nov. 26, 2024) (ordering discovery into all versions of AI defendant's technology that trained on plaintiffs' copyrighted works, including those that "may not have been publicly released" and those "currently under development"); *see also Kadrey v. Meta,* No. 23-cv-3417-VC (TSH), Dkt. 279 at 4 (N.D. Cal. Nov. 15, 2024) (deeming relevant AI model allegedly trained on plaintiffs' copyrighted works, "notwithstanding that it is still under development").  Consistent with these rulings, the Court should compel Udio to produce documents and communications regarding *all* of the models it developed using Plaintiffs' copyrighted sound recordings.  At the very least, and consistent with the court's ruling in *Concord Music Grp. Inc. v. Anthropic PBC*, the Court should compel Udio to produce information relating to any models that were trained on Plaintiffs' sound recordings and used to develop features that were implemented into Udio's AI music generation service.

Throughout their discovery requests, Plaintiffs incorporated a defined term, "AI MODEL," to encompass all models Udio developed.[5]  However, Udio proposed to narrow this term to capture only "predecessor models that are similar in functionality to the models that Plaintiffs used to generate outputs

---

[4] In connection with this dispute, Udio has submitted a declaration from its co-founder David Ding providing information about the AI models Udio developed for which it is withholding discovery.  For reasons it has not explained, Udio provided none of this information during the conferral process.  But in addition to withholding information that might have progressed the parties' negotiations, Udio still has refused to confirm which of these AI models were trained on Plaintiffs' copyrighted sound recordings and were used to develop features ultimately incorporated into Udio's public product.  As other courts have recognized, *see infra*, those models may be relevant and discoverable even if not released to the public.

[5] Plaintiffs define "AI Model" to mean "any and all computer programs or 'neural networks,' inclusive of software source code, parameters, and other settings, that You constructed using 'tens of millions of instances of different kinds of recordings' in order to derive a 'collection of statistical insights about the auditory characteristics of those recordings' for the purpose of allowing Your Service to generate Outputs." Ex. A (quoting Answer at 3; *id.* ¶ 41).  In turn, Plaintiffs define "Service" as "any and all of Your 'artificial intelligence-powered service[s]' that allow Users to 'use plain English descriptions of genres, styles, and other musical elements' to generate Outputs." *Id.* (quoting Answer at 1, 2).

# HUESTON HENNIGAN LLP

for the complaint and that were released prior to June 24, 2024." Ex. B.  After receiving Udio's proposal, Plaintiffs asked Udio for a list of models that would fall inside and outside the scope of its proposed definition. Ex. C.  Udio thereafter explained that its definition encompassed just two of its AI models—Udio v.1 and v.1.5—but would specifically exclude the "hundreds" of other models Udio developed internally.  Ex. D; Ex. E; Ex. F.  Udio also never responded to Plaintiffs' request for a list of AI Models that it contends are not "similar in functionality" to the models Plaintiffs used, so Plaintiffs remain in the dark regarding the full scope of materials that Udio is refusing to produce.

There is no basis for Udio's attempt to limit discovery to the two AI models that it has publicly released.  Contrary to Udio's suggestion, Plaintiffs' Complaint does not at any point identify any single version of the Udio model as *the* offending model; rather it challenges any unauthorized copying of Plaintiffs' sound recordings to train a music-generative AI service.  Udio asserts that the absence of an explicit reference to its internal-only models in the Complaint is a reason to deny Plaintiffs' requested discovery. But Plaintiffs never excluded such models from the scope of their claim.  And Udio, too, has described its AI service as utilizing a singular "model" in a generalized fashion.  *See* Answer at 3 (describing its "model" as "a type of computer program . . . constructed by showing the program many instances of different kinds of recordings").[6]

That Plaintiffs lacked full insight into the inner workings of Udio's AI model development process during their pre-complaint investigation does not mean that Udio can continue to withhold the most basic of information about the extent of its unauthorized copying, regardless of the particular model involved.  In connection with this filing, Udio has now for the first time revealed that its publicly available models did not simply spring into existence fully formed but were the product of continued iteration and "extensive further refinements."  Plaintiffs must be able to test the extent to which their sound recordings were copied during this process of refinement and the role those recordings played.  Indeed, the process of refinement may have had a particular focus on sound recordings owned by Plaintiffs.  Plaintiffs must also be able to assess Udio's development decisions that informed its commercial product, which includes, at minimum, discovery into the intermediate models that Udio built for the purpose of "tweak[ing] the code to obtain a more effective and efficient algorithm" to improve the functioning of its commercial AI music generation service.  Ex. G ¶ 6. If, for example, work on a developmental model led to the conclusion that Plaintiffs' recordings needed to be more heavily weighted, Plaintiffs must be permitted to explore those facts.  But again, at the most basic level, if Udio made copies of Plaintiffs' sound recordings at any stage of development, Plaintiffs are entitled to know.

A virtually identical discovery dispute arose in another copyright infringement action involving a generative AI defendant.  In *Concord Music Grp. Inc. v. Anthropic PBC*, the plaintiffs allege that Defendant Anthropic trained its "Claude" AI models using their copyrighted musical compositions.  *See* No. 24-cv-03811-EKL (SVK), Dkt. 1 (N.D. Cal. Oct. 18, 2023).  The plaintiffs served document requests and interrogatories seeking documents and information regarding these AI models, including Anthropic's models that were not released to the public or that were in development.  *Concord Music Grp. Inc. v. Anthropic PBC*, No. 24-cv-03811-EKL (SVK), Dkt. 245 at 1 (N.D. Cal. Oct. 1, 2024).  In response, Anthropic—like Udio here (and represented by the same attorneys as Udio)—tried to restrict discovery only to commercially available models, arguing that the factual allegations in the complaint refer to the first two versions of

---

[6] *See also* Press Release, Udio, *AI and the Future of Music*, Udio ("Generative AI models, including our music model, learn from examples."), *available at* https://www.udio.com/blog/ai-and-the-future-of-music?ref=completemusicupdate .com.

# HUESTON HENNIGAN LLP

Anthropic's commercially available AI product, and discovery into other models is not relevant to the plaintiffs' claims. *Id*. at 2.

Rejecting Anthropic's argument, the Court ruled that documents and information that concern the use of the plaintiffs' works to train *any* AI models are relevant to the dispute:

> In light of the allegations in the complaint, prototype technologies that were: (1) 'trained' with the Publishers' copyrighted works; and (2) used to develop or integrated into Claude are within the scope of relevance under Federal Rule of Civil Procedure 26(b), **even though such prototypes may not have been publicly released**. Similarly, versions of Claude **currently under development** that Anthropic trains with the Publishers' copyrighted works are also within the scope of relevance under Rule 26(b).

*Concord Music Grp. Inc. v. Anthropic PBC*, No. 24-cv-03811-EKL (SVK), Dkt. 273 at 1-2 (N.D. Cal. Nov. 26, 2024) (emphases added).  Other courts to consider the issue have reached the same result.  *See, e.g.*, *Kadrey v. Meta,* No. 23-cv-3417-VC (TSH), Dkt. 279 at 4 (N.D. Cal. Nov. 15, 2024) ("The Court agrees with Plaintiffs that Llama 4 [one of Meta's AI models] is relevant to this case, notwithstanding that it is still under development."); *id.*, Dkt. 315 at 7 (N.D. Cal. Dec. 6, 2024) (deeming AI model under development relevant to copyright infringement claims).[7]

The analogous facts here dictate the same result.  Plaintiffs' Complaint asserts direct copyright infringement claims based on Udio's copying of Plaintiffs' copyrighted sound recordings to use as training data.  *See* Complaint ¶¶ 9, 42-47, 51-74.  Plaintiffs also allege active and ongoing infringement of their copyrighted works.[8]  *See id.* ¶ 16 ("Plaintiffs bring this action seeking an injunction and damages commensurate with the scope of Udio's massive and ongoing infringement.").  Udio's unauthorized copying of Plaintiffs' sound recordings is relevant to Plaintiffs' infringement claims, regardless of whether a particular model was released to the public, and Plaintiffs are entitled to understand the development process that led to Udio's AI music generation service.

Moreover, there is no "public use" defense to copyright infringement.  To shield Udio's non-public copying would amount to a finding that such copying was fair use, without having developed a factual record.  Though Udio suggests that copying Plaintiffs' sound recordings for research purposes falls squarely within

---

[7] Udio cites *Authors Guild* and *Tremblay* as examples of "reasonable limitations on the scope of discovery in this case." Yet, even *Tremblay* contemplated broader discovery than what Udio is offering here, as the court authorized discovery into certain "in-development . . . models where the pre-training phase has been completed and the model is intended for production, *including the next GPT-class model still being developed* . . . ." *Tremblay v. OpenAI, Inc.*, No. 23-cv-3223-AMO, Dkt. 247 at 4 (N.D. Cal. Jan. 13, 2025) (emphasis added).  And *Authors Guild* involved a request for discovery into "hundreds of thousands of research artifacts that OpenAI never used in a product," a much larger burden than the one alleged by Udio.  *Authors Guild v. OpenAI Inc.*, No. 23-cv-8292, Dkt. Nos. 281, 293, at 2 (S.D.N.Y. Dec 6, 2024).

[8] Udio suggests that the Court must impose a reasonable temporal limit on the scope of its discovery obligations, but Udio declines to note that the parties' have already agreed to limit Udio's discovery obligations dating back to July 2023, which is when Udio represents its AI music generation service was first conceptualized.  *See* Ex. E.  Udio's cited authority pertains to discovery requests that ranged much further.  *See, e.g.*, *Republic of Turkey v. Christie's, Inc.*, 312 F. Supp. 3d 385, 389 (S.D.N.Y. 2018) (in action seeking to recover rare artifact, limiting discovery into auction house's antiquities transactions to _thirteen year period_ after subject acquisition).

# HUESTON HENNIGAN LLP

its fair use defense, it is difficult to believe that this for-profit startup spent much of its time pursuing altruistic research with no potential benefit for its commercial product.   Indeed, Udio itself acknowledges that it also has "intermediate models," which it is refusing to produce, that were developed to test and improve the functioning of the publicly released models.  *See* Ex. G ¶¶ 6–8.  Udio suggests that copying Plaintiffs' sound recordings for research purposes falls squarely within its fair use defense, but it has admitted that not all of the models it is withholding were for research.  Furthermore, the Complaint does not limit the offending conduct to a single, specific model.

Plaintiffs are entitled to discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]"  Fed. R. Civ. P. 26(b)(1); *see also John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014) ("Courts have recognized that '[a]lthough not unlimited, relevance, for purposes of discovery, is an extremely broad concept.'").  Under this standard, each and every AI model that Udio trained on Plaintiffs' copyrighted sound recordings and was "used to develop" its AI music generation service is within the scope of discovery.  *Concord Music Grp. Inc. v. Anthropic PBC*, Dkt. 273 at 1-2; *see also, e.g.*, *Fine v. Facet Aerospace Prods. Co.*, 133 F.R.D. 439, 441 (S.D.N.Y. 1990) ("Generally, different models of a product will be relevant if they share with the accident-causing model those characteristics pertinent to the legal issues raised in the litigation.").  Udio may not unilaterally limit the scope of discovery without "demonstrating specifically how, despite the broad and liberal construction afforded the federal discovery rules" making a production consistent with that scope would be "overly broad, burdensome, or oppressive."  *John Wiley & Sons*, 298 F.R.D. at 186 (internal quotation marks omitted).

Plaintiffs have asserted unauthorized copying of their sound recordings for Udio's training data, and they are entitled to explore the purpose, character, and extent of Udio's unsanctioned use of their copyrighted works through discovery.  This extends to documents and communications relating to any of Udio's AI models that have been or will be trained using their copyrighted recordings.  The Court should reject Udio's attempt to erect artificial limits and manufacture a bogus "public release" limitation on such legitimate discovery into the scope of its unauthorized copying of Plaintiffs' copyrighted sound recordings.

### 2. Udio's Position

Udio has only ever released two versions of its product:  v.1, released on April 10, 2024, and v.1.5, released on July 23, 2024.  February 18, 2025 Ding Decl. ¶ 2.  As discussed below, the allegations in Plaintiffs' Complaint (which was filed on June 24, 2024), are squarely aimed at v.1; they do not even discuss v.1.5—and could not, since v.1.5 was not released until *after* the Complaint was filed.  Nevertheless, Udio has voluntarily agreed to treat v.1.5 as within the scope of discovery.  Plaintiffs' demand that Udio also provide discovery into Udio's hundreds of unreleased models is disproportionate to the needs of this case.  Producing source code and other documents related to each model would needlessly explode the scope of discovery.  And the result Plaintiffs seek is not supported by the authority they cite.  In fact, courts in generative AI copyright infringement suits (including those in this district) have generally *rejected* broad discovery into unreleased AI models.

Discovery into every unreleased model Udio ever created would be extremely burdensome.  Plaintiffs' demand implicates two categories of unreleased models: intermediate models and research models.  Intermediate models are byproducts of engineers iteratively revising model code in order to find the most effective and efficient algorithm.  February 18, 2025 Ding Decl. ¶ 6.  Intermediate models generally cannot run standalone, as they often have bugs and internal mistakes, which were subsequently fixed in the public models.  *Id.*  Internal research models are experimental models built on the side to test the

# HUESTON HENNIGAN LLP

boundaries of model capabilities without compromising Udio's commercial product. *Id*. at ¶ 7. Across these two categories, a single engineer may build multiple models over just a few weeks. *Id*. at ¶ 8. As a result, Udio has developed hundreds of models solely for research or development purposes that have never been commercially released. *See id*. at ¶¶ 5, 8. To the extent that any portions of these models were actually incorporated into the publicly-released version of Udio, Plaintiffs would have access to the code when they inspect the commercial model.

In addition to the sheer number of unreleased models, the burden on Udio would be compounded by the technical difficulty of resuscitating these models. In fast-moving development, it is not within the normal course of business for Udio (or most engineers) to keep meticulous documentation of every single experimental research model or intermediate model. February 18, 2025 Ding Decl. ¶ 9. Thus, to satisfy Plaintiffs' request to produce every internal research model or intermediate model created since Udio's inception, Udio may need to conduct a line-by-line review of code history and revert the code base to an earlier snapshot in time for each past research or intermediate model it needs to revive. *Id*. at ¶ 9. As already noted, there are hundreds of such models. *Id*. at ¶ 5. Complicating the process, different Udio engineers often created these research or intermediate models concurrently on each of their local computers. *Id*. at ¶ 9. Therefore, fully capturing every single research or intermediate model would first require extensive fact-gathering with each individual engineer to understand what research or intermediate models even exist before attempting to start the labor-intensive reconstruction process—if it is even possible. *Id*. at ¶ 9. Naturally, such a process would be a massive undertaking that would require months of time, if not more. *Id*. at ¶ 10. Searching for *documents and communications* relating to each model would further increase the burden.

Such a burdensome production is not proportional to the at-best minimal relevance of these unreleased models. Plaintiffs' Complaint is directed at a single, publicly-available version of Udio. Each of the factual allegations in the Complaint refers to v.1, which was then Udio's only publicly-available product. *See, e.g.*, Compl. ¶ 11 (describing "Udio's *model*" and how Plaintiffs "tested Udio's *product*"); ¶¶ 38–40 (detailing how v.1 was released on April 10, 2024 and later offered subscription tiers on May 8, 2024); *see generally* ¶¶ 55–68 (referring to v.1's outputs and capabilities). The Complaint does not include any mention of internal-only models. That is reason enough to deny Plaintiffs' request. Fed. R. Civ. P. 26, Adv. Comm. Note to Subdivision (b)(1) (noting that a party has "no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings"). Such efforts are particularly disproportionate at this juncture in the case; if Udio's use of Plaintiffs' sound recordings for its *commercial* product were to be deemed a fair use, surely its use for *research* purposes would be as well. *See, e.g.*, 17 U.S.C. § 107 (noting "research" as a favored use for purposes of the fair use inquiry).

Likewise, requiring discovery into models under development—months after Plaintiffs filed their Complaint—would require Udio to continue to produce discovery *ad infinitum*. Courts have recognized that discovery requests must contain reasonable temporal limits. *See, e.g.*, *In re Welspun Litig.*, No. 16-cv-06792, 2018 WL 4693586, at *4 (S.D.N.Y. Mar. 4, 2018) (discovery requests without "*any* time limitation [were] facially overbroad") (emphasis in original); *Republic of Turkey v. Christie's, Inc.*, 312 F. Supp. 3d 385, 389 (S.D.N.Y. 2018) (noting that discovery must be proportional and exercising discretion to impose temporal limitation on discovery even after recognizing broader discovery might have some relevance).

Given the burden associated with producing the multitude of internal research or intermediate models required to develop a generative AI model, courts in other AI copyright cases have been wary of ordering broad discovery regarding unreleased models. Courts in this district faced with similar questions have narrowed or denied such requests. In *Authors Guild v. OpenAI Inc.,* another court in this District

# HUESTON HENNIGAN LLP

recently denied plaintiffs' demand that defendant OpenAI produce documents on every single model that OpenAI ever trained. No. 23-cv-8292, Dkt. No. 293 at 2 (S.D.N.Y. Dec 6, 2024). Like Plaintiffs here, the *Authors Guild* plaintiffs sought discovery into additional models because they "allege[d] that all OpenAI models infringe," so all models were relevant. Dkt. No. 270 at 2. Defendants, on the other hand, argued production would require undertaking a "massive forensic exercise." Dkt. No. 281 at 1. The court ruled for the defendants, limiting discovery and production regarding OpenAI's large language models to the models that were made available via OpenAI's commercial products.[9] *See* Dkt. No. 293 (court limiting discovery and production to the models identified in response to interrogatory #11); *see also id.*, Dkt. No. 281 at 1 (OpenAI agreeing "to supplement its response to Interrogatory 11 to identify all models that OpenAI has made available through its commercial products [i.e. ChatGPT and the API] up until the date of the First Consolidated Class Action Complaint") (internal quotes omitted). Similarly, in *Tremblay v. OpenAI, Inc.*, the court limited the scope of the plaintiffs' discovery requests seeking information about in-development models to those models that are "intended for production." No. 23-cv-03223, Dkt. No. 247 at 4 (N.D. Cal. Jan. 13, 2025). Given the burden associated with production here, the Court should apply similar, reasonable limitations on the scope of discovery in this case.

Plaintiffs' cases do not counsel otherwise. In fact, both of the generative AI discovery orders cited in Plaintiffs' brief concern only a threshold question of relevancy. Neither addresses burden, and both decisions are narrower than Plaintiffs represent. In *Concord Music Group, Inc., et al. v. Anthropic PBC*, No. 24-cv-03811-EKL (SVK), Dkt. No. 273, at 1–2 (N.D. Cal. Nov. 26, 2024), plaintiffs alleged that Anthropic developed its generative AI, Claude, "using unauthorized copies of the plaintiffs' copyrighted music and [. . .] reproduce[d] unauthorized copies of that music when third parties use the technology." *Id.* at 1. The court ruled that Claude should be defined to include unreleased models only "where *both*: (1) the Publishers' lyrics were included in the training data for the model; *and* (2) the model was *used to train publicly released* Claude models," or "the model *[was] being used to train not-yet-released* Claude models,"—i.e., incorporated model weights from the predecessor model. *Id.* at 2 (emphasis added). The *Anthropic* court's holding was narrow: only models used to "train" versions of Claude that were actually released or were intended for production were deemed relevant. *Id.* Pure research models not used for production were held not relevant. Additionally, the court deferred ruling on burden altogether. *Id.* at 3. Likewise, in *Kadrey v. Meta*, also cited by Plaintiffs, the court ruled generally that Llama 4, a single, announced, forthcoming model in Meta's "Llama" large language model series, was relevant to the plaintiffs' claims. No. 23-cv-3417-VC (TSH), Dkt. No. 279 at 4 (N.D. Cal. Nov. 15, 2024). The defendant in that case did not argue, however, that production of documents relating to the in-development model would be burdensome. In fact, the defendant had apparently already searched for and reviewed documents relating to Llama 4, and had merely withheld them as irrelevant. *Id.* Accordingly, the court ordered the defendant to produce only documents it had previously withheld as nonresponsive. *Id.*

In this case, the burden associated with production should be dispositive. Plaintiffs have established only minimal relevance. On the other hand, the burden of broadening the scope of the definition would be considerable. Such a broad scope would be disproportionate.

---

[9] In the *Authors Guild* complaint, the plaintiffs specifically refer to "GPT-N" or GPT-based models. *Authors Guild,* No. 23-cv-08292, Dkt. No. 1 at 9–10. Authors Guild plaintiffs sought additional models, including a future model, GPT-5, as well as models beyond the GPT-based models, such as "Orion," other commercial OpenAI models, and research models. Dkt. No. 270 at 1.

# HUESTON HENNIGAN LLP

**B.      Requests Related to Udio's Training of its AI Models (RFP Nos. 2, 3, 8, 12, & 17)**

   *1.      Plaintiffs' Position:*

Plaintiffs propounded several requests seeking documents and communications relating to how Udio acquired its training data (including Plaintiffs' copyrighted sound recordings) and the process by which Udio used that data to train its AI Models.[10]  These requests are essential subjects in this litigation.  Nevertheless, Udio has resisted responding in full to these basic requests and seeks to leverage ancillary issues to hinder Plaintiffs' ability to develop critical facts about how Udio decided what sound recordings to use as training data and what processes they used to acquire copies of those recordings.  Rather than respond to these requests and negotiate appropriate search terms (as the parties are doing with respect to many other requests), Udio has offered several inadequate proposals for the subject Requests that fall short of Udio's obligations under the Federal Rules.

Initially, Udio outright refused to produce documents responsive to *any* of Plaintiffs requests for production.  Ex. H.  Over the course of the parties' negotiations, Udio adopted a shifting-sands strategy to this subject matter and offered various alternatives to responding in full to these Requests, including (1) providing Plaintiffs "access to training data for in-scope AI Models" and "source code for in-scope AI models" or stipulating that Plaintiffs' works asserted in the Complaint are among Udio's training data; (2) producing documents "sufficient to show" several narrowly drawn matters, including Udio's process for training in-scope AI models and its process for developing its training data; and (3) producing documents and communications referencing only the specific works asserted in the Complaint.  Ex. B; Ex. I.  None of Udio's proposed substitutes for the served discovery are sufficient.  Given the central importance of the subject matter of these requests, Plaintiffs are entitled to all responsive materials, not merely Udio's curated selection.

*First*, providing Plaintiffs with access to Udio's training data and source code is not the equivalent of providing documents and communications concerning these same materials.  Nor is entering a stipulation concerning the recordings contained in Udio's training data.  Both ideas would deprive Plaintiffs of critical context and details to which they are entitled under the Federal Rules.  In order to establish their asserted direct copyright infringement claims, rebut Udio's fair use defense, and demonstrate Udio's willful infringement, Plaintiffs must be able to draw on the full context surrounding Udio's training data and AI models.  *See, e.g.*, *Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 426 (S.D.N.Y. 2018) (observing

---

[10] These requests are Plaintiffs' Request Nos. 2, 3, 8, 12, and 17, which read, in full:

- **Req. No. 2:** All Documents and Communications Concerning Your Training Data, including without limitation All Documents and Communications Relating To the collection, copying, reproduction, development, compilation, maintenance, alteration, and revision of Your Training Data.

- **Req. No. 3 (as narrowed during parties' conferral)**: All Documents and Communications concerning the contents of your AI Model or relating to the manner in which you trained your AI Model.

- **Req. No. 8:** All Documents and Communications Related To Your downloading, copying, and/or reproduction of Sound Recordings, including but not limited to how, and what portions of, the Sound Recordings are downloaded, copied, and/or reproduced.

- **Req. No. 12:** All Documents and Communications Related To Your efforts to obtain Your Training Data.

- **Req. No. 17:** All Documents and Communications Related To how You identified and accessed Any Copyrighted Sound Recordings included in Your Training Data.

# HUESTON HENNIGAN LLP

that "[t]he fair use determination is an open-ended and context-sensitive inquiry") (internal quotation marks omitted); *Agence France Presse v. Morel*, 2014 WL 3963124, at *3–4 (S.D.N.Y. Aug. 13, 2014) (analyzing social media messages and emails to assess willfulness and explaining that willful infringement is predicated on defendant's actual or constructive knowledge of infringement).  Udio's internal documents and communications regarding its training data and AI models are necessary to contextualize and understand basic facts such as how Udio developed the technology at issue, including how it obtained, copied, and used copyrighted sound recordings in the AI Model training process.  Without that critical context, bare access to the training data and source code, or a stipulation as to whether certain material is contained in the training data, would provide an incomplete picture and reveal nothing about the how and why Udio copied Plaintiffs' sound recordings or its state of mind when doing so.  *See N.A.S. Imp., Corp. v. Chenson Enterprises, Inc.*, 968 F.2d 250, 252 (2d Cir. 1992) (explaining that an "infringers' state of mind" is relevant to determining the appropriate amount of damages).  Indeed, the Court has already recognized that these facts bear on the adjudication of Plaintiffs' claims.  *See* Aug. 21, 2024 Hr'g Tr. at 16:8-16 (MR. KABA: . . . the fact that they are using copyrighted sound recording to train, they are using it for commercial purposes knowingly -- THE COURT: I would need to know just how that happens.").

In addition, the full panoply of documents and communications regarding how Udio developed its training data and trained its AI Models will demonstrate Udio's willfulness, which, in turn, bears on Udio's fair use defense, as well as Plaintiffs' claim for equitable relief and the appropriate monetary award.  *See Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1115 (2d Cir. 1986) (finding willfulness based in part on "internal memoranda" that acknowledged the defendant's limited rights to reprint plaintiff's copyrighted material); *Broad. Music, Inc. v. 315 W. 44th St. Rest. Corp.*, 1995 WL 408399, at *5 (S.D.N.Y. July 11, 1995) ("Willful violation is established if defendants knew that their actions constituted copyright infringement.").  Willfulness is "easily establishe[d]" in cases where a defendant was alerted to the need for a license but "nevertheless refused to secure a license."  *Broad. Music, Inc. v. Prana Hosp., Inc.*, 158 F. Supp. 3d 184, 198 (S.D.N.Y. 2016); *see also Broad. Music, Inc. v. Wexford INR LLC*, 2014 WL 4626454, at *11 (N.D.N.Y. Sept. 15, 2014) ("Despite Plaintiffs' warnings and attempted licensing negotiations, Defendants continued to perform such musical compositions without Plaintiffs' permission.").  Willfulness may also be proven where Udio accessed and copied Plaintiffs' sound recordings from sources known to offer pirated copies of those recordings.  *See N.A.S. Imp., Corp.*, 968 F.2d at 252 (explaining that constructive knowledge is enough for willfulness, which "need not be proven directly but may be inferred from the defendant's conduct").  Mere access to Udio's source code and training data will not reveal whether and to what extent Udio considered that it needed a license to use copyrighted works in its training data.  The answer to this question lies in Udio's documents and communications, which it must produce in full, and not in its source code.  It is also disingenuous for Udio to resist producing this information on the ground that it may only be relevant to damages, when earlier in the litigation Udio vigorously objected to Plaintiffs' proposal to bifurcate discovery to focus first on Udio's fair use defense and leave damages discovery for a later date.  *See* Dkt. 36 at 11–14.

Udio discusses Request No. 3,[11] and claims that "Plaintiffs' proposed search terms . . . sweep[] in over 60,000 documents."  As an initial matter, it is unclear what Udio is referring to when it mentions "Plaintiffs' proposed search terms."  The parties never negotiated search terms for that request, and Udio never offered a hit count for that request prior to providing its portion of this submission.  Nor do Plaintiffs

---

[11] Udio singles out RFP No. 3 as illustrative of the burden associated with responding to all of the requests that are the subject of the present dispute.  Yet Udio ignores the other requests, including Nos. 8, 12, and 17, which are targeted at documents and communications specifically relating to Udio's "downloading, copying, and/or reproduction" of sound recordings, "efforts to obtain" the training data, and Udio's identification and access to copyrighted sound recordings.

# HUESTON HENNIGAN LLP

intend for their requests to focus on highly technical minutiae shared between engineers, but that, too, can be addressed through the identification of appropriate custodians and search terms.  Plaintiffs are, of course, willing to negotiate an appropriate set of search terms targeted at the information most relevant to Plaintiffs' claims, but these negotiations cannot occur in the dark.  Plaintiffs' need for documentation concerning basic aspects of Udio's conduct stems from Udio's persistent pattern of evasion dating back to even before this litigation was filed.  As noted in the Complaint, Plaintiffs sought to engage in a dialogue about Udio's use of Plaintiffs' sound recordings, but Udio deliberately evaded Plaintiffs' outreach.  *See* Complaint ¶¶ 8–10.  Udio's present attempt to limit its obligation to produce information bearing on fundamental aspects of the conduct at issue is merely a continuation of this evasive pattern.

*Second*, Udio's offer to produce documents "sufficient to show" its process for developing and training its AI Model is, at best, self-serving.  As part of its fair use defense, Udio asserts that its "AI tool uses a back-end technological process, invisible to the public, in the service of creating an ultimately non-infringing new product."  Answer at 34-35.  Plaintiffs must be permitted to explore all relevant documents in Udio's possession, custody or control regarding that process, not just those that Udio unilaterally decides it wants to produce.  *See Tri-Star Pictures, Inc. v. Unger*, 171 F.R.D. 94, 101 (S.D.N.Y. 1997) ("Under Rule 26(b)(1), every party to a civil action is entitled to the disclosure of all relevant information in the possession of any person, unless the information is privileged.") (cleaned up); *Reddy v. Lowe's Companies, Inc.*, 2014 WL 12644304, at *1 (D. Mass. Oct. 21, 2014) ("Defendant Evolution's duty to produce relevant documents is not satisfied by the production of some subset of documents that 'fall within the scope' of a request or that it has unilaterally determined are 'sufficient to show' the information Plaintiff seeks.") (cleaned up).  This information is especially relevant in this case, given Udio's assertion that the "data processing techniques" and "engineering processes" that went into compiling and manipulating its training data were "incredibly complicated and labor-intensive."  Ex. J ¶ 6.  Udio has even represented that "one of [its] cofounders worked on data processing full time for the first two months, and his expertise in this area was a significant factor in his inclusion in the team."  *Id.* ¶ 7.  If the process of training Udio's AI model is as complex as Udio asserts, and Udio intends to rely on this complexity as part of its defense in this case, *see* Answer at 3, Plaintiffs need access to the documents and communications regarding this process to respond to any such defense, not just a carefully sanitized summary crafted by Udio's attorneys.  Moreover, Udio claims that it "has continually updated the data processes (at the same cadence as model updates)[.]"  *Id.* ¶ 7.  It is not practicable or helpful for Udio to produce documents "sufficient to show" a process that is continually being updated.

*Third*, Udio's offer to produce only those documents and communications referencing specific works identified in the Complaint is an empty promise.  It is highly unlikely that most of Udio's documents and communications reference any specific sound recording (let alone the sound recordings Plaintiffs identified in the Complaint) given the millions of recordings Udio claims it used to train its AI model.  *See* Aug. 21, 2024 Hr'g Tr. at 8:18-23 ("MR. GASS: . . . [T]he way that the technology was developed -- you can't look at two recordings or six recordings or a thousand recordings.  In order to study the constitutive elements of what a recording in a given genre sounds like, you need millions of these recordings.").  Indeed, Udio has represented that its training data is so vast in size that it does not even know which sound recordings are in it.  *See* Ex. D ("Udio does not presently know exactly which songs are in its training data").  The indiscriminate copying of so many works is, of course, further proof of willful disregard for Plaintiffs' most valuable intellectual property.  And given the breadth, quality, popularity, and prominence of Plaintiffs' catalogs of sound recordings, it is certain that those recordings played a critical and essential role in training Udio's infringing service.

# HUESTON HENNIGAN LLP

More importantly, Plaintiffs' claims are not solely focused on the specific copyrighted sound recordings identified in the Complaint, nor is Udio's conduct limited to these works. Plaintiffs clearly state in the Complaint that the list of copyrighted sound recordings identified therein is non-exhaustive and that Plaintiffs intend to amend the Complaint after discovery to reflect a more complete picture of Udio's massive infringement. *See* Complaint ¶ 30 ("A non-exhaustive, illustrative sampling of Plaintiffs' federally copyrighted sound recordings that Udio has illegally reproduced is attached hereto as Exhibit A . . . Plaintiffs intend to amend the Complaint at an appropriate time to provide an expanded list of works that Udio has infringed."); *see also id.* at ¶ 45 ("As the myriad examples discussed below reflect, Udio's model obviously was trained on the Copyrighted Recordings . . ."). The Court has already acknowledged that discovery will include the full scope of Udio's infringement and the various sound recordings it has used for training data and provided Plaintiffs with a deadline of March 25, 2025 to amend the Complaint without leave specifically to identify additional copyrighted sound recordings. Dkt. 56; *see also* Aug. 21, 2024 Hr'g Tr. at 20:25-21:1. Indeed, Udio in its Answer promised that Plaintiffs would have a full opportunity to determine which songs beyond those identified in the Complaint have been copied in Udio's training process. As Udio pleaded, "[t]his case is not a 'whodunnit.' Irrespective of whether UMG's particular version of 'My Way' was in Udio's training data, many other UMG recordings probably were. Plaintiffs will have ample opportunity to comb through the relevant data, all of which has been preserved, once discovery commences." Answer at 9-10. Having made that assurance, Udio is in no position to backpedal on its basic discovery obligations.

Ignoring the law of the case, Udio cites various inapposite cases in support of imposing limits on discovery into unasserted works, but that misses the mark. Most importantly, it is a matter of when, not if, Plaintiffs amend their complaint to identify additional asserted works. Plaintiffs made this clear in the Complaint, which provided Udio with clear notice regarding which works Plaintiffs intend to identify and put at issue in this case. Moreover, Plaintiffs do not seek documents and communications regarding Udio's training data and training process for the purpose of identifying those additional works—Udio is correct that is something Plaintiffs intend to achieve by inspecting the training data itself. Rather, Plaintiffs seek such materials to fully understand how Udio obtained Plaintiffs' sound recordings and what Udio did with them to develop its AI models and build its AI music generation service.

Consistent with the purposes of discovery and the information to which they are entitled under the Federal Rules, Plaintiffs need access to information regarding the full scope of Udio's training data and its use of sound recordings in order to ascertain the nature and extent of Udio's infringement and the circumstances bearing on its fair use defense. *See, e.g., Ritani, LLC v. Aghjayan,* 880 F.Supp.2d 425, 451 (S.D.N.Y. 2012) ("[T]he precise details as to the specific information that Aghjayan misappropriated and what exactly he did with this information is peculiarly within the possession and control of Aghjayan and will be uncovered during the discovery process."). And courts have permitted such discovery where plaintiffs have plausibly alleged infringement of other, as-yet unspecified works. *See, e.g., Scholz Design Tex., LLC v. Lampert Yards - US LBM, LLC,* 2019 WL 13216582, at *3–4 (N.D. Iowa Sept. 4, 2019) (allowing discovery into other possibly infringed works where plaintiff plausibly showed that examples of infringement alleged in complaint "may not be isolated" and that requested discovery was "founded upon plausible reasons to suspect other instances of infringement"); *see also Design Basics LLC v. Best Built Inc,* 2016 WL 1060253, at *2 (E.D. Wis. Mar. 15, 2016) (granting motion to compel discovery into defendant's "entire inventory of designs" where plaintiff's pleaded examples gave them a "toehold" … [that] entitled [them] to explore "how deep the rot runs").

Udio "has the burden of demonstrating specifically how, despite the broad and liberal construction afforded by the federal discovery rules, each request is not relevant or how each question is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden."

# HUESTON HENNIGAN LLP

*John Wiley & Sons*, 298 F.R.D. at 186 (cleaned up).  Yet, despite having ample opportunity during the meet and confer process, Udio never demonstrated any specific burden that would warrant limiting its response to these requests.  Continuing its pattern of withholding information conducive to a productive conferral, Udio only now articulated a specific burden associated with certain unidentified search terms.  As Plaintiffs have continually maintained, any legitimate concern regarding the scope of the requests can be discussed and dealt with when the parties negotiate search terms.

    *2.  Udio's Position*

    Plaintiffs' demands for the production of "all documents and communications" regarding Udio's training process are overbroad, unduly burdensome, and disproportionate to the needs of this case.[12]  Udio is more than willing to provide Plaintiffs with the information they need, but disputes Plaintiffs' assertion that these RFPs, as drafted, are an appropriate way to obtain that information.

    Udio has committed to provide Plaintiffs extensive information about its source code, its training data, and the process by which both were developed.  Udio has already agreed to Plaintiffs' request to inspect both Udio's training data and its source code.  And Udio continues to be willing to provide document discovery about particular technical aspects of its model development if Plaintiffs identify what, in particular, they want to know.  Despite this, Plaintiffs insist on production of *every document and communication* about Udio's training process, most of which would have no bearing on the claims and defenses at issue.  As just one example, Plaintiffs' RFP No. 3 seeks "ALL DOCUMENTS and COMMUNICATIONS concerning the contents of YOUR AI MODEL or RELATING TO the manner in which YOU trained YOUR AI MODEL"—and that is as *narrowed* by Plaintiffs.  Indeed, even after applying Plaintiffs' proposed search terms on this topic, the request sweeps in over 60,000 documents, most of which are likely to be *ad hoc*, highly-technical communications between engineers about their development work.

    While this burden may be justified in some circumstances, it is not here.

    *First,* Plaintiffs' argument that they require such extensive discovery to "contextualize and understand basic facts" relevant to their infringement claims is not persuasive.  If Plaintiffs seek to understand the technical nature of Udio's model development as a factual matter, alternative methods would better balance Plaintiffs' need for relevant information with the burden imposed on Udio.  As Plaintiffs admit, Udio already offered to provide documents sufficient to show Udio's training process.  Likewise, Udio offered to provide broader discovery—beyond simply documents sufficient to show—into any particular technical aspects of its training process, if Plaintiffs inquired more specifically about what information they were interested in.  *See* Ex. K at 1.  And Plaintiffs will, of course, have the opportunity to depose individuals involved in Udio's model development.  To the extent there is something specific Plaintiffs are looking for, Plaintiffs should propound more targeted document requests rather than demanding "all documents and communications" "relating to the manner in which [Udio] train[ed] [its] AI model."[13]

---

[12] *See supra* n.5 (citing, for example, Request for Production No. 3:  "All Documents and Communications Concerning Your AI Model, including without limitation All Documents and Communications reflecting the contents of Your AI Model or Relating To the manner in which You developed, trained, fine-tuned, and refined Your AI Model.").

[13] Courts in this district "have long held that requests for 'any and all' documents are generally improper."  *See, e.g.*, *Agerbrink v. Model Serv. LLC*, No. 14-cv-07841, 2017 WL 933095, at *2 (S.D.N.Y. Mar. 8, 2017) (collecting cases).  For example, in *Optionality Consulting Pte. Ltd. v. Edge Tech. Grp. LLC*, No. 18-cv-05393, 2022 WL 1977746, at *4

# HUESTON HENNIGAN LLP

*Second,* Plaintiffs overstate the relevance of evidence related to Udio's state of mind, but Udio has *already* agreed to produce discovery into that issue, regardless. As an initial matter, the "willfulness" inquiry Plaintiffs point to is only relevant to Plaintiffs' claims for statutory damages, and does not bear on Udio's liability in this case. 17 U.S.C. § 504(c)(2); *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 143 (2d Cir. 2010) ("Pursuant to Section 504(c)(2) of the Copyright Act, an infringer's intent can affect the amount of statutory damages awarded: only a minimal award may be warranted where the infringement is innocent; a higher award may be warranted where the infringer acted willfully."); *Faulkner v. Nat'l Geographic Soc.*, 576 F. Supp. 2d 609, 613 (S.D.N.Y. 2008) ("Copyright infringement is a strict liability wrong in the sense that a plaintiff need not prove wrongful intent or culpability in order to prevail."). Moreover, the relevant inquiry is not simply whether Udio knew it might have copied copyrighted sound recordings, but whether Udio reasonably believed that its conduct was unlawful, or instead constituted a fair use. *See Agence France Presse v. Morel*, 934 F. Supp. 2d 547, 570 (S.D.N.Y. 2013) (Nathan, J.) ("Infringement is generally not willful if a party reasonably and in good faith believes that its conduct is innocent, despite warnings to the contrary.") (denying summary judgment on willfulness where factual disputes existed regarding whether defendants believed they had a valid license to use photographs at issue), *reconsideration granted in irrelevant part,* 934 F. Supp. 2d 584 (S.D.N.Y. 2013); *Princeton Univ. Press v. Mich. Document Servs.,* 99 F.3d 1381, 1392 (6th Cir.1996) ("[W]e cannot say that the defendants' belief that their copying constituted fair use was so unreasonable as to bespeak willfulness." (cleaned up)); *see also Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1229 (9th Cir. 2012) (affirming finding that defendant did not willfully infringe because of its "reasonable belief in their fair use"); *Fitzgerald v. CBS Broad., Inc.*, 491 F. Supp. 2d 177, 190 (D. Mass. 2007) ("Defendant argues that the broadcast of the photographs was done in good faith belief that it was fair use. A defendant's good faith belief that its use of copyrighted material is fair use is enough to defeat a finding of willfulness. If a defendant believed it was engaging only in fair use, it cannot be said to have known that it was infringing."); *Encyclopaedia Britannica Educ. Corp. v. Crooks*, 558 F. Supp. 1247, 1252 (W.D.N.Y. 1983) ("In considering plaintiffs' claims of bad faith, a determination of bad faith depends not only on whether a defendant deliberately used copyrighted material which it had been denied permission to use, but also on whether the defendant genuinely believed that, nevertheless, it had the legal right to make such use. Put another way, the issue of good faith or bad faith in this context depends in large part on the substantiality of the defense offered as justification for the offending acts."). That is because a "[w]illful violation is established if [a defendant] knew that their actions constituted *copyright infringement,*" not simply knowledge of copying. *See Broad. Music, Inc. v. 315 W. 44th St. Rest. Corp.*, No. 93-cv-08082, 1995 WL 408399, at *5 (S.D.N.Y. July 11, 1995) (emphasis added). Udio agreed to provide discovery into that issue in response to RFP No. 42, which (as narrowed per the parties' agreement) calls for internal documents and communications "relating to [Udio's] consideration of potential legal or financial risks relating to the training of [Udio's] AI service using sound recordings." Ex. E at 2. Any more intrusive or wide-ranging "all documents" requests concerning the training data are overly burdensome for Plaintiffs' stated purposes, and Plaintiffs have failed to justify this burden.

*Finally*, Plaintiffs' argument that Udio has improperly sought to limit discovery to only the specific works identified in the Complaint is a straw man. As related to training data—the "relevant data" Udio committed it would provide Plaintiffs with access to in its Answer—Udio offered to allow Plaintiffs to inspect the *whole* of its training dataset. Udio has also offered to produce documents sufficient to show its training process, and has expressed a willingness to provide even broader discovery with respect to any particular

---

(S.D.N.Y. June 3, 2022), the court denied the plaintiff's motion to compel requests for "all documents," such as a request for all of an employee's documents and communications related to his cybersecurity work. There, the court found such requests were "wildly overbroad" and "presumptively improper" and held that "Defendants need not respond to this request."

# HUESTON HENNIGAN LLP

technical aspects of that process.  None of those offers were limited to only the works in suit.  However, with respect to RFP No. 17, which requests "all documents and communications related to how [Udio] identified and accessed any copyrighted sound recordings included in [its] training data," Udio *also* offered to produce "any responsive non-privileged documents and communications referencing the [specific] works asserted in the Complaint[.]"  *See* Ex. C at 8.  Regardless, Plaintiffs' suggestion that they are entitled to broad discovery into works they have never had a Rule 11 basis to assert flouts Rule 26.  *See* Adv. Comm. Note to Subdivision (b)(1) (plaintiffs "have no entitlement to discovery to develop new claims . . . that are not already identified in the pleadings.").  Courts routinely reject similar efforts by plaintiffs to seek discovery into unasserted works.  *See, e.g., Psihoyos v. Pearson Educ., Inc.*, No. 10-cv-05912, 2010 WL 11889066, at *1 (S.D.N.Y. Dec. 7, 2010) (treating different works as separate infringement claims and denying discovery into works not pleaded in the complaint, "find[ing] that plaintiffs' request for documents concerning images not identified in their Complaint" was "grossly overbroad" and "nothing more than . . . an impermissible fishing expedition."); *see also UMG Recordings Inc. v. Internet Archive*, No. 23-cv-06522, Dkt. No. 154, at 7–8 (N.D. Cal. Dec. 19, 2024) (denying discovery into unasserted sound recordings (citing *Psihoyos, Teradyne*, and *Slate* and noting that "the defendants cited cases where courts did not allow discovery about non-asserted works")).[14]

Relatedly, Plaintiffs' argument that the works identified in their Complaint are "non-exhaustive," *see* Pls. Stmt. at 12, such that they are entitled to seek broad discovery into unidentified, hypothetical additional works relies on a fundamental misunderstanding of copyright law and Federal Rule of Civil Procedure 8.  Copyright infringement claims are work-specific, and require individual allegations—and, ultimately, proof—of registration and ownership for each allegedly infringed work.  *See* 17 U.S.C. § 411 ("no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title"); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) ("To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.").  For similar reasons, courts have rejected attempts by copyright plaintiffs to argue that the works asserted in their complaint are "non-exhaustive" lists, reasoning that a defendant "is entitled to clear notice" of the "copyrights he is alleged to have infringed."  *Compare* Pls. Stmt. at 12 (describing the works listed in Exhibit A of Plaintiffs' Complaint as an "illustrative sampling" of potentially infringed works) *with Adobe Sys. Inc. v. Software Speedy*, No. 14-cv-02152, 2014 WL 7186682, at *6 (N.D. Cal. Dec. 16, 2014) (finding a "non-exhaustive list" of the plaintiff's copyrights and "a general allegation that Defendants have infringed its . . . 'copyrights'" in plaintiff's complaint was "insufficient," as defendant "is entitled to clear notice" of the "copyrights he is alleged to have infringed"); *see also Cole v. John Wiley & Sons, Inc.*, No. 11-cv-02090, 2012 WL 3133520, at *12 (S.D.N.Y. Aug. 1,

---

[14] *See also Teradyne, Inc. v. Astronics Test Sys., Inc.*, No. 20-cv-02713, 2022 WL 18397125, at *6 (C.D. Cal. Dec. 22, 2022) (denying the plaintiff's attempt to take discovery into unasserted copyrights and finding that, when it came to requests to "seek[] evidence of potential copyright infringement not currently at issue, the Court need not allow Plaintiff to engage in a fishing expedition for new causes of action"); *Slate v. Am. Broad. Cos.*, 274 F.R.D. 350, 352 (D.D.C. 2011) (limiting discovery to the infringement alleged within "the four corners of the Complaint" and rejecting plaintiff's argument that evidence of other copyright infringement "could, conceivably, establish a pattern and practice of copyright infringement"); *Epidemic Sound v. Meta*, No. 22-cv-04223, Dkt. No. 177 (N.D. Cal. Oct. 10, 2024) (rejecting an attempt by a music production library to seek intrusive data discovery from the defendant that was not related to works not asserted in the complaint); *Capitol Records, Inc. v. Alaujan*, No. 03-cv-11661, May 13, 2009 Text Order (D. Mass. May 13, 2009) (denying many of these same plaintiffs discovery into defendants' conduct in another copyright infringement case with respect to works not asserted in the complaint and reminding the plaintiffs that "this lawsuit is not an opportunity to explore any potential copyright infringement committed by the Defendant at any time or place" but "[r]ather, this suit and relevant discovery are limited to the infringement of specific songs whose copyrights are owned or licensed by the Plaintiffs *and which were identified* . . . [in] their Complaint" (emphasis added)).

# HUESTON HENNIGAN LLP

2012) (finding that it is "insufficient to list certain works . . . and then allege that the [infringement] claim is also intended to cover other, unidentified works.").[15] Plaintiffs' cited cases are not to the contrary.[16]

At bottom, Plaintiffs' RFP Nos. 2, 3, 8, 12, and 17 are overbroad and unduly burdensome, and seek information well beyond the scope of what is relevant to this dispute. Plaintiffs' Motion should therefore be denied as to these requests.

## C.    Request Related to Outputs That Have Been Removed by Udio (RFP No. 5)

### 1.    Plaintiffs' Position

Plaintiffs served Udio with several requests seeking information regarding outputs—*i.e.* the digital music files generated by Udio's AI music generation service in response to user prompts.  Udio initially refused entirely to respond to requests regarding any outputs, arguing that outputs, as a categorical matter, are not relevant to this case.[17]  Udio has since softened its stance and agreed to produce documents responsive to some of Plaintiffs' output-related requests.  Udio, however, still unjustifiably attempts to limit its production of certain output-related documents to which Plaintiffs are entitled, namely those regarding its decision to remove certain outputs from its service.[18]  Having articulated no specific burden associated with this request, and unable to rebut Plaintiffs' showing of relevance, the Court should compel Udio to produce all materials responsive to this request.

Udio has only agreed to produce a limited number of documents responsive to this Request, specifically documents and communications relating to the removal of outputs in response to "accusations of copyright infringement" and "documents related to its policies, protocols, and procedures related to the

---

[15] *See also Gold Value Int'l Texile, Inc. v. Sanctuary Clothing, LLC*, No. 16-cv-00339, 2017 WL 3477746, at *7–8 (C.D. Cal. May 12, 2017) (finding that an "action cannot proceed as to any alleged infringement" of works whose "registrations were not identified in the pleadings" absent amendment); *Oracle Am., Inc. v. HPE*, No. 16-cv-01393, 2016 WL 11806000, at *2 (N.D. Cal. Nov. 7, 2016) (denying motion to compel discovery into unasserted works and finding that "[t]he vague placeholder language" in the complaint "'includes, without limitation' does nothing to expand the scope of discovery to software not specifically put at issue by the complaint.").

[16] Plaintiffs cite only two cases in which a court compelled discovery into unalleged works in a copyright infringement action.  *See* Pls. Stmt. at 13 (citing *Design Basics LLC v. Best Built Inc,* No. 14-cv-00597, 2016 WL 1060253, at *2 (E.D. Wis. Mar. 15, 2016) & *Scholz Design Tex., LLC v. Lampert Yards - US LBM, LLC*, No. 18-cv-04074, 2019 WL 13216582, at *3–4 (N.D. Iowa Sept. 4, 2019)).  Both out-of-circuit orders concern nearly identical disputes related to architectural designs, and the sole case to have cited each for this principle was another architecture design case. And *Ritani, LLC v. Aghjayan,* 880 F.Supp.2d 425, 451 (S.D.N.Y. 2012) is clearly distinguishable, as that case concerned a motion to dismiss trade secret misappropriation claims prior to discovery. There, the court merely noted that documents pertaining to the defendant's alleged misappropriation would be produced in discovery.

[17] Though Plaintiffs have made clear that they are not currently alleging that Udio's outputs themselves infringe Plaintiffs' copyrighted sound recordings, *see* Complaint ¶ 51, Udio's outputs are nonetheless relevant to several key issues in this case: (1) the first factor of Udio's fair use defense, that is, the purpose and character of Udio's use; (2) the fourth factor of Udio's fair use defense, that is, the effect of Udio's use on the potential market for Plaintiffs' sound recordings; and (3) damages. Udio is hard pressed to insist that its copying of Plaintiffs' sound recordings to generate outputs that demonstrably compete with Plaintiffs' recordings is outside the scope of discovery.

[18] The request at issue, Req. No. 5, reads, in full: "All Documents And Communications Relating To Outputs that You have removed from Your AI Service, including but not limited to Documents Relating To the reasons for Any such removal and any policies, protocols, or procedures concerning the removal of Outputs."

# HUESTON HENNIGAN LLP

same."  Ex. K.  But Udio's proposal is unjustifiably narrow and would exclude documents and communications directly related to Udio's infringement of copyrighted sound recordings.  For instance, Udio has likely removed certain outputs from public access on its service because they contain portions of copyrighted sound recordings or vocal matches (known as "deepfakes") to actual recording artists.  Indeed, the Complaint cites one such example: In April of 2024, Udio users posted on X a technique that they could use to create outputs that mimicked real artists.  Complaint ¶¶ 70-73.  The posts went viral, and in response, Udio removed all the offending outputs, as well as the ability to recreate them.  *Id*.  These outputs were not removed in response to "accusations of copyright infringement," but because users were publicly posting and talking about Udio's ability to generate outputs with recognizable vocals—an ability that demonstrates that Udio likely trained its AI model using copyrighted sound recordings that included the recognizable vocals of the original recording artists.  Documents and communications discussing these outputs, as well as other outputs removed under similar circumstances, would be excluded under Udio's proposed production of documents.

Udio's proposal would also carve out any documents or communications related to outputs that Udio removed based on its own internal controls.  It is clear that, during the development and operation of its AI Service, Udio employees adopted a practice of identifying and removing outputs that they found to be problematic.  This was demonstrated by the above example, as well as the fact that Udio removed every output included in the body of Plaintiffs' Complaint the day after it was filed.[19]  Whether an output was identified and reported by a Udio user or found by Udio itself, the relevance of its removal is the same.  Udio's attempt to narrow its response to only a small portion of these responsive documents must be rejected.

Udio strains to frame Plaintiffs' request for removed outputs as irrelevant and presents its partial response to this Request as "a matter of compromise."  The Court should reject this framing.  As Plaintiffs plausibly alleged in the Complaint, Udio reacted on several occasions to indications that its AI model had a tendency to output audio files that closely resemble the sound recordings on which it trained.  What Udio did to conceal evidence regarding the specific materials its model trained on is highly relevant to this dispute.  Among other things, it is acknowledgement of wrongdoing and relevant to demonstrating willfulness.  *See Odegard, Inc. v. Costikyan Classic Carpets, Inc.*, 963 F.Supp. 1328, 1341 (S.D.N.Y. 1997) (holding "an enhancement of damages" was "appropriate" because the defendants were "willing to act dishonestly to hide their infringement from the plaintiffs").  It also bears on Udio's fair use defense, which requires consideration of the purported justifications for Udio's unauthorized copying, the equitable circumstances surrounding the use of Plaintiffs' sound recordings, and the production of sound files that potentially substitute for Plaintiffs' sound recordings.  Even if Udio's outputs themselves are non-infringing, Udio created them by copying Plaintiffs' sound recordings and for the purposes of creating potential market substitutes, which the Supreme Court has described as the "bête noire" of copyright.  *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023).  Thus, Udio's contention that Plaintiffs somehow seek this evidence to develop evidence for a right-to-publicity claim or fish for circumstantial evidence of particular recordings that Udio stole is simply wrong.

Because the information requested is relevant and Udio has not articulated any specific burden associated with this Request, Udio must be compelled to produce all responsive documents and communications.

---

[19] Udio's Terms of Service state that "the Company reserves the right, and has absolute discretion, to remove, screen, filter, edit, or delete any of Your Content at any time, for any reason, and without notice."  Udio Terms of Service, § 6.3(3), *available at* https://www.udio.com/terms-of-service.

# HUESTON HENNIGAN LLP

2.    *Udio's Position:*

The documents Plaintiffs seek are irrelevant and disproportionate to the needs of the case.  Plaintiffs' Complaint asserts only copyright infringement claims.  *See* Compl. ¶¶ 92–109.  In particular, the Complaint alleges that Udio infringed Plaintiffs' alleged copyrights in the asserted works when it copied them as part of a back-end process in service of creating an AI model capable of generating new music.  The Complaint, however, goes out of its way to disclaim that it is alleging that any output generated by Udio's AI tool also infringed Plaintiffs' copyrights.  Compl. ¶ 51.  Plaintiffs reiterate that position in this letter, "ma[king] clear that they are not currently alleging that Udio's outputs themselves infringe Plaintiffs' copyrighted sound recordings."  *See* Pls. Stmt. at 17 n.17 (citing Compl. ¶ 5).  As a matter of compromise, Udio has nonetheless agreed to produce documents relating to outputs taken down due to assertions of copyright infringement (if any), as well as documents related to Udio's policies, protocols, and procedures related to the same.  *See* Ex. K at 3.  Udio is also willing to produce documents and communications related to outputs it removed on its own accord due to concerns of copyright infringement.  Those are the only documents that would be relevant to the copyright claims asserted in this case—including Plaintiffs' related allegations that Udio's alleged copying was willful.

Plaintiffs argue that Udio is *also* obligated to produce documents relating to the removal of outputs that contain vocals that sound alike to an existing artist.  But, as explained below, any dispute regarding sound-alike voices would be a right-of-publicity claim, and Plaintiffs are not asserting any such claims in this case.  Nor is this discovery proportional to Plaintiffs' stated need to determine whether Udio trained its models on Plaintiffs' sound recordings—Udio already agreed to allow Plaintiffs to inspect the whole of its training data.

*First*, a replica of a person's voice, even a famous person, does not come within the subject matter of copyright.  That is because "[a] voice is not copyrightable."  *Midler v. Ford Motor Co.*, 849 F.2d 460, 462 (9th Cir. 1988) (rejecting copyright claim based on use of "soundalike" actor (citing 17 U.S.C. 102(a))); *see also In re Jackson*, 972 F.3d 25, 45 (2d Cir. 2020) ("[. . .] neither stage names nor *voices* — nor a person's 'identity' or 'likeness' — are 'works of authorship' that fall within the subject matter of copyright") (emphasis added) (citation omitted).[20]  Plaintiffs do not assert right-of-publicity claims in this case.  *See generally* Compl.  Nor are Plaintiffs entitled to use the discovery process to fish for those claims—if the record labels would even have standing to assert them.  *See* Fed. R. Civ. P. 26, Adv. Comm. Note to Subdivision (b)(1) (plaintiffs "have no entitlement to discovery to develop new claims . . . that are not already identified in the pleadings."); *see also* N.Y. Civ. Rights Law §§ 50-51 (McKinney) (limiting the right of publicity to belong to "a living person"); *Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233, 249 (2d Cir. 2021) (holding that "Section 51 . . . protects a statutory right of publicity" and "serves to protect the sentiments, thoughts and feelings of *an individual*") (emphasis added) (internal quotations omitted).

*Second*, insofar as Plaintiffs are seeking this information as circumstantial evidence that any particular sound recording is among Udio's training data, the requested discovery is not proportional to the needs of the case.  Udio is already allowing Plaintiffs to inspect the training data itself—the primary source—

---

[20] Sound recordings—the copyrightable media at issue in this case—"are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied."  17 USC § 101.

# HUESTON HENNIGAN LLP

for the works in suit.  Inspection is the most efficient and thorough process for Plaintiffs to discern which of their recordings, if any, are present in Udio's training data.

Request for Production No. 5 is irrelevant to Plaintiffs' asserted copyright infringement claims and represents an unwarranted fishing expedition relating to unasserted (and speculative) rights.  The Court should deny this request as irrelevant, overbroad, and disproportionate to the needs of the case.

D.    **Requests Related to Udio's Investors (RFP Nos. 45, 46, 47)**

1.    *Plaintiffs' Position*

Plaintiffs served Requests seeking the identity of Udio's investors and the information Udio shared with investors about its training data, use of copyrighted sound recordings, and its overall business model.[21] Udio has categorically refused to produce documents responsive to these requests, on the basis that such information is "invasive" and "irrelevant."  Udio is incorrect.[22]

As alleged in the Complaint, Plaintiffs have reason to believe that Udio discussed the risk of copyright liability when soliciting investments.   For instance, one of Udio's chief investors a16z,[23] extensively discussed in a public submission to the United States Copyright Office the potential copyright infringement exposure posed by generative AI models (like Udio's) that train on copyrighted data.  *See* Ex. L at 5 (recognizing that "the only practical way generative AI models can exist is if they can be trained on an almost unimaginably massive amount of content, much of which . . .  will be subject to copyright"); *id.* at 8 (warning that "imposing the cost of actual or potential copyright liability on the creators of AI models will either kill or significantly hamper their development.").  And a16z filed this submission with the Copyright Office nearly a year before announcing its substantial investment in Udio.  In other words, a16z invested in Udio clear-eyed about the reality that Udio trained its AI model on a corpus of copyrighted sound recordings and that this conduct posed a risk of copyright liability.  Moreover, it is unfathomable that a sophisticated investment firm like a16z, with "dedicated venture funds, each with its own team of experts and capabilities," did not discuss copyright risk with Udio or perform due diligence into the legal risks attendant to Udio's business

---

[21] Plaintiffs' Requests 45, 46, and 47 state, in full:

- **Req. No. 45**: Documents sufficient to identify all Persons who invested in or financially backed Udio.

- **Req. No. 46 (as narrowed during parties' conferral)**: All Documents and Communications between You and Any investors, venture capital backers, seed funders, or any other potential investors in UDIO, including but not limited to Andreessen Horowitz (a16z), Steve Stoute's UnitedMasters, will.I.am, Common, Tay Keith, Kevin Wall, Mike Krieger, and Oriol Vinyals, regarding Your Training Data, Sound Recordings, copyright law, and/or business risks.

- **Req. No. 47**: All Documents and Communications Relating To investor presentations and meetings, including but not limited to pitch decks to investors and potential investors.

[22] Plaintiffs also served a third-party subpoena on one of Udio's primary investors, the venture capital firm Andreesen Horowitz ("a16z").  Like Udio, a16z has wholesale objected to producing documents responsive to Plaintiffs' requests on relevance grounds.

[23] a16z is a venture capital firm that "has $44B in committed capital across multiple funds" and touts investments in companies such as Airbnb, Coinbase, Facebook, Instacart, Lyft and many others.  *See* About a16z, *available at* https://a16z.com/about/; Builders We've Backed, *available at* https://a16z.com/portfolio/.

# HUESTON HENNIGAN LLP

prior to investing in the company.[24]  It hardly stretches the imagination that others contemplating an investment in Udio would inquire into the legal and financial risks associated with Udio's business, as these are ordinary topics of due diligence for any financial transaction.  Plaintiffs are entitled to, at the very least, all information that Udio exchanged with its actual and potential investors on these points.[25]

As Plaintiffs have repeatedly explained during conferral, these requests target information that bears on the first fair use factor, namely "whether [Udio's] use of [Plaintiffs' copyrighted sound recordings] is of a commercial nature" and whether Udio "stands to profit from exploitation of the copyrighted material without paying the customary price."  *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 184 (2d Cir. 2024); *see also* 17 U.S.C. § 107(1) (stating that the first fair use factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes.").   The Second Circuit has explained that "[t]he crux of the profit/nonprofit distinction" is "whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."  *Hachette Book Grp.*, 115 F.4th at 184 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985)). The value proposition that Udio presented to investors is likely to provide compelling evidence of Udio's potential to profit off its exploitation of Plaintiffs' copyrighted works.  And there is every reason to believe that Udio shared its vision to monetize its AI music generation service with various investors in the process of raising the $10 million seed funding round it announced in April 2024.[26]

---

[24] Ben Horowitz, *New Funds, New Era*, Andreesen Horowitz (Apr. 16, 2024) (explaining that a16z has "expand[ed] from one great investor in each segment to a dedicated investing team with a differentiated platform" tailored to specific venture strategies because, for instance, "founders building AI foundation models need an entirely different set of networks and capabilities than founders building biotech therapies"), *available at* https://a16z.com/new-funds-new-era/.

[25] Udio cites two cases with wildly different facts to suggest the impropriety of the present requests.  *First*, *Oliver v. Meow Wolf, Inc.* involved a plaintiff who alleged that an artist collective reneged on its promise to pay the artist for contributed artwork.  2021 WL 4171574, at *1 (D.N.M. May 17, 2021).  The court determined that the plaintiff's request for "Complete lists of everyone who ever attended a Meow Wolf promotional event and comprehensive information about all persons who have ever invested in Meow Wolf are over-broad," particularly in light of the fact that the court had already ruled that the plaintiff had "not stated a claim for a revenue share of" the artist collective.  *Id.* at *3.  And *Umbach v. Carrington Inv. Partners (US) LP*, is not a copyright suit at all but rather a securities class action brought under the Private Securities Litigation Reform Act.  No. 3:08 CV 484 (EBB), 2009 WL 3287537, at *1–2 (D. Conn. Oct. 9, 2009).  In any event, the court in *Umbach* permitted investor discovery as relevant and proportional to the needs of the case.  *See id.* at *3 ("The names and contact information of the discrete number of investors responsive to these Interrogatories are relevant . . . .").  Neither of these cases speak to the present circumstances where Plaintiffs' well-pleaded allegations reflect that a startup company pitched a novel, disruptive product to investors knowing that the underlying technology was predicated on the unauthorized use of copyrighted works.

[26] *See* Daniel Tencer, New AI-Powered 'Instant' Music-Making App Udio Raises $10M; Launches with Backing from Will.I.Am., Common, UnitedMasters, A16Z, Music Business Worldwide (Apr. 10, 2024), *available at* https://www.musicbusinessworldwide.com/new-ai-powered-instant-music-making-app-udio-raises-10m-launches-with-backing-from-will-i-am-common-unitedmasters-a16z/; *see also* Press Release, *Former Google Deepmind Researchers Assemble Luminaries Across Music And Tech To Launch Udio, A New AI-Powered App That Allows Anyone To Create Extraordinary Music In An Instant*, PR Newswire (Apr. 10, 2024) ("April 10 Press Release") ("The company has also secured leading investors in the seed round including a16z, as well as prominent tech and music angels like Mike Krieger (Cofounder & CTO of Instagram) and Oriol Vinyals (head of Gemini at Google)."), *available at* https://www.prnewswire.com/news-releases/former-google-deepmind-researchers-assemble-luminaries-across-music-and-tech-to-launch-udio-a-new-ai-powered-app-that-allows-anyone-to-create-extraordinary-music-in-an-instant-302113166.html.

# HUESTON HENNIGAN LLP

Udio contends that these requests are "not necessary to establish" its commercial purpose for its unauthorized copying, but that is not the appropriate standard.  *See John Wiley & Sons*, 298 F.R.D. at 186 ("[R]elevance, for purposes of discovery, is an extremely broad concept.'").  Nor can Udio stipulate away the relevance of this evidence by merely admitting to a commercial purpose.  *See, e.g.*, *Persky v. Dolgencorp, Inc.*, 2008 WL 11422159 at *2 (W.D. Okla. Jan. 11, 2008) ("The burden of proving the issue lies at the feet of Plaintiff and she is entitled to meet that burden with any relevant and admissible evidence at her disposal.  Defendants cannot dictate the type of proof on which Plaintiff relies."); *BPI Sports, LLC v. ThermoLife Int'l, LLC*, 2021 WL 2583493, at *6 (S.D. Fla. Feb. 25, 2021) (rejecting defendant's attempt to limit the scope of discovery via admission because "to judicially admit alter ego liability does not change the scope of the discovery as to the underlying licensing agreement."); *cf. Smith v. Summers*, 334 F. Supp. 3d 339, 345 & n.6 (D.D.C. 2018) (observing that "[a] party is not required to accept a judicial admission of his adversary, but may insist on proving the fact" and noting that "[t]ry as Defendant may to stipulate away the parties' contractual relationship, it remains foundational to Plaintiff's claim").

It is also evident that Udio's investors considered—indeed, were motivated by—the potential impact that Udio's AI music generation service will have on the market for sound recordings and the music industry, generally.  This is a consideration central to the fourth fair use factor.  *See* 17 U.S.C. § 107(4) (the fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work."); *see also Hachette Book Grp.*, 115 F.4th at 189 ("This factor focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy [rather than] the original." (cleaned up)).  For instance, a theme of one of Udio's early press releases was the company's "design[ ] to make song creation as easy as possible."  Ex. M.  Striking this same chord, Mike Krieger, one of Udio's touted investors, emphasized in the same press release, "[i]t's early days but just like Instagram brought photography sharing to the masses, I believe Udio has the power to bring music creation to the masses as well."  *Id.*  And David Ding, Udio's founder, explained that Udio's AI music generation service is meant to be responsive to people's desire for "music that sounds indistinguishable from music that's created by professional human producers."[27]  Put simply, Udio drew investors in, at least in part, by dangling the promise of the rapid proliferation of AI-generated music.  Plaintiffs are entitled to know the details of how Udio pitched its business to investors, including the extent to which Udio advertised the possibility that music generated by its AI service would displace human-created sound recordings.

Udio also attempts to narrow the potential relevance of investor communications to the fourth fair use factor in a way that is legally unsound.  Udio's argument is that because Plaintiffs' claims are predicated on Udio's use of sound recordings as training inputs, the only relevant market is the market for sound recordings as training data.  As a preliminary matter, it is quite possible that there would be responsive and relevant communications with investors regarding that market (*e.g.*, discussing the costs of licensing Plaintiffs' recordings rather than illicitly copying them).  But more fundamentally, Udio is mistaken in thinking that it can divorce the act of training its AI model from that model's purpose.  The law is clear that "fair use is a 'flexible' concept, whose application varies depending on the context."  *Hachette Book Grp.,* 115 F.4th at 179*; see also Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014) (explaining that fair use requires courts to "engage in an open-ended and context-sensitive inquiry" that entails exploration of all factors enumerated in § 107, "in light of the purposes of copyright" (internal quotation marks omitted)).  In the context of Plaintiffs' claims, this means that Udio cannot disaggregate its actions in

---

[27] *See* Dredge, *AI Music startup Udio launches backed by artists and Instagram's co-founder*, Music Ally (April 10, 2024) (quoting Udio's founder David Ding as saying that Udio is designed to be), *available at* https://musically.com/2024/04/10/ai-music-startup-udio-launches-backed-by-artists-and-instagrams-co-founder/.

# HUESTON HENNIGAN LLP

obtaining training data from the intent, purpose, and effects of those actions. Unsurprisingly then, the only decision to have addressed fair use in the context of training an AI model soundly rejects Udio's cribbed conception of the fourth fair use factor. *See Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*, — F.Supp.3d —, 2025 WL 458520, at *9–10 (D. Del. Feb. 11, 2025) (in suit involving copyright infringement claims against AI legal research company for training on copyrighted content, considering "the original market . . . [for] legal research platforms," "the potential derivative market . . . [for] data to train legal AIs" _and_ "any public benefits the copying will likely produce") (internal quotation marks omitted).[28]

These requests also seek information central to Plaintiffs' determination of whether to pursue statutory or actual damages for Udio's infringement, including but not limited to Udio's state of mind with respect to its infringement and the benefits Udio reaped from its infringement. Section 504 of the Copyright Act permits a district court, in its discretion, to award between $750 and $30,000 for each copyright infringed, the upper bound of which can be increased to $150,000 per infringed work if the court finds willful infringement. 17 U.S.C. § 504(c)(1)–(2); *see also Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 262–63 (2d Cir.2005). Factors courts consider "[w]hen determining the amount of statutory damages to award for copyright infringement" include "the infringer's state of mind"; "the expenses saved, and profits earned, by the infringer"; "the infringer's cooperation in providing evidence concerning the value of the infringing material"; and "the conduct and attitude of the parties." *Bryant v. Media Rights Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010); *see also Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986).

Whether Udio told investors about the materials comprising its training data and whether Udio acknowledged the risk that it could be sued for copyright infringement stemming from its unauthorized use of copyrighted sound recordings, would, at the very least, provide evidence of Udio's "state of mind." *Bryant*, 603 F.3d at 144. Such communications could also evidence Udio's willfulness. *See Island Software*, 413 F.3d at 263 ("To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard for, or willful blindness to, the copyright holder's rights." (internal quotation marks omitted.)). Moreover, Udio's communications with investors may also reflect on Udio's "conduct and attitude" with respect to its infringing conduct. *Bryant*, 603 F.3d at 144. Udio questions the basis for Plaintiffs' belief that Udio would expressly market its product to investors as illegal, but an explicit acknowledgment of illegality is not necessary to make Udio's communications with investors relevant to this dispute. Udio likely made all sorts of representations about the potential for its AI music generation service to disrupt, upend, or revolutionize the music industry, and Plaintiffs are entitled to present evidence about the permissible inferences that can be drawn from what Udio told its investors.[29]

---

[28] Udio's cited authority is not to the contrary. In *Seltzer v. Green Day, Inc.*, an artist sued a rock band for the unauthorized use of his art as a video backdrop for live performances. 725 F.3d 1170, 1174 (9th Cir. 2013). The Ninth Circuit observed only that the original art work "was primarily intended as street art" whereas the rock band's allegedly infringing use "was never placed on merchandise, albums or promotional materials and was used for only one song in the middle of a three hour touring show." *Id.* at 1179. "In this context," the Ninth Circuit reasoned, "there is no reasonable argument that conduct of the sort engaged in by Green Day is a substitute for the primary market for Seltzer's art." *Id.* Here, Udio has been transparent that the purpose of training its AI model on Plaintiffs' copyrighted sound recordings is to allow a growing number of people "to translate the ideas in their minds into high-quality, great-sounding, never-before-heard music." Answer at 1. This stated goal necessarily entails creating competing market substitutes for the genuine, human-created sound recordings on which Udio trained.

[29] *See, e.g.*, Dredge, *supra note* 25 (quoting Udio's current CEO Andrew Sanchez as saying, "we're building out new

# HUESTON HENNIGAN LLP

It is understandable why Udio wishes to shield from discovery evidence that would confirm that it pitched its commercial product to the marketplace clear-eyed about the risks of building a business around the infringement of Plaintiffs' copyright sound recordings.  Sophisticated investors, like those who have funded Udio, would have been keenly interested in this risk, and Plaintiffs are entitled to know what Udio shared or learned on this point.[30]  Moreover, Udio has not set forth any argument regarding the burden associated with this request, and Udio has made no factual assertions regarding the number of investors or documents implicated by these Requests.  Thus, the Court should compel Udio to respond to these requests in full.

> ## 2. Udio's Position:

RFP Nos. 45, 46, and 47 seek invasive, irrelevant discovery regarding Udio's investors, specifically investor identities, all documents and communications between any investors or potential investors and Udio, and all documents and communications relating to investor presentations and meetings.  There is no basis to compel intrusive investor discovery in order to discover evidence that is more likely to be contained in Udio's internal files (if it exists).

To start, Plaintiffs claim that discovery into Udio's investors targets information that bears on the first fair use factor, in particular whether Udio's use of sound recordings is "of a commercial nature or is for nonprofit educational purposes."  *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 178 (2d Cir. 2024); *see also* 17 U.S.C. § 107(1).  But investor discovery is surely not necessary to establish whether Udio's "use is of a commercial nature or nonprofit educational purposes"—Udio does not dispute that it is a for-profit corporation.  *See* Answer ¶ 7 ("Udio [. . .] admits that it charges many of its users monthly fees to use its product and produce digital files").  And Udio has agreed to produce financial information that will confirm the same.  *See* Ex. Q at 4 (agreeing to produce documents sufficient to show its profits on a monthly basis in response to Plaintiffs' RFP No. 48).  Seeking all documents and communications related to Udio's investors simply to determine whether or not Udio's business is "of a commercial nature" is grossly disproportionate to the needs of the case.

Next, Plaintiffs argue that investor information is relevant to Factor Four of the fair use test: "effect of the use on the potential market for or value of the copyrighted work."  17 U.S.C § 107(4).  Again, Plaintiffs have not asserted a claim regarding any potential copyright infringement by Udio's outputs: that is, the music created by Udio.  *See* Compl. ¶ 51.  The only alleged unlawful "use" here, and the subject of Udio's fair use defense, is Udio's alleged "use" of Plaintiffs' sound recordings as part of a back-end process to train its model.  *See, e.g., Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) (fair use to copy all of the books in numerous university libraries in order to create a commercial, full-text searchable index of the assembled corpus); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) (fair use to copy essentially all of the images on the open internet and show thumbnail versions to users, in the service of creating an image-search functionality).  Accordingly, the documents or communications potentially relevant to the effect of Udio's "use" on the market under Factor Four of the fair use test would relate to the market for training data, not whether the non-infringing output generated by the model competes with the Asserted

---

patterns for how artists are going to make money off this in the future," which is something "our backers are really into").

[30] Udio's supposition that Plaintiffs investor-related requests amount to a fishing expedition for additional defendants is both unfounded and misguided.  *See infra* note 33.  As described above, Plaintiffs' requests seek relevant information, and that relevance has nothing to do with identifying additional defendants.

# HUESTON HENNIGAN LLP

Works—which would simply be fair competition. *See Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013) (If an allegedly infringing use "does not substitute for the original and serves a 'different market function,' [the fourth] factor weighs in favor of fair use.").[31] Udio has already agreed to produce documents related to its "licensing or contemplation of potential licensing" of training data."[32]  *But the court need not reach these issues.*  Even accepting Plaintiffs' (incorrect) view of the law, and assuming at least part of the relevant inquiry is the degree to which the output from Udio's model might substitute for Plaintiffs' works, it is unclear why investor discovery is the appropriate source of information about that topic.  The mere fact that Udio's platform creates new music that has the *potential* to compete with Plaintiffs' sound recordings is plainly ascertainable from the model itself.  One does not need investor discovery to confirm that "Udio has the power to bring music creation to the masses."  And questions regarding the *degree* to which any output from the Udio model might substitute for any particular work asserted in this case surely will not be answered by reviewing Udio's communications with its investors.

Lastly, Plaintiffs claim that discovery requests related to Udio's investors are relevant to uncover evidence of willfulness (which is a matter of damages, not liability) and Udio's state of mind because Udio may have "discussed the risk of copyright liability when soliciting investments" and "acknowledged the risk that it could be sued."  *See* Pls. Stmt. at 20, 23.  As a preliminary matter, the only party's state of mind that is relevant is Udio's—not its investors'.[33]  S*ee Bryant v. Media Rights Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010) ("courts consider . . . the *infringer's* state of mind") (emphasis added).  What a16z (or any other investor) thought about the legality of the product is not relevant to Plaintiffs' claims against *Udio*—though it bears note that a16z stated in the submission to the Copyright Office cited by Plaintiffs that it "believes that generative AI model training is a productive, non-exploitive use of training material" and that "model training falls squarely under the fair use doctrine."  *See* Ex. L.  Moreover, the relevant inquiry is not simply whether Udio knew it might have copied copyrighted sound recordings, but whether Udio reasonably believed that its conduct was unlawful, or instead constituted a fair use.  *See Agence France Presse*, 934 F. Supp. 2d at 570 ("Infringement is generally not willful if a party reasonably and in good faith believes that its conduct is innocent, despite warnings to the contrary.") (denying summary judgment on willfulness where factual disputes existed regarding whether defendants believed they had a valid license to use photographs at issue), *reconsideration granted in irrelevant part,* 934 F. Supp. 2d 584 (S.D.N.Y. 2013); *Princeton Univ. Press,* 99 F.3d at 1392 ("[W]e cannot say that the defendants' belief that their copying constituted fair use was so unreasonable as to bespeak willfulness."); *see also Evergreen Safety*, 697 F.3d at 1229 (9th Cir. 2012) (affirming finding that defendant did not willfully infringe because of its "reasonable belief in their fair use"); *Fitzgerald*, 491 F. Supp. 2d at 190 ("Defendant argues that the broadcast of the photographs was

---

[31] *Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*, — F.Supp.3d —, 2025 WL 458520 (D. Del. Feb. 11, 2025) is inapposite.  That case did not concern generative AI:  "It is undisputed that Ross's AI is not generative AI"; "Because the AI landscape is changing rapidly, I note for readers that only non-generative AI is before me today."  *Id.* at *7, *8.

[32] See Plaintiffs' Request No. 15: "ALL DOCUMENTS and COMMUNICATIONS RELATED TO licensing or contemplation of potential licensing of ANY TRAINING DATA, including but not limited to licensing of any SOUND RECORDINGS included in YOUR TRAINING DATA."

[33] Insofar as these requests are an attempt by Plaintiffs to discover additional potential defendants (with deep pockets) not named in their Complaint, courts in this Circuit have consistently found that Federal Rule of Civil Procedure 26 limits discovery to asserted claims and defenses—it does not entitle parties to utilize discovery as a fishing expedition to develop new claims or to identify additional defendants.  *See, e.g.*, *Martinez v. Thompson*, No. 04-cv-0440, 2007 WL 1017315, at *2 (N.D.N.Y. Mar. 29, 2007) ("The Court will not permit Plaintiff to use discovery as a fishing expedition to identify other possible defendants or witnesses.").

# HUESTON HENNIGAN LLP

done in good faith belief that it was fair use. A defendant's good faith belief that its use of copyrighted material is fair use is enough to defeat a finding of willfulness. If a defendant believed it was engaging only in fair use, it cannot be said to have known that it was infringing."); *Encyclopaedia Britannica Educ. Corp*, 558 F. Supp. at 1252 (W.D.N.Y. 1983) ("In considering plaintiffs' claims of bad faith, a determination of bad faith depends not only on whether a defendant deliberately used copyrighted material which it had been denied permission to use, but also on whether the defendant genuinely believed that, nevertheless, it had the legal right to make such use. Put another way, the issue of good faith or bad faith in this context depends in large part on the substantiality of the defense offered as justification for the offending acts."). And as discussed, Udio agreed to provide discovery into that issue in response to RFP No. 42, which (as narrowed per the parties' agreement) calls for internal documents and communications "relating to [Udio's] consideration of potential legal or financial risks relating to the training of [Udio's] AI service using sound recordings." Ex. E at 2. It is unclear why Plaintiffs believe Udio would be pitching its product as unlawful to investors.

Plaintiffs' requests are also wildly intrusive and not proportionate to the needs of the case. In seeking all documents and communications between Udio and "any investors"—including "*potential* investors" in RFP Nos. 46 and 47—Plaintiffs essentially ask Udio to disclose all of its communications with any individual or entity who has ever expressed a business interest in Udio, regardless of whether or not they actually invested and regardless of whether they actually played any role in Udio's operations or business decisions. This is overbroad and unduly burdensome. *See, e.g., Oliver v. Meow Wolf, Inc.*, No. 20-cv-237, 2021 WL 4171574, at *3 (D.N.M. May 17, 2021) ("[I]nvestment information [] has little relevance to those [copyright] claims."); *see also Umbach v. Carrington Inv. Partners (US), LP,* No. 08-cv-484, 2009 WL 3287537 at *3 (D. Conn. Oct. 9, 2009) ("[P]laintiff's discovery into the identity of all investors, and the amounts of their investments . . . is overly broad and unduly burdensome, even if such sensitive information was limited under the stipulated protective order to 'attorney's eyes only.'" (emphasis added)). Without more, Plaintiffs fail to articulate a sufficient basis for the Court to order such broad investor discovery.

## III.    Plaintiffs' Requests for Admission

### 1.    Plaintiffs' Position

Plaintiffs move to compel a response to one request contained in Plaintiffs' First Set of Requests for Admission ("RFA"). Fed. R. Civ. Pr. 36(a)(6). RFA 50 is focused on what should be an undisputed fact related to Udio's treatment of the outputs created by its AI service:

- Request for Admission No. 50: Admit that You do not contend that Outputs are copyrightable.

Initially, Udio objected and refused to respond to every RFA that Plaintiffs served. Ex. N. During the parties' negotiations, Udio revisited its position and decided that it would provide responses to the majority of Plaintiffs' RFAs. Udio must be compelled to provide one additional, substantive response to RFA 50.

Pursuant to Federal Rule of Civil Procedure 36, Udio is required to "admit the request, specifically deny it or state in detail why the answering party cannot truthfully admit or deny it." *Woodward v. Holtzman*, 329 F.R.D. 16, 25 (W.D.N.Y. 2018); *see also* Fed. R. Civ. P. 36(a)(4). "On finding that an answer does not comply with [Rule 36(a)], the court may order either that the matter is admitted or that an amended answer be served." Fed. R. Civ. P. 36(a)(6).

# HUESTON HENNIGAN LLP

Here, Udio has failed to comply with Rule 36, instead attempting to avoid responding to a request that would confirm facts that should not be in dispute: that it does not contend that the outputs its service creates are copyrightable. A clear admission to this RFA in either direction is relevant to, at least, Plaintiffs' response to Udio's fair use defense. For instance, on the first fair use factor Udio contends that its use of Plaintiffs' sound recordings is transformative. But if Udio admits that it does not contend in this litigation that outputs from its AI music generation service are copyrightable, Plaintiffs will be able to rebut Udio's argument on this score by arguing that Udio's use of their protected works is for the purpose of creating uncopyrightable outputs, which is not something that copyright policy should encourage. Indeed, one of the primary justifications for the fair use defense is that it should not impede creative authorship, whereas the Courts have uniformly found that AI-generated content does not represent copyrightable authorship. *See, e.g., Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1529–30 (S.D.N.Y. 1991) ("The copyright law, through the fair use doctrine, has promoted the goal of encouraging creative expression and integrity by ensuring that those who produce intellectual works may benefit from them."); *see also Thaler v. Perlmutter*, 687 F.Supp.3d 140, 146 (D.D.C. 2023) (explaining the "consistent understanding that human creativity is the *sine qua non* at the core of copyrightability, even as that human creativity is channeled through new tools or into new media."). Conversely, if Udio admits that it will contend that its outputs are copyrightable, this is relevant to Plaintiffs' argument that Udio has created a tool that creates market substitutes for their copyrighted sound recordings, which is relevant to both the first and fourth fair use factors. *See Andy Warhol*, 598 U.S. at 528 ("[T]he first [fair use] factor relates to the problem of substitution" and "[t]he use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for . . . the work"); *see also Hachette Books*, 115 F.4th at 189 (explaining that the fourth fair use factor "focuses on whether the copy brings to the marketplace a competing substitute for the original.*").

Udio also claims that the RFA improperly seeks Udio to "opine on a novel question of law." Not so. The RFA asks Udio to admit that it *does not contend* that outputs are copyrightable. This is purely a fact-based inquiry: either Udio is asserting the position that outputs of its music generation service are copyrightable, or it is not. The RFA does not require Udio to admit or deny whether outputs are actually copyrightable.[34] Udio's cited cases pertain to its red herring—a request designed to extract a legal conclusion—not the type of Request at issue here eliciting a party's position on an issue in the litigation.[35] In fact, one of Udio's cited cases overruled a defendant's objections to an analogous request seeking to elicit an admission concerning whether a defendant intended to make specific arguments. *See E.E.O.C.*,

---

[34] In any event, Udio would be flouting established guidance from the Copyright Office and well-reasoned case law in asserting that outputs from its generative AI music service are copyrightable. *See* Ex. O ("Copyright does not extend to purely AI-generated material, or material where there is insufficient human control over the expressive elements."); Ex. P ("[W]hen an AI technology receives solely a prompt from a human and produces complex written, visual, or musical works in response, the 'traditional elements of authorship' are determined and executed by the technology—not the human user."); *see also Thaler*, 687 F.Supp.3d at 146, 149–50 (observing that "[h]uman authorship is a bedrock requirement of copyright" and holding that "a work generated autonomously by a computer system … did not give rise to a valid copyright upon its creation").

[35] *See, e.g., Rodriguez v. NNR Glob. Logistics USA Inc.*, No. CV 14-1766 (JFB) (AKT), 2017 WL 11510163, at *5 (E.D.N.Y. Mar. 31, 2017) (denying motion to compel response to RFA seeking admission "That Plaintiff Tania Rodriguez engaged in protected activity within the meaning of Title VII while employed at NNR Global."); *E.E.O.C. v. Bloomberg L.P.*, No. 07 Civ. 8383 (LAP), 2010 WL 3260150, at *1—2 (S.D.N.Y. Aug. 4, 2010) (denying motion to compel in response to RFAs seeking admissions that "Bloomberg's [specific action/decision] complied with Title VII;" "Title VII permits/does not require that Bloomberg [take a specified action]").

# HUESTON HENNIGAN LLP

2010 WL 3260150, at *2 (overruling objections to requests asking whether the "EEOC does not seek to prove that [specified person]'s [specified actions] violated Title VII").

"The purpose of the rule pertaining to requests for admissions is to expedite trial by removing essentially undisputed issues, thereby avoiding time, trouble and expense which otherwise would be required to prove issues." *SEC v. Rayat*, No. 21-cv-4777 (LJL), 2022 WL 1606953, at *2 (S.D.N.Y. May 19, 2022) (cleaned up). Plaintiffs served each of their RFAs with this purpose in mind, hoping to "confirm information and eliminate issues for trial." *Spectrum Dynamics Med. Ltd. v. Gen. Elec. Co.,* No. 18-CV-11386 (VSB) (KHP), 2021 WL 735241, at *2 (S.D.N.Y. Feb. 25, 2021). Udio must be compelled to provide a substantive response to RFA 50.

   2.    *Udio's Position:*

Plaintiffs ask Udio to admit that it does "not contend that [AI] Outputs are copyrightable." Plaintiffs' attempt to improperly use Rule 36 to compel Udio to opine on a novel question of law should be rejected. *See Republic of Turkey v. Christie's, Inc.*, 326 F.R.D. 394, 399 (S.D.N.Y. 2018) ("requests for admission are used to establish admission of facts *about which there is no real dispute*." (quoting 7 *Moore's Federal Practice* § 36.02[1] (3d ed. 2013)). The copyrightability of generative AI outputs is a hotly debated legal question. Indeed, as Plaintiffs recognize, just two weeks ago, the United States Copyright Office released a fifty-two-page report providing guidance on this issue because of its novelty and complexity. *See Copyright Office Releases Part 2 of Artificial Intelligence Report*, U.S. Copyright Office, (Jan. 29, 2025). Requests for admission are not a discovery tool—let alone a method for eliciting legal positions—"their sole purpose is to streamline the presentation of evidence at trial." *BAT LLC v. TD Bank, N.A.*, No. 15-cv-5839, 2018 WL 3626428, at *6 (E.D.N.Y. July 30, 2018) (quoting *T. Rowe Price Small-Cap Fund, Inc. v. Oppenheimer & Co.*, 174 F.R.D. 38, 43 (S.D.N.Y. 1997)) (emphasis added).

Although Plaintiffs contend that this Request seeks simple confirmation of "facts that should not be in dispute," not admission of a legal conclusion, this argument fails. Plaintiffs state no facts in this Request. *See T. Rowe Price Small-Cap Fund, Inc. v. Oppenheimer & Co.*, 174 F.R.D. 38, 46 (S.D.N.Y. 1997) (noting that the "basic requirement" for requests to admit is that they "be simple and concise and *state facts* singly, so that they can easily and coherently be admitted or denied.") (emphasis added). While the Rules of Civil Procedure allow a party to seek an application of facts to law, the party making the request must "set forth a 'factual basis to derive the legal conclusion'" and Plaintiffs do no such thing here. *Rodriguez*, 2017 WL 11510163 at *5 (quoting *Petrunich v. Sun Bldg. Sys., Inc.*, No. 04-cv-2234, 2006 WL 2788208, at *5 (M.D. Pa. Sept. 26, 2006)). "Without the inclusion of specific facts and circumstances, [a] legal proposition alone is 'too abstract to derive [a] legal conclusion,' rendering [an] admission improper." *Id.* (quoting *Petrunich*, 2006 WL 2788208, at *5). Here, whether or not Udio "contends" that its outputs are "copyrightable" is a question seeking a bare legal conclusion. *See E.E.O.C. v. Bloomberg L.P.*, No. 07-cv-8383, 2010 WL 3260150, at *1 (S.D.N.Y. Aug. 4, 2010), (noting that "it would be inappropriate for a party to demand that the opposing party ratify legal conclusions"); *Disability Rights Council of Greater Washington v. Washington Metropolitan Area Transit Authority*, 234 F.R.D. 1, 2-5 (D.D.C.2006) *Disability Rights Council of Greater Washington*, 234 F.R.D. at 2-5 (D.D.C.2006) (rejecting Defendant's motion to compel Plaintiffs to respond to RFAs seeking Plaintiffs' view on various provisions of the relevant acts because these RFAs called for legal conclusions); *id.* at 3 (noting that though Rule 36 allows for requests "applying law to fact … It is still true, however, that one party cannot demand that the other party admit the truth of a legal conclusion."); *Raviv v. Mirror Biologics, Inc.*, No. 22-cv-6847, 2024 WL 2798870, at *28 (S.D.N.Y. May 31, 2024) ("Requests for admissions that 'call for legal conclusions' are 'manifest[ ]ly improper[.]'") (internal quotations

# HUESTON HENNIGAN LLP

omitted) (alteration in original) (quoting *In re S.W. Bach & Co.*, No. 07-cv-11569, 2010 WL 681000, at *4 (Bankr. S.D.N.Y. Feb. 24, 2010). This is an improper use of a RFA and should be denied.

Plaintiffs cannot avoid this conclusion by hiding behind semantics. Udio is not a plaintiff in this litigation "asserting" any claim over its AI-generated output. So it is unclear what occasion it would have to "contend" that the outputs of its model are or are not copyrightable.

Compounding the impropriety of Plaintiffs' Request is the lack of relevance between RFA 50 and any claims or defenses in this case. Plaintiffs allege that Udio improperly used their copyrighted sound recordings to *train* its generative AI model. *See* Compl. ¶¶ 98; 107. Whether Udio believes that the outputs users generate through Udio's service are copyrightable has no bearing on whether any alleged training use was a fair use. Plaintiffs are flat wrong that copyright law only seeks to encourage the creation of *copyrightable* content. The purpose of the Copyright Act is to promote the "growth [of] creative expression, based on the dissemination of other creative works and the unprotected ideas contained in those works." *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992), *as amended* (Jan. 6, 1993). Plaintiffs point to no precedent for the notion that a transformative use must result in copyrightable content—and indeed, there are ample *counterexamples*. For example, in *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015), the Second Circuit held that there was "no doubt" Google's use of the plaintiffs' books to create a tool that "allow[ed] readers to learn the frequency of usage of selected words in the aggregate corpus of published books in different historical periods" was a transformative use, despite the fact that there was nothing copyrightable about the information the tool provided. 804 F.3d at 217. Likewise, in *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009), the Fourth Circuit found the defendant's use of the plaintiffs' student papers as inputs to create a digital technological system that detected plagiarism to be a transformative use—even though the output was merely a report indicating what percentage of a student's work might be plagiarized, which surely would not be copyrightable. And Plaintiffs' argument that the RFA is directed at determining whether the outputs of Udio's model are "market substitutes" likewise misses the mark. Udio disputes Plaintiffs' framing of the relevant inquiry under Factor Four of the fair use doctrine (*see supra* at 24-25). But, regardless, whether Udio's outputs might be copyrighted by their creators does not determine whether or not they could compete with the Asserted Works in the marketplace. Thus, even if Udio "admitted" it "did not contend" its outputs are copyrightable—which, again, would be a legal conclusion—such an admission would not be relevant to its fair use defense.

RFA 50 is improper, and Udio should not be compelled to respond. If Plaintiffs believe that AI-generated output is not copyrightable and that legal conclusion has some consequences with respect to any factor of Udio's fair use defense, they are free to brief that legal issue at summary judgment. This is not an appropriate use of a request for admission.

# HUESTON HENNIGAN LLP

Respectfully submitted,


Dated: February 18, 2025


_s/  Moez M. Kaba_
Moez M. Kaba
Mariah N. Rivera
Alexander R. Perry
**HUESTON HENNIGAN LLP**
1 Little West 12th Street
New York, New York 10014
Telephone: (646) 930-4046
Facsimile: (888) 775-0898
mkaba@hueston.com
mrivera@hueston.com
aperry@hueston.com


Robert N. Klieger
Rajan S. Trehan
**HUESTON HENNIGAN LLP**
523 West 6th Street, Suite 400
Los Angeles, California 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898
rklieger@hueston.com
rtrehan@hueston.com

_Counsel for Plaintiffs_

_s/  Brittany N. Lovejoy_
Steven N. Feldman
Nathan Taylor
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
steve.feldman@lw.com
nathan.taylor@lw.com

Andrew M. Gass (_pro hac vice_)
Brittany N. Lovejoy (_pro hac vice_)
**LATHAM & WATKINS LLP**
505 Montgomery Street
Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
andrew.gass@lw.com
brittany.lovejoy@lw.com

Sarang V. Damle
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
sy.damle@lw.com

Alex Spiro
Todd Steven Anten
Jessica Anne Rose
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
51 Madison Avenue
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com
toddanten@quinnemanuel.com

**HUESTON HENNIGAN LLP**

jessicarose@quinnemanuel.com

Andrew H. Schapiro
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
191 N. Wacker Drive
Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401
andrewschapiro@quinnemanuel.com

*Counsel for Defendant Uncharted Labs, Inc., d/b/a Udio.com*