**Brittany N. Lovejoy**
Direct Dial: (415) 646-8329
brittany.lovejoy@lw.com

505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Tel: +1.415.391.0600  Fax: +1.415.395.8095
www.lw.com

# LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

March 4, 2025

**VIA ECF & FEDEX**

Honorable Alvin K. Hellerstein
United States District Judge for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

   Re: *UMG Recordings, Inc. et al. v. Uncharted Labs, Inc. et al.*,
      No. 1:24-cv-04777 (AKH)

Dear Judge Hellerstein:

  Pursuant to Rule 2(E) of this Court's Individual Rules, the parties write jointly to inform the Court of a dispute related to Defendant Uncharted Labs, Inc.'s ("Udio") first set of Requests for Production ("RFPs").

  Udio served these requests on Plaintiffs on September 16, 2024. Plaintiffs served their Responses and Objections on October 16, 2024. Though the parties met and conferred at length via videoconference and by email over the following months,[1] they are at an impasse as to the requests identified below. This dispute is therefore ripe for Court intervention.

## I.  PRELIMINARY STATEMENT

###   A.  Udio's Statement

  Udio is a pioneering AI company that offers a transformative tool for making new music. Udio's tool empowers its users' creativity by leveraging advanced neural network technology and vast amounts of data to derive insights into various musical styles and genres, enabling users to

---

[1] The parties first met and conferred concerning these requests via videoconference on October 22, 2024. Britt Lovejoy, Grace McLaughlin, and Lydia Franzek attended on Udio's behalf, and Rajan Trehan and Alexander Perry attended on Plaintiffs' behalf. Following that meeting, the parties exchanged their positions via email on November 1, 9, and 25, 2024, on January 14, 2025, and on February 5, 2025. Udio served its position statement on Plaintiffs and communicated its intent to move to compel on February 18, 2025. In response, Plaintiffs provided updated position statements with respect to certain requests on February 21, 2025.

**LATHAM&WATKINS**LLP

generate unique and original songs. Developing a tool that promotes artistic, musical expression is a quintessential fair use under copyright doctrine. *See* Answer, Dkt. No. 26, at 4–5. Plaintiffs are a consortium of music labels that likely controls over 75% of the recordings that U.S. consumers stream, purchase, and listen to. Plaintiffs allege that Udio's tool ingested some of their sound recordings during its training process, which they believe constitutes copyright infringement.

Throughout the discovery process, Udio has consistently demonstrated its commitment to advancing this litigation. As part of this commitment, Udio agreed to provide extensive discovery, including allowing Plaintiffs to inspect its source code and training data. These data are among the most sensitive documents in Udio's possession and are highly sought after by Udio's competitors, as they are central to the development and operation of Udio's AI music generation tool. Udio nevertheless granted Plaintiffs access to this information in order to move this case forward. But despite Udio's willingness to engage in comprehensive discovery, Plaintiffs continue to stonewall Udio's efforts to obtain the most basic and essential discovery related to the works Plaintiffs claim are infringed.

Udio's discovery requests seek to obtain basic information regarding Plaintiffs' Asserted Works, which are identified in an Exhibit attached to Plaintiffs' Complaint. *See* Dkt. No. 9-1. Though Plaintiffs have agreed to provide some of the information Udio has requested, they have refused to provide responsive documents concerning the deposit copies of all of Plaintiffs' Asserted Works and agreements establishing Plaintiffs' ownership of Asserted Works that are works made for hire. This information is crucial for determining (1) whether Plaintiffs own the works at the heart of their copyright case, and (2) what those works consist of. Given the relevance and necessity of this information, Udio respectfully requests that the Court grant its motion to compel and require Plaintiffs to produce the requested information about the works-in-suit.

  **B.**  **Plaintiffs' Statement**

Defendant Uncharted Labs, Inc. ("Defendant" or "Udio") operates an AI-powered music generation service that generates audio files in response to plain English text prompts entered by its users. Plaintiffs UMG Recordings, Inc. and Capitol Records, LLC (collectively "UMG"); Sony Music Entertainment, Arista Music, and Arista Records LLC (collectively "Sony"); Atlantic Recording Corporation, Rhino Entertainment Company, Warner Music Inc., Warner Music International Services Limited, Warner Records Inc., Warner Records LLC, and Warner Records/SIRE Ventures LLC (collectively "Warner," and together with UMG and Sony, "Plaintiffs"), are record companies that, together, own or exclusively control copyrights in a great majority of the most commercially valuable sound recordings in the world. In developing the AI model that powers its service, Udio made unauthorized copies of an untold number of Plaintiffs' copyrighted sound recordings and used them to train its AI model to create audio outputs that compete with the sound recordings on which it trained. The core issue presented in this case is whether Udio's predication of its competing business on extensive copying of Plaintiffs' protected sound recordings qualifies as fair use.

Try as Udio may to deflect the focus from its own conduct, this litigation is about what Udio has done (and continues to do) with Plaintiffs' copyrighted sound recordings. Though there

is no serious question that Plaintiffs own or exclusively control the asserted works, Udio misstates the relevant law and portrays Plaintiffs as evading their obligation to establish ownership. This is false. Plaintiffs have, in fact, agreed to produce all of the information necessary to satisfy their burden to prove that they own the works that currently form the basis of their copyright infringement claims, including copyright registration, index, and certain chain-of-title information for the 1,670 copyrighted sound recordings alleged in the operative Complaint. Beyond this, Udio demands two unnecessary categories of discovery: (1) deposit copies of every asserted work; and (2) the agreements associated with any copyrighted sound recording registered as a work for hire. As described below, these requests are unnecessary, unduly burdensome, and disproportionate to the needs of the case, especially considering the ownership information Plaintiffs already agreed to produce.

Plaintiffs allege infringement on an immense scale, based on Udio's indiscriminate copying of perhaps the entirety of Plaintiffs' catalogs of protected sound recordings. Udio's demand for additional, unnecessary ownership discovery suggests that Udio envisions conducting a host of mini trials into whether Plaintiffs, in fact, own or exclusively control every asserted work it allegedly infringed. This is impractical and unnecessary. Udio already admitted that it trained on Plaintiffs' sound recordings and that Plaintiffs own a significant majority of the recordings that U.S. consumers listen to today. *See* Answer at 9 ("[T]he many recordings that Udio's model trained on presumably included recordings whose rights are owned by the Plaintiffs in this case."); *see also id.* at 5 (noting that Plaintiffs collectively "likely control[ ] well over 75% of the recordings that U.S. consumers tend to listen to today."). As Udio's admissions establish, this case will not boil down to whether Plaintiffs own this or that particular sound recording. Yet, as a diversion to distract from the central issues in this case, Udio seeks discovery in preparation for a fishing expedition into ownership deficiencies regarding a subset of the numerous asserted works that are (and may be) asserted in this case. Udio's demand for additional ownership discovery is a sideshow designed to frustrate Plaintiffs' pursuit of their claims.

The true scope of Udio's infringement is imminently set to come to light, once Plaintiffs have an opportunity to inspect Udio's training data and identify the torrent of copyrighted works they unlawfully exploited. In the meantime, Plaintiffs have agreed to produce all the evidence required to establish their ownership of the 1,670 works presently asserted in the Complaint. Because the remainder of what Udio seeks is unnecessary and disproportionate to the needs of the case, the Court should deny Udio's motion to compel.

## II.   DISCUSSION

### A.   Udio's Statement

Udio seeks foundational discovery regarding the "Asserted Works"—i.e., the discrete works Plaintiffs asserted in this litigation, which are detailed in an Exhibit attached to Plaintiffs' Complaint, *see* Dkt. No. 9-1 (listing each Asserted Work)—in order to establish that Plaintiffs own those works and to confirm what those works consist of. Udio first served these RFPs in September 2024. *See* Ex. A at 9 (Udio's RFPs). In their responses and objections, during the parties' subsequent meet and confer, and in subsequent email communications, Plaintiffs repeatedly refused to respond to the RFPs as written. Not only did Plaintiffs take the position that they should

be permitted to delay their production of ownership-related information until after they had an opportunity to inspect Udio's training data in an attempt to discover additional works, they also refused to produce certain categories of information Udio sought. *See, e.g.*, Ex. B at 1, 3 (A. Perry Nov. 25 email) (refusing to produce deposit copies, chain-of-title information, documents to show the dates of publication, or indexes for pre-1972 works). Accordingly, on February 18, pursuant to Rule 2(E) of this Court's Individual Rules, Udio sent Plaintiffs a motion to compel discovery on five disputed RFPs, which Udio anticipated filing with the Court after Plaintiffs inserted their arguments. *See* Exs. C & D (L. Franzek Feb. 18 email & Udio's Feb. 18 Letter Brief). Instead, on February 21, Plaintiffs made an about-face and agreed to produce documents responsive to a number of Udio's requests, including copyright registrations and indexes, thus mooting several of the disputes. *See* Ex. E at 1–2 (A. Perry Feb. 21 email).[2] Notably, Plaintiffs did so only after Udio had spent considerable resources and effort drafting its motion to compel. Thus, to the extent any party has "prolonged discovery . . . by commencing negotiations with flatly unreasonable positions only to later walk them back," *see* Pls.' Stmt at 9 n.8, it is Plaintiffs.

Notwithstanding this belated progress, Plaintiffs still refuse to produce the deposit copies for their Asserted Works or agreements that establish their ownership of Asserted Works whose registration information identifies them as works made for hire.[3] Plaintiffs' refusal is inconsistent with the burden they bear as copyright plaintiffs and should be rejected.

### 1. Deposit Copies

Plaintiffs have alleged that Udio infringed their copyright rights in the specific works identified in Exhibit A of their Complaint. *See* Dkt. No. 9-1. To establish infringement, Plaintiffs bear the prima facie burden of proving, for each of the works at issue, "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). As one court in this District has put it, "[a] party alleging copyright infringement always has to prove that he owns the copyright he is asserting, it is an element of his claim!" *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 80 F. Supp. 3d 535, 543 (S.D.N.Y. 2015) (emphasis added); *see also, e.g., Kwan v. Schlein*, No. 05-cv-459, 2009 WL 10678967, at *3 (S.D.N.Y. Apr. 23, 2009) ("*Of course, an infringement claimant must first prove that she owns the copyright*, that the defendant does not own the copyright, and that the defendant infringed on her copyright." (emphasis added)).

In order to determine whether Plaintiffs own any particular sound recording that they may find in Udio's training data, it is necessary to compare that alleged copy against the copyright-registered versions of Plaintiffs' Asserted Works, as reflected in their respective deposit copies—

---

[2] Plaintiffs have stated, as to several RFPs, that they do not waive any objections "with respect to Plaintiffs' production obligations after the list of asserted works grows." *See* Ex. E at 1. To be clear, Plaintiffs' obligation to provide basic discovery concerning their prima facie claims does not depend on the number of works they assert. If Plaintiffs decide to assert additional works, Udio is entitled to ownership information as to those works.

[3] Plaintiffs have agreed to produce chain-of-title information for the pre-1972 Asserted Works and the post-1972 Asserted Works for which the copyright registration does not identify Plaintiffs as an author or owner of the work. *See* Ex. E. Udio's request for work-for-hire agreements is accordingly limited to the Asserted Works for which Plaintiffs are listed as an author or owner on the registration but that are listed as works for hire.

4

i.e., the recordings submitted to the U.S. Copyright Office when the works were registered. *Cf. Structured Asset Sales, LLC v. Sheeran*, 120 F.4th 1066, 1075 (2d Cir. 2024) (affirming the district court's exclusion of evidence about anything outside "the four corners of the Deposit Copy"); *Morisky v. MMAS Research LLC*, No. 21-cv-1301, 2024 WL 4136492, at *8 (W.D. Wash. Aug. 20, 2024) (ordering production of deposit copy, finding that "[w]ithout providing the required discovery related to the copyright deposit and source code, [party] should not be permitted to purs[u]e copyright infringement claims and defenses").

Contrary to Plaintiffs' briefing, the import of deposit copies is not limited to litigation under the Copyright Act of 1909. Though a deposit copy may not be required for copyright *protection* to attach under later versions of the Act, it is still required for a copyright plaintiff to *bring suit*, and is necessary for a copyright defendant to *ascertain what the plaintiff has registered, and how it might compare to an allegedly infringing work.* As the Second Circuit explains in *Structured Asset Sales*, "[o]ne cannot fairly be liable for infringement without the ability to understand the contours of a prior creator's rights. That is why the 'deposit (and accompanying registration) requirement was *(as it still is)* a condition precedent to the right to bring an infringement action.'" 120 F.4th at 1075 (quoting 2 Nimmer on Copyright § 7.16 [A][2][b] (2024)) (emphasis added). Udio is not seeking deposit copies to determine whether the asserted works are "protectable." Udio seeks deposit copies in order to determine what actual sound recordings Plaintiffs have registered with the Copyright Office, and how those recordings compare with any audio file in Udio's training data that Plaintiffs may argue reflects an unlawful "copy" of their Asserted Works. Indeed, it is quite possible that there are multiple sound recordings associated with a particular musical work that are owned by different rightsholders.[4] Deposit copies will identify the particular works actually at issue in this litigation.

Rather than produce their deposit copies, Plaintiffs instead propose that Udio use identifying metadata, such as International Standard Recording Code ("ISRC") codes, to itself locate publicly available copies of Plaintiffs' Asserted Works. What then? Are Plaintiffs proposing that Udio purchase those works for production into the record in this case—in lieu of Plaintiffs simply producing the deposit copies that are in their possession or that they can request from the Copyright Office? And why should Udio have to take label representatives at their word that the sound recordings they released to the public are one and the same as those submitted to the Copyright Office? Discovery into basic information concerning whether Plaintiffs own the works at the basis of their copyright case—and even more critically, *what those works are*—should not be controversial: ownership of the Asserted Works is one of two elements Plaintiffs must

---

[4] Taylor Swift's recent re-recording of her prior catalog in order to create recordings that she owns is illuminating. While there is just one copyright registration for the composition of her song "Love Story," for example (that is, the musical arrangement and lyrics), the original recording of the song from the album "Fearless" is owned by Shamrock Holdings, whereas the more recently released "Love Story (Taylor's Version)" is owned by Taylor Swift. Thus, Shamrock Holdings may have rights in one version of "Love Story" but not in another, similar-sounding recording by the same artist. Like Shamrock Holdings, Plaintiffs here hold the rights to some recordings but may not hold the rights to similar-sounding recordings of the same compositions. Plaintiffs contend Audible Magic is technically equipped to identify such sound recordings as distinct, but that does not address Udio's fundamental concern: it does not know what sound recordings Plaintiffs provided to Audible Magic and whether they differ from those Plaintiffs deposited with the Copyright Office. Nor is the reliability of Audible Magic's matching technology—about which there are presently no facts in the record—a foregone conclusion.

5

**LATHAM&WATKINS**LLP

establish in their prima facie case, and Udio is entitled to documents that would tend to prove or disprove that element.

Moreover, insofar as Plaintiffs are suggesting that metadata will itself provide a sufficient basis for establishing that a particular audio file in Udio's training data belongs to Plaintiffs, Plaintiffs' counsel argued the exact opposite in the context of justifying their demand to share Udio's training data with the third-party Audible Magic for identification. In the context of that dispute before the Special Master, Plaintiffs represented that *"metadata is not a reliable means of ascertaining the ownership of a particular sound recording because it may be incomplete, incorrect, or unreliable. And metadata can be created and attached to an audio file by a third party, some of whom may have an incentive to mislabel or mislead."* Ex. F at 1 (A. Perry Jan. 21, 2025 email). "For those reasons," Plaintiffs' counsel correctly "presume[d] that Udio would refuse to stipulate that it copied a recording based on its metadata alone." *Id. Having argued the insufficiency of metadata as a means of proof when convenient to them*, Plaintiffs cannot expect Udio to accept it as a means of identification in place of Plaintiffs' actual deposit copies.[5]

Indeed, Plaintiffs have made clear that they intend to use Audible Magic, a content identification program, to determine whether works in Udio's training data match works they purportedly own. Yet Audible Magic is a third-party entity whose process and methodology are, at this point, a black box. Without access to deposit copies, Udio has no way to confirm what sound recordings have been provided to Audible Magic or whether those recordings are the same "versions" as the ones Plaintiffs submitted to the Copyright Office alongside their registration applications—again, Udio should not have to simply take Plaintiffs' representatives at their word. Because the deposit copies of the Asserted Works define the scope of Plaintiffs' ownership, Plaintiffs need to establish, and Udio needs to be able to test, that the deposit copies—and not some other recordings or versions of the works—are identical to works in Udio's training data. Accordingly, Plaintiffs must produce deposit copies of their Asserted Works. *See Ferdman v. CBS Interactive, Inc.*, 342 F. Supp. 3d 515, 525–29 (S.D.N.Y. 2018) (ordering sanctions when the plaintiff repeatedly refused to produce deposit copies); *see also Antonick v. Elec. Arts, Inc.*, 841 F.3d 1062, 1066 (9th Cir. 2016) (affirming district court decision that "[t]he jury [] could not compare the works to determine substantial similarity" because the works that were purportedly infringed were not in evidence).

Plaintiffs argue that *UMG Recordings, Inc. v. Grande Communications Networks, L.L.C.*, 118 F.4th 697 (5th Cir. 2024) supports their refusal to produce deposit copies. Yet *Grande* concerned an entirely different issue. There, a copyright defendant filed a post-trial renewed motion for judgment as a matter of law, arguing that proving infringement requires "a side-by-side comparison" of the works asserted and the allegedly infringing works and that the plaintiffs had

---

[5] Plaintiffs, relying on two cases, argue that deposit copies are not "the only way" "for a copyright plaintiff to satisfy its burden of proof." *See* Pls.' Stmt at 11. Neither case is at all analogous. In *Ross-Nash v. Almond*, No. 19-cv-957, 2020 WL 6947691 (D. Nev. Oct. 28, 2020), the defendant admitted that she owned and copied an "original and authentic" copy of Red Thread (the book at issue), and there was "no genuine dispute that Red Thread [was] the work that [she] copied." *Id.* at *2. Here, in contrast, Udio has made no such admission. *United States v. Cassim*, 693 F. Supp. 2d 697 (S.D. Tex. 2010), meanwhile, was a criminal conspiracy case, and, on that basis, the court declined to adopt the Defendant's "extremely well-articulated and thoughtful argument as to the insufficiency of the Government's evidence," reasoning that "the holdings related to civil enforcement of copyright law are inapplicable." *Id.* at 703.

6

not met their burden through witness testimony identifying the plaintiffs' works and Audible Magic results. *Id.* at 709. The Fifth Circuit rejected this argument, holding that the jury was "entitled to rely" on the plaintiffs' evidence. *Id.* at 710. But the issue currently before this Court is not whether evidence that the Plaintiffs have *already* presented to a jury is sufficient to prove their claims. Rather, the issue is what discovery Udio is entitled to as "relevant" to Plaintiffs' claims or Udio's defenses. *See* Fed. R. Civ. P. 26(b)(1); *cf. Lyons v. N.Y. Life Ins. Co.*, No. 20-cv-3120, 2021 WL 1405602, at *2 (S.D.N.Y. Apr. 14, 2021) (noting Rule 26's "obviously broad standard for discoverable evidence" (citation omitted)). Regardless of whether Plaintiffs can or cannot satisfy their prima facie burden in this case without putting their deposit copies in the record, surely those records are "relevant" to the claims and defenses in this case. And a review of the district court docket in *Grande* makes clear that the defendant never sought to compel production of deposit copies. *Grande* thus provides no insight at all into how the Fifth Circuit or any other court would assess a discovery request seeking this information.

Finally, Plaintiffs claim that producing deposit copies would be an "immense burden." *See* Pls.' Stmt at 14. As an initial matter, Plaintiffs have not explained why they cannot satisfy their discovery obligations by simply requesting their deposit copies from the Copyright Office. *See* Ex. G (U.S. Copyright Office, Circular 6: Obtaining Access to and Copies of Copyright Office Records and Deposits (2019)); *see also, e.g.*, *Ferdman*, 342 F. Supp. 3d at 528 (critiquing the plaintiff for not explaining "why [he] did not produce the [deposit copies the defendant sought] during discovery," including after "represent[ing] that he did not have a copy of what was submitted to the Copyright Office"). Moreover, Plaintiffs do not explain how or why production of this basic information would be *unduly* burdensome when balanced against the criticality of the information to the case. Having brought this action, Plaintiffs have an affirmative obligation to produce identifying information regarding the Asserted Works, *including* the deposit copies that establish what they have registered with the Copyright Office and what the Asserted Works actually consist of.

### 2. Works Made for Hire

Plaintiffs also oppose Udio's request for artist-label agreements for Asserted Works where the copyright registration identifies the work as a work "made for hire."

Initially, Plaintiffs refused to provide Udio with any chain-of-title or related information for *any* Asserted Work—Plaintiffs offered only certificates of registration or "a sworn declaration by an individual with knowledge attesting to ownership of the work." Ex. B at 3–4. Plaintiffs recently agreed to provide chain-of-title documentation, but only for pre-1972 works and post-1972 works in which Plaintiffs *do not* appear on the registration. *See* Ex. E at 1–2. Plaintiffs' chain-of-title compromise would not provide any information regarding Asserted Works in which Plaintiffs *are* listed as owners or authors on the registration *but* which the registration makes clear are works made for hire—that is, works have been authored by another party under contract with Plaintiffs. After Udio served its motion to compel, Plaintiffs proposed an "illustrative sampling approach," by which Plaintiffs would produce work-for-hire agreements for 10% of the Asserted Works, with Udio selecting 5% of the sound recordings and Plaintiffs selecting the other 5%. *See* Ex. H at 1 (A. Perry Feb. 26 email). But Plaintiffs have not produced the copyright registrations that would allow Udio to assess how many of Plaintiffs' Asserted Works are registered as works

LATHAM&WATKINS LLP

for hire—a fact critical for Udio to meaningfully assess the necessity and appropriateness of Plaintiffs' proposed sampling approach.

The artist-label agreements Udio seeks are necessary to test whether works in this category were created by an employee of Plaintiffs or were "specially commissioned" works, which are the *only* two ways they could properly qualify as works for hire under the Copyright Act. *See* 17 U.S.C. § 101.[6] If the works fall into neither category, then the authors of those works, not Plaintiffs, own those works—and Plaintiffs do not have standing to bring this lawsuit. *In re Napster Inc. Copyright Litigation*, 191 F. Supp. 2d 1087 (N.D. Cal. 2002), provides useful guidance. In that case, the court ordered record label plaintiffs "to produce all documentation relevant to their ownership of the works listed as 'works for hire,'" including contracts between the plaintiffs and artists, for review by a Special Master, after which "the court w[ould] order further discovery as necessary," noting that refusing to permit such discovery would improperly create an irrebuttable presumption in the plaintiff's favor. *Id.* at 1100; *cf. Int'l Media Films, Inc. v. Lucas Ent., Inc.*, 703 F. Supp. 2d 456, 463 (S.D.N.Y. 2010) ("[T]ransferee plaintiff in a copyright infringement action must prove that the copyright was properly transferred to the plaintiff."); *Tapscan, Inc. v. Friberg*, No. 04-cv-696, 2005 WL 8174972, at *2 (ordering the plaintiff to respond to an interrogatory asking to identify "all documents which refer or relate in any way to any transfer, assignment or license of all or any portions of any Omega Software for which you claim you own the copyright"). The same outcome is appropriate here with respect to the Asserted Works that are listed as works made for hire. Moreover, the *Napster* litigation likewise implicated large numbers of sound recordings: at the time of the court's opinion, the plaintiffs had already asserted 213 works, but both the court and the plaintiffs anticipated that the number of works at issue would expand into the thousands. *Napster*, 191 F. Supp. 2d at 1100 n.9. Nevertheless, the *Napster* court held Plaintiffs to their burden, ordering production of "all documentation relevant to the ownership of the works listed as 'works for hire.'" *Id.* at 1100.[7]

---

[6] In fact, a sound recording likely cannot be a "specially commissioned" work under the Copyright Act, since it is not one of the nine types of work specifically enumerated in the Act. *See Napster*, 191 F. Supp. 2d at 1097–98; see also 17. U.S.C. § 101 (enumerating works that may be "work[s] made for hire"); *Ballas v. Tedesco*, 41 F. Supp. 2d 531, 541 (D.N.J. 1999) (finding that sound recordings do not qualify as works for hire under the Copyright Act); *JCW Investments, Inc. v. Novelty, Inc.*, 289 F. Supp. 2d 1023, 1031 n.7 (N.D. Ill. 2003) (noting that a work cannot be a work for hire if it is not made by an employee and does not fall in one of the nine categories of "specially ordered or commissioned works" listed in the Copyright Act); *Bucciarelli-Tieger v. Victory Records, Inc.*, 488 F. Supp. 2d 702, 709 (N.D. Ill. 2007) (finding that, because sound recordings are not on the list of works that can be specially commissioned, "the only way [they] can be a work for hire" is if the author is an employee). Accordingly, the Asserted Works can be considered works for hire only if their authors were Plaintiffs' employees.

[7] Plaintiffs, quoting *Napster*, claim that Udio "does not have standing to challenge the presumption of ownership when Plaintiffs claim ownership by assignment." *See* Pls.' Stmt at 15–16 (quoting *Napster*, 191 F. Supp. 2d at 1097). But in *Napster*, the court rejected the plaintiffs' standing argument, finding that the cases the plaintiffs cited "are more limited than [they] suggest" and that the "third-party standing doctrine does not preclude this court from considering Napster's argument that the Schedule A Works are not 'works for hire.'" *Napster*, 191 F. Supp. 2d at 1097. The same is true here. Plaintiffs' additional cited cases are inapposite and do not change this result. Unlike in those cases, Udio does not attempt to invalidate any transfer of ownership or work-for-hire agreement; rather, Udio seeks the discovery at issue to confirm that Plaintiffs own the asserted works—and can meet their prima facie burden to prove infringement. *See Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 36 (2d Cir. 1982) (rejecting a

8

LATHAM&WATKINS LLP

Plaintiffs have not articulated the burden associated with providing the discovery Udio seeks. Again, the category of works implicated here is a narrow one—Plaintiffs need only produce artist-label agreements for works registered as works made for hire. *Plaintiffs have not yet produced copyright registrations for any of the Asserted Works in this case* and, therefore, Udio cannot meaningfully assess either the necessity for or reasonableness of Plaintiffs' sampling proposal because *Udio does not know how many of the Asserted Works are registered as works made for hire*. Notably, Plaintiffs' brief also does not say—presumably, if the number of works implicated by Udio's request were substantial, Plaintiffs would have said so. And, indeed, Udio's initial investigation suggests that a good number of the Asserted Works were *not* registered as works for hire and can be excluded from the scope of this discovery request. Moreover, the number of artist-label agreements that Plaintiffs need collect is further limited by the fact that a single agreement between a label and artist may cover multiple works, and Plaintiffs' list of Asserted Works implicates fewer than 100 artists total. Plaintiffs cannot force a compromise position on Udio while withholding the facts Udio needs to assess the need for and appropriateness of that compromise.

At bottom, Plaintiffs brought this copyright infringement action on the basis of a discrete number of Asserted Works. Udio is entitled to discovery into what those works are and whether Plaintiffs in fact own them. Udio respectfully requests that the Court compel Plaintiffs to produce deposit copies for all Asserted Works and, for Asserted Works where Plaintiffs are listed as the author or owner of a work, but the copyright registration identifies the work as a "work made for hire," the agreements that establish Plaintiffs' ownership of those works.

### B. Plaintiffs' Statement

Udio's motion to compel is based on the false premise that Plaintiffs seek to shirk their duty to identify and prove they own the asserted works. To the contrary, Plaintiffs have consistently sought to proceed with discovery in an expedient manner that accounts for the tremendous breadth of Udio's infringing conduct (and Udio's attempts to conceal the same).[8] As detailed in the Complaint, the scope of Udio's infringement likely extends orders of magnitude beyond the 1,670 sound recordings that comprise the current list of works in suit. Given their allegations of mass infringement, Plaintiffs initially proposed producing ownership discovery after

---

third-party infringer's attempt to invalidate an oral license between the copyright plaintiff and the licensor); *AMC Film Holdings LLC v. Rosenberg*, No. 03-cv-3835, 2005 WL 2105792, at *5 (E.D.N.Y. Aug. 31, 2005) (same).

[8] Udio characterizes Plaintiffs' initial proposal as designed to delay necessary discovery, while Udio has all the while been "willing[ ] to engage in comprehensive discovery." Udio Statement at 2. This is a caricature of the record, as Udio has persistently prolonged discovery by withholding information that could facilitate progress in discovery negotiations and commencing negotiations with flatly unreasonable positions only to later walk them back. This pattern of evasion started even before Plaintiffs filed suit, when Udio disingenuously told Plaintiffs that their concerns over Udio's extensive unauthorized use of their protected sound recordings were "premised on a highly speculative assumption about the content of Udio's training data." Udio has characteristically backed away from this feeble attempt to conceal its use of Plaintiffs' sound recordings, having since admitted in its Answer that it copied Plaintiffs' works to train its AI model. *See* Answer at 8-10.

9

they fix the universe of asserted works and have a clear sense of the burdens associated with producing such discovery. Udio rejected this proposal.[9]

Since then, Plaintiffs agreed to produce the following information to establish their ownership of the current universe of asserted works:

- Documents from the U.S. Copyright Office reflecting registrations for each of the post-1972 works listed in Exhibit A of the Complaint;

- U.S. copyright indexes for the pre-1972 works listed in Exhibit A of the Complaint;

- Chain-of-title information for the pre-1972 works asserted in Exhibit A of the Complaint, and the post-1972 works asserted in Exhibit A of the Complaint for which the copyright registration does not identify Plaintiffs as an author or owner of the work; and

- Documents sufficient to show that the pre-1972 works asserted in Exhibit A of the Complaint are not in the public domain.

The only remaining areas of dispute relate to Udio's requests seeking (1) deposit copies for every asserted work; and (2) all agreements regarding copyrighted sound recordings registered as works for hire.[10] The Court should deny Udio's motion to compel on both issues.

### 1. Deposit Copies

Udio seeks to compel the production of deposit copies for every asserted work. However, deposit copies are not necessary for Plaintiffs to satisfy their burden of proof, and compelling Plaintiffs to produce them would be unduly burdensome and disproportionate to the needs of the case.

Generally speaking, to register a copyright in a published work, the owner must deposit two copies of the work with the Copyright Office. *See* 17 U.S.C. § 408(b)(2); *see also* 37 C.F.R.

---

[9] To be clear, Plaintiffs never "refused to produce . . . foundational information" regarding the works they assert in the Complaint. Udio Statement at 4. Since the beginning of discovery negotiations, Plaintiffs maintained that they would produce all documents required to demonstrate ownership of the works asserted in the Complaint. *See, e.g.*, Ex. C ("The appropriate course is for Plaintiffs to produce information concerning ownership of the asserted works all at once, which will only be possible after Udio produces the training data that Plaintiffs have repeatedly requested."). There was only ever a question of timing as to the works presently asserted.

[10] Since the inception of this litigation, Plaintiffs have indicated their expectation that the universe of asserted works will dramatically expand once they inspect Udio's training data and shine light on the full scope of Udio's infringement. As Plaintiffs are not yet certain as to the number of asserted works they will add when they amend their complaint, they are not presently in a position to assess the burden associated with producing all of the materials Udio is requesting for all of the works that may ultimately be asserted in this case. Accordingly, Plaintiffs agree to meet and confer following their anticipated amendment to their pleadings to discuss a workable approach to ownership discovery that is proportional to the needs of the case.

§ 202.20(c).[11] To obtain a copyright registration for a sound recording, a rightsholder must deposit the recording with the Copyright Office in either a physical medium (*e.g.*, in the form of CDs or vinyl records) or a digital medium.[12]

Udio's motion centers on its contention that a close analysis of the actual deposit copies submitted to the Copyright Office is the only way to establish that the sound recordings Udio copied for inclusion in its training data are substantially similar to those owned by Plaintiffs. *See* Udio Statement at 4. Udio is simply incorrect as a matter of law. While introducing deposit copies is certainly one way for a copyright plaintiff to satisfy its burden of proof, it is not the *only* way. *See, e.g.*, *Ross-Nash v. Almond*, 2020 WL 6947691, at *2 (D. Nev. Oct. 28, 2020) (rejecting argument that plaintiffs needed deposit copy because "the lack of a . . . copy [of the infringed work] is not dispositive because there is direct evidence of copying in this case"); *United States v. Cassim*, 693 F. Supp. 2d 697, 703 (S.D. Tex. 2010) ("[T]he Court cannot conclude that the Government's decision not to present the recordings deposited with the United States Copyright Office renders its evidence of Registration legally insufficient or inadmissible."). And Udio is also wrong that deposit copies define the metes and bounds of copyrighted works under the Copyright Act of 1976. While Udio cites *Structured Asset Sales, LLC v. Sheeran*, 120 F.4th 1066, 1075 (2d Cir. 2024), to suggest that a copyright emanates from the deposit copy, that case involved a work protected under the Copyright Act of 1909, which did require depositing a work with the Copyright Office to generate a protectable copyright. This is not the case under the 1976 Act, which expressly provides that a work is entitled to copyright protection "upon fixation . . . in a tangible medium . . . meaning mandatory deposit remains unnecessary to gain copyright." *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1233 (D.C. Cir. 2023); *see also Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 275 (2020) ("Unlike other forms of intellectual property, copyright protection is both instant and automatic. It vests as soon as a work is captured in a tangible form, triggering a panoply of exclusive rights that can last over a century.").

Moreover, this case is nothing like *Structured Asset Sales*, in which there was an actual question about whether Ed Sheeran's "Thinking Out Loud" was sufficiently similar to Marvin Gaye's "Let's Get it On," such that the former infringed the latter's copyrighted musical composition. 120 F.4th at 1075. In that case, the two songs at issue had such manifest differences, including with respect to melody, lyrics, and overall feel, that substantial similarity was a determinative issue in the case. *Id.* at 1081. But here, Plaintiffs allege systematic direct copying based on Udio's scraping of Plaintiffs' sound recordings from commercially available sources. In these circumstances, there is no need to engage in an involved "substantial similarity analysis" because we will know beyond doubt what sound recordings Udio scraped and from where. *See Jackson v. Odenat*, 9 F. Supp. 3d 342, 352 (S.D.N.Y. 2014) ("Plaintiffs only need to show substantial similarity when there is no evidence of actual direct copying"); *see also Range Rd. Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148, 1154 (9th Cir. 2012) ("A showing of 'substantial similarity' is irrelevant in a case like this one, in which the Music Companies produced

---

[11] There is no deposit copy requirement for pre-1972 sound recordings. *See* 17 U.S.C. § 1401(f)(5) (outlining requirement that a rights holder file with the Copyright Office "a schedule that specifies the title, artist, and rights owner of the sound recording . . .").

[12] *See* Copyright Registration for Sound Recordings, Circular 56 (Mar. 2021), https://www.copyright.gov/circs/circ56.pdf.

evidence that the public performances entailed direct copying of copyrighted works.") (internal footnote omitted).[13]

In the case of copyrighted sound recordings, the face of the registrations themselves may contain sufficient identifying information to allow the public to identify the copyrighted work. For instance, UMG often obtains and includes in their registrations an International Standard Recording Code ("ISRC"), a Universal Product Code ("UPC"), and/or a unique Catalog Number corresponding to the registered work. Declaration of Tegan Kossowicz ("Kossowicz Decl.") at ¶ 4; *see also* Ex. I (Copyright Registration for Nirvana listing the Catalog Number). "ISRC is a standard identifying code that can be used to identify sound recordings and music video recordings so that each such recording can be referred to uniquely and unambiguously." International ISRC Registration Authority, *International Standard Recording Code (ISRC) Handbook* (4th ed. 2021).[14] Similarly, UPC is a standardized product identification system managed by the Global Standards Organization (GS1). *See* GS1, EAN/UPC Barcodes, https://www.gs1.org/standards/barcodes/ean-upc. Consumers can input these identifiers into publicly available databases to find the particular sound recordings reflected in the copyright registrations.[15] Sony too has a practice of including a unique Catalog Number in certain of their copyright registration applications when submitting deposit copies of sound recordings in a physical medium. Declaration of David Castagna ("Castagna Decl.") at ¶ 4; *see also* Ex. J (Copyright Registration for Bruce Springsteen

---

[13] *Morisky v. MMAS Research LLC*, 2024 WL 4136492, at *11–13 (W.D. Wash. May 16, 2024), is similarly inapt. This is a sanctions decision imposing case dispositive sanctions on a defendant for defying multiple discovery orders. The reasoning in this order has no application to this case.

[14] In pointing to the reliability of ISRCs, Udio attempts to paint Plaintiffs as trying to strategically utilize metadata only when it benefits them. *See* Udio Statement at 9. The record belies this assertion. Instead, Plaintiffs' attempts to gather information regarding the metadata associated with Udio's training data reflects a prime example of Udio's withholding of information that could have progressed discovery negotiations. During the parties' negotiations over the training data inspection protocol, Udio urged Plaintiffs to rely on the metadata associated with its training data files to ascertain what sound recordings in the training data set may belong to Plaintiffs. *See* Ex. F at 5 (B. Lovejoy Jan. 16, 2025 Email). When Plaintiffs inquired as to how Udio was able to draw this conclusion regarding the reliability of its metadata, Udio refused to provide any further information "outside the context of a formal discovery dispute." *Id.* at 3–4 (B. Lovejoy Jan. 16, 2025 Email). Plaintiffs rightfully declined to accept Udio's say-so about the veracity of its metadata, blind as its source, provenance, or available fields.

This stands in stark contrast to the ISRCs reflected in certain copyright registrations. Contrary to Udio's assertion, ISRCs are not simply "metadata attached to audio files." Udio Statement at 9. Rather, ISRCs are assigned to particular audio files through an application process that involves, among other things, payment of an application fee. *See* Obtaining Code, International Standard Recording Code, *available at* https://usisrc.org/about/obtaining_code.html. Once assigned, an IRSC remains permanently associated with the particular audio content, and the Copyright Office encourages applicants to include ISRC numbers with registration applications, when applicable. *See* Standard Application Help: Publication/Completion, U.S. Copyright Office ("If your work has an ISRC number, give it in the space provided."), *available at* https://www.copyright.gov/eco/help-publication.html. Moreover, an ISRC can be permanently encoded into a product, and most music streaming services require an ISRC be included with a recording for it to be included on their platforms. *See* Frequently Asked Questions, International ISRC Database, *available at* https://isrcsearch.ifpi.org/. ISRC numbers are thus eminently more reliable than whatever "unspecified metadata of unknown veracity" Udio plans to make available with its training data. *See* Ex. F at 1 (A. Perry Jan. 21, 2025 Email).

[15] *See, e.g.*, International Federation of the Phonographic Industry, International ISRC Database, *available at* https://isrcsearch.ifpi.org/; Barcode Lookup (searchable UPC database), *available at* https://www.barcodelookup.com/api; Discogs (searchable Catalog Number database), *available at* https://www.discogs.com/search/advanced.

listing Catalog Number). And Warner has filed copyright registrations that include excerpted UPCs. Declaration of Jennifer Romeo ("Romeo Decl.") ¶ 4. The point here is simply that Plaintiffs need not introduce the deposit copies into the record to establish the identity of the asserted works, when Udio can simply reference any number of publicly available sources (including, presumably, the source from which it accessed Plaintiffs' works when compiling its training dataset) to achieve this end.

But even without this unique identifying information, Plaintiffs will be able to identify the sound recordings they own within Udio's training data with precision. As a matter of course, Plaintiffs submit the same sound recordings to the Copyright Office that are commercially released to the public. *See* Kossowicz Decl. ¶ 3; Castagna Decl. ¶ 3; Romeo Decl. ¶ 3. Thus, Plaintiffs will be able to establish that the official versions of the asserted sound recordings available on, for instance, Youtube or Spotify are, in fact, the same sound recordings they own and deposited with the Copyright Office.

Plaintiffs also plan to use industry-standard audio fingerprinting technology from Audible Magic to confirm which sound recordings in Udio's training data belong to them. Audible Magic's technology works by "tak[ing] audio 'fingerprints'" of sound files "and compar[ing] them to a database of copyrighted content provided by copyright holders." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1012 (9th Cir. 2013); *see also Arista Records LLC v. Lime Wire LLC*, 06 Civ. 05936 (KMW), 2010 WL 10031251, at *6 (S.D.N.Y. Aug. 9, 2010) (defining "Fingerprinting Technology," which is "available from commercial vendors such as Audible Magic," as "the most effective available means of content-recognition filtering based on recognizing the unique content of an underlying audio-visual work and detecting and preventing copying of that content"). Plaintiffs systematically ensure that the sound recordings they upload to Audible Magic's content database are the same sound recordings they deposited with the Copyright Office. *See* Declaration of Kim Beauchamp ("Beauchamp Decl.") ¶ 6; Declaration of Dong Jang ("Jang Decl.") ¶ 6; Declaration of Courtney-Anne Duchardt ("Duchardt Decl.") ¶ 5.

In short, Plaintiffs will be able to satisfy their burden of proof on ownership and direct copying by establishing that (1) the sound recordings they deposit with the Copyright Office are the same sound recordings they release for commercial consumption; (2) the sound recordings they commercially release are the same sound recordings they provide to Audible Magic; and (3) Audible Magic can match audio files in Udio's training data to Plaintiffs' sound recordings. Thus, Plaintiffs have a complete evidentiary chain linking the copyrighted sound recordings they deposited with the Copyright Office to the audio files in Udio's training data.

This is not a novel means of proving ownership and copying in a mass copyright infringement case involving sound recordings. *See, e.g.*, *UMG Recording, Inc. v. Escape Media Group, Inc.*, No. 11 Civ. 8407, 2014 WL 5089743, at *15, 17 (S.D.N.Y. Sept. 29, 2014) ("Audible Magic's methods of analysis are not a secret and have been relied upon in various similar copyright litigations."). For instance, in *UMG Recordings, Inc. v. Grande Communications Networks, L.L.C.*, a mass infringement defendant sought to overturn an adverse jury verdict by arguing that "because Plaintiffs did not introduce the copyrighted songs at issue into evidence, the jury could not conduct a side-by-side comparison of the works, and thus could not find that the allegedly infringing works were substantially similar to the works owned by Plaintiffs." 118 F.4th 697, 709

13

(5th Cir. 2024). The Fifth Circuit rejected this argument, explaining that even though Plaintiffs did not put the deposit copies into evidence, "Plaintiffs introduced extensive, forensically reliable evidence proving that the files . . . downloaded were exact copies of Plaintiffs' sound recordings" and "[t]he jury was entitled to rely on the record generated by Audible Magic, which themselves evinced a 'side-by-side comparison' between Plaintiffs' copyrighted sound recordings and [the infringing] downloads." *Id.* at 710.[16]

Udio attempts to gin up confusion regarding the possibility that there may be multiple variations of sound recordings embodying the same musical composition. This is a red herring. The Copyright Act defines sound recordings as "works that result from the fixation of a series of musical, spoken, or other sounds," and endows sound recording rightsholders with the exclusive "right to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality." 17 U.S.C. §§ 101, 114(b). This means that remasters, remixes, or other reproductions of the *same* sound recording would all be encompassed within a singular copyright registration. Udio cites the example of Taylor Swift re-recording her own musical compositions, which is an example of an entirely new fixation of musical sounds that is entitled to a distinct sound recording copyright than the original recording. But this is precisely the value of Audible Magic, whose fingerprinting technology can identify distinct sound recordings. Plaintiffs will introduce evidence that will leave no question that the sound recordings found within Udio's training data are matches to their own copyrighted works.

Besides being unnecessary, collecting and producing deposit copies poses an immense burden. Plaintiffs do not maintain deposit copies for every copyrighted sound recording they own (a measure rendered unnecessary by Plaintiffs' uniform practice of commercially releasing the same sound recordings they register with the Copyright Office). Moreover, neither UMG nor Warner store in their offices deposit copies for the copyrighted sound recordings they submitted to the Copyright Office in physical form. *See* Kossowicz Decl. ¶¶ 5–6; Romeo Decl. ¶ 5. While UMG does store physical copies of submitted sound recordings, these deposit copies are stored in off-site vaults that are not organized in a manner conducive to searching. Kossowicz Decl. at ¶¶ 5–6. UMG does not have, for instance, a central repository or catalog to indicate which deposit copies may be located at the off-site vault and searching for any particular deposit copy would likely entail manually searching through tens of thousands of uncategorized boxes of archival records, without knowing for certain whether the deposit copy exists in that location. *Id.* ¶ 6. Similarly for Sony and Warner, retrieving and searching for physical deposit copies would be a manual process that would entail a significant burden. Castagna Decl. ¶ 5; Romeo Decl. ¶ 5. In any event, even if Plaintiffs were to locate copies of the versions of sound recordings in suit they deposited with the Copyright Office, they would simply provide a copy of the same recording that is commercially available. Kossowicz Decl. ¶ 6; Castagna Decl. ¶ 5.

---

[16] Plaintiffs in that case also introduced into the record testimony from an employee of the Recording Industry Association of America who stated that "he has used Audible Magic 'millions of times' to determine whether digital files downloaded from many different sources online are actual copies of Plaintiffs' sound recordings in Audible Magic's database. In all that use, Audible Magic never made a mistake in identifying the contents of a digital file." *Grande Commc'ns*, 118 F.4th at 709 n.7. Underscoring the point, "one of Plaintiffs' experts offered unrebutted testimony that Audible Magic's error rate in identifying the contents of digital audio files is approximately one in three billion." *Id.*

Udio posits that Plaintiffs can simply request deposit copies from the Copyright Office directly. *See* Udio Statement at 7. But the Copyright Office Circular that Udio cites regarding deposit copies makes clear that the "Copyright Office does not retain all works deposited for copyright registration." Ex. G at 3; *see also id.* ("If you request a reproduction of a deposit not retained under the Control of the Copyright Office, the Office will inform you of this fact."). And with respect to sound recordings, specifically, the Copyright Office Circular notes that if "you request a reproduction of a phonorecord, such as an audiotape, cassette, CD, or diskette, in which . . . a sound recording . . . is embodied, the Copyright Office will provide *proximate reproduction*" of the work and that "[b]ecause of the characteristics of available sound reproduction, all frequencies contained in the original phonorecord may not be reproduced." *Id.* In other words, even the Copyright Office would have to make a replica of the physical deposit copy upon request, which is no different than what Plaintiffs have made commercially available. *See* Kossowicz Decl. ¶ 3; Castagna Decl. ¶ 3; Romeo Decl. ¶ 3. Furthermore, in response to such requests, the "Copyright Office will provide the title and the registration number of the phonorecord," which is information Plaintiffs have already provided to Udio. *Id.*

At bottom, Udio's demand that Plaintiffs produce deposit copies for all of their asserted works is unnecessary, unduly burdensome, and entirely disproportionate to the needs of the case. Because Plaintiffs have clear means to satisfy their burden of proof of ownership and substantial similarity, the Court should deny Udio's motion to compel production of deposit copies.

### 2. Agreements Pertaining to Registered Works for Hire

Udio also requests that Plaintiffs produce all contracts evidencing their ownership of any asserted work registered as a work for hire that lists Plaintiffs as an owner or author. Given the chain of title information Plaintiffs already agreed to produce, there is no additional benefit to forcing Plaintiffs to collect and produce a suite of agreements that are unlikely to possess evidentiary value. Nevertheless, in an effort at compromise, Plaintiffs have offered an illustrative sampling approach pursuant to which Plaintiffs would produce agreements with provisions pertaining to sound recordings registered as works for hire for approximately 10% of the asserted works currently listed in Exhibit A. Under Plaintiffs' proposal, Udio would identify half of the sound recordings for which Plaintiffs would produce such materials and Plaintiffs would select the remainder.[17] Plaintiffs explained during conferral that there will be substantial similarities among the relevant provisions of these agreements, including clauses that ensure that all rights in the work remain with the commissioning party. If, after Plaintiffs produce this sample, Udio identifies any further issues that might warrant a broader production, Plaintiffs offered to meet and confer on such issues.

This proposal is tailored to the needs of the case. As noted above, Plaintiffs already agreed to produce chain of title information for any sound recordings with copyright registrations that do not reflect one of the Plaintiff entities as the author. Accordingly, Udio will have documents evidencing how Plaintiffs came into possession of any sound recordings originally registered under

---

[17] Plaintiffs envision this process taking place after they produce the copyright registrations such that Udio will be able to identify the works that fall into this category. Pursuant to this sampling proposal Plaintiffs would produce agreements associated with up to approximately 167 of the current list of asserted works (that is, 10% of 1,670).

15

another owner.  Plaintiffs also agreed to produce chain of title information for all pre-1972 sound recordings.  Thus, the area in dispute is relatively narrow: agreements related to sound recordings designated as works for hire with registrations indicating that Plaintiffs are the owner or author the work.  This is a category of information that is exceedingly unlikely to bear relevance to this dispute.

Possession of a certificate of registration made within five years after first publication of the copyrighted work provides its holder with a rebuttable presumption of ownership of a valid copyright, as well as a rebuttable presumption that all facts stated in the certificate are true.  *R.F.M.A.S., Inc. v. Mimi So*, 619 F. Supp. 2d 39, 52 (S.D.N.Y. 2009).  Udio claims that these contracts are necessary to confirm that Plaintiffs own their registered works for hire, but it will be readily apparent from the sampling of agreements Plaintiffs produce that their typical practice is to include "belt-and-suspenders" assignment clauses in their agreements, which expressly assign them all rights in the work, irrespective of work-for-hire status.[18]  Udio is apparently hoping to develop evidence for the purpose of embarking on mini trials challenging these transfers between Plaintiffs and a third-party regarding each registered work for hire.  Again, this approach is impractical given the massive scope of Udio's infringement and implicates the additional issue that Udio "does not have standing to challenge the presumption of ownership when Plaintiffs claim ownership by assignment."  *In re Napster, Inc. Copyright Litig*., 191 F. Supp. 1087, 1097 (N.D. Cal. 2002) (citing *Magnuson v. Video Yesteryear*, 85 F.3d 1424 (9th Cir.1996)); *see also Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 36 (2d Cir. 1982) ("In this case, in which the copyright holder appears to have no dispute with its licensee on this matter, it would be anomalous to permit a third party infringer to invoke this provision against the licensee."); *AMC Film Holdings LLC v. Rosenberg*, 2005 WL 2105792, at *5 (E.D.N.Y. Aug. 31, 2005) ("Courts have repeatedly held that where a transferor and transferee of a copyright agree that the transfer was valid, an alleged infringer may not use the writing requirement as a sword to avoid liability.").

Given the volume of works Plaintiffs anticipate being at issue in this case, this proposed sampling approach is a sensible means to allow Udio to test the validity of Plaintiffs' copyrights in registered works for hire, while cabining the burden associated with producing potentially hundreds of highly sensitive artist contracts that are, for the most part, far afield from the claims asserted in this action.  If, after Plaintiffs produce the sampling of such agreements, Udio identifies any specific issues or works for which it believes it requires additional information, Plaintiffs are willing to meet and confer to discuss those concerns.  In the absence of any basis to believe that the sought-after agreements will shed light on any disputed issue, Udio's request for every

---

[18] Udio contends that "a sound recording likely cannot be a 'specially commissioned' work under the Copyright Act, since it is not one of the nine types of work specifically enumerated in the Act."  Udio Statement at 8 n.6.  Udio, again, misstates the law, as sound recordings can be "specially ordered or commissioned" as a "contribution to a collective work" or "compilation," which are two categories enumerated in 17 U.S.C. § 101.  *See Waite v. UMG Recordings, Inc.*, 2023 WL 1069690, at *6 (S.D.N.Y. Jan. 27, 2023) ("Although 'sound recordings' are not listed in Section 101(2), something that happens to be a sound recording may still be eligible as a specially commissioned work, as long as it simultaneously qualifies under one of the statutorily enumerated categories." (internal quotation marks omitted)).  In any event, the "belt-and-suspenders" assignment clauses will render analysis into the work-for-hire status of these registered works unnecessary.

**LATHAM&WATKINS**LLP

agreement pertaining to each of their sound recordings registered as a work for hire is disproportionate to the needs of the case. The Court should deny Udio's motion to compel.

**LATHAM & WATKINS** LLP

Respectfully submitted,

Dated: March 4, 2025

| | |
|---|---|
| *s/ Moez M. Kaba* | *s/ Brittany N. Lovejoy* |
| Moez M. Kaba[19] | Steven N. Feldman |
| Mariah N. Rivera | Nathan Taylor |
| Alexander R. Perry | **LATHAM & WATKINS LLP** |
| **HUESTON HENNIGAN LLP** | 1271 Avenue of the Americas |
| 1 Little West 12th Street | New York, NY 10020 |
| New York, New York 10014 | Telephone: (212) 906-1200 |
| Telephone: (646) 930-4046 | Facsimile: (212) 751-4864 |
| Facsimile: (888) 775-0898 | steve.feldman@lw.com |
| mkaba@hueston.com | nathan.taylor@lw.com |
| mrivera@hueston.com | |
| aperry@hueston.com | Andrew M. Gass (*pro hac vice*) |
| | Brittany N. Lovejoy (*pro hac vice*) |
| Robert N. Klieger | **LATHAM & WATKINS LLP** |
| Rajan S. Trehan | 505 Montgomery Street |
| **HUESTON HENNIGAN LLP** | Suite 2000 |
| 523 West 6th Street, Suite 400 | San Francisco, CA 94111-6538 |
| Los Angeles, California 90014 | Telephone: (415) 391-0600 |
| Telephone: (213) 788-4340 | Facsimile: (415) 395-8095 |
| Facsimile: (888) 775-0898 | andrew.gass@lw.com |
| rklieger@hueston.com | brittany.lovejoy@lw.com |
| rtrehan@hueston.com | |
| | Sarang V. Damle |
| *Counsel for Plaintiffs* | **LATHAM & WATKINS LLP** |
| | 555 Eleventh Street, NW |
| | Suite 1000 |
| | Washington, D.C. 20004-1304 |
| | Telephone: (202) 637-2200 |
| | Facsimile: (202) 637-2201 |
| | sy.damle@lw.com |
| | |
| | Alex Spiro |
| | Todd Steven Anten |
| | Jessica Anne Rose |

---

[19] Udio uses electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

18

LATHAM&WATKINS LLP

                        **QUINN EMANUEL URQUHART & SULLIVAN LLP**
51 Madison Avenue
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com
toddanten@quinnemanuel.com
jessicarose@quinnemanuel.com

Andrew H. Schapiro
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
191 N. Wacker Drive
Suite 2700
Chicago, IL 60606
Telephone: (312) 705-7400
Facsimile: (312) 705-7401
andrewschapiro@quinnemanuel.com

*Counsel for Defendant Uncharted Labs, Inc., d/b/a Udio.com*

cc: All Counsel of Record (via ECF & FedEx)