**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, SONY MUSIC ENTERTAINMENT, ARISTA MUSIC, ARISTA RECORDS LLC, ATLANTIC RECORDING CORPORATION, RHINO ENTERTAINMENT COMPANY, WARNER MUSIC INC., WARNER MUSIC INTERNATIONAL SERVICES LIMITED, WARNER RECORDS INC., WARNER RECORDS LLC, and WARNER RECORDS/SIRE VENTURES LLC, | Case No. 1:24-cv-04777-AKH<br><br>Hon. Alvin K. Hellerstein<br><br>**ORAL ARGUMENT REQUESTED** |

*Plaintiffs*,

v.

UNCHARTED LABS, INC., d/b/a Udio.com, and JOHN DOES 1-10,

*Defendant*.

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT UNCHARTED LABS, INC.'S MOTION TO DISMISS**
**COUNT THREE OF THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................. 3

    A.    Statutory Background ................................................................................3

        1.    Text and Structure ........................................................................3

        2.    Legislative History .......................................................................7

    B.    Plaintiffs' Allegations ..............................................................................10

III.  LEGAL STANDARD ........................................................................................ 11

IV.   ARGUMENT ..................................................................................................... 12

    A.    Plaintiffs' Allegations Establish that the Rolling Cipher Is a Copy Control, Not an Access Control ...............................................................13

    B.    Plaintiffs Cannot Solve Their Pleading Failure by Trying to Recharacterize the Rolling Cipher as a Technology that Restricts Access ..........16

    C.    The Only Contrary Decision Failed to Address the Distinction Between Access Controls and Copy Controls ......................................................18

V.    CONCLUSION .................................................................................................. 21

# **TABLE OF AUTHORITIES**

## **CASES**

*All. of Artists & Recording Cos., Inc. v. Gen. Motors Co.*,
    162 F. Supp. 3d 8 (D.D.C. 2016) ........................................................................ 4

*Antifun Ltd. T/A Premium Vape v. Wayne Indus. LLC*,
    616 F. Supp. 3d 291 (S.D.N.Y. 2022) ............................................................... 11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................... 12

*Bartz v. Anthropic PBC*,
    No. 24-cv-05417, 2025 WL 1741691 (N.D. Cal. June 23, 2025) ....................... 1

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................... 11

*Capitol Records, LLC v. ReDigi Inc.*,
    934 F. Supp. 2d 640 (S.D.N.Y. 2013) .............................................................. 17

*Everest Foods Inc. v. Cuomo*,
    585 F. Supp. 3d 425 (S.D.N.Y. 2022) .............................................................. 12

*Hattler v. Ashton*,
    No. 16-cv-4099, 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017) ............ 15, 16, 20

*JCW Software, LLC v. Embroidme.com, Inc.*,
    No. 10-cv-80472, 2012 WL 13015051 (S.D. Fla. May 29, 2012) ....................... 13

*Kadrey v. Meta Platforms, Inc.*,
    No. 23-cv-03417, 2025 WL 1752484 (N.D. Cal. June 25, 2025) ....................... 1

*Keane v. Velarde*,
    No. 21-cv-8257, 2022 WL 3577841 (S.D.N.Y. Aug. 19, 2022) ......................... 12

*Lexmark Int'l v. Static Control Components*,
    387 F.3d 522 (6th Cir. 2004) ............................................................................ 15

*Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*,
    180 F.3d 1072 (9th Cir. 1999) .......................................................................... 21

*United States v. Elcom Ltd.*,
    203 F. Supp. 2d 1111 (N.D. Cal. 2002) ..................................................... 3, 5, 6, 9

*Universal City Studios Prods. LLLP v. Bigwood*,
    441 F. Supp. 2d 185 (D. Me. 2006) .................................................................. 14

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001) .................................................................... 4, 9, 14

*Wallen v. Consumer Reps., Inc.*,
   No. 21-cv-8624, 2022 WL 17555723 (S.D.N.Y. Dec. 9, 2022) ............................ 12

*Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*,
   633 F. Supp. 3d 650 (D. Conn. 2022) .................................................. 18, 19, 20

## STATUTES

17 U.S.C.
   § 106 .......................................................................................................4, 14, 17
   § 107 .........................................................................................................9, 17
   § 501 ...............................................................................................................10
   § 1201 ................................................................................................... passim

## RULES

Fed. R. Civ. P. 12(b)(6) .................................................................................... 12

## OTHER AUTHORITIES

H.R. Rep. No. 105–551 (1998) ...................................................................... 5, 13

Jessica D. Litman, *Digital Copyright* (2d ed. 2006) .................................... 7, 8

NII Copyright Prot. Act of 1995, H.R. 2441, 104th Cong. § 1201 (1995) ................. 7

NII Copyright Prot. Act of 1995: Hearing before Subcomm. on Cts and Intell.
   Prop., Part. 2, 104th Cong. (1996) ........................................................... 7, 8

S. Rep. 105-190 (1998) .......................................................................... 4, 9, 10, 14

U.S. Copyright Office, *Section 1201 of Title 17: A Rep. of the Reg. of Copyrights*
   (June 2017) .......................................................................................... passim

U.S. Copyright Office, *The Digit. Millennium Copyright Act of 1998: U.S.
   Copyright Off. Summary* (Dec. 1998) ................................................... passim

WIPO Copyright Treaties Implementation Act; Online Copyright Liab. Limitation
   Act: Hearing before the Subcomm. on Cts and Intell. Prop., 105th Cong.
   (1997) .......................................................................................... 8, 9, 10, 15

## I.    INTRODUCTION

Plaintiffs' Amended Complaint is a gambit to try to evade application of the fair use doctrine to Defendant Uncharted Labs's ("Udio") technology development process.  Since this lawsuit was filed, two courts have ruled that using copyrighted content to train generative AI models is fair use.  *See Bartz v. Anthropic PBC*, No. 24-cv-05417, 2025 WL 1741691, at *18 (N.D. Cal. June 23, 2025); *Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417, 2025 WL 1752484, at *23 (N.D. Cal. June 25, 2025).  Plaintiffs in this case, presumably in response to those decisions, have now interposed a new legal theory on which they hope to prevail even if the Court here agrees with the burgeoning consensus that using copyrighted content to train AI models is perfectly lawful.  The theory they pursue is that the initial *acquisition* of music violates a separate statutory prohibition on circumventing certain kinds of "technological protection measures" ("TPMs") that can be applied to copyrighted works—a prohibition to which fair use is presumptively not a defense.

The Court should dismiss this new cause of action because it fails to state a claim for relief.  Plaintiffs' newly asserted claim arises under 17 U.S.C. § 1201, which was enacted as part of the Digital Millennium Copyright Act of 1998 ("DMCA").  Critically, section 1201 distinguishes between two types of TPMs: **access controls**, which prevent users from viewing, reading, or listening to works without proper authorization, and **copy controls**, which protect the copyright holder's exclusive rights, like reproduction or distribution, after lawful access has been obtained.  While section 1201 prohibits the act of circumventing access controls, *see* 17 U.S.C. § 1201(a)(1), it does **not** prohibit the act of circumventing copy controls, *see id.* § 1201(b).

Plaintiffs' section 1201 claim elides this foundational distinction.  The provision of section 1201 that they invoke bans the act of circumventing *access controls*; but the facts they allege plainly concern *copy controls*.  More specifically, Plaintiffs contend that Udio obtained audio files

from YouTube to train its generative AI model, and in doing so violated section 1201. But anyone can access YouTube content. You can go to YouTube and watch music videos without restriction. Plaintiffs do not allege otherwise, nor do they contend that Udio circumvented any TPM at all to view YouTube content in the first instance. Instead, what Plaintiffs allege is that Udio circumvented restrictions that prohibit *copying* of YouTube content. More precisely, they assert that Udio, which is able to freely access YouTube videos just as the rest of the world is, went to YouTube and circumvented TPMs that prevent the videos from being *downloaded*, in order to extract the music from those video files for use as AI-model-training data. *See* Dkt. No. 119 ("Am. Compl.") ¶ 57 (alleging "unlawful circumvention" of measures that "YouTube may have implemented **to prevent the downloading and copying** of licensed content" (emphasis added)).

That alleged conduct may give rise to a claim for *copyright infringement*—which is already part of this case, and which will in turn implicate the fair use issues that courts around the country are wrestling with in the context of generative AI. But it does not yield a separate claim for violation of section 1201 because section 1201 does not proscribe the circumvention of *copy controls*. And Plaintiffs plead no facts alleging what the statute actually forbids, which is circumventing *access controls.*

The reason why Congress chose not to prohibit the act of circumventing copy controls, even as it did prohibit the act of circumventing access controls, was specifically to preserve the public's right to engage in fair uses of content that is lawfully accessible. *See* U.S. Copyright Office, *The Digit. Millennium Copyright Act of 1998: U.S. Copyright Off. Summary*, at 3 (Dec. 1998), https://www.copyright.gov/legislation/dmca.pdf ("USCO 1998 Report") ("This distinction was employed to assure that the public will have the continued ability to make fair use of copyrighted works."). As it happens, during the legislative process that led to the enactment of

that law, the record labels attempted to persuade Congress to pass a broader one that would indeed have outlawed the conduct alleged in Plaintiffs' Amended Complaint—but despite ample effort to expand the scope of activity prohibited by section 1201, they failed to do so. The Court should decline the invitation to do what Congress chose not to: impose a section 1201 violation for *downloading* content that is publicly accessible in the first instance, thereby impairing the public's right to engage in fair uses of copyrighted content that the owner has elected to make available to the world. Plaintiffs' section 1201 claim should be dismissed.

## II.    BACKGROUND

### A.    Statutory Background

1.    **Text and Structure**. Congress enacted 17 U.S.C. § 1201 as part of the Digital Millennium Copyright Act of 1998, "in recognition of the fact that in the digital age, authors must employ protective technologies in order to prevent their works from being unlawfully copied or exploited." *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1119 (N.D. Cal. 2002). In section 1201, "Congress sought to prohibit certain efforts to unlawfully circumvent protective technologies, while at the same time preserving users' rights of fair use." *Id.* The statute does so by drawing distinctions along two dimensions: (1) the types of TPMs that can be placed on a copyrighted work, and (2) the kinds of acts that are deemed to violate the law.

*Access Controls versus Copy Controls.* Section 1201 addresses two different types of TPMs. *See id.* at 1119–20. Section 1201(**a**) targets "technological measures that effectively control *access* to a copyrighted work." *Id.* at 1119 (emphasis in original); *see* 17 U.S.C. §§ 1201(a)(1)–(a)(2). These are commonly referred to as "**access controls**." *See* U.S. Copyright Office, *Section 1201 of Title 17: A Rep. of the Reg. of Copyrights*, at 6 (June 2017) ("USCO 2017 Report"). To "control access to a work" means to prevent the public from viewing, reading, or using its content, e.g., by "encrypt[ing]" the content of a book so that it cannot be read, or

"scramb[ling]" an audio file so that it cannot be played.  17 U.S.C. § 1201(a)(3)(A); *see also*

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 441 (2d Cir. 2001) (access controls "*prevent*

access to a work" (emphasis in original)); *see also* S. Rep. 105-190 at 12 (1998) (hereinafter

"Senate Judiciary Committee Report") (access controls "limit[] access to the plain text of a work").

The quintessential access control is a "password requirement limiting access to a website

to paying customers."  USCO 2017 Report at 6.  The function of the "password requirement" is to

prevent anyone who lacks the "authority of the copyright owner" from "gain[ing] access to the

work."  17 U.S.C. § 1201(a)(3)(B).  In so doing, the password requirement "controls access" to

the work.  *Id.* § 1201(a)(1)(A).

Section 1201(**b**) targets TPMs "that effectively protect[] a right of a copyright owner under

this title."  17 U.S.C. § 1201(b)(1).  These are commonly referred to as "**copy controls**."  USCO

2017 Report at 6.  These are measures that "effectively protect[] a right of a copyright owner under

this title," *id.* § 1201(b)(2)(B), including the copyright owner's exclusive right of reproduction,

*see id.* § 106(1).  They kick in after a user has gained access to a work by, e.g., "preventing the

copying of an e-book after it has been downloaded to a user's device."  USCO 2017 Report at 6.

In that sense, they are "designed to *permit access* to a work but *prevent copying* of th[at] work."

*Corley*, 273 F.3d at 441 (emphasis in original).

The quintessential copy control is a system that prohibits the subsequent copying of an

audio tape.  *See, e.g.*, *All. of Artists & Recording Cos., Inc. v. Gen. Motors Co.*, 162 F. Supp. 3d 8,

10–11 (D.D.C. 2016) (describing a system that "prevents any copies being made from [] copies"

of digital audio tapes).  Such a system does not prohibit a user who possesses the tape from

listening to it, which means it is not an access control.  17 U.S.C. § 1201(a).  But it does prevent

that user from creating an unauthorized reproduction of the tape, and in so doing "effectively

4

protects a right of a copyright owner," *id.* § 1201(b)(1)(A)—that is, the reproduction right, *id.* § 106(1). Copy controls, in other words, "do[] nothing to prevent access to the plain text of the work, but [are] designed to prevent that work from being copied." Senate Judiciary Report at 12; *see also* H.R. Rep. No. 105–551, pt. 1, at 19 (1998) ("House Judiciary Committee Report") (explaining that section 1201(b) "applies when a person has obtained authorized access to a copy or a phonorecord of a work, but the copyright owner has put in place technological measures that effectively protect his or her rights under Title 17 to control or limit the nature of the use of the copyrighted work").

*Act-of-Circumvention Prohibitions versus Trafficking Prohibitions.* Section 1201 imposes different limitations on circumvention of access controls and copy controls. "With regard to the first category [i.e., access controls], Congress banned both the act of circumventing access control restrictions as well as trafficking in and marketing of devices that are primarily designed for such circumvention." *Elcom*, 203 F. Supp. 2d at 1119–20. Specifically, section 1201(a)(1)(A) provides that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A). This is often referred to as a "circumvention prohibition." *See* USCO 2017 Report at 36. Section 1201(a)(2), in turn, provides that:

> [n]o person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—
>
> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;
>
> (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

> (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

17 U.S.C. § 1201(a)(2).  This is often referred to as a "trafficking prohibition."  *See* USCO 2017 Report at 50.

Section 1201(b), however, contains ***only*** a trafficking prohibition, which parallels the one in section 1201(a)(2):

> [n]o person shall manufacture, import, offer to the public, provide or otherwise traffic in any technology, product, service, device, component, or part thereof, that—
>
> (A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof;
>
> (B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or
>
> (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof.

17 U.S.C. § 1201(b).  In other words, unlike for the access controls covered by section 1201(a)(1), Congress did not ban the *act of circumventing* copy controls; it banned only *trafficking* in devices primarily designed to circumvent copy controls.  *See Elcom*, 203 F. Supp. 2d at 1120.

So, as summarized by the U.S. Copyright Office, the statutory structure of section 1201 is as follows:

| 17 U.S.C. § 1201 | Circumvention Prohibition? | Trafficking Prohibition? |
|---|---|---|
| **Access Controls** | **Yes** **§ 1201(a)(1)** | **Yes** **§ 1201(a)(2)** |
| **Copy Controls** | **No** | **Yes** **§ 1201(b)** |

USCO 2017 Report at 7.

      **2.**      **Legislative History.**  This was no accident.  When proposals for an anti-circumvention bill first came before Congress in 1995, the bill initially prohibited only *trafficking* in devices designed to circumvent technological measures that "inhibit[] the violation[] of any of the exclusive rights" protected by copyright.  NII Copyright Protection Act of 1995, H.R. 2441, 104th Cong. § 1201 (1995).  Legacy media industries—including the Recording Industry of America ("RIAA"), the record labels' trade organization—wanted to go even further, and lobbied for a sweeping prohibition on the *act of circumvention* of any technological measure designed to protect against copyright infringement—and insisted that prohibition be backed by criminal sanctions.  *See, e.g.*, NII Copyright Prot. Act of 1995: Hearing before Subcomm. on Courts and Intell. Prop., pt. 2 at 380, 104th Cong. 380 (1996) (hereinafter "1996 Hearings") (Viacom arguing that Congress should prohibit the "actual circumvention" of "anti-copying" measures); *id.* at 494 (RIAA coalition arguing that the bill could be "improve[d]" by "making criminal penalties available" for "use of protection-defeating technology"); *see also* Jessica D. Litman, *Digital Copyright* 131 (2d ed. 2006), available at https://repository.law.umich.edu/books/1/.

But technology industry representatives and others noted that such a broad prohibition would "impede 'legal' copying."[1]  As one group explained, it is well established that the public "in some instances may make copies of [a] work without infringing the copyright," including by making fair use of the content without the permission of the rightsholder.[2]  Prohibiting *any* circumvention of copy controls would chill that fair-use activity.

In response, Congress endorsed the "compromise" outlined above, under which the statute would carefully distinguish between *access controls* and *copy controls* and ensure that the circumvention of the latter would not violate the new statutory provision.  Litman, *supra*, at 133–34; *see also* USCO 1998 Report at 3 ("This distinction was employed to assure that the public will have the continued ability to make fair use of copyrighted works.  Since copying of a work may be a fair use under appropriate circumstances, section 1201 does not prohibit the act of circumventing a technological measure that prevents copying.").  By 1997, legacy media groups had backed off their initial positions and threw their support behind the compromise.  *See* WIPO Copyright Treaties Implementation Act; and Online Copyright Liab. Limitation Act: Hearing before the Subcomm. on Cts and Intell. Prop. 105th Cong. at 203 (1997) (hereinafter "1997 Hearings") (RIAA CEO "fully endors[ing]" the compromise bill, even though "[m]ost in the record industry feel strongly that these provisions should have gone further").

The proffered justification for the compromise reflected in the resulting statutory framework was straightforward.  Any copyright owner has the baseline right to decide when and how to make her work accessible to the public—e.g., whether to keep a newly written book under

---

[1] *See, e.g.*, 1996 Hearings at 149 (statement of IEEE-USA); *see also id.* at 83, 432 (tech coalitions arguing that Congress must "protect the customary and reasonable fair use rights of consumers" and that "any 'anti-circumvention' provision must be carefully drafted so as not to prevent legitimate activities").

[2] 1996 Hearings at 543 (American Committee for Interoperable Systems).

"lock and key," whether to "show it to others selectively," or whether to make it freely available for public access. 1997 Hearings at 49 (testimony of Marybeth Peters, Register of Copyrights). Access controls are one way copyright owners implement those decisions; prohibiting their circumvention is in a sense nothing more than a way to "back[]" the choice to withhold access *ab initio* "with legal sanctions." *Corley*, 273 F.3d at 435. The concept was sold as being no different than passing a law to prohibit "break[ing] into a locked room." 1997 Hearings at 49 (testimony of Marybeth Peters, Register of Copyrights).

But once a copyright owner decides to make a work accessible to the public, the question whether someone can copy it depends not on the copyright owner's preference, but rather on the contours of the Copyright Act—including the doctrine of fair use. 17 U.S.C. § 107; *see also Elcom*, 203 F. Supp. 2d at 1121 ("once a published copy is sold," fair use "allow[s] a certain amount of direct copying for certain uses, without the permission of the copyright owner"). Copyright holders and platforms are free to engage in self-help by implementing measures to prevent that copying as a technical matter—i.e., copy controls. And Congress gave that self-help a limited degree of statutory fortification, by prohibiting trafficking in tools that would allow others to circumvent copy controls. But making copy controls effectively impregnable by prohibiting their circumvention outright would have amounted to a strict legal prohibition on copying that the doctrine of fair use explicitly authorizes. Instead, "Congress expressly disclaimed any intent to impair any person's rights of fair use." *Elcom*, 203 F. Supp. 2d at 1120-21 (citing 17 U.S.C. § 1201(c)(1)). This is why the statute, as enacted, does not prohibit the circumvention of TPMs that "do[] nothing to prevent access to the plain text of the work, but [are] designed to prevent that work from being copied." Senate Judiciary Committee Report at 12.

That is how the asymmetry between the treatment of access controls and copy controls in the DMCA came to be. Translated into the structure of the statute, "there is no prohibition on conduct in 1201(b) akin to the prohibition on circumvention conduct in 1201(a)(1)." *See* Senate Judiciary Committee Report at 12. Any effort to subject the circumvention of a *copy control* technology to the statutory prohibition against circumventing *access control* technology would thus contravene not only the statutory language that Congress enacted, but also Congressional intent—along with the record labels' own contemporaneous support for the legislative compromise that the DMCA embodied.[3]

### B.    Plaintiffs' Allegations

Plaintiffs are the largest record labels in the world. Dkt. No. 9 ("Compl.") ¶ 6. Defendant Udio is a startup that developed an artificial intelligence-powered tool for making music. *Id.* ¶¶ 7, 38–40. The gravamen of Plaintiffs' original Complaint is that, in the course of developing its AI tool, Udio made unauthorized copies of sound recordings, for which it was directly liable for copyright infringement under 17 U.S.C. § 501. Compl. ¶¶ 92–109.[4] Now, almost 15 months into this litigation, Plaintiffs add a new claim based on 17 U.S.C. § 1201(a). *See* Am. Compl. ¶¶ 118–125. That claim is based on Udio's alleged acts of circumvention of certain TPMs put in place by YouTube, in the course of Udio's alleged acquisition of audio files from YouTube. Am. Compl. ¶ 122.[5] Specifically, Plaintiffs allege that Udio acquired "many" of the sound recordings it used

---

[3] 1997 Hearings at 200–03 (testimony of Hilary Rosen, Recording Industry Association of America) (expressing support).

[4] The two counts of the original Complaint applied the same legal theory (direct copyright infringement) to two categories of sound recordings—those made before 1972 and those made in and after 1972—that are governed by different provisions of the Copyright Act. *See* Compl. ¶¶ 92–109.

[5] For purposes of this motion, Udio accepts Plaintiffs' allegations as true.

for training "by illicitly downloading them from YouTube" using a method called "stream ripping." *Id.* ¶ 51. According to Plaintiffs, while "YouTube ***allows*** users to 'stream' content," i.e., "playing it as it is retrieved," and engage in "restricted downloading" of that content, "it is not designed to allow and actually prohibits making permanent, unrestricted copies of the content it streams." *Id.* ¶¶ 52–53 (emphasis added).

Plaintiffs allege that they "upload certain of their copyrighted sound recordings to the Official YouTube Channels for specific artists on YouTube." *Id.* ¶ 52. Critically, Plaintiffs do not allege that YouTube imposes technological measures that restrict *access* to the content for watching or listening. Instead, the measures Plaintiffs describe (e.g., "rolling cipher[s]," *id.* ¶ 53) do nothing more than "prevent[] an ordinary user from creating a permanent, unrestricted ***download*** of a sound recording" that is otherwise "made available on YouTube only for streaming and restricted downloading." *Id.* (emphasis added).

Plaintiffs unambiguously and repeatedly allege that the restrictions Udio circumvented are restrictions on *copying* of YouTube content. *See, e.g.*, *id.* ("YouTube employs enhanced technological measures to protect against unauthorized ***downloading and copying*** of licensed content, such as Plaintiffs' sound recordings." (emphasis added)); *id.* ¶ 57 ("Udio's unauthorized extraction, copying, and storage of Plaintiffs' Copyright Recordings from YouTube for use in its training data was accomplished by Udio's unlawful circumvention of YouTube's rolling cipher and any other technological measures YouTube may have implemented ***to prevent the*** ***downloading and copying*** of licensed content." (emphasis added)).

## III. LEGAL STANDARD

"A complaint is properly dismissed where, as a matter of law, 'the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief.'" *Antifun Ltd. T/A Premium Vape v. Wayne Indus. LLC*, 616 F. Supp. 3d 291, 301 (S.D.N.Y. 2022) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 558 (2007)).  Courts thus routinely grant motions to dismiss where the plaintiff's case turns on an erroneous interpretation of statutory language that conflicts with the statute's text, context, or legislative history.  *See, e.g.*, *Keane v. Velarde*, No. 21-cv-8257, 2022 WL 3577841, *4–7 (S.D.N.Y. Aug. 19, 2022), *aff'd sub nom*, *Keane v. Dibbins*, No. 22-2833, 2023 WL 6785370 (2d Cir. Oct. 13, 2023) (granting motion to dismiss where plaintiffs' interpretation of statute was inconsistent with "statutory context and [] broader statutory scheme" reflected in legislative history); *Wallen v. Consumer Reps., Inc.*, No. 21-cv-8624, 2022 WL 17555723, *4–6 (S.D.N.Y. Dec. 9, 2022) (dismissing complaint where plaintiff's interpretation was inconsistent with legislative history and would "transform" statute "into sweeping . . . law[]").  Further, "[t]o survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Everest Foods Inc. v. Cuomo*, 585 F. Supp. 3d 425, 434 (S.D.N.Y. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim is facially plausible when it pleads 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

## IV.   ARGUMENT

The "rolling cipher" described in the new factual allegations in Plaintiffs' Amended Complaint is a copy control, not an access control.[6]  Section 1201 of the Copyright Act does not prohibit the act of circumventing copy controls.  So Count Three of the Amended Complaint fails

---

[6] There is a separate issue whether, whatever kind of control the "rolling cipher" is, the porous nature of the protection it provides means that it does not do its intended job *effectively* within the meaning of section 1201.  By saying in this brief that the "rolling cipher" is a copy control, Udio does not mean to concede that it *effectively* protects the rights of a copyright owner within the meaning of section 1201(b). But for simplicity's sake, Udio uses the phrase "copy control" throughout the brief without articulating that qualification each time.

to state a claim on which relief can be granted and should therefore be dismissed.

### A.    Plaintiffs' Allegations Establish that the Rolling Cipher Is a Copy Control, Not an Access Control

The only type of TPM that section 1201 prohibits the circumvention of is an access control—i.e., one that "effectively controls access" to a copyrighted work.  *See* 17 U.S.C. § 1201(a)(1).  The statutory language is crystal clear: "control[ling] access to a work" means to prevent the public from viewing, reading, or using its content—e.g., by "encrypt[ing]" the content of a book so that it cannot be read, or "scrambl[ing]" an audio file so that it cannot be played.  *Id.* § 1201(a)(3)(A); *see e.g.*, *JCW Software, LLC v. Embroidme.com, Inc.*, No. 10-cv-80472, 2012 WL 13015051, at *2 (S.D. Fla. May 29, 2012) (software that required users to register and pay for a "Key" to "Unlock" it was an access control).  In other words, an access control is a digital lock that must be opened before a user can read, view, use, or listen to the work at all—such as a password-protected website or a paywall.  *Id.* § 1201(a)(3)(A) (to circumvent an access control "means to descramble a scrambled work, to decrypt an encrypted work, [etc.]").  And the part of the statute addressing access-control TPMs begins and ends with access in the first instance: section 1201(a) "does not apply to the subsequent actions of a person once he or she had obtained authorized access to a copy of a work . . . even if such actions involve circumvention of additional forms of technological protection measures."  *See* House Judiciary Committee Report at 18.

Plaintiffs have failed to allege that Udio circumvented any access control on YouTube content in violation of 17 U.S.C. § 1201(a)(1).  To the contrary, the allegations supporting Count Three of the Amended Complaint establish that the YouTube content at issue is *not* guarded by any access control within the meaning of the statute.  Plaintiffs explain that the YouTube platform "allows users to 'stream' content" for free and without restriction.  Am. Compl. ¶ 52.  The content is not "scrambled" or "encrypted," nor does a user need to "avoid, bypass, remove, deactivate, or

13

impair" any technological barriers in order to view it.  17 U.S.C. § 1201(a)(3)(A).  No owner-authorized credentials or passwords or the application of any other information is required to "gain access to the work."  *Id.* § 1201(a)(3)(B).  On Plaintiffs' own account, then, YouTube is the paradigmatic online platform whose content is accessible *without* circumventing any TPM.  For that reason alone, Plaintiffs have failed to state a claim for a violation of section 1201(a).[7]

The TPM they describe is a copy control.  The Amended Complaint is unmistakably clear that the conduct Plaintiffs complain of is not Udio's *accessing* YouTube in the first instance, but Udio's (allegedly) having *downloaded* content from YouTube in order to use it in a manner that they contend is infringing and that Udio contends is fair use—that is, as training data for AI development.  The "rolling cipher" that they describe is, in their own words, intended to prevent users from "downloading" or "making permanent copies" of the publicly available streamed content.  Am. Compl. ¶¶ 52–54, 57.  This is the textbook definition of a ***copy*** control, not an access control.  *See* 17 U.S.C. § 1201(b)(2)(B) (defining copy controls as measures that "prevent[], restrict[], or otherwise limit[] the exercise of a right of a copyright owner"); 17 U.S.C. § 106(1) (defining the exclusive right "to reproduce the copyrighted work in copies or phonorecords").[8]  It is a "technolog[y] designed to *permit access* to a work but *prevent copying* of th[at] work."  *Corley*, 273 F.3d at 441 (describing copy controls under section 1201(b)); Senate Judiciary Committee Report at 12 (copy controls "do[] nothing to prevent access to the plain text of the work, but [are] designed to prevent that work from being copied").

---

[7]  Plaintiffs' allegations regarding YouTube's Terms of Service, *see* Am. Compl. ¶ 53, are irrelevant, as those legal terms are not a "technological measure."  *See* 17 U.S.C. § 1201(b)(2)(B).

[8]  "Downloading" content unquestionably implicates a copyright owner's right of reproduction.  *See, e.g.*, *Universal City Studios Prods. LLLP v. Bigwood*, 441 F. Supp. 2d 185, 190 (D. Me. 2006) ("[B]y downloading files containing the Motion Pictures, Defendant infringed Plaintiffs' exclusive right of reproduction.").

In short, the fact pattern Plaintiffs describe here is the precise scenario that the legislative history of the DMCA, reflected in the basic structure of the statute, indicates should fall *outside* the prohibitions of section 1201. As the Register of Copyrights explained at the time, the statute's divergent treatment of copy controls and access controls was intended specifically to avoid the application of anti-circumvention claims to the situation in which someone has lawful *access* to a work in the first instance and circumvents a TPM to make a *copy* of it on fair use grounds. 1997 Hearings at 49. It would be hard to conceive of a hypothetical that fits this paradigm more squarely than the facts Plaintiffs now allege.

Courts have repeatedly confronted and rejected similar attempts to assert section 1201 claims based on the circumvention of TPMs that manifestly do not control *access* to a copyrighted work at all. The Sixth Circuit did so, for example, in *Lexmark Int'l v. Static Control Components*, 387 F.3d 522 (6th Cir. 2004). In that case, *Lexmark*, a printer manufacturer, brought an anti-trafficking claim against the maker of remanufactured toner cartridges under 17 U.S.C. § 1201(a)(2), on the theory that those toner cartridges were a product that circumvented the access controls on a "Printer Engine Program" that prevented "making use of" the program code. *Id.* at 548. The court of appeals rejected that claim, reversing the district court. There was "[n]o security device" that "protect[ed] access" to the code and "no security device accordingly must [have been] circumvented to obtain access to that program code." *Id.* at 547. The court thus concluded that a measure that prevented "making use of" a copyrighted work was not an access control where the work was "otherwise accessible." *Id.* at 547–48.

The legal question whether a TPM is an access control or a copy control is one that courts properly address at the pleading stage. For instance, in *Hattler v. Ashton*, No. 16-cv-4099, 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017), the court considered a claim that the defendants

had violated section 1201(a) "when they downloaded the Works in a manner that circumvented technological protections on the websites where the Works were available for streaming." *Id.* at *5. The court granted the defendants' motion to dismiss, concluding that the "statutory structure, appellate precedent and legislative history of the DMCA all support" the conclusion that "where § 1201(a)(1) refers to technological measure[s] that control 'access' to a protected work, that section should be interpreted narrowly to exclude technologies that permit access to [a] copyrighted work, but restrict copying." *Id.* at *8. As the court explained, Congress decided that there was no public policy need for the DMCA to penalize circumvention of a copy control "because such conduct was already outlawed as copyright infringement" where not a fair use, and the defendants "ha[d] not contested [] that Plaintiff ha[d] stated a claim for copyright infringement." *Id.* at *7 (internal quotation marks and citation omitted).

### B. Plaintiffs Cannot Solve Their Pleading Failure by Trying to Recharacterize the Rolling Cipher as a Technology that Restricts Access

Although Plaintiffs have failed to allege that YouTube's "rolling cipher" limits access to streams of their sound recordings in any way, they may argue that it nevertheless should be considered an "access" control on the theory that it prevents "access" to the underlying *digital file* from which a YouTube stream is generated. The Amended Complaint does allege, after all, that:

- For each of the videos/recordings at issue, there is a single file that sits on YouTube's servers. Am. Compl. ¶ 53.

- The "rolling cipher" effectively means that the location of that file, itself, is not ordinarily known or discoverable to the public. *Id*.

- So while access to the resulting *streams* from the file may not be directly protected by any TPM, access to the underlying file itself is protected by the "rolling cipher." *Id*.

Hence, the argument would go, the rolling cipher is an access-control TPM under section 1201(a).

That argument fails as a matter of law. The only "technological measures" that qualify under section 1201(a) are those that "control[] access to [the] *work*" by "requir[ing] the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the *work*." 17 U.S.C. §§ 1201(a)(1), (a)(3)(B) (emphasis added). A "work," in this context, means essentially *the content itself*—i.e., the copyrighted expression embodied in the "video files" that YouTube makes available for free public streaming.[9]   Am. Compl. ¶ 53. If *the content* is available without going through or circumventing the TPM, then the TPM does not "effectively control[] access to [the] work." *See* 17 U.S.C. § 1201(a)(1)(A). For that reason, it would not save Plaintiffs to argue that what they meant to say was that, even though a YouTube *stream* is accessible without going through the TPM, the underlying digital file from which the stream is generated is not. The unfettered accessibility of the stream, through which *the content* (i.e., "the work") is available to the world, means that whatever the TPM does, it does not "control[] access to [the] work" itself.

Plaintiffs themselves are adamant that the purpose and effect of the "rolling cipher" is to prohibit *downloading*. *See* Am. Compl. ¶ 53 (rolling cipher is "designed to impede external access to the underlying YouTube video files, *thereby preventing or inhibiting any downloading, copying, or distribution of the videos*" (emphasis added)). For that reason, its function is to "effectively protect[] a right of a copyright owner," 17 U.S.C. § 1201(b), i.e., Plaintiffs' exclusive right to reproduce a work in copies, 17 U.S.C. § 106(1), which is subject to the fair use defense, *see* 17 U.S.C. § 107. The fact that Plaintiffs allege that it accomplishes that end via a "complex and

---

[9] The term "work" under the Act refers to an author's creative expression, rather than the particular "material embodiments" of the work (*i.e.*, copies of it). *See, e.g.*, *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 648–49 (S.D.N.Y. 2013) (noting that copyrighted works, including sound recordings, are "distinguished from their material embodiments" and citing House and Senate Reports concluding the same).

periodically changing algorithm" to obscure a file URL changes none of that. Am. Compl. ¶ 53. A copy control does not become an access control simply by hiding the underlying file, when the content of that file is streamed for everyone in the world to see and hear on demand whenever they want it.

### C.    The Only Contrary Decision Failed to Address the Distinction Between Access Controls and Copy Controls

There is one judicial opinion that supports Plaintiffs' position—a district court case currently on appeal. *See Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*, 633 F. Supp. 3d 650 (D. Conn. 2022), *appeal docketed*, No. 22-2760 (2d Cir. Oct. 28, 2022). In *Yout*, the plaintiff provided software that allowed users to enter a YouTube video URL and download the audio content from that video as an MP3 file. *Id.* at 657–58. The RIAA, which represents the major record labels, sent takedown notices to Google, alleging that Yout's service violated section 1201(a) of the DMCA by circumventing YouTube's "rolling cipher." *Id.* at 658. In response, Yout filed a declaratory judgment action, seeking a ruling that its service did not violate section 1201. *See* Second Am. Compl. ("Yout SAC") ¶ 124 *in Yout, LLC v. Recording Indus. Ass'n of Am.*, No. 3:20-cv-01602, ECF 45 (D. Conn. Sept. 14, 2021).

The resulting judicial opinion contains language that on its face supports the position Plaintiffs assert in this case. But in reality it is of limited utility here, because the distinction that is critical to this motion—between access controls under section 1201(a) and copy controls under section 1201(b)—did not matter in the *Yout* case. Yout provided a "service" designed to circumvent what the RIAA claimed to be a section 1201-qualifying "technological measure," and was therefore accused of violating (and sought a declaratory judgment regarding) the DMCA's anti-trafficking provisions. *See* 633 F. Supp. 3d at 676–77. But unlike section 1201's act-of-circumvention prohibition, which applies <u>only</u> to access controls, the act's anti-trafficking

prohibitions apply equally to both access controls and copy controls.  *See* 17 U.S.C. § 1201(a)(2) (prohibiting access control circumvention devices); *id.* § 1201(b)(1) (same, for copy controls). Yout's liability thus did not turn on whether the YouTube technological measures at issue were access controls or copy controls.

For that reason, neither Yout's pleadings nor the parties' briefing focused on the access control vs. copy control distinction.  See Yout SAC ¶ 124; RIAA Mot. to Dismiss SAC at 10–14, No. 3:20-cv-01602, ECF 49-1.  Instead, the parties focused exclusively on a different question: whether YouTube's "rolling cipher" qualified in the first instance as a "technological measure" that Yout's service was designed to "circumvent."  *See, e.g.*, RIAA Mot. to Dismiss SAC at 10–14, No. 3:20-cv-01602, ECF 49-1; Yout Resp. to Mot. to Dismiss SAC at 7–11. No. 3:20-cv-01602, ECF 55; RIAA Reply ISO Mot. to Dismiss SAC at 1–7, No. 3:20-cv-01602, ECF 56.

The district court granted the record labels' motion to dismiss the declaratory relief action. In so doing, the court quietly declined to analyze the question whether the "YouTube technological measure" constitutes a copy control under Section 1201(b), which it disregarded in a footnote, observing that Yout had not explicitly sought a declaration regarding that statutory subsection. 633 F. Supp. 3d at 677 n.14.  Instead, the <u>only</u> question the Court analyzed was whether the TPM in question constituted an access control under Section 1201(a)(1)—and the Court concluded that it did.  *See id.* at 669.  The Court did not once consider the possibility that the TPM is a copy control under section 1201(b), rather than an access control under section 1201(a), even though the Court repeatedly acknowledged that the TPM's sole function and purpose is to make it more difficult to "download" videos that YouTube makes freely accessible on its "player page."  *Id.* at 666; *but see* Senate Judiciary Report at 11 (TPMs that "do[] nothing to prevent access to the plain text of the work, but [are] designed to prevent the work from being copied" are copy controls, not

access controls).

That was an oversight. Had the court analyzed the distinction between access controls and copy controls, it would have found that the technological measures alleged—i.e., mechanisms that "restrain a YouTube user's freedom or ability to . . . download" YouTube videos, *see id.* at 664—are copy controls, not access controls. *See Hattler*, 2017 WL 11634742, at *5, *8 (reaching precisely that result). Even the RIAA's initial notices to Yout acknowledged as much. *See* Exhibit A to Compl. in *Yout, LLC v. Recording Indus. Ass'n of Am.*, No. 3:20-cv-01602, ECF 1-1 (D. Conn. Oct. 25, 2020) ("YouTube's rolling cipher, a technical protection measure, . . . protects our members' works on YouTube *from unauthorized copying/downloading*." (emphasis added)). In short, because the *Yout* court did not consider whether the rolling cipher was a copy control rather than an access control, that opinion should be given no weight in considering Plaintiffs' section 1201(a)(1) claim in this case.

Notably, Udio recently filed a proposed amicus brief in the Second Circuit to bring the Court's attention to these important errors in the Yout opinion, which the parties to that appeal had not sufficiently addressed in their briefing. Proposed Brief for Amici Curiae in *Yout LLC v. Recording Indus. Ass'n. of Am.*, No. 22-2760, ECF 113-3 (2d Cir., Oct. 7, 2025). The RIAA—an industry association whose members include the Plaintiffs in this case—vigorously opposed Udio's motion to file that brief. *See* Mot. for Leave in *Yout LLC v. Recording Indus. Ass'n. of Am.*, No. 22-2760, ECF 113-2 at 4–7 (2d Cir. Oct. 7, 2025). Over that objection, the Second Circuit panel granted Udio's motion for leave on October 10, 2025 and invited both Yout and the RIAA to file supplemental briefs in response to the arguments in Udio's brief. *See* Mot. Order in *Yout LLC v. Recording Indus. Ass'n. of Am.*, No. 22-2760, ECF 124 (2d Cir., Oct. 10, 2025).

\*       \*       \*

20

The legal theory underlying Count Three of the record labels' Amended Complaint is foreclosed by the text, structure, purpose, and history of the statute they invoke.  They are seeking to repudiate a legislative compromise that they themselves embraced to get the DMCA passed in the 1990s—acting now, nearly thirty years later, as if they won a lobbying battle that in fact they lost.  *See supra* 7–8.  This is a game that the record labels have played before—and the last time they tried, the courts stopped them.  *See Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1078 n.6 (9th Cir. 1999) (rejecting record labels' claims against technology maker under an earlier digital-music-protection law, on the basis that the theory asserted was foreclosed by a key compromise that was necessary to get the bill passed).  Udio respectfully asks the Court to do the same here.

## V.    CONCLUSION

For the reasons identified above, Count Three of Plaintiffs' Amended Complaint fails to state a cognizable cause of action.  The Court should therefore dismiss this Count with prejudice.


Dated: October 10, 2025

Respectfully submitted,

*/s/ Andrew M. Gass*
Andrew M. Gass (*pro hac vice*)
Brittany N. Lovejoy (*pro hac vice*)
Joseph R. Wetzel
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
andrew.gass@lw.com
britt.lovejoy@lw.com
joe.wetzel@lw.com

Sarang V. Damle
LATHAM & WATKINS LLP
555 Eleventh Street NW

Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
sy.damle@lw.com

Grace McLaughlin
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1747
Facsimile: (212) 751-4864
grace.mclaughlin@lw.com

Alex Spiro
Andrew H. Schapiro
Jessica A. Rose
Todd S. Anten
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
295 5th Avenue
New York, NY 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com
andrewschapiro@quinnemanuel.com
jessicarose@quinnemanuel.com
toddanten@quinnemanuel.com

*Counsel for Defendant Uncharted Labs, Inc.,
d/b/a Udio.com*

## <u>CERTIFICATION OF COMPLIANCE</u>

As required by Local Civil Rule 7.1(c), I hereby certify that the foregoing Memorandum of Law contains 6,688 words, excluding the parts of the Memorandum that are exempted from Local Civil Rule 7.1(c).

<u>*/s/ Andrew M. Gass*</u>
Andrew M. Gass