**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, SONY MUSIC ENTERTAINMENT, ARISTA MUSIC, ARISTA RECORDS LLC, ATLANTIC RECORDING CORPORATION, RHINO ENTERTAINMENT COMPANY, WARNER MUSIC INC., WARNER MUSIC INTERNATIONAL SERVICES LIMITED, WARNER RECORDS INC., WARNER RECORDS LLC, and WARNER RECORDS/SIRE VENTURES LLC,<br><br>          Plaintiffs,<br>vs.<br><br>UNCHARTED LABS, INC., d/b/a Udio.com, and JOHN DOES 1-10,<br><br>          Defendant. | Case No. 1:24-cv-04777 (AKH) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT UNCHARTED LABS, INC.'S MOTION TO DISMISS
<u>COUNT THREE OF THE AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

Page(s)

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND ..................................................................................................4

        A.      The Digital Millennium Copyright Act ................................................4

        B.      Statement of Facts.................................................................................9

III.    LEGAL STANDARD..........................................................................................13

IV.     ARGUMENT ......................................................................................................14

        A.      Plaintiffs' Plausibly Allege that YouTube's Rolling Cipher "Controls Access" Under § 1201(a) ..................................................................................14

        B.      The Purpose For Which a Defendant Circumvents Access Is Not Material Under § 1201(a)(1) ..................................................................................19

        C.      Plaintiffs' Reading of § 1201(a)(1) Does Not Eliminate Fair Use ....................23

        D.      Any Dispute Concerning How YouTube's TPMs "Control Access" Is a Question of Fact to Be Resolved on Summary Judgment.................................................25

V.      CONCLUSION....................................................................................................26

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*,
    307 F. Supp. 2d 1085 (N.D. Cal. 2004) ................................................................. 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................... 13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................... 13

*Chambers v. Time Warner Inc.*,
    282 F.3d 147 (2d Cir. 2002) .................................................................................. 10

*Colpitts v. Blue Dimond Growers*,
    527 F. Supp. 3d 562 (S.D.N.Y. 2021) ..................................................... 13, 16, 25

*DiPilato v. 7-Eleven, Inc.*,
    662 F. Supp. 2d 333 (S.D.N.Y. 2009) ................................................................... 13

*Disney Enters., Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017) ........................................................................ Passim

*Green v. United States Dep't of Just.*,
    111 F.4th 81 (D.C. Cir. 2024) ............................................................................... 16

*Hattler v. Ashton*,
    2017 WL 11634742 (C.D. Cal. Apr. 20, 2017) ..................................................... 21

*In re Okura & Co. (Am.), Inc.*,
    249 B.R. 596 (Bankr. S.D.N.Y. 2000) ................................................................... 18

*Lexmark International, Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) ................................................................................. 21

*McCray v. Lee*,
    963 F.3d 110 (2d Cir. 2020) .................................................................................... 1

*McGucken v. Newsweek LLC*,
    464 F. Supp. 3d 594 (S.D.N.Y. 2020) ................................................................... 10

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
    629 F.3d 928 (9th Cir. 2010) ................................................................... 3, 8, 17, 21

*Murphy v. Millennium Radio Grp. LLC*,
    650 F.3d 295 (3d Cir. 2011) ................................................................ 17, 20

*Piper v. Chris-Craft Indus., Inc.*,
    430 U.S. 1 (1977) .................................................................................... 22

*UMG Recordings, Inc. v. Kurbanov*,
    2021 WL 6492907 (E.D. Va. Dec. 16, 2021) ......................... 2, 10, 13, 18

*United States ex rel. Weiner v. Siemens AG*,
    87 F.4th 157 (2d Cir. 2023) ...................................................................... 22

*United States v. Garcia*,
    2023 WL 1110567,n.3 (D. Nev. Jan. 30, 2023) ...................................... 18

*United States v. Paldiel*,
    2025 WL 524659,n.4 (E.D.N.Y. Feb. 18, 2025) ..................................... 18

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ............................................................Passim

*Walsche v. First Invs. Corp.*,
    981 F.2d 649 (2d Cir. 1992) ...................................................................... 18

*Young Advocates for Fair Educ. v. Cuomo*,
    2018 WL 10561496 (E.D.N.Y. Oct. 30, 2018) ....................................... 19

*Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*,
    633 F. Supp. 3d 650 (D. Conn. 2022) ................................... 2, 17, 18, 19

**Statutes**

17 U.S.C. § 1201(a)(3)(B) ................................................................... 6, 21

17 U.S.C. § 106 ................................................................................... 7, 8

17 U.S.C. § 1201 .............................................................................Passim

17 U.S.C. § 1201(a) .........................................................................Passim

17 U.S.C. § 1201(a)(1)(A) .................................................................Passim

17 U.S.C. § 1201(a)(1)(B)-(D) ..................................................................... 3

17 U.S.C. § 1201(a)(3)(A) ............................................................... 6, 17, 20

17 U.S.C. § 1201(c)(1) .................................................................................................. 7, 24

17 U.S.C. § 101, 102(a)(7), 103 ........................................................................................ 19

17 U.S.C. § 1201(a) ........................................................................................................... 21

17 U.S.C. § 1201(a)(1) ................................................................................................. Passim

17 U.S.C. § 1201(a)(2) ......................................................................................................... 6

17 U.S.C. § 1201(b) ..................................................................................................... 21, 24

**Rules**

Fed. R. Civ. P. 15(a)(2) ...................................................................................................... 25

**Regulations**

37 C.F.R. § 201.40(b) ........................................................................................................ 25

37 C.F.R. § 201.40(b)(2) ...................................................................................................... 7

**Other Authorities**

H.R. Rep. No. 105-551(I) ................................................................................................ 4, 14

S. Rep. No. 105-190 ..................................................................................................... Passim

## I.    INTRODUCTION

Udio seeks dismissal of Count Three of Plaintiffs' Amended Complaint—which alleges that Udio violated 17 U.S.C. § 1201 by circumventing YouTube's access controls that protect Plaintiffs' sound recordings—by mischaracterizing Plaintiffs' factual allegations and the legal landscape.  For purposes of its motion, Udio does not contest that YouTube's "rolling cipher" qualifies as a "technological measure," or that the rolling cipher is "effective."  Nor does Udio dispute that Plaintiffs plausibly allege that Udio "circumvent[ed]" the rolling cipher.  The only question is whether Plaintiffs have plausibly alleged that the rolling cipher "controls access to a [copyrighted] work" under 17 U.S.C. § 1201(a)(1)(A).  They plainly have.

Plaintiffs allege that YouTube "facilitates streaming music and offers a substantially restricted download feature for paying subscribers," but blocks unfettered access to Plaintiffs' sound recordings such as would be required for "downloading and making permanent, unrestricted copies of the content on the platform." Dkt. 119 ("Am. Compl.") ¶ 53.  To achieve this, "YouTube employs a 'rolling cipher' encryption measure," which "encrypt[s]" part of each media file—the "file URL"—using "a complex and periodically changing algorithm . . . designed to impede external access." *Id.*  The rolling cipher thus prevents users from bypassing these limitations, which is necessary for "downloading, copying, or distribut[ing]" YouTube videos. *Id.*  These allegations easily satisfy Rule 8(a)'s liberal pleading standard. *See McCray v. Lee*, 963 F.3d 110, 116 (2d Cir. 2020) ("[T]he statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." (internal quotation marks and ellipsis omitted)).  Regardless of any arguments Udio may ultimately advance on summary judgment, which would follow an opportunity to obtain discovery regarding how the rolling cipher operates and the manner in which Udio circumvented it, Plaintiffs' claim may not properly be disposed of on a motion to dismiss.

Udio's argument that these allegations are legally insufficient suffers from two fatal flaws: (1) Udio treats access under § 1201(a)(1) as an all-or-nothing proposition; and (2) Udio treats "access" and "copy" controls as a binary choice. Both positions are wrong.

**First**, Udio's all-or-nothing reading of § 1201 would mean that once a copyright owner makes a work accessible to the public to *any* degree, there can be no "access control" that guards the work. That is not the law. Section 1201(a)(1)(A) prohibits circumventing a technological protection measure ("TPM") that "*controls* access" to a copyrighted work—a phrase that plainly encompasses mechanisms that fall short of blocking access to a work *ab initio*. Udio may wish the statute said "prevents access" instead of "controls access," *see, e.g.*, Dkt. 125 ("Motion") at 3 (arguing "control access" means "prevent the public from viewing, reading, or using"), but that is not what Congress wrote. Statutory language controls, full stop. A TPM that limits *how* or *under what conditions* a user may access copyrighted content "controls access" within the statute's plain meaning. *See, e.g.*, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 444 (2d Cir. 2001); *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 864-65 (9th Cir. 2017).

Plaintiffs allege exactly that: YouTube's rolling cipher controls how users may access copyrighted works—allowing authorized streaming of music videos on the platform while blocking other forms of access, including offline playback for non-Premium users, mobile playback, ad-free viewing, evasion of territorial and age restrictions, and extraction of copyrighted audio. *See* Am. Compl. ¶¶ 7, 43, 53-58. Multiple courts that have addressed this issue have recognized that allegations of circumventing YouTube's TPMs plead a viable § 1201(a)(1)(A) claim. *See Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*, 633 F. Supp. 3d 650, 664-65 (D. Conn. 2022) (YouTube's rolling cipher "controls access" by restraining users' ability to reach downloadable files); *UMG Recordings, Inc. v. Kurbanov*, 2021 WL 6492907, at *6-7 (E.D. Va.

Dec. 16, 2021) (finding § 1201(a)(1) violation where a service bypassed the cipher, noting the cipher prevents downloading and poses technological obstacles to accessing the media files), *report and recommendation adopted*, 2022 WL 20417526 (E.D. Va. Feb. 10, 2022).

     **Second**, Udio essentially argues that because *its purpose* for circumventing YouTube's rolling cipher was to copy Plaintiffs' sound recordings, the TPM must be a "copy control," and therefore cannot be an "access control."  But a defendant's reasons for circumventing a TPM have no bearing on whether a TPM is an access control or a copy control, nor is there any prohibition on a TPM qualifying as both.  A contrary rule would flout the plain language of the statute and the line of precedent establishing that circumventing DVD encryption technology violates § 1201(a)(1)(A), irrespective of whether the defendant sought to view the content on an unauthorized device or make an unauthorized copy.  Those TPMs restricted both access to and copying of the underlying copyrighted works and thus qualify as *both* access controls and copy controls.  *See VidAngel, Inc.*, 869 F.3d at 864 ("The DMCA does not provide that a TPM cannot serve as both an access control and a use control."); *see also MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 946 (9th Cir. 2010) ("[I]f a copyright owner puts in place an effective measure that both (1) controls access and (2) protects against copyright infringement," liability can arise under both subsections.).  YouTube's rolling cipher does the same.

     **Finally**, Udio's "fair use" arguments are wrong on both the law and the equities.  Congress expressly accounted for fair use in enacting § 1201 by creating explicit statutory exemptions and establishing a triennial rulemaking process before the Copyright Office to identify additional exemptions as needed.  *See, e.g.*, 17 U.S.C. § 1201(a)(1)(B)-(D) (directing the Library of Congress to conduct triennial rulemakings to exempt classes of works whose users may be "adversely affected … in their ability to make noninfringing uses"); *id.* § 1201(d)-(j) (codifying exemptions

for specified uses); *id.* § 1201(c)(1) (preserving the fair-use defense to infringement). Udio ignores this comprehensive statutory scheme entirely.

Had Udio lawfully acquired copies of the sound recordings at issue without circumventing YouTube's rolling cipher—for instance, by purchasing them—there would be no DMCA circumvention issues; the case would turn entirely on whether Udio's subsequent copying for AI training is fair use (and it is not). But Udio chose otherwise. It unlawfully accessed Plaintiffs' sound recordings by stream-ripping them from YouTube, which required circumventing YouTube's rolling cipher. "Fair use has never been held to be a guarantee of access to the copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original." *Corley*, 273 F.3d at 459. It was Udio's decision to violate § 1201 and make this case about more than fair use.

At this juncture, it is enough that Plaintiffs have plausibly alleged that YouTube employs access controls within the meaning of § 1201 and that Udio circumvented those controls. How, exactly, those controls function, and what Udio did to circumvent them, are questions of fact to be answered through discovery. If Udio believes that discovery reveals undisputed facts that YouTube's TPMs do not function as access controls, Udio can move for summary judgment on that basis. However, because the Amended Complaint states a clear-cut circumvention claim under § 1201(a)(1), the Court should deny Udio's motion to dismiss.

## II.    BACKGROUND

### A.    The Digital Millennium Copyright Act

Congress enacted the Digital Millennium Copyright Act ("DMCA") in 1998 to "create[] the legal platform for launching the global digital on-line marketplace for copyrighted works" and to "facilitate making available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of the American creative genius." S. Rep. No. 105-

190, at 8 (1998); *see also* H.R. Rep. No. 105-551(I), at 9 (1998) (the DMCA was "intended to ensure a thriving electronic marketplace for copyrighted works on the Internet"); *id.* at 10 ("When copyrighted material is adequately protected in the digital environment, a plethora of works will be distributed and performed over the Internet.").  Congress recognized that online piracy posed a serious threat to the Internet's potential as a platform for lawful distribution of copyrighted works. Due to "the ease with which digital works can be copied and distributed worldwide," inadequate legal protection against piracy would cause "copyright owners [to] hesitate to make their works readily available on the Internet."  S. Rep. No. 105-190, at 8; *see also Corley*, 273 F.3d at 435.

Congress responded by establishing a framework to prohibit the circumvention of technological measures that safeguard access to copyrighted content.  *See Corley*, 273 F.3d at 435. Congress intentionally designed the framework to adapt to new technologies and business models that were, at the time, only emerging or as yet unforeseen.  *See* S. Rep. No. 105-190, at 15 (envisioning "the rapid and dynamic development of better technologies"); *id.* at 2 (recognizing that "[c]opyright laws have struggled through[out] the years to keep pace with emerging technology" and that "the law must adapt").  In doing so, Congress deliberately avoided specifying the technologies that would qualify for protection, focusing instead on how they function.

The result was 17 U.S.C. § 1201.  Section 1201 prohibits two types of conduct: (1) circumventing or trafficking in a technology designed to circumvent a TPM that "controls access" to a copyrighted work, 17 U.S.C. § 1201(a); and (2) trafficking in a technology designed to circumvent a TPM that "protects a right of a copyright owner," *id.* at § 1201(b).  Critically, these categories are not mutually exclusive.  *See VidAngel, Inc.*, 869 F.3d at 864 ("The DMCA does not provide that a TPM cannot serve as both an access control and a use control.").

- 5 -

This case concerns the first type of conduct prohibited by § 1201, which, as relevant here, makes it unlawful to "circumvent a technological measure that effectively controls access to a [copyrighted] work." 17 U.S.C. § 1201(a)(1)(A). Udio refers to such measures as "access controls." *See, e.g.*, Motion at 3.

To state a claim that Udio violated § 1201(a), Plaintiffs must plausibly allege that:

- **Access to Their Works Was Controlled by an Effective Technological Measure**: Under § 1201(a), a technological measure "effectively controls access to a work" if it "requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B); and

- **Udio Circumvented the Relevant Measure**: Circumvention is defined as "descrambl[ing] a scrambled work, . . . decrypt[ing] an encrypted work, or otherwise . . . avoid[ing], bypass[ing], . . . deactivat[ing], or impair[ing] a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A).

While not relevant to the elements of Plaintiffs' claim, the other types of conduct prohibited by § 1201 help to clarify the statute's structure and rebut Udio's arguments. In addition to prohibiting circumvention, § 1201 also makes it independently unlawful to (a) traffic in technologies that circumvent access controls, *see id.* § 1201(a)(2)[1]; or (b) traffic in technologies that circumvent what Udio calls "copy controls," which are technological measures that

---

[1] In relevant part, § 1201(a)(2) states: "No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that . . . is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title."

"effectively protect[] a right of a copyright owner" under § 106 of the Copyright Act. *Id.* § 1201(b)(1)(A).

In other words, while Plaintiffs allege that Udio is liable under § 1201 for *circumventing* access controls, § 1201 also imposes distinct and independent liability on anyone who *traffics* in tools designed to defeat either access controls or copy controls. Udio raises legislative discussions regarding the potential interplay between the affirmative fair use defense and liability if the § 1201(a) were to impose liability for circumventing a copy control. Motion at 7-10. That issue ultimately did not matter: Congress did not impose liability for *circumventing* copy controls because doing so would risk creating duplicative liability, as violations of copy controls generally already infringe rights protected by 17 U.S.C. § 106. As the Senate Report explains

> The prohibition in 1201(a)(1) is necessary because prior to this Act, the conduct of circumvention was never before made unlawful. The device limitation in 1201(a)(2) enforces this new prohibition on conduct. The copyright law has long forbidden copyright infringements, so no new prohibition was necessary. The device limitation in 1201(b) enforces the longstanding prohibitions on infringements.

S. Rep. No. 105-190, at 12.

Moreover, Congress expressly did account for fair use in crafting § 1201 in two complementary ways. First, Congress preserved the traditional fair use defense by providing that "[n]othing in [§ 1201] shall affect the rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title." 17 U.S.C. § 1201(c)(1). Second, Congress established a triennial rulemaking process to identify classes of works whose users may be "adversely affected . . . in their ability to make non-infringing uses" and to exempt those classes from § 1201(a)'s circumvention ban. *Id.* § 1201(a)(1)(B)-(D); *see also id.* § 1201(d)-(j) (codifying

exemptions).[2]  Through this mechanism—entrusted to the Library of Congress and the Copyright Office—Congress ensured that § 1201 would remain adaptable, allowing exemptions for legitimate, noninfringing purposes while still preventing large-scale piracy.

Nothing in § 1201 states that a technological measure must be *either* an "access control" or a "copy control," and courts have rejected attempts to create such a rigid dichotomy.  As *VidAngel* explained, "the statute does not provide that a TPM cannot serve as both an access control and a use control," and "does not suggest that a defendant could not violate both 17 U.S.C. §1201(a)(1)(A) . . . and § 106" when it circumvents a measure to reproduce or use the accessed work.  869 F.3d at 864.  Similarly, *MDY Industries* confirmed that if an effective measure "both (1) controls access and (2) protects against copyright infringement," liability can arise under both subsections.  629 F.3d at 946.

Congress intended this flexibility by designing the DMCA to "improve the ability of copyright owners to prevent the theft of their works" and to evolve alongside "the rapid and dynamic development of better technologies."  S. Rep. No. 105-190, at 15.  In this regard, § 1201 achieved Congress's desired result, and enabled online distribution of works, by affording copyright owners protections that extended beyond the exclusive rights set forth in § 106.  "Many copyright owners argue that the statute has worked just as Congress intended, laying the legal foundation for the explosion in legitimate digital dissemination models over the past two decades."

---

[2] Exemptions codified through this rulemaking process include, for example, those for educational accessibility services to add captions or audio descriptions to films where accessible versions are unavailable, for use by students, faculty, or staff with disabilities, 37 C.F.R. § 201.40(b)(2); enabling read-aloud or screen-reader access to e-books and digital text or notation by eligible individuals and authorized entities, *id.* § 201.40(b)(6); patient access to data generated by their own medical devices or personal monitoring systems, *id.* § 201.40(b)(7); diagnosis, maintenance, or repair of consumer devices by owners or their agents, *id.* § 201.40(b)(15); and preservation of lawfully acquired, no-longer-available computer programs and dependent digital materials by eligible libraries, archives, and museums, *id.* § 201.40(b)(20).

U.S. Copyright Office, *Section 1201 of Title 17: A Report of the Register of Copyrights* ("Copyright Office Report"), at ii (June 2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf.  Copyright owners have noted that "[t]he legal protections afforded by section 1201 have played a critical role in their decisions to enter emerging digital markets." *Id.* at 37.  One example of § 1201's positive effects is "[t]he dramatic growth of streaming services," including "ad-supported services," such as YouTube and others, which have "become a preferred method of delivering copyrighted content." *Id.* at 44-46.

By its Motion, Udio seeks to undercut those protections in a manner that would imperil the very methods of online distributions that § 1201 was enacted to advance.

### B.    Statement of Facts

Plaintiffs are a group of record companies and recorded music businesses that collectively own or exclusively control copyrights in many of the most historically significant and commercially valuable sound recordings in the world.  Am. Compl. ¶ 6.  Defendant Uncharted Labs, Inc. ("Udio") operates an AI-powered music generation service that allows users to generate audio files through text prompts describing the desired musical output in plain English. *Id.* ¶ 7.

To develop this service, Udio copied millions of Plaintiffs' copyrighted sound recordings without authorization, using those copies to train AI models capable of producing an unlimited number of audio files that directly compete with the very works Udio unlawfully appropriated. *Id.* ¶ 7.  Udio has admitted that its training data likely includes numerous recordings owned by Plaintiffs.  *See* Dkt. 26 ("Answer") at 9-10 ("Irrespective of whether UMG's particular version of 'My Way' was in Udio's training data, many other UMG recordings probably were.").  There is little doubt that Udio built its commercial product through the mass infringement of Plaintiffs' copyrighted works.

But Udio's misconduct extended beyond mere copyright infringement. Udio unlawfully accessed Plaintiffs' copyrighted sound recordings by circumventing the protections that YouTube places on its platform to control how copyrighted works may be accessed, viewed, and copied. Am. Compl. ¶ 7.

### 1.   *YouTube's Platform and Access Controls.*

YouTube is one of the world's most widely used online streaming platforms. *Id.* ¶ 52. It makes audiovisual content available for users to stream in real time, typically free of charge and supported by advertising. *Id.* ¶ 7; *see also Kurbanov*, 2021 WL 6492907, at *7. Users can stream music videos through YouTube's web player. Those who subscribe to YouTube Premium may download temporary copies of videos for offline playback within the YouTube app. Am. Compl. ¶¶ 52-53; *see also* Watch Videos Offline with YouTube Premium, YouTube Help, https://support.google.com/youtube/answer/11977233?sjid=17756054639003176980-NA#zippy=%2Cdownload-videos-to-watch-offline (last visited Oct. 24, 2025).

Although videos are available to stream on YouTube, a user's access to YouTube's content is far from unlimited. YouTube controls and restricts user access to content in numerous ways, including by requiring users to view advertisements before accessing content and by expressly prohibiting users from "access[ing], reproduc[ing], [or] download[ing] any Content except (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders." Terms of Service, YouTube, https://www.youtube.com/static?template=terms (last visited Oct. 24, 2025); *see also* Am. Compl. ¶ 53 & n.9.[3]

---

[3] The Court may take judicial notice of YouTube's Terms of Service, which are incorporated by reference into paragraph 53 of the Amended Complaint. *See Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (taking judicial notice of documents incorporated by reference in the complaint); *McGucken v. Newsweek LLC*, 464 F. Supp. 3d 594, 600 & n.2 (S.D.N.Y. 2020) (similar for Instagram's terms of service).

YouTube also forbids users from "circumvent[ing] . . . or otherwise interfer[ing] with any part of the Service . . . that prevents or restricts the copying or other use of Content." Terms of Service, *supra*.

In addition, YouTube employs multiple technical and operational safeguards to ensure that users access content only as authorized. Am. Compl. ¶¶ 52-53. These include, among other things: (a) limiting playback to YouTube's authorized playback mechanisms such as its proprietary website, video players, and applications; (b) restricting downloads to temporary, offline copies available only to Premium users; (c) enforcing geographic and age-based access restrictions; and (d) prohibiting commercial use or permanent copying of content. Collectively, these restrictions ensure that copyrighted works made available on YouTube can be streamed—but not copied, extracted, or redistributed—without authorization. *Id.*

YouTube accomplishes this through several TPMs, the most significant of which is its "rolling cipher." *Id.* ¶ 53. The rolling cipher is an encryption mechanism designed to prevent external sites, services, or users from directly accessing the underlying media files for certain copyrighted content, including the music videos corresponding to the Asserted Works. *Id.* Each of these YouTube videos has two separate URLs: the page URL, which is visible to users and corresponds to the webpage where playback occurs, and the file URL, which identifies the underlying media file and is encrypted using a dynamic and periodically changing algorithm—the rolling cipher. *Id.* This cipher requires a valid, authorized decryption process to access the file URL. Without it, external programs cannot directly retrieve or download the media files. *Id.*

The rolling cipher thus controls access to the underlying audiovisual files by ensuring that users can view or listen to content only through YouTube's authorized and advertising-supported playback mechanisms. *Id.* ¶ 54. It limits external access, automated scraping, or direct downloads

of source files, *id.*, and thereby inhibits unauthorized activities such as (a) extracting audio from YouTube videos, (b) creating permanent or unrestricted copies, (c) redistributing content outside the platform, and (d) converting streaming content into downloadable media files. By design, the rolling cipher ensures that the underlying audio and video files cannot be accessed, copied, or distributed except as expressly authorized by YouTube and the relevant rights holders. *Id.* ¶ 53.

YouTube's contractual and technological restrictions on access to copyrighted content reflect the fundamental economic bargain between the platform and rightsholders like Plaintiffs. *Id.* ¶¶ 52-55. Record companies authorize YouTube to stream their music videos to the public, thereby allowing limited access to their works, but only under tightly controlled conditions that preserve both the integrity and the value of those works. YouTube's free, ad-supported model is central to that arrangement: users may stream content without paying a fee, but only while viewing advertisements, and YouTube shares a portion of that advertising revenue with the rightsholders whose works appear on the platform. *See* YouTube Partner Program, YouTube, https://www.youtube.com/creators/partner-program/ (last visited Oct. 24, 2025). This revenue-sharing model depends on YouTube's ability to ensure that content is accessed only through authorized, ad-supported playback mechanisms—not downloaded, copied, or distributed outside the platform. To honor these conditions and sustain that ecosystem, YouTube employs TPMs such as the rolling cipher to prevent unauthorized access to copyrighted works.

### 2. *Udio's Unauthorized Circumvention and "Stream Ripping."*

Unlike ordinary YouTube users who access music videos for streaming as intended, Udio deliberately circumvented YouTube's TPMs to gain unauthorized access to Plaintiffs' sound recordings. *Id.* ¶¶ 7, 54-55. Specifically, Udio used a command-line program known as YT-DLP, an open-source software tool widely used for "stream ripping." *Id.* ¶¶ 54-55.

Stream ripping refers to the process of converting content made available for streaming into permanent, locally stored files—a well-known and pervasive form of digital piracy. *Id.* ¶ 54. YT-DLP automates this process by deciphering YouTube's rolling cipher to identify and extract the encrypted file URLs that point to the underlying media files. *Id.*; *see also Kurbanov*, 2021 WL 6492907, at *5. Once those URLs are decrypted, YT-DLP downloads the audio component of the video and converts it into a permanent audio file (such as an MP3) that can be freely stored, shared, or reused. *Kurbanov*, 2021 WL 6492907, at *4-5.

By employing YT-DLP, Udio bypassed YouTube's encryption measures, including the rolling cipher, to access Plaintiffs' copyrighted sound recordings outside of the YouTube platform, and free of any of the restrictions on offline playback, ad-free viewing, or extraction of copyrighted audio. Am. Compl. ¶¶ 54-55. This conduct unlawfully circumvented the TPMs that YouTube implements to restrict access to licensed content, including Plaintiffs' recordings. *Id.* ¶¶ 52-55.

## III. LEGAL STANDARD

A complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts "must deny a motion to dismiss for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim which would entitle him to relief." *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 342 (S.D.N.Y. 2009) (internal brackets omitted). The Court "must accept all factual allegations in the complaint as true and draw inferences from the allegations in the light most favorable to the plaintiff." *Colpitts v. Blue Dimond Growers*, 527 F. Supp. 3d 562, 574 (S.D.N.Y. 2021).

IV.     **ARGUMENT**

A.     **Plaintiffs' Plausibly Allege That YouTube's Rolling Cipher "Controls Access" Under § 1201(a).**

Udio contends that Plaintiffs have not alleged a "technological measure" that "controls access" under § 1201(a)(1)(A) because, according to Udio, the works are "freely accessible." Motion at 19. That argument mischaracterizes Plaintiffs' well-pleaded allegations and misunderstands what it means to "control access."

Udio's position assumes that a TPM can "control[ ] access" only if it completely blocks access to a work. But controlling access is not all or nothing. A measure can qualify as an access control if it regulates the *manner* and *conditions* under which access occurs, as opposed to barring access altogether. Section 1201(a)'s text confirms this: Congress chose the word *control*, not *prevent*. "Control" means "to exercise restraining or directing influence over." *Control*, Merriam-Webster, https://www.merriam-webster.com/dictionary/control; *see also Control*, Black's Law Dictionary (12th ed. 2024) (defining "control" as "[t]o exercise power or influence over"). Therefore, a measure need not "prevent" all access to a copyrighted work to be an access control—it need only *restrain*, *direct*, or *influence* the conditions of access.

Congress deliberately adopted this flexible approach to how copyright owners could control access to their works. In enacting the DMCA, Congress sought to build the legal foundation for a secure and dynamic digital marketplace—one that would enable creators to distribute their works online while maintaining meaningful controls over how those works were accessed and used. *See* S. Rep. No. 105-190, at 8 (explaining that the DMCA "create[s] the legal platform for launching the global digital on-line marketplace for copyrighted works" and "facilitate[s] making available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of the American creative genius"); H.R. Rep. No.

105-551(I), at 9 (1998) (the DMCA was "intended to ensure a thriving electronic marketplace for copyrighted works on the Internet").  Congress understood that the statute would need to accommodate new forms of digital distribution and emerging technologies ensuring that copyright protections could evolve alongside them.  *See* S. Rep. No. 105-190, at 15 (anticipating "the rapid and dynamic development of better technologies").  Section 1201's access-control provisions reflect Congress's intent to provide rightsholders the flexibility to develop lawful, innovative ways to make works available online without forfeiting control over the conditions of access.

YouTube's model for distributing copyrighted works and remunerating rightsholders is a paradigmatic example of this Congressional intent: rightsholders, like Plaintiffs, can upload copyrighted content to YouTube and earn a share of advertising revenue associated with the consumption of those works.[4]  This is precisely the sort of innovation in digital distribution models the DMCA was enacted to promote (and that would be thwarted on Udio's reading of § 1201).  *See* Copyright Office Report, *supra*, at ii ("[T]he statute has worked just as Congress intended, laying the legal foundation for the explosion in legitimate digital dissemination models over the past two decades.").

It is therefore not surprising that courts construing § 1201(a) have long recognized that *partial* restrictions on access fall squarely within this provision.  In a line of cases involving encryption on DVDs, courts held that circumvention of the encryption technology violated § 1201(a) even though purchasers could lawfully view the content using licensed players.  *See, e.g.*, *Corley*, 273 F.3d at 444-45; *VidAngel*, 869 F.3d at 863-65; *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1096 (N.D. Cal. 2004).  These courts explained that

---

[4] *See, e.g.*, YouTube Partner Earnings Overview, YouTube Help, https://support.google.com/youtube/answer/72902?hl=en#zippy=%2Chow-do-i-earn-revenue%2Cwhats-my-revenue-share (last visited Oct. 24, 2025) (describing a model for how creators can monetize content on YouTube).

the DVD Content Scramble System ("CSS") was an access control because it permitted access to content on the DVD solely for purposes of viewing the movie on an authorized player. *See, e.g.*, *VidAngel*, 869 F.3d at 864-65 (finding CSS an access control where "only authorized [DVD] players get those keys" to access the discs' contents); *see also Corley*, 273 F.3d at 444-45 (rejecting the claim that a DVD purchaser could decrypt a disc's encryption "to view the DVD on a competing platform," explaining that the statute exempts only those authorized "to circumvent an access control," not those merely permitted "to view" the work).

Plaintiffs plausibly allege that YouTube's TPMs similarly provide *restricted* access to the music videos on its platform. While users can access a "page URL" to stream music videos on an ad-supported basis within YouTube, they cannot reach "the video file itself that is played within the page," which resides at a distinct, encrypted "file URL." Am. Compl. ¶ 53. That file URL is protected by a dynamic, periodically changing algorithm—the "rolling cipher"—"**designed to impede external access to the underlying YouTube video files**." *Id.* (emphasis added). Udio's Motion entirely ignores these well-pleaded factual allegations, yet the Court is required to accept them "as true and draw inferences from the allegations in the light most favorable" to Plaintiffs. *Colpitts*, 527 F. Supp. 3d at 574.

Through this system, YouTube controls *how* users may interact with (or access) copyrighted works, restricting other forms of access, such as offline playback (for non-Premium users), mobile playback, ad-free viewing, evasion of territorial and age restrictions, and direct downloads. In Udio's own words, the rolling cipher thus operates as a "digital lock that must be opened" before a user can fully access a work. Motion at 13; *see also Green v. United States Dep't of Just.*, 111 F.4th 81, 99 (D.C. Cir. 2024) (describing § 1201(a) as a "protection against circumvention of digital locks").

Udio deliberately picked this lock.  Using YT-DLP, Udio "circumvent[ed] YouTube's encryption" to rip copyrighted audio files from the music videos.  Am. Compl. ¶ 55.  By bypassing YouTube's TPMs, Udio obtained unrestricted versions of Plaintiffs' sound recordings—separate from the music videos, free of advertisements, playable offline, and fully downloadable (and available for subsequent illicit copying, including for use as training data).  That conduct is the "electronic equivalent of breaking into a locked room" to retrieve the work inside.  *See MDY Indus.*, 629 F.3d at 947 (citation omitted); *see also Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 300 (3d Cir. 2011) ("[I]f a movie studio encrypts a DVD so that it cannot be copied without special software or hardware, and an individual uses his own software to 'crack' the encryption and make copies without permission, the studio may pursue the copier . . . for his circumvention of the encryption, which is a 'technological measure' designed to 'control access to' the DVD, under the DMCA." (internal ellipsis omitted) (quoting *Corley*, 273 F.3d at 444).  Because YouTube does not authorize the kind of unfettered access Udio obtained—and Plaintiffs did not grant Udio permission to bypass YouTube's TPMs—Udio plainly violated § 1201(a)(1)(A).  *See* 17 U.S.C. § 1201(a)(3)(A) (defining "circumvent" as bypassing a TPM "without the authority of the copyright owner"); *VidAngel*, 869 F.3d at 863 (same).

The court in *Yout, LLC v. Recording Industry Association of America, Inc.* applied this same analysis to YouTube's TPM and reached the same conclusion.  *Yout* explained that "the plain meaning of a measure that 'controls access' to a protected work appears to be broader than a measure that 'prevents' access."  633 F. Supp. 3d at 664.  It expressly held that the phrase "controls access" encompasses technical measures that "restrain a YouTube user's freedom or ability to access the location where downloadable files are stored and download them."  *Id.*  Udio's attempt to cabin *Yout* by claiming that the court "did not meaningfully engage with the question of whether

- 17 -

a rolling cipher is an access control or a copy control," Motion at 19-20, mischaracterizes the
opinion and ignores that Yout litigated the case as a § 1201(a)(1) claim and made the same
arguments Udio makes here regarding "free" access to the works.[5]  The *Yout* court conducted a
careful textual analysis, reviewing the dictionary definitions of "control" and "access" to derive
the plain meaning of the phrase "controls access," before concluding that YouTube's rolling cipher
falls squarely within § 1201(a).  *Yout*, 633 F. Supp. 3d at 664-65; *see also Kurbanov*, 2021 WL
6492907, at *6-7 (finding § 1201(a)(1) violation for bypassing YouTube's rolling cipher, noting
that the cipher "does not allow users to download the videos or audio files streamed on the watch
pages").

    The fact that *Yout* is on appeal does not deprive the district court's opinion of its persuasive
force.  Until reversed or vacated, it remains a valid and carefully reasoned application of law by a
sister court.  *See, e.g.*, *United States v. Garcia*, 2023 WL 1110567, at 2 n.3 (D. Nev. Jan. 30, 2023)
("Nothing prohibits me from relying on a case as persuasive authority merely because an appeal
of that decision is pending."); *cf. In re Okura & Co. (Am.), Inc.*, 249 B.R. 596, 611 n.10 (Bankr.
S.D.N.Y. 2000) ("While vacatur may diminish an opinion's precedential value, it has no effect on
its persuasiveness.").  Indeed, "the general rule [is] that a court must apply the law as it exists at
the time it renders its decision." *Walsche v. First Invs. Corp.*, 981 F.2d 649, 653 (2d Cir. 1992);
*see also United States v. Paldiel*, 2025 WL 524659, at 9 n.4 (E.D.N.Y. Feb. 18, 2025) ("My duty
is to apply the law as it currently stands, rather than to attempt to predict the Supreme Court's
views on the matter.").  If either party believes the Second Circuit's future decision in *Yout* is

---

[5] *See* Opposition to Motion to Dismiss, *Yout, LLC*, No. 20-cv-01602 (SRU), Dkt. 55 at 4 (arguing that Yout
"cannot 'circumvent' the rolling cipher, 'TPM,' or any other protection measure, per that term's definition
in 17 U.S.C. § 1201, because YouTube already offers the means of accessing these video streams to anyone
who requests them").

persuasive authority for this Court (or not), that party can raise that argument at summary judgment, not as a threshold reason for dismissal under Rule 12(b)(6).[6]

In short, Plaintiffs plausibly allege that YouTube's rolling cipher "controls access" to their copyrighted works, and their § 1201 claim should therefore advance beyond the pleading stage.[7]

### B.    The Purpose For Which a Defendant Circumvents Access Is Not Material Under § 1201(a)(1).

Udio argues that YouTube's rolling cipher is a "copy control" rather than an "access control" because *its purpose* for circumventing the TPM was to download (and thus copy) Plaintiffs' copyrighted sound recordings for use in training its AI. *See* Motion at 13-14. In other words, Udio claims that because it bypassed the rolling cipher in order to copy Plaintiffs' works, the rolling cipher cannot be an access control. This argument is meritless.

Section 1201(a) prohibits the act of circumvention itself, regardless of what the user intends to do after gaining access. The text of § 1201(a)(1)(A) contains no purpose-based limitation. Instead, it focuses squarely on the unauthorized evasion of a TPM that "controls access" to a copyrighted work. The violation lies in the circumvention, not the reason for it.

*VidAngel* is instructive. There, VidAngel purchased DVDs and Blu-ray discs and used

---

[6] The Court should similarly reject Udio's tactical and two-year-belated amicus filing in *Yout* as a basis to defer ruling on the present motion. "Amicus briefs which do no more than repeat the arguments made in the briefs of the litigants are no friends of the court." *Young Advocates for Fair Educ. v. Cuomo*, 2018 WL 10561496, at *1 (E.D.N.Y. Oct. 30, 2018). Udio asserts that "the parties to th[e *Yout*] appeal had not sufficiently addressed" the question of access controls, Motion at 20, yet ignores that the RIAA's answering brief included an entire subsection explaining why that distinction is contrary to the statute, *see* Answering Br. at 29, *Yout, LLC v. Recording Indus. Ass'n of Am.*, No. 22-2760 (2d Cir. May 4, 2023), Dkt. 76 ("Section 1201 'Access-Control' Provisions Apply To Technology That Restrains A User's Ability To Access The Copyrighted Work").

[7] Udio also argues that Plaintiffs have not alleged circumvention of an "access control" because the copyrighted "work" is the audiovisual content itself, not the underlying digital file. *See* Motion at 16-17. Even accepting that premise, the argument fails. Although the music videos available to stream on YouTube are copyrighted works, the sound recordings Udio ripped from those music videos embody separate copyrights. *See* 17 U.S.C. §§ 101, 102(a)(7), 103. Udio accessed the sound recordings on their own, even though YouTube does not make them publicly available apart from the music videos.

decryption software to strip the encryption for purposes of copying the movies to its own servers. 869 F.3d at 853. VidAngel claimed the DVD encryption systems were "use controls" (what Udio refers to as "copy controls") rather than "access controls," because "the Studios object only to decryption to copy—a *use* of the copyrighted work—but permit those who buy discs to decrypt to view—a way of *accessing* the work." *Id.* at 863-64 (emphasis in original). In other words, VidAngel claimed that because it circumvented the encryption to copy rather than to view, it had only bypassed a "use control" and therefore could not have violated § 1201(a)(1).

The Ninth Circuit disagreed. It held that "the statute does not provide that a TPM cannot serve as both an access control and a use control," and that "[i]ts text does not suggest that a defendant could not violate both § 1201(a)(1)(A), by circumventing an access control measure, and § 106, by, for example, reproducing or publicly performing the accessed work." *Id.* at 864. While "unlawful circumvention under § 1201(a) . . . are acts that ***do not necessarily infringe*** or facilitate infringement," a defendant who "decrypts the TPMs and then also reproduces that work[] . . . is liable for both circumvention in violation of § 1201(a)(1)(A) and copyright infringement in violation of § 106(1)." *Id.* (emphasis added); *see also Murphy*, 650 F.3d at 300.

The same logic applies here. Like the DVD encryption in *VidAngel*, YouTube's rolling cipher and related TPMs restrict how users may access copyrighted content. Udio does not dispute that it bypassed those access controls. Though Udio's circumvention enabled it to download and copy Plaintiffs' copyrighted sound recordings for use as training data, liability under § 1201(a)(1) turns only on the act of bypassing a technological barrier without authorization. *See* 17 U.S.C. § 1201(a)(3)(A) (defining "circumvent" as "bypass[ing], remov[ing], deactivat[ing], or impair[ing] a technological measure, without the authority of the copyright owner"). Tellingly, Udio cites no case holding that a TPM controlling access loses that status when the circumvention

is for copying.  To the contrary, courts have consistently recognized that a single TPM may simultaneously control access and restrict copying.  *See, e.g.*, *VidAngel*, 869 F.3d at 864 (observing that a TPM may "serve as both an access control and a use control"); *MDY Indus.*, 629 F.3d at 946 (acknowledging that a defendant "could be liable under both § 1201(a) and (b)").

The structure of the statute confirms this overlap.  Section 1201(a) targets circumventing measures that control access to works, and § 1201(b) targets trafficking in devices that circumvent measures that protect the rights of copyright owners.  The definitions are distinct but not mutually exclusive.  *Compare* § 1201(a)(3)(B) (defining an access control as a measure that "requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work"), *with id.* § 1201(b)(2)(B) (defining a copy control as a measure that "prevents, restricts, or otherwise limits the exercise of a right of a copyright owner").  A measure that restricts how one gains access to a work—such as encryption or authorization keys— necessarily limits the ability to copy it as well.

Udio's reliance on *Lexmark International, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004), underscores the weakness of its position.  *Lexmark* held that an "authentication sequence" for toner cartridges was not an access control because "[a]nyone who buys a Lexmark printer may read the literal code of the Printer Engine Program *directly* from the printer memory, *with or without* the benefit of the authentication sequence."  *Id.* at 546 (emphasis added).  Put differently, there was no TPM that gated access to the work at all.  Here, by contrast, Plaintiffs' sound recordings are not unguarded.  The YouTube player permits only access via streaming by use of the rolling cipher—precisely the restriction *Lexmark* found lacking.

Nor does *Hattler v. Ashton*, 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017), support Udio's position.  As a threshold matter, *Hattler* was decided *before* the Ninth Circuit's decision in

*VidAngel*, and thus is likely no longer good law. But even if it were, it is distinguishable on its facts, as *Hattler* analyzed the technological measure at issue as one that permitted all forms of access other than copying, whereas YouTube's rolling cipher restricts access more broadly, including for purposes of enforcing territorial and age restrictions, limiting ad-free viewing and offline playback for non-Premium users, and preventing extraction of copyrighted audio from the licensed music videos.

Unable to locate support in the text or relevant caselaw, Udio leans heavily on legislative history to manufacture a bright-line divide between access controls and copy controls. But "a statute's legislative history cannot overcome the plain meaning of the text." *United States ex rel. Weiner v. Siemens AG*, 87 F.4th 157, 162-63 (2d Cir. 2023) (internal quotation marks omitted); *see also Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 26 (1977) ("Reliance on legislative history . . . is a step to be taken cautiously."). Nor is Udio's characterization of the legislative history accurate. The history of the statute *does not* establish that a TPM cannot simultaneously qualify as an access control and copy control. *See VidAngel*, 869 F.3d at 865 ("[N]either the language of section 1201 nor the legislative history addresses the possibility of access controls that also restrict use." (internal quotation marks omitted)). Indeed, *Corley* recognized that Congress enacted § 1201(a)(1)(A) to combat "copyright piracy in its earlier stages, before the work was even copied," by targeting "those pirates who would circumvent these digital walls," thereby confirming that the purpose behind a § 1201(a)(1)(A) violation is often to facilitate copying. 273 F.3d at 435 (emphasis omitted).

From the legislative discussions reflecting an awareness that an overbroad circumvention prohibition would risk compromising the fair use doctrine, Udio makes the immense logical leap that a TPM controlling copying *per se* cannot control access. *See* Motion at 7-8. But the legislative

history also supports the alternative narrative that Congress simply perceived a risk of duplicative liability if it created an independent cause of action for bypassing copy controls. As noted in the Senate Report, "[t]he prohibition in 1201(a)(1) is necessary because prior to this Act, the conduct of circumvention was never before made unlawful," whereas "copyright law has long forbidden copyright infringements, so no new prohibition [on circumventing copy controls] was necessary." S. Rep. No. 105-190 at 12. That same report makes clear that Congress intended to create broad and forward-looking protection. *See, e.g.*, S. Rep. No. 105-190, at 15 (recognizing § 1201 "depends in large part on the rapid and dynamic development of better technologies" and was designed to evolve alongside advances in encryption and access control measures). Udio's constrained interpretation of the statute is inconsistent with this legislative history.

In sum, a defendant's reason for circumventing a TPM is irrelevant to liability under the DMCA's anti-circumvention provisions. When Udio bypassed YouTube's rolling cipher and gained unfettered access to Plaintiffs' copyrighted works, it violated § 1201(a)(1). This act of circumvention is what the statute forbids.

### C.    Plaintiffs' Reading of § 1201(a)(1) Does Not Eliminate Fair Use.

Udio warns that Plaintiffs' reading of § 1201(a)(1) would extend the statute beyond its intended scope and eviscerate the doctrine of fair use. Motion at 1, 3. This prediction is unfounded.

Udio's argument conflates two distinct causes of action: copyright infringement and unlawful circumvention. Copyright infringement under § 106 concerns unauthorized copying and distribution and is subject to a fair use defense. Section 1201(a)(1), by contrast, targets the act of circumventing a TPM that controls access to a protected work. Nothing in Plaintiffs' theory collapses those inquiries or eliminates the fair-use defense for subsequent copying.

Once again, *VidAngel* is illustrative.  There, movie studios sued under both § 1201(a)(1) for circumvention of DVD encryption and under § 106 for copyright infringement. 869 F.3d at 855.  The Ninth Circuit held that VidAngel violated § 1201(a)(1) by decrypting DVDs, *id.* at 864, but separately addressed VidAngel's fair use defense in connection with the infringement claim, *id.* at 860-62.  The same approach is appropriate here.  While Udio may attempt a fair use defense (though it will fail) to justify its copying of Plaintiffs' sound recordings to train its AI models, fair use cannot excuse its decision to access these protected works by circumventing YouTube's TPMs.

If Udio wanted fair use to shield it from liability entirely, it could have acquired its training data without circumventing a TPM.  Instead, Udio chose a cheaper and faster route: stream-ripping from YouTube, which entailed circumventing YouTube's TPMs.  Section 1201(a)(1) exists to deter precisely that kind of shortcut—to ensure that fair use remains available to lawful users, not to those who bypass access controls to obtain works without authorization.  Udio may argue fair use with respect to its subsequent copying, *see, e.g.*, Answer at 4 ("[I]t is fair use . . . to make a copy . . . as part of a back-end technological process[.]"), but that defense cannot excuse its unlawful accessing of the works in the first place.

Nor do Udio's professed concerns about fair use find any footing in the statute or its history.  Congress deliberately designed § 1201 to coexist with fair use, not displace it.  Indeed, the statute includes an express preservation clause stating that "[n]othing in [§ 1201] shall affect the rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title." 17 U.S.C. § 1201(c)(1).  Congress also established a triennial rulemaking process empowering the Librarian of Congress, upon the Register of Copyright's recommendation, to exempt from § 1201(a)'s circumvention prohibition "classes of works" whose users may be "adversely affected . . . in their ability to make noninfringing uses."  *Id.* § 1201(a)(1)(B)-(D); *see also id.*

§ 1201(d)-(j).  That process has repeatedly produced carefully tailored exemptions to facilitate legitimate non-infringing activities—such as accessibility for the visually impaired, device repair and security research, and preservation by libraries and archives—demonstrating that Congress built flexibility and fairness into the statute itself.  *See* 37 C.F.R. § 201.40(b).  In short, § 1201 already strikes the very balance Udio claims to defend: preserving fair use for lawful users while prohibiting the unauthorized circumvention of access controls.

If Udio truly believed that prohibiting stream-ripping under § 1201(a)(1) would chill fair use, its remedy lies with the Library of Congress, which can grant class-specific exemptions through the rulemaking process.  But such an exemption would be inconsistent with § 1201(a)(1)'s core purpose: "back[ing] with legal sanctions the efforts of copyright owners to protect their works from piracy behind digital walls."  *Corley*, 273 F.3d at 435.  There is no need to distort the statute to account for fair use concerns—the law Congress enacted already strikes the appropriate balance.

**D.  Any Dispute Concerning How YouTube's TPMs "Control Access" Is a Question of Fact to Be Resolved on Summary Judgment.**

Plaintiffs have clearly alleged that YouTube's technological measures provide users limited access to "stream" copyrighted content, yet prohibit access to "permanent, unrestricted copies of the content on the platform."  Am. Compl. ¶ 53.  Udio circumvented these access controls, thereby accessing Plaintiffs' sound recordings, shorn of the access restrictions YouTube imposes.  *See id.* ¶¶ 52-55.  At the pleading stage, the Court is required to accept those allegations as true and draw all reasonable inferences in Plaintiffs' favor.  *See Colpitts*, 527 F. Supp. 3d at 574.  If Udio disputes that YouTube's TPMs function to limit access in this fashion, such factual questions are properly explored in discovery and addressed on summary judgment or trial.

Moreover, to the extent the Court concludes that any of Plaintiffs' factual allegations require further detail, Plaintiffs respectfully request leave to amend to supplement those allegations

and cure any perceived deficiencies.  *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").

## V.    CONCLUSION

Plaintiffs' anti-circumvention claim (Count Three) meets the liberal standard set forth in Rule 8(a).  Plaintiffs plausibly allege that YouTube's rolling cipher is a TPM that "effectively controls access" to copyrighted works within the meaning of § 1201(a)(1), and that Udio circumvented this measure.  A TPM "controls access" under § 1201(a)(1) when it regulates the manner and conditions under which users may reach a work—here, by allowing streaming through YouTube's authorized platform while blocking permanent, unrestricted copies.  It need not prevent access altogether.  Nor does the statute draw the artificial line Udio proposes between access and copy controls; a single technological measure may serve both functions.  Plaintiffs' allegations easily satisfy the statutory requirements, and any factual questions about the precise operation of YouTube's rolling cipher can be resolved through discovery.

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Udio's Motion to Dismiss Count Three of Plaintiffs' Amended Complaint.

Dated:    October 24, 2025
          New York, New York

By: _____
Moez M. Kaba
Mariah N. Rivera
Alexander R. Perry
Samuel Givertz
**HUESTON HENNIGAN LLP**
1 Little West 12th Street
New York, New York 10014
Telephone: (646) 930-4046
Facsimile: (888) 775-0898
mkaba@hueston.com
mrivera@hueston.com
aperry@hueston.com
sgivertz@hueston.com

Christina Von der Ahe Rayburn (*pro hac vice*)
**HUESTON HENNIGAN LLP**
620 Newport Center Drive, Suite 1300
Newport Beach, California 92660
Telephone: (949) 356-6412
Facsimile: (888) 775-0898
crayburn@hueston.com

Robert N. Klieger (*pro hac vice*)
Rajan S. Trehan (*pro hac vice*)
**HUESTON HENNIGAN LLP**
523 West 6th Street, Suite 400
Los Angeles, California 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898
rklieger@hueston.com
rtrehan@hueston.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those identified as non-registered participants on October 24, 2025.

Moez M. Kaba
*Counsel for Plaintiffs*