# EXHIBIT B
# (Redacted)

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ~~UMG RECORDINGS, INC., CAPITOL RECORDS, LLC,~~ SONY MUSIC ENTERTAINMENT, ALAMO RECORDS LLC, ARISTA MUSIC, ARISTA RECORDS, LLC, ~~ATLANTIC RECORDING CORPORATION, RHINO ENTERTAINMENT COMPANY, WARNER MUSIC INC., WARNER MUSIC INTERNATIONAL SERVICES LIMITED, WARNER RECORDS INC., WARNER RECORDS LLC, and WARNER RECORDS/SIRE VENTURES LLC,~~ LAFACE RECORDS, LLC, RECORDS LABEL, LLC, ~~INTERSCOPE RECORDS,~~ SONY MUSIC ENTERTAINMENT US LATIN, LLC, ULTRA RECORDS, LLC, VOLCANO ENTERTAINMENT III, LLC, ~~ZOMBA RECORDING CORPORATION,~~ ZOMBA RECORDING LLC, <br><br> Plaintiffs, <br><br> v. <br><br> UNCHARTED LABS, INC., d/b/a Udio.com, and JOHN DOES 1-10, <br><br> Defendant. | Case No.: 1:24-cv-04777-AKH <br><br> **[PROPOSED]    SECOND    AMENDED COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs ~~UMG Recordings, Inc. ("UMG") and Capitol Records, LLC ("Capitol," and collectively with UMG, "Universal");~~ Sony Music Entertainment ("SME"), Alamo Records, LLC ("Alamo") ~~("Alamo"),~~ Arista Music, Arista Records LLC ("Arista Records~~,~~"), LaFace Records, LLC ("LaFace"), Records Label, LLC ("Records Label"), ~~Interscope Records ("Interscope"),~~ Sony Music Entertainment US Latin, LLC ("SME US Latin"), Ultra Records, LLC ("Ultra"), Volcano Entertainment III, LLC ("Volcano"), ~~Zomba Recording Corporation ("Zomba Corp."),~~ and Zomba Recording LLC ("Zomba ~~LLC" and~~ and collectively with ~~Arista Music and SME~~ SME,

Alamo, Arista Music, Arista Records, LaFace, Records Label, ~~Interscope,~~ SME US Latin, Ultra, Volcano, ~~Zomba Corp.,~~ and Zomba ~~LLC,~~ ~~"Sony~~Plaintiffs")~~; Atlantic Recording Corporation ("Atlantic"), Rhino Entertainment Company ("Rhino"), Warner Music Inc. ("WMI"), Warner Music International Services Limited ("WMISL"), Warner Records Inc., Warner Records LLC, and Warner Records/SIRE Ventures LLC ("WR/SIRE," and collectively with Atlantic, Rhino, WMI, WMISL, Warner Records Inc., and Warner Records LLC, "Warner," and together with Universal and Sony, "Plaintiffs")~~, by and through their undersigned counsel, file this Second Amended Complaint against Uncharted Labs, Inc. ("Udio") and allege as follows:

## NATURE OF THE ACTION

1.      From the invention of the phonograph record, through the eras of vinyl, cassette tapes, CDs, and now streaming and social media, the recorded music industry has been at the forefront of technological advancement.  Artificial intelligence ("AI") and machine learning are the next frontier of technological development, poised to push boundaries and expand commercial opportunity.  But with AI's enormous capabilities comes an equally enormous potential for abuse, making it critical that AI technology be implemented responsibly, ethically, and legally.

2.      Most fundamentally, AI companies, like all other enterprises, must abide by the laws that protect human creativity and ingenuity.  There is nothing that exempts AI technology from copyright law or that excuses AI companies from playing by the rules.  This lawsuit seeks to enforce these basic principles.

3.      Perhaps more so than with many other technologies, there is both promise and peril with AI.  As more powerful and sophisticated AI tools emerge, the ability for AI to weave itself into the processes of music creation, production, and distribution grows.  If developed with the permission and participation of copyright owners, generative AI tools will be able to assist humans in creating and producing new and innovative music.  But if developed irresponsibly, without regard for fundamental copyright protections, those same tools threaten enduring and irreparable harm to recording artists, record labels, and the music industry, inevitably reducing the quality of new music available to consumers and diminishing our shared culture.

4.     This case concerns a generative AI service, which allows users to generate digital music files that sound like genuine human sound recordings in response to basic inputs.  The capacity for a generative AI service to produce convincing imitations of genuine sound recordings starts with copying a vast range of sound recordings.  When those who develop such a service steal copyrighted sound recordings, the service's synthetic musical outputs could saturate the market with machine-generated content that will directly compete with, cheapen, and ultimately drown out the genuine sound recordings on which the service is built.

5.     Foundational principles of copyright law dictate that copying protected sound recordings for the purpose of developing an AI product requires permission from rightsholders. Otherwise, such AI offerings will erode the value of the artistic works that comprise the essential raw materials that allow them to function in the first place.  If left unmoored from existing and longstanding legal constraints, such products could supplant, rather than support, genuine human creativity.

6.     Plaintiffs are affiliated record companies or recorded music businesses that, together, own or exclusively control copyrights in somea great majority of the most commercially valuable sound recordings in the world.   They have developed their enviable catalogs by discovering, developing, and promoting human recording artists, whose artistic contributions are the bedrock of the recorded music industry and the music we listen to today.  These artists range from promising newcomers to the most famous musicians and performers in the world to myriad other artists who may not fill stadiums but who nevertheless shape culture.  Plaintiffs have a track record of embracing innovation and have entered into voluntary free-market licensing deals that authorize the use of their protected sound recordings in emerging technologies.  Such deals include full-catalog licenses with streaming music services and user-generated content platforms, and other licenses with innovative businesses associated with social media, fitness, gaming, the metaverse, and more.

7.     Defendant Uncharted Labs, Inc. is the company behind Udio, a generative AI service that creates digital music files within seconds of receiving a user's prompts.  Building and

operating a service like Udio's requires at the outset copying and ingesting massive amounts of data to "train" a software "model" to generate outputs. For Udio specifically, this process involved copying decades worth of the world's most popular sound recordings and then ingesting those copies into Udio's AI models so they can generate outputs that imitate the qualities of genuine human sound recordings. And to make matters worse, Udio obtained those copies in the first instance by unlawfully "stream ripping" them from the popular streaming platform YouTube, and circumventing the technological measures designed specifically to prevent such unauthorized copying. Udio charges many of its users monthly fees to use its product and produce digital music files, which are designed to entertain, evoke emotion, and stoke passion just like the genuine sound recordings Udio copied.

8.    Given that the foundation of its business has been to exploit copyrighted sound recordings without permission, until Plaintiffs filed this action, Udio hads been deliberately evasive about what exactly it has copied. This is unsurprising. After all, to answer that question honestly would be to admit willful copyright infringement on an almost unimaginable scale. Udio's executives instead speak publicly in exceedingly general terms. For example, they have said Udio's service is trained on "a large amount of publicly-available and high-quality music" that is "obtained from the internet" and the "*best quality music* that's out there."[1]

9.    Of course, it is has always been obvious what Udio's service is trained on. Udio copied Plaintiffs' copyrighted sound recordings *en masse* and ingested them into its AI models. Udio's product can only work the way it does by copying vast quantities of sound recordings from artists across every genre, style, and era. The copyrights in many of those sound recordings—the recordings Udio's executives have described as the "best quality music" that can be obtained—are owned or exclusively controlled by Plaintiffs. In other words, if Udio had taken efforts to avoid copying Plaintiffs' sound recordings and ingesting them into its AI models, Udio's service would not be able to reproduce the convincing imitations of such a vast range of human musical

---

[1] Sharon Goldman, *AI Music May Be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024), https://fortune.com/2024/05/17/ai-music-training-scraped/.

expression at the quality that Udio touts.  Udio's service trains on the expressive features of these copyrighted sound recordings for the ultimate purpose of poaching the listeners, fans, and potential licensees of the sound recordings it copied.

10.    If there were any doubt regarding Udio's unauthorized copying, Udio dispelled it by effectively conceding in pre-litigation correspondence that it copied Plaintiffs' copyrighted sound recordings.  When Plaintiffs directly accused Udio of copying Plaintiffs' sound recordings to train its model, Udio did not deny or proffer any facts to undermine those allegations.  It would have been simple for Udio to say that it used other, legally acquired recordings, if that were the case.  Instead, Udio deflected and disingenuously asserted that its training data is "competitively sensitive" and constitutes "trade secrets"—despite being based on "publicly available" music "out there" for music fans.  Udio also claimed that its large-scale copying of sound recordings is "fair use," which was telling because fair use only arises as a defense to an otherwise unauthorized use of a copyrighted work.

11.    Plaintiffs could have proceeded with this action based solely on eliciting that reasonable inference of copying.  Nevertheless, Plaintiffs' claims are based on much more.  In particular, Plaintiffs tested Udio's product and generated outputs using a series of prompts that pinpoint a particular sound recording by referencing specific subject matter, genre, artist, instruments, vocal style, and the like.  Udio's service repeatedly generated outputs that closely matched the targeted copyrighted sound recording, which means that Udio copied those copyrighted sound recordings to include in its training data.  In addition, the public has observed (and Plaintiffs have confirmed) that even less targeted prompts can cause Udio's product to generate outputs that resemble specific recording artists and specific copyrighted sound recordings.  Such outputs are clear evidence that Udio trained its models on Plaintiffs' copyrighted sound recordings.

11.12.  With the benefit of discovery, Plaintiffs now have clarity regarding the scope of Udio's infringement.  Plaintiffs' inspection of Udio's training data revealed that Udio collected over ▮▮▮▮▮▮ *audio files* to build its training dataset.  Confronted with this staggering sum,

Plaintiffs developed a process to identify their sound recordings amongst the countless audio files in Udio's training data. This process involved using Audible Magic, an industry-standard audio content recognition tool, to determine with precision which sound recordings Udio included in its training dataset. At the end of this process, Plaintiffs identified hundreds of thousands of copyrighted sound recordings in Udio' training dataset that are owned or controlled just by the current Plaintiffs and were copied by Udio without authorization.

12.13. Udio is not exempt from the copyright laws that protect human authorship. Like any other market participant, Udio cannot reproduce copyrighted works for a commercial purpose without permission. Heedless of this basic principle, Udio's unauthorized copying erodes the value and integrity of Plaintiffs' copyrighted sound recordings with rapid and devastating impact. Udio's service generates music with such speed and scale that it risks overrunning the market with AI-generated music and generally devaluing and substituting for human-created work. Despite only having launched approximately two months agoTwo months after its launch, Udio's product was already makes making a reported 10 music files per second, which amounts to 864,000 files per day, or just over 6,000,000 files per week. These digital music files have been released to the public—some already finding their way onto the major streaming services—and compete with the copyrighted sound recordings that enabled their creation; yet Udio sought no permission from and gives no credit or compensation to the human artists or other rightsholders whose works fueled their creation.

13.14. Udio also profits substantially from its infringement of Plaintiffs' copyrighted sound recordings. Udio has raised millions of dollars in funding, touts a roster of high-profile backers, and has monetized its service, charging users up to $30 per month for its highest subscription tier. None of that would be possible without the vast troves of copyrighted sound recordings that Udio copied to train its AI models.

14.15. Udio cannot avoid liability for its willful copyright infringement by claiming fair use. The doctrine of fair use promotes human expression by permitting the unlicensed use of copyrighted works in certain, limited circumstances, but Udio offers imitative machine-generated

music—not human creativity or expression.  Moreover, the Copyright Act enumerates four factors to assess whether an unauthorized use is fair, none of which favors Udio's product.  These factors are: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  In these circumstances, the purpose of Udio's use of Plaintiffs' copyrighted sound recordings is quintessentially commercial and creates directly competitive digital music files that serve the same purpose as the recorded music Plaintiffs create and substitute for genuine recordings by humans; Udio copies the key expressive features of Plaintiffs' copyrighted sound recordings; those copyrighted sound recordings are at the core of copyright protection; and Udio's infringement undermines both existing and potential commercial markets for selling, licensing, and distributing sound recordings.  If left unchecked, Udio risks upending whole segments of the legitimate music industry.

15.16.  At its core, this case is about ensuring that copyright continues to incentivize human invention and imagination, as it has for centuries.  Achieving this end does not require stunting technological innovation, but it does require that Udio adhere to copyright law and respect the creators whose works allow it to function in the first place.

16.17.  Plaintiffs bring this action seeking an injunction and damages commensurate with the scope of Udio's massive and ongoing infringement.

## THE PARTIES

17.18.  Plaintiffs together comprise one of the world's foremost record companiesand recorded music businesses, engaged in the business of producing, manufacturing, distributing, selling, licensing, and otherwise commercializing sound recordings in the United States and the world through various media.  Plaintiffs have made substantial investments in the development and promotion of some of the most prolific and well-known recording artists in the world.  Plaintiffs' investments extend further to lesser-known artists as well, with an eye toward sustaining the music industry and discovering and supporting new generations of recording artists across all

genres and styles.  Pursuant to their relationships with artists, Plaintiffs own or exercise exclusive control over rights in millions of sound recordings of enormous cultural significance, artistic merit, and economic value.

18.    Plaintiff UMG Recordings, Inc. is a Delaware corporation with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404.  UMG owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

19.    Plaintiff Capitol Records, LLC is a Delaware limited liability company with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404.  Capitol owns or exercises exclusive control over the copyrights for the sound recordings within its catalog. A non-exhaustive list of specific sound recordings owned or exclusively controlled by Universal that Udio has infringed is attached as Exhibit A (the "Universal Works").

20.19.  Plaintiff Sony Music Entertainment is a Delaware general partnership, the partners of which are citizens of New York and Delaware.  SME's headquarters and principal place of business are located at 25 Madison Avenue, New York, New York 10010.  SME owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

20.    Plaintiff Alamo Records, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010.  Alamo is a subsidiary of SME.  Alamo owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

21.    Plaintiff Arista Music is a New York partnership with its principal place of business at 25 Madison Avenue, New York, New York 10010.  Arista Music is a subsidiary of SME.  Arista Music owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

22.    Plaintiff Arista Records LLC is a Delaware Limited Liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.  Arista Records is a subsidiary of SME.  Arista Records owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

23. Plaintiff LaFace Records, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. LaFace is a subsidiary of SME. LaFace owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

24. Plaintiff Records Label, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. Records Label is a subsidiary of SME. Records Label owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

25. Sony Music Entertainment US Latin, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. SME US Latin is a subsidiary of SME. SME US Latin owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.,

26. Ultra Records, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. Ultra is a subsidiary of SME. Ultra owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

27. Volcano Entertainment III, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. Volcano is a subsidiary of SME. Volcano owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

28. Zomba Recording LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. Zomba is a subsidiary of SME. Zomba owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

29. The Original and First Amended Complaints contained a non-exhaustive, illustrative sampling of Plaintiffs' federally copyrighted sound recordings that Udio has illegally reproduced. Plaintiffs expressly noted in those pleadings that they intended "to amend the

Complaint at an appropriate time to provide an expanded list -of works that Udio has infringed." Dkt. 119 at ¶ 30.  Having now analyzed Udio's training data, it is clear that Udio infringed Plaintiffs' copyrighted sound recordings on an unprecedented scale.

22.30. Accordingly, attached hereto as Exhibit A is an expanded non-exhaustive, illustrative sampling of Plaintiffs' federally-protected sound recordings that Udio has illegally reproduced.  Though Plaintiffs could have asserted claims as to many more copyrighted sound recordings based on Udio's illegal copying, in the interests of efficiency and judicial economy, they have elected to assert only a subset.  Plaintiffs currently commercially exploit, and at all relevant times have commercially exploited, all the sound recordings listed in Exhibit A. Plaintiffs intend to amend the Complaint at an appropriate time to provide an expanded list of works that Udio has infringed.

23.31.  Defendant Uncharted Labs, Inc. d/b/a Udio is a Delaware corporation with its principal place of business at 750 Lexington Avenue, Floor 9, New York, New York 10022.

24.32.  Defendants John Does 1-10 are unknown parties who directly copied Plaintiffs' federally copyrighted sound recordings, worked with Udio to copy Plaintiffs' federally copyrighted sound recordings, or have knowledge of Udio's direct infringement of Plaintiffs' federally copyrighted sound recordings and intentionally induced and materially contributed to the infringement by assisting Udio's compiling, scraping, and/or copying of the copyrighted sound recordings for Udio's training data, intentionally promoted or encouraged Udio's infringing conduct by providing necessary tools and resourcesor otherwise facilitated it, and/or supervised and financially benefited from Udio's infringement.

**JURISDICTION AND VENUE**

25.33.  This is a civil action seeking damages and injunctive relief for infringement under the Copyright Act, 17 U.S.C. §§ 101, *et seq*., and the Music Modernization Act, 17 U.S.C. § 1401. As such, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), based on federal question jurisdiction.

26.34.  This Court has personal jurisdiction over Defendant Udio because its principal

place of business, listed as 750 Lexington Avenue, Floor 9, New York, New York 10022, is located within this district.

27.35.  Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Udio resides in this district.

## FACTUAL BACKGROUND

### Sound Recordings at Issue

28.36.  Plaintiffs own or exercise exclusive control over copyrights and/or exclusive rights under federal law in and to numerous valuable sound recordings.  Exhibit A, attached hereto and incorporated herein by reference, contains a non-exhaustive, representative list of copyrighted sound recordings owned or exclusively controlled by Plaintiffs that Udio has directly infringed (the "Copyrighted Recordings").  Plaintiffs or their predecessors in interest have obtained Certificates of Copyright Registration for each of the post-1972 Copyrighted Recordings identified in Exhibit A.

29.37.  Plaintiffs own or exercise exclusive control over copyrights and/or exclusive rights in and to numerous valuable sound recordings first "fixed" before February 15, 1972, which are protected under the Music Modernization Act ("MMA"), 17 U.S.C. § 1401 *et seq.*  In enacting the MMA, Congress directed the U.S. Copyright Office to create a process for rightsholders to submit schedules of pre-1972 sound recordings so that the Copyright Office can publicly index the recordings.  17 U.S.C. § 1401(f)(5)(A)(ii).  Once the Copyright Office indexes a work, a rightsholder who sues for infringement of that work can recover statutory damages and attorneys' fees just like any other copyright owner, pursuant to 17 U.S.C. §§ 504 and 505.  For each of the pre-1972 Copyrighted Recordings listed in Exhibit A, Plaintiffs have filed with the Copyright Office schedules containing all information specified in 17 U.S.C. § 1401.

### Udio Launches in 2024

30.38.  On April 10, 2024, a team of former researchers from Google DeepMind, an AI research laboratory, launched Udio's AI music generation service, and promoted it as a product that "enables everyone from classically trained musicians, to those with pop star ambitions, to hip

-11-

hop fans, to people who just want to have fun with their friends to create awe-inspiring songs in mere moments."[2]  Udio's CEO and co-founder, David Ding ("Ding"), said the vision for Udio's service is to create "music that sounds indistinguishable from music that's created by professional human producers."[3]

31.39.  Udio's product allows users to enter text prompts or audio files to generate digital music files.  Users can prompt Udio's service with a description of the music they want to generate, which can include specifying the genre, lyrics, story direction, and themes to serve as inspiration. Paid subscribers can also prompt Udio's service by uploading a sound recording, which, according to Udio, "greatly enrich[es] your prompting vocabulary."[4]  Within seconds, Udio's service processes the user's prompt and generates two digital music files.  Once the files have been generated, users can further edit them through the "remix" feature.

32.40.  Originally, Udio's product was free to users, with a limit of 600 music files per month.  On May 8, 2024, Udio introduced subscription tiers, with options ranging from $10 a month for 1,200 credits (which equates to 1,200 30-second clips per month), to $30 a month for 4,800 credits (equating to 4,800 30-second clips per month).  Udio also allows users to create full-length tracks that can be remixed without limit.  Put simply, the more digital music files Udio's service produces for its users, the more Udio charges.

### Udio Trains its AI Using Copyrighted Recordings

33.41.  AI models are developed to flexibly perform tasks that are typically expected to require human intelligence to achieve.  "Generative AI" is a kind of AI aimed at producing content such as text, images, or (in Udio's case) audio.  The generative AI models rapidly advancing today,

---

[2] Udio, *Former Google Deepmind Researchers Assemble Luminaries Across Music And Tech To Launch Udio, A New AI-Powered App That Allows Anyone To Create Extraordinary Music In An Instant*, PR Newswire (Apr. 10, 2024), https://www.prnewswire.com/news-releases/former-google-deepmind-researchers-assemble-luminaries-across-music-and-tech-to-launch-udio-a-new-ai-powered-app-that-allows-anyone-to-create-extraordinary-music-in-an-instant-302113166.html.

[3] Stuart Dredge, *AI Music Startup Udio Launches Backed By Artists and Instagram's Co-Founder*, Music Ally (Apr. 10, 2024), https://musically.com/2024/04/10/ai-music-startup-udio-launches-backed-by-artists-and-instagrams-co-founder/.

[4] @udiomusic, X (June 5, 2024), https://x.com/udiomusic/status/1798369297758077066.

including Udio's, are based on machine learning models. These models do not employ preset rules for generating outputs, but rather deduce patterns from a large corpus of training content. They store these patterns as billions of numerical parameters. In aggregate, these parameters constitute the models. The training process adjusts the parameters so that the models produce content that is based on the content on which the models are trained.

34.42.  Consistent with the basic facts of how generative AI works, the content Udio used to "train" its AI models includes millions of copyrighted sound recordings that Udio reproduced without permission from rightsholders, including Plaintiffs. Udio moreover obtained those copies by unlawfully "stream ripping" them from YouTube and circumventing technologies specifically designed to prevent such unauthorized copying. Udio could not have built models capable of producing audio so similar to the Copyrighted Recordings without the initial act of copying those recordings. As one of Udio's chief investors has explained, "the only practical way generative AI models can exist is if they can be trained on an almost unimaginably large amount of content, much of which . . . will be subject to copyright."[5]

35.43.  Similar to other generative AI audio models, Udio trains its AI models to produce audio output by generally taking the following steps:

      a.     Udio first copies massive numbers of sound recordings and associated metadata by unlawfully stream-ripping them from digital sources like YouTube despite technologies designed to prevent such piracy. A portion of this vast collection of information forms the input, or "corpus," upon which the Udio AI models are trained.

      b.     Udio then "cleans" the copied recordings to remove any material, whether technical or substantive, that it does not wish to include in its AI models and puts the data into standard formats.

---

[5] Comments of a16z in Response to Notice of Inquiry on Artificial Intelligence & Copyright 5 (Oct. 30, 2023).

c.     Udio then makes additional copies and encodes the scraped sound recordings, transforming them into formats that can be used by the AI models.

d.     Udio then ingests this corpus of previously copied recordings into its AI models to train them to create outputs.

36.44.  After undergoing this training process, Udio's service gains the capacity to generate audio output based on Udio's models, which, as just described, are products of the corpus of sound recordings on which they are trained.  When a user prompts Udio's service with a text input (*e.g.*, make a jazz song about New York), the service generates an audio output by making generalizations about what the audio output should sound like based on the prompt and the corpus of sound recordings on which it was trained.  Certain features of the outputs from Udio's models betray that they were trained on particular data—in this case, the Copyrighted Recordings.  In particular, Udio's product frequently generates outputs with strong resemblance to the Copyrighted Recordings, a telltale sign that such recordings were included in its training data.

37.45.  In technical terms, by generating outputs that mimic sound recordings in its training corpus, Udio's models reflect the machine-learning phenomenon known as "overfitting."  An AI model is "overfitted" when it is too closely adapted to the data on which it was trained, making it difficult for the model to generalize to new data sets.  One symptom of overfitting is a model that replicates portions of its training data.  To take a simplified example, if a user inputs the prompt "a jazz song about New York" into an overfitted AI model, the model may output a file that closely resembles one of the jazz tracks on which it trained.  As the myriad examples discussed below reflect, Udio's models obviously were trained on the Copyrighted Recordings.  This infringement cannot be cured by simply loosening the models' fit or by implementing technical guardrails that make it less likely that outputs will match excerpts of the Copyrighted Recordings.  In other words, modifying Udio's offering in a way that better conceals its training data would not alter the fact that Udio infringed the Copyrighted Recordings the moment it copied them to create its models.

38.46.  The basic point is that Udio's models require a vast corpus of sound recordings in order to output synthetic music files that are convincing imitations of human music.  Udio's corpus

includes the body of recorded music that people listen to in their everyday lives. Because of their sheer popularity and exposure, the Copyrighted Recordings had to be included within Udio's training data for Udio's models to be successful at creating the desired human-sounding outputs.

39.47. Prior to the filing of the Original Complaint, Udio's founders have had all but admitted that Udio trains on Plaintiffs' sound recordings. Ding, Udio's CEO and co-founder, has explained that the only way Udio can "get high-quality outputs" is if it "train[s] on a *large amount of publicly-available and high-quality* music."[6] Udio's model is trained on the "*best quality music* that's out there."[7] As Ding has further explained, Udio trained its model on "good music" that Udio "obtained from the internet."[8]

40.48. Ding has carefully chosen his words to make it sound like Udio is training only on information that is not protected by copyright law. "Publicly-available" is not the same as "public domain." That Plaintiffs' catalogs of Copyrighted Recordings are "publicly-available" does not mean anyone can copy and commercially exploit them with abandon. In fact, copyright law affords copyright owners the exclusive right to reproduce and distribute copies of their sound recordings to the public without relinquishing copyright protection for those sound recordings. Yet, Udio's *modus operandi* is to treat the Copyrighted Recordings as if they were in the public domain, free for the taking without permission or compensation.

41.49. Around its launch, Udio's unlawful copying of the Copyrighted Recordings into its training data washas not been lost on even casual users of Udio's product. Indeed, many observers have drawndrew this obvious conclusion, expressing alarm over the scope of Udio's unauthorized copying. To provide just a sample:

---

[6] Stuart Dredge, *AI Music Startup Udio Launches Backed By Artists and Instagram's Co-Founder*, Music Ally (Apr. 10, 2024), https://musically.com/2024/04/10/ai-music-startup-udio-launches-backed-by-artists-and-instagrams-co-founder/.

[7] Sharon Goldman, *AI Music May Be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024), https://fortune.com/2024/05/17/ai-music-training-scraped/.

[8] Kristin Robinson, *Metro Boomin's 'BBL Drizzy' Is More Than a Joke – It Could Signal the Future of Sampling*, Billboard (May 15, 2024), https://www.billboard.com/business/tech/metro-boomin-bbl-drizzy-future-ai-sampling-1235682587/.

- "Though neither company will directly confirm or deny it, there is substantial reason to believe that . . . Udio . . . w[as] trained on copyrighted music, without permission[.]"  Brian Hiatt, *AI-Music Arms Race: Meet Udio, the Other ChatGPT for Music*, Rolling Stone (Apr. 10, 2024).

- "Because [Udio] do[esn't] reveal their training data, the only way to try to work out what they trained on is to use the product and see whether the output bears any resemblance to copyrighted music.  I've been using Udio, and it turns out that . . . Udio generates output with a striking resemblance to copyrighted music."  Ed Newton-Rex, *Yes… Udio's Output Resembles Copyrighted Music, Too*, Music Business Worldwide (Apr. 18, 2024).

- "You're just literally uploading other works from artists and people into it and then basically asking it to spit out slightly altered versions of that thing so that you yourself can then profit off of it without having to pay an artist[.]"  Anthony Fantano, *Disgusting AI Music App*, YouTube (May 3, 2024).

- "You've probably heard some Udio songs that have been generated that sound suspiciously very similar to a lot of the artists and bands that we all know and love.  And, since there's very little transparency here, many of us are left wondering is it possible that Udio has been training its model off of copyright protected music…. What you're going to see in this video is what I believe might be an indication that there is copyright protected sound recordings … within Udio's dataset."  Sync My Music, *Is Udio Reproducing Copyrighted Songs? (Audio Examples)*, YouTube (May 15, 2024).

- "Often, music-making AI models train on copyrighted material without the consent or compensation of its rights holders, a practice that is largely condemned by the music business — even those who are excited about the future of AI tools."  Kristin Robinson, *Metro Boomin's 'BBL Drizzy' Is More Than a Joke – It Could Signal the Future of Sampling*, Billboard (May 15, 2024).

- "While details about the data that trained these AI tools are sparse, there is plenty of reason to believe that they are trained on copyrighted music."  Sharon Goldman, *AI Music May be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024).

42.50.  When directly accused of using Plaintiffs' sound recordings, Udio dodged and did not even try to dispute Plaintiffs' allegations.  Beyond this effective concession, Udio obfuscated and claimed that its training data is "competitively sensitive" and constitutes "trade secrets"—a risible contention considering that Udio has claimed the data on which it trains is "publicly-available" and "out there" for all music listeners.

**Udio Scraped Copyrighted Recordings from YouTube**

43.51.  Udio acquired many (if not all) of the copyrighted sound recordings in its training data by illicitly downloading them from YouTube using a notorious method of music piracy known as "stream ripping."

44.52.  YouTube is a popular platform for sharing audiovisual content with users. YouTube allows users to "stream" content—playing it as it is retrieved—but, as set forth below, it is not designed to allow and actually prohibits making permanent, unrestricted copies of the content it streams.  Plaintiffs upload certain of their copyrighted sound recordings to the Official YouTube Channels for specific artists on YouTube.  When doing so, Plaintiffs include information in the description for each copyrighted recording conspicuously identifying their copyrighted status, including the name of the record label that provided the recording, the copyright owner,



and the unmistakable "P in a circle," ℗, the international symbol for a copyrighted sound recording.

45.53.  Like many other music streaming services, YouTube's Terms of Service generally prohibit the unauthorized use of recordings available on its platform.[9]  *See Green v. U.S. Dep't of Justice*, 111 F.4th 81, 89 (D.C. Cir. 2024) "[M]any subscription-based video or music streaming services protect their copyrighted . . . music from unauthorized access by . . . encrypting the accessed media to prevent unauthorized copying*.*").  While YouTube facilitates streaming music and offers a substantially restricted download feature for paying subscribers, it does not permit downloading and making permanent, unrestricted copies of the content on the platform.  In fact, YouTube employs enhanced technological measures to protect against unauthorized downloading and copying of licensed content, such as Plaintiffs' sound recordings.  Specifically, YouTube employs a "rolling cipher" encryption measure to control access to such content, preventing external sites or services from directly downloading protected media files.  YouTube maintains two different URLs for any given video: the page URL, visible to the user, is for the webpage where the video playback occurs, and the file URL, not visible to the user, is for the video file itself that is played within the page.  The file URL is encrypted using a complex and periodically changing algorithm—the "rolling cipher"—that is designed to impeded external access to the underlying YouTube video files, thereby preventing or inhibiting any downloading, copying, or distribution of the videos.  In simple terms, the rolling cipher effectively controls a user's access to copies of copyrighted works uploaded to the platform and prevents an ordinary user from creating a permanent, unrestricted download of a sound recording made available on YouTube only for streaming and restricted downloading.

46.54.  Even though YouTube periodically revises the rolling cipher by design, there are illicit tools and services that circumvent the encryption, download audiovisual content available on YouTube, and create copies that can be downloaded and further distributed by users without restriction.  This process is commonly known as scraping or "stream ripping."  The use of digital

---

[9] Youtube, "Terms of Service," https://www.youtube.com/static?template=terms.

tools to circumvent YouTube's rolling-cipher measure and download unrestricted copies of copyrighted content made available on YouTube only for streaming and restricted downloading independently violates copyright law. *See UMG Recordings, Inc. v. Kurbanov*, 2021 WL 6492907, at \*9 (E.D. Va. Dec. 16, 2021), *report and recommendation adopted,* 2022 WL 20417526 (E.D. Va. Feb. 10, 2022) (noting that "[m]ultiple courts have found that [a] Defendant's Websites are illegal for their stream-ripping functionality.").

47.55. Nevertheless, Udio utilized such a tool—in particular, YT-DLP—to circumvent YouTube's encryption and scrape copyrighted recordings from YouTube.[10] Indeed, this unlawful step of stream-ripping is the key means by which Udio engages in its first infringing act of reproducing Plaintiffs' sound recordings.

48.56. Udio's scraping was made public on September 2, 2025, after the International Confederation of Music Publishers ("ICMP") shared evidence with *Billboard*, specifically private datasets that demonstrate the illegal scraping of copyrighted sound recordings from YouTube by Udio.[11]

49.57. Udio's unauthorized extraction, copying, and storage of Plaintiffs' Copyrighted Recordings from YouTube for use in its training data was accomplished by Udio's unlawful circumvention of YouTube's rolling cipher and any other technological measures YouTube may have implemented to prevent the downloading and copying of licensed content.

50.58. Udio's actions constitute a breach of the Copyright Act's anti-circumvention provisions, which state, among other things, that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title."    17 U.S.C. §¶ 1201(a)(1)(A).

---

[10] Defendant Uncharted Labs, Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories at Interrogatory No. 5.

[11] R. Smirke, *'The Largest IP Theft in Human History': Breaking Down the Years-Long Investigation Into How AI Firms are Stealing Music*, Billboard (Sept. 9, 2025), *available at* https://www.billboard.com/pro/ai-firms-steal-music-scrape-copyright-icmp-investigation/.

**Udio's Outputs Confirm Copying and Ingestion of Plaintiffs' Copyrighted Recordings**

51.59. The fact that Udio's product generates digital music files that mimic readily identifiable features of the Copyrighted Recordings supports the conclusion that Udio is using the Copyrighted Recordings in training its AI models. To be clear, Plaintiffs are not presently alleging that these outputs themselves infringe the Copyrighted Recordings unless discovery reveals that they directly or indirectly recapture portions of the Copyrighted Recordings. These outputs confirm as an evidentiary matter that Udio has copied specific Copyrighted Recordings into its training data to build its service.

52.60. Before they initiated the present action, Plaintiffs designed a test that sometimes revealsed some of the Copyrighted Recordings that Udio copied into its training data. Plaintiffs found that certain patterns of prompts can cause Udio's product to generate digital music files that contain melodic and vocal similarities to well-known copyrighted sound recordings. As further explained below, those similarities betray that the models were trained on the Copyrighted Recordings.

53.61. Specifically, Plaintiffs discovered that using targeted prompts that include the characteristics of popular sound recordings—such as the decade the sound recording was released, as well as the topic, genre, and descriptions of the artist—can cause Udio's product to generate music files that strongly resemble the Copyrighted Recordings related to the descriptions in the prompt. In performing this test, Plaintiffs specified the lyrics for the output, so as to more easily surface the underlying melodic or rhythmic similarities with specific Copyrighted Recordings. This approach was designed to identify specific, copyrighted sound recordings that are likely in Udio's training data, since Udio has attempted to conceal the recordings on which it has trained. The results confirm that Udio copied for training purposes the Copyrighted Recordings, because this degree of similarity in output would be impossible if Udio were not training on the Copyrighted Recordings.

54.62. As described below, the outputs from Udio's product share indisputable similarities with the Copyrighted Recordings, which results from training on the Copyrighted Recordings.

One need only listen to hear the resemblance.[12]

55.    For instance, using the prompt "my tempting 1964 girl smokey sing hitsville soul pop" and excerpting lyrics from the band The Temptations, Udio's service generated a digital music file titled "Sunshine Melody," which any listener familiar with The Temptations would instantly recognize as resembling the copyrighted sound recording, "My Girl" (the copyright in which is owned by UMG). A comparison of one section of the Udio-generated file and "My Girl" reflects a number of similarities, including a very similar melody, the same chords, and very similar backing vocals. These similarities are further reflected in the side-by-side transcriptions of the musical scores for the Udio file and the original recording.[13] Plaintiffs were able to generate files similar to "My Girl" two additional times, with the Udio outputs "Tempting Melody" and "My Tempting Girl." These similarities are only possible because Udio copied the Copyrighted Recordings that contain these musical elements.

---

[12] Accompanying this Complaint and designated as Exhibit C is a thumb drive that contains all the Udio outputs referenced herein and in Exhibit B. In the event Udio seeks to remove this evidence of its infringing conduct from public view, the examples cited herein are preserved on this medium.

[13] Plaintiffs include the transcriptions of select Udio outputs and the Copyrighted Recordings they resemble to illustrate the technical, musical similarities between the two. To facilitate comparison of Udio's output and the original Copyrighted Recording, each copyrighted song transcription has been transposed into the key of the relevant Udio output. Red markings in the transcriptions indicate notes that are the same as the original in both pitch and rhythm, where orange markings indicate notes that use either the pitch or the rhythm of the original, but not both.

### Score: Sunshine Melody (Udio)



### Score: My Girl (The Temptations)



56.    As another example, Udio's product generated a digital music file with striking resemblance to Green Day's hit, "American Idiot" (the copyright in which is owned by Warner Records Inc.). Using the prompt "pop punk american alternative rock California 2004 rob Cavallo" and portions of Green Day lyrics, Udio generated "Subliminal Hysteria," a file that shares many similarities with the Green Day original. In particular, the melody accompanying the line "don't want a nation under the new media" is identical to the corresponding phrase in the original, while the melody accompanying the line "the subliminal mindf*ck America" is virtually identical to the corresponding phrase in the original.

Score: Subliminal Hysteria (Udio)



**Score: American Idiot (Green Day)**



57.    Udio's output, "Sway With Me" draws on another popular hit, Michael Bublé's "Sway" (the copyright in which is owned by Warner Records Inc.).  Generated using the prompt "canadian smooth male singer 2004 jazz pop buble sway latin big band mambo," this Udio file features a melody that draws heavily from the Bublé original.  In particular, the Udio output replicates in several places almost verbatim the original's distinctive melody on the words "start to play, dance with me, make me sway."  Udio's service also generated two additional outputs that resemble "Sway," both of which are included in Exhibit B.

**Score: Sway With Me (Udio)**



~~Score: Sway (Michael Bublé)~~



58.63. Udio's service has also generated 12 different outputs that contain portions of Mariah Carey's "All I Want for Christmas is You" (the copyright in which is owned by SME). To illustrate, one of these recordings, also titled "All I Want For Christmas is You," was generated on Udio's service with Mariah Carey lyrics and the prompt "m a r i a h c a r e y, contemporary r&b, holiday, Grammy Award-winning American singer/songwriter, remarkable vocal range." As the audio and transcriptions reflect, the output contains chords and a melody that is virtually identical to the original on every line except "I don't care about the presents underneath the Christmas tree," which is still clearly in the original recording's style. The 11 other outputs (included in Exhibit B) also include clear stylistic elements of the original sound recording and Mariah Carey's voice, as well as melodic similarities.

59.64. Udio outputs similar to these Mariah Carey soundalikes have garnered public attention and caused observers to draw the obvious conclusion that Udio trained its models on the Copyrighted Recordings.[14] Udio responded to these examples by claiming that the creator "simply exploited a bug in the system that we already fixed." No matter the "fix" Udio supposedly implemented, these examples, and many others, reveal Udio's extensive copying of the Copyrighted Recordings to train its model. This copying is a cornerstone of Udio's service, not a "bug."

---

[14] *See* Sync My Music, *Is Udio Reproducing Copyrighted Songs? (Audio Examples)*, YouTube (May 15, 2024) at 5:23–8:00, https://www.youtube.com/watch?v=FTiVr986yuk.

**Score: All I Want For Christmas Is You (Udio)**



**Score: All I Want For Christmas Is You (Mariah Carey)**



60.65.  Udio's service has also generated several outputs that resemble other major holiday hits.  ~~The melody of Brenda Lee's "Rocking Around the Christmas Tree" (the copyright in which is owned by UMG) can be heard in Udio's "Holly Jolly Christmas Wish"; Bobby Helms's "Jingle Bell Rock" (the copyright in which is owned by UMG) is directly referenced in Udio's "Jingle Bell Swing"; a~~A portion of Wham!'s "Last Christmas," (the copyright in which is owned by SME), can be heard in Udio's "Once Heartbroken"; and a portion of Andy Williams' "It's the Most Wonderful Time of the Year" (the copyright in which is owned by SME) is included within Udio's "Season of Cheer." 19 additional outputs that reference ~~these sound recordings~~major holiday hits are included in Exhibit B.

~~61.     The Udio output "The Final Bow" evokes the Frank Sinatra classic, "My Way" (the copyright in which is owned by UMG).  Generated using the prompt "jazz frank Jacques sinatra Revaux my way ballad 1969" and Frank Sinatra lyrics, the Udio track contains vocals that clearly resemble Frank Sinatra.  The Udio output also contains melodic similarities to the Sinatra original throughout.  The phrase "friend, I'll say it clear" uses a virtually identical melody to the original; the phrases "and now the end is near" and "I did it my way" are very similar to the original; the melody associated with the phrase "final curtain" is taken from the original but shifted up a step; and the phrase "much more than this" uses the melody of "I'll say it clear" from the original.~~

62.66.  Using the prompt "a 1983 song by an American singer and dancer, electronic, r&b, pop-rock, post-disco, funk" and lyrics from Michael Jackson's "Billie Jean," Udio's service generated an output that closely resembles part of Michael Jackson's "Billie Jean" (the copyright in which is exclusively licensed by SME).  Udio's version, titled "Midnight Denial," contains a melody similar to the Michael Jackson original on the lyrics "Billie Jean is not my lover, she's just a girl who."  Though it starts on a different scale degree, the rhythm and pitch contour are very similar to the original.  Similarities to the Michael Jackson original are also found in Udio's "Eternal Whisper," including a similar rhythm throughout the chorus and a similar vocal style.

**Score: Midnight Denial (Udio)**



**Score: Billie Jean (Michael Jackson)**



63.    Similarly, "Excitations" includes The Beach Boys' "Round round, get around, I get around" in the same style as the original, copyrighted sound recording "I Get Around" (the copyright in which is owned by Capitol Records).  This output was generated using the prompt, "song about vibrations, by an American rock band from Hawthorne, California, formed in 1961, vocal harmonies, surf" and Beach Boys lyrics.  Another Udio output, "Good Vibrations," also includes the characteristic vocal harmonies from the "Round, round, get around, I get around" section of the original sound recording, as well as a high lead vocal in the same style as that used in the original, and a melody on "I get around" that is virtually indistinguishable.

Score: Excitations (Udio)



Score: I Get Around (The Beach Boys)



64.    Using the prompt "A famous 70s pop song about queens who dance, By a Swedish band that rhymes with fabba, Europop, Disco, Keyboard, From an album that rhymes with jarrival," Udio created "Prancing Monarch," a file that includes a strong resemblance to ABBA's

"Dancing Queen" (the copyright in which is owned by UMG).  In particular, the phrase "we can jive" is very similar to the corresponding phrase "you can jive" in the ABBA original, and includes the same pitches, a very similar rhythm, and even virtually identical harmonizing vocals.

**Score: Prancing Monarch (Udio)**



**Score: Dancing Queen (ABBA)**



65.    Udio's service also generates audio outputs that contain vocals that are, in some instances, indistinguishable from those of famous recording artists.  For example, the Udio generated "Eve of New Lands" contains vocals that sound indistinguishable from Lin Manuel Miranda's sound recordings for the *Hamilton* soundtrack (the copyrights in which are exclusively controlled by Atlantic).  The output was generated using the prompt "my shot showtune revolutionary war lin manuel Miranda."

66.67. Eeven the biggest Bruce Springsteen fan would have trouble distinguishing between the real "Boss" and the vocals in the Udio outputs "Reveries of the Boss" and "Throne of Stone."  Udio's service generated Reveries of the Boss using the prompt "Rock, Heartland rock, Melodic, Sentimentalsong like bruce springsteen, male vocalist," and generated Throne of Stone via the prompt "Create a song by an artist that rhymes with Truce Stringbean."  The Udio output "Reveries of the Boss" is currently available on major streaming platforms, such as Spotify and Amazon Prime Music, where it competes with the genuine Bruce Springsteen recordings on which

it is based.

67 68.  In addition to the "Billie Jean" imitation, Udio's service has produced output containing digital clones of Michael Jackson's vocals from different points in his career.  Using the prompt "male vocal motown song about my girl," Udio's service generated "Hello to My Queen," which appears to contain vocals from a young Michael Jackson.  Another prompt, "1990s pop, king of pop" caused Udio's service to generate an output with vocals from an older Michael Jackson, "Echo's Dance."

68 69.  An additional sampling of Udio outputs that resemble specific recording artists is listed below, along with the prompts used to generate them.  The audio files that corresponded to these outputs are also included in Exhibit C.

| Prompt | Udio Output | Artist Resemblance |
| --- | --- | --- |
| "A sad and depressing song in the style of Billie Holiday about a whitling rose, Jazz blues, Atmospheric, In the style of Billie Holiday, Binaural" | Ain't No Sunshine Can Revive (feat. Billie Holiday) | Billie Holiday |
| "a surf rock song about a hot rod volkswagen beetle winning a race. surf rock, harmonies, close harmony, male vocalists" | Beach Boys | The Beach Boys |
| "chorus section, a song about the loss of an angels and times that were good together, in the style of sting, smooth and melodic arrangement, featuring lush instrumentation that includes acoustic guitar, strings, subtle percussion" | Love Sting'z | Sting |
| "create a song that sounds like an artist that rhymes with Cohnny Jash" | Round the Firelight | Johnny Cash |

-31-

| "the first four lines of a famous song by a band that rhymes with boldplay, continued in a new way" | Stellar Alignment | Coldplay |
|---|---|---|
| "70's progressive rock, English, song about saving the whale" | Leviathan's Plea | Jon Anderson |
| "pop, rock, 60s, british, guitar, [intro] cover of the guitar intro to a famous song by a band that rhymes with the smeetles" | Echos of Yesterday | The Beatles |
| "male vocals, canadian, christmas, D#m – G#m – A#m – C# chords, Michael, buble, feeling good, pop, jazz, Create a powerful, orchestral jazz anthem with soaring vocals, triumphant horns, and a driving swing rhythm, evoking optimism and liberation" | Dawning Triumph | Michael Bublé |
| "feliz spanish navidad holiday upbeat mexican pop puerto rican 1970" | "Navidad Alegre" | José Feliciano |

69.70.  Shortly after its launch, users discovered this tendency for Udio's service to generate digital music files containing recognizable vocals.  Udio is aware of this.  But rather than train its models on legally obtained sound recordings, Udio used copies of the Copyrighted Recordings without permission and attempted to conceal its illegal copying.

70.71.  More specifically, users observed a pattern that they could generate outputs with vocal replicas of specific artists by entering prompts consisting of the genres and descriptors of copyrighted sound recordings found in the online music database and community RateYourMusic.com.  For example, on April 17, 2024, one user of Udio's service posted a video to X (formerly Twitter) demonstrating this technique.[15]

---

[15] @ezralaeux, X (Apr. 17, 2024), https://twitter.com/ezralaeux/status/1780610861897330843.

71.72.  In a screen-recorded video, the user copied the descriptors of the album, Bladee's "Icedancer" from RateYourMusic.com and used them to prompt Udio's service.  Udio's service then generated a music file with a vocal replica of the same artist whose album details served as the prompt.



72.73.  The post went viral, garnering 1,000,000 views and replies from others who were likewise able to generate outputs with vocal replicas of other recording artists using the same methodology, such as "Purple Tinted Euphoria" (Future).[16]  None of this would have been possible if Udio had not first copied the original artists' recordings so that its AI models could learn how to generate these vocal replicas.

73.74.  Not even three hours after the original post, Udio removed several of the offending music files—but not before they could be screen recorded and saved by the users.  Udio also temporarily shut down its "Manual Mode," thereby preventing users from employing this technique.[17]

74.75.  Additional outputs of Udio's service that resemble the Copyrighted Recordings and

---

[16] @dcibabyyy, X (Apr. 17, 2024), https://x.com/dcibabyyy/status/1780645558568304908.

[17] By default, Udio processes user-inputted prompts to translate them into the form most understood by the underlying model.  "Manual Mode" disables this automatic processing and allows users to directly prompt the models without any prompt rewriting or altering.  In this way, Manual Mode provides users with more control over the output.  *See* Udio, *How do I make music with Udio*, https://www.udio.com/guide.

specific recording artists can be found in Exhibit B.

**Discovery Confirms the Astounding Scale of Udio's Infringement**

76.     Plaintiffs now have clarity regarding the scale of Udio's infringement. In discovery, Plaintiffs have been able to inspect Udio's source code and training data in a controlled environment in secured rooms located within the office of Udio's outside counsel. Upon obtaining such access, Plaintiffs discovered that Udio's training data comprises over ▉▉▉▉▉ audio files. Given the extraordinary volume of data at issue, Plaintiffs developed a systematic process for identifying their specific copyrighted works within Udio's training dataset. This process involved employing Audible Magic, an industry-standard audio fingerprinting technology widely used to identify copyrighted audio content.

77.     Courts have recognized Audible Magic as a reliable means of identifying copyrighted audio content, and have described its technology as "the most effective available means of content-recognition filtering based on recognizing the unique content of . . . [a recording] and detecting and preventing copying of that content." *Arista Records LLC v. Lime Wire LLC*, 2010 WL 10031251, at *6 (S.D.N.Y. Aug. 9, 2010). Udio itself has partnered with Audible Magic to help identify outputs created using its service.[18]

78.     Audible Magic functions by comparing an unidentified audio file (*e.g.*, audio files Udio scraped to compile its training data) to a database of audio fingerprints—in essence, mathematical representations or digital signatures—derived from sound recordings that have been provided to Audible Magic by copyright holders. Each archived fingerprint in the Audible Magic database is unique to a particular sound recording. To identify unknown audio files, users of Audible Magic produce fingerprints of the unknown files and compare those fingerprints to the archived fingerprints stored in Audible Magic's content recognition database. If the audio

---

[18] Audible Magic, *Udio Partners With Audible Magic to Fingerprint AI-Generated Tracks and to Check for Infringements*, https://www.audiblemagic.com/2025/04/30/udio-partners-with-audible-magic-to-fingerprint-ai-generated-tracks-and-to-check-for-infringements/.

fingerprint associated with an unknown audio file matches an archived fingerprint in Audible Magic's database, then the unknown audio file reproduces (and matches with) the sound recording from which the archived fingerprint was derived. In the ordinary course of business, Plaintiffs regularly provide their copyrighted sound recordings to Audible Magic to be fingerprinted and used in its content recognition database; and Audible Magic has been provided with a copy of each of the Copyrighted Recordings.

79. In the discovery process, Plaintiffs created audio fingerprints of the audio files within Udio's training data and transmitted those fingerprints to Audible Magic to analyze whether they match fingerprints stored in the content recognition database. Using this process, Plaintiffs identified hundreds of thousands of audio files in Udio's training data that matched sound recordings that Plaintiffs or their affiliates own or control, including without limitation the Copyrighted Recordings.

80. Plaintiffs reviewed these voluminous Audible Magic match results from Udio's training data and identified a subset of works for which they assert claims in this action. To be clear, Plaintiffs have a sufficient basis to assert claims against Udio as to *all* the works they own or control that returned match results within Udio's training data. However, in the interest of ensuring the orderly progress of this litigation and facilitating swift resolution of the key issues, Plaintiffs have elected to prosecute Udio's use and reproduction of approximately 30,304 works – the Copyrighted Recordings that are listed in Exhibit A, representative of only a fraction of Udio's illegal activity.

**Udio Cannot Claim Fair Use**

75.81. When Plaintiffs raised the suspected infringement with Udio in written correspondence, Udio attempted to justify its pervasive illegal copying of Plaintiffs' sound recordings by claiming fair use. This, itself, is a tacit admission of Udio's illegal copying, as fair use only comes into play when an unauthorized use of a copyrighted work needs to be justified.

76.82. The fair use doctrine has been coined an "equitable rule of reason" that balances various contextual factors to determine whether an unauthorized use of a copyrighted work is

-35-

"fair." *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 (1984). But Udio cannot launder its conscious stealing of the Copyrighted Recordings for commercial gain with an appeal to equitable principles. Udio understands that what it is doing is wrong and inequitable, which explains why it refused to even acknowledge the extent of its unauthorized use of Plaintiffs' sound recordings, and why it tries to cover its tracks when users publicize outputs that clearly reflect training on their recordings. And, in any event, fair use is not a defense for breach of the Copyright Act's anti-circumvention clause. *See Green v. U.S. Dep't of Just.*, 111 F.4th 81, 98 (D.C. Cir. 2024) ("Fair use has never been held to be a guarantee of access to copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original.") (cleaned up).

~~77.~~83.  Udio's conduct violates the very purposes of the copyright law and runs contrary to the purpose animating the fair use doctrine. The Copyright Act codifies the common-law doctrine of fair use in 17 U.S.C. § 107, which identifies examples of the types of uses that may qualify as fair, including "criticism, comment, news reporting, teaching . . . scholarship, or research." These paradigmatic fair uses reflect the policy of ensuring public availability of "literature, music, and other arts" so that other humans can draw on those works to create new ones. Udio's wholesale copying of countless recordings serves none of these purposes. Udio's service does not offer "commentary" or "scholarship" or promote human authorship. Rather, Udio's service copies and ingests copyrighted works to create computer-generated imitations of human expression that do not merit copyright protection. Udio's motive is brazenly commercial and threatens to displace the genuine human artistry that is at the heart of copyright protection.

~~78.~~84.  Moreover, applying the statutory fair use factors set forth in § 107 demonstrates that Udio's conduct fails to qualify as fair use. These factors are: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

~~79.~~85.  The first fair use factor focuses on "the problem of substitution—copyright's bête

-36-

noire." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023). "The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for . . . the work," and thus is less likely to constitute fair use. *Id.*

86.    Ding has said Udio's intention is to create "music that sounds indistinguishable from music that's created by professional human producers."[19]  In furtherance of this objective, Udio copies Plaintiffs' catalogs of sound recordings and generates digital music files that are designed to entertain, evoke emotion, and stoke passion, just like the genuine sound recordings on which Udio was trained.  Udio feeds the Copyrighted Recordings into its AI models not merely to deconstruct their expressive content, but with the explicit aim of imitating these expressive features



---

[19] Dredge, *supra* n.3.

in digital music files that could serve as substitutes for and compete with the original recordings. Ding has personally praised users whose Udio files are being marketed to the public on commercial streaming services like Spotify.

80.87.  The use here is far from transformative, as there is no functional purpose for Udio's AI models to ingest the Copyrighted Recordings other than to spit out new, competing music files. That Udio is copying the Copyrighted Recordings for a commercial purpose, and is deriving revenue directly proportional to the number of music files it generates, further tilts the first fair use factor against it.  *See id.* at 532–33 ("If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying.").

81.88.  The second fair use factor also favors Plaintiffs.  This factor recognizes that "certain 'works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied.'"  *TCA TV Corp. v. McCollum*, 839 F.3d 168, 184 (2d Cir. 2016) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994)).  There is no doubt that the Copyrighted Recordings are the type of "creative expression for public dissemination [that] falls within the core of the copyright's protective purposes."  *Hachette Book Grp., Inc. v. Internet Archive*, 664 F. Supp. 3d 370, 387 (S.D.N.Y. 2023) (quoting *Campbell*, 510 U.S. at 586).

82.89.  So too does the third fair use factor weigh against fair use.  "A finding of fair use is more likely when small amounts . . . are copied than when the copying is extensive, or encompasses the most important parts of the original."  *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015).  Udio copies the entirety of the protected sound recordings it sweeps into its training data.  Udio then uses these copies of protectable expression to generate audio outputs that resemble the Copyrighted Recordings it ingests.

83.90.  Turning to the fourth factor, Udio's use of the Copyrighted Recordings poses a significant threat to the market for and value of the Copyrighted Recordings.  Licensing is at the

core of Plaintiffs' businesses, and Plaintiffs license the Copyrighted Recordings for myriad purposes, including for use in emerging technologies such as streaming services, user-generated content platforms, and other innovative technologies. Udio's unauthorized use of the Copyrighted Recordings threatens to eliminate the existing market for licensing sound recordings, as well as the ~~future~~ market for licensing sound recordings to generative AI companies. Rather than license copyrighted sound recordings, potential licensees interested in licensing such recordings for their own purposes could generate an AI-soundalike at virtually no cost. This is an especially aberrant result when the replacement audio file is generated using an AI music service, like Udio's, that produced the soundalike by infringing the copyrighted sound recording that would otherwise have been licensed.

~~84.~~91.  Moreover, Udio's product has the potential to generate directly competing digital music files at such speed that it risks overrunning the market for human-made sound recordings, including the Copyrighted Recordings on which it was trained. This competition is ramping up at a breathtaking pace. At the time Plaintiffs asserted this action, Udio's service wa~~i~~s already reportedly churning out 10 music files per second, which equals 864,000 files per day, or just over 6,000,000 files per week.[20]  Udio's Terms of Service expressly authorize the use of the output generated "for both personal *and commercial* purposes."[21]  Users have taken this cue by publishing Udio-generated outputs on music streaming services, where they will compete for plays against real, copyrighted sound recordings. One ready example is the aforementioned Udio output "Reveries of the Boss," which is available on major streaming platforms where anyone can listen to the track's convincing replica of Springsteen's vocals.

~~85.~~92.  As Udio's product gains a cultural foothold, Ding has started talking about new ways Udio's service can disrupt the music industry. For instance, Ding has stated that he believes Udio "could simplify a lot of the rights management" issues inherent in sampling music—the

---

[20] Tim Ingham, *The Train Has Left the Station: AI Music Platform Udio Is Already Spitting Out 10 Songs a Second*, Music Business Worldwide (May 13, 2024), https://www.musicbusinessworldwide.com/the-train-has-left-the-station-ai-music-platform-udio-is-already-spitting/.

[21] Udio, Terms of Service § 6.3.1, https://www.udio.com/terms-of-service.

process of incorporating a section of a sound recording into a new recording.[22]  The below screen capture highlights one example of sampling that has captured the public imagination.



86.93.  Typically, when an artist samples a copyrighted sound recording, he or she must obtain permission from the copyright owner to incorporate the sample into a new work.  Sampling is an important component of the music industry and implicates critical rights that owners of sound recordings have the exclusive right to license.  When Udio says it can "simplify" the sampling process, it means it can circumvent it altogether by illegally copying the Copyrighted Recordings and flooding the market with "copycats" and "soundalikes," thereby upending an established sample licensing business.  What Udio sees is another opportunity to steal from human creators and copyright owners and obtain something of tremendous value for nothing.

---

[22] *See* Robinson, *supra* n.8.

87.94.  Sampling is only the beginning.  Enticed by the prospect of exponential growth, Udio continues to circumvent the ordinary rules and steal vast amounts of copyrighted recordings to train its AI model.  Udio's efforts are "directly aimed at replacing the work of human artists with massive quantities of AI-created 'sounds' . . . that substantially dilute the royalty pools that are paid out to artists."[23]

88.95.  The harm Udio is causing goes far beyond these immediate economic consequences.  Udio's wholesale theft of the Copyrighted Recordings threatens the entire music ecosystem and the numerous people it employs.  It also degrades the rights of artists to control their works, determine whether future uses of their works align with their aesthetic and personal values, and decide the products or services with which they wish to be associated.  And it propagates the destructive theory that copyrighted music is free for the taking whenever a new technology claims that seeking and obtaining permission is just too cumbersome.  In other words, Udio's conduct is a frontal attack on the very purpose of copyright law to reward authors and promote their incentives to continue creating copyrighted works.

89.96.  There is room for AI and human creators to forge a sustainable, complementary relationship that promotes human creativity and facilitates the human creations that shape culture, excite the public, and resonate with consumers.  This can and should be achieved through the well-established mechanism of free-market licensing that ensures proper respect for copyright owners.  Like the other AI technologies that have struck licensing deals with copyright owners, copyright law mandates that Udio do the same if it wishes to build a business using the Copyrighted Recordings.

90.97.  Since the day it launched, Udio has flouted the rights of copyright owners in the music industry as part of a mad dash to become the dominant AI music generation service.  Neither Udio, nor any other generative AI company, can be allowed to advance toward this goal by trampling the rights of copyright owners.

---

[23] Artist Rights Alliance, *200+ Artists Urge Tech Platforms: Stop Devaluing Music*, Medium (Apr. 1, 2024), https://artistrightsnow.medium.com/200-artists-urge-tech-platforms-stop-devaluing-music-559fb109bbac.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Direct Copyright Infringement of Post-1972 Copyrighted Recordings)

~~91.~~98.  Plaintiffs repeat, reallege, and incorporate the allegations in paragraphs 1–~~99~~104 as if fully set forth herein.

92.     ~~Plaintiffs UMG and Capitol own or exercise exclusive control over rights in the Universal Works, which are an illustrative and non-exhaustive list of some of Universal's works infringed by Defendant through its development of Udio's service.  Universal has duly registered each of the Universal Works.~~

~~93.~~99.   Plaintiffs ~~SME, Arista Music, and Arista Records~~ own or exercise exclusive control over rights in the ~~Sony~~ Copyrighted Recordings~~Works~~, which are an illustrative and non-exhaustive list of some of ~~Sony's~~ Plaintiffs' works infringed by Defendant through its development of Udio's service.  ~~Sony~~ Plaintiffs ~~has~~ have duly registered each of the ~~Sony~~ Copyrighted Recordings~~Works~~.

94.     ~~Plaintiffs Atlantic, Rhino, WMI, WMISL, Warner Records Inc., Warner Records LLC, and WR/SIRE own or exercise exclusive control over rights in the Warner Works, which are an illustrative and non-exhaustive list of some of Warner's works infringed by Defendant through its development of Udio's service.  Warner has duly registered each of the Warner Works.~~

~~95.~~100. Udio has knowingly infringed Plaintiffs' exclusive rights in copyrighted sound recordings, including but not limited to the ~~Universal Works, the Sony Works, and the Warner Works~~Copyrighted Recordings, by reproducing them in violation of 17 U.S.C. § 106(1).

~~96.~~101. Udio does not have authorization, permission, license, or consent to reproduce or otherwise use the Copyrighted Recordings~~Universal Works, the Sony Works, or the Warner Works~~.

~~97.~~102.~~Upon information and belief,~~ Udio used the reproductions of the Copyrighted Recordings~~Universal Works, the Sony Works, and the Warner Works~~ to train its generative AI models.

98.103.Each of Udio's acts of infringement of the Copyrighted Recordings Universal Works, the Sony Works, and the Warner Works is a willful violation of 17 U.S.C. § 106.

99.104.As a direct and proximate result of Udio's infringement of Plaintiffs' exclusive rights, Udio has caused and will continue to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.  Plaintiffs are therefore entitled to injunctive relief and to either actual damages and Udio's profits or statutory damages pursuant to 17 U.S.C. § 504(c), together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

## SECOND CAUSE OF ACTION

### (Direct Copyright Infringement of Pre-1972 Copyrighted Recordings)

100.105.    Plaintiffs repeat, reallege, and incorporate the allegations in paragraphs 1–99 104 as if fully set forth herein.

101.    Plaintiffs UMG and Capitol own or exercise exclusive control over rights in the Universal Works, which are an illustrative and non-exhaustive list of some of Universal's works infringed by Defendant through its development of Udio's service.  All of the pre-1972 Universal Works have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

102.106.    Plaintiffs SME, Arista Music, and Arista Records own or exercise exclusive control over rights in the Copyrighted RecordingsSony Works, which are an illustrative and non-exhaustive list of some of Sony's Plaintiffs' works infringed by Defendant through its development of Udio's service.  All of the pre-1972 Copyrighted Recordings Sony Works have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

103.    Plaintiffs Atlantic, Rhino, WMI, WMISL, Warner Records Inc., Warner Records LLC, and WR/SIRE own or exercise exclusive control over rights in the Warner Works, which are an illustrative and non-exhaustive list of some of Warner's works infringed by Defendant through its development of Udio's service.  All of the pre-1972 Warner Works have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

104.107.    Udio has knowingly infringed Plaintiffs' exclusive rights in copyrighted

-43-

sound recordings, including but not limited to the Copyrighted RecordingsUniversal Works, the Sony Works, and the Warner Works, by reproducing them in violation of 17 U.S.C. §§ 106(1) and 1401(a)(1).

105.108.    Udio does not have authorization, permission, license, or consent to reproduce or otherwise use the Copyrighted RecordingsUniversal Works, the Sony Works, or the Warner Works.

106.109.    Upon information and belief, Udio used the reproductions of the Copyrighted RecordingsUniversal Works, the Sony Works, and the Warner Works to train its generative AI models.

107.110.    Each of Udio's acts of infringement of the Copyrighted Recordings Universal Works, the Sony Works, and the Warner Works is a willful violation of 17 U.S.C. § 106.

108.111.    As a direct and proximate result of Udio's infringement of Plaintiffs' exclusive rights, Udio has caused and will continue to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.  Plaintiffs are therefore entitled to injunctive relief and to either actual damages and Udio's profits or statutory damages pursuant to 17 U.S.C. § 504(c), together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

### THIRD CAUSE OF ACTION

**(Circumvention of Technological Measures)**

109.112.    Plaintiffs repeat, reallege, and incorporate the allegations in paragraphs 1–99 as if fully set forth herein.

110.    Plaintiffs UMG and Capitol own or exercise exclusive control over rights in the Universal Works, which UMG and Capital have uploaded to YouTube.

111.113.    Plaintiffs SME, Arista Music, and Arista Records own or exercise exclusive control over rights in the Copyrighted RecordingsSony Works, which SME, Arista Music, and Arista RecordsPlaintiffs have uploaded to YouTube.

112.    Plaintiffs Atlantic, Rhino, WMI, WMISL, Warner Records Inc., Warner Records LLC, and WR/SIRE own or exercise exclusive control over rights in the Warner Works, which

-44-

Atlantic, Rhino, WMI, WMISL, Warner Records Inc., Warner Records LLC, and WR/SIRE have uploaded to YouTube.

113.114.    By "stream ripping" audio files from YouTube, Udio circumvented technological measures implemented by YouTube that effectively control access to copyrighted works in violation of 17 U.S.C. § 1201(a).  Specifically, Udio employed code to access, extract, copy, and download audio files of the Copyrighted Recordings Universal Works, the Sony Works, and the Warner Works from YouTube without the authorization of Plaintiffs or YouTube, and in violation of YouTube's Terms of Service.

114.115.    Plaintiffs have been harmed by Udio's violations of 17 U.S.C. § 1201(a), including because Udio's circumvention of YouTube's technological measures has facilitated Udio's ongoing and mass-scale infringement of Plaintiffs' copyrights through its unauthorized use of the Copyrighted Recordings Universal Works, the Sony Works, and the Warner Works in its training data.

115.116.    Udio's conduct in violation of 17 U.S.C. § 1201(a) as described herein was and is willful, intentional, and purposeful, in disregard of the rights of Plaintiffs.

116.117.    As a direct and proximate result of Udio's violations of 17 U.S.C. § 1201(a), Plaintiffs are entitled to either the maximum statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(A) or, in the alternative, their actual damages pursuant to 17 U.S.C. § 1203(c)(2), including Udio's profits from circumvention in amounts to be proven at trial, together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. §§ 505 and 1203(b)(4), (5).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request a judgment in their favor and against Udio as follows:

A.    For a declaration that Udio has willfully infringed Plaintiffs' protected sound recordings, including the Copyrighted RecordingsUniversal Works, the Sony Works, and the Warner Works.

B.    For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Plaintiffs' protected sound recordings, including a preliminary and permanent injunction requiring that Udio and its officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, cease infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the infringement of any of Plaintiffs' exclusive rights under federal law, including without limitation in the sound recordings in Exhibit A;

C.    For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Udio's willful violations of Plaintiffs' rights, including in an amount up to $150,000 per work infringed; or, in the alternative, at Plaintiffs' election, Plaintiffs' actual damages and/or Udio's profits from infringement pursuant to 17 U.S.C. § 504(b), in an amount to be proven at trial;

D.    For statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(A), in an amount up to the maximum provided by law, arising from Udio's willful circumvention of technological measures in furtherance of its violations of Plaintiffs' rights, including in an amount up to $2,500 with respect to each act of circumvention; or, in the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 1203(c)(2), Plaintiffs' actual damages and/or Udio's profits from its circumvention, in an amount to be proven at trial;

E.    For an award of Plaintiffs' costs and disbursements in this action, including

reasonable attorneys' fees, pursuant to §§ 505 and 1203(b)(4), (5);

F.     For an award of pre-judgment and post-judgment interest, to the fullest extent available, on any monetary award made part of the judgment against Udio; and

G.     For such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all claims for which trial by jury is proper.

May 22, 2026

HUESTON HENNIGAN LLP

By: _____

OF COUNSEL
Jonathan Z. King
COWAN, LIEBOWITZ & LATMAN P.C.
114 West 47th Street
New York, New York 10036
Telephone: (212) 790-9200
Facsimile: (212) 575-0671
jzk@cll.com

Moez M. Kaba
Mariah N. Rivera
Alexander R. Perry
HUESTON HENNIGAN LLP
1 Little West 12th Street
New York, New York 10014
Telephone: (646) 930-4046
Facsimile: (888) 775-0898
mkaba@hueston.com
mrivera@hueston.com
aperry@hueston.com

Robert N. Klieger
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, California 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898
rklieger@hueston.com

*Attorneys for Plaintiffs*
*Sony Music Entertainment, Alamo Records LLC, Arista Music, Arista Records, LLC, LaFace Records, LLC, Records Label, LLC, Sony Music Entertainment US Latin, LLC, Ultra Records, LLC, Volcano Entertainment III, LLC, Zomba Recording LLC* ~~UMG Recordings, Inc., Capitol Records, LLC, Sony Music Entertainment, and Arista Music, Arista Records LLC, Atlantic Recording Corporation, Rhino Entertainment Company, Warner Music Inc., Warner Music International Services Limited, Warner Records Inc., Warner Records LLC, and Warner Records/SIRE Ventures LLC~~