**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT, ARISTA MUSIC, and ARISTA RECORDS, LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNCHARTED LABS, INC., d/b/a Udio.com, and JOHN DOES 1-10,<br><br>    Defendant. | Case No.: 1:24-cv-04777-AKH |

**DEFENDANT UNCHARTED LABS, INC.'S OPPOSITION TO PLAINTIFFS'**
**SECOND MOTION FOR LEAVE TO AMEND COMPLAINT**

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ........................................................................................................ 1

II.  BACKGROUND ........................................................................................................ 3

    A.   Plaintiffs' Early Allegations of Widespread Infringement and the Litigation Concerning Their 333 Asserted Works .................................................. 3

    B.   Plaintiffs' Delay in Identifying the Works in Udio's Training Data ..................... 4

III. LEGAL STANDARD ................................................................................................ 7

IV.  ARGUMENT ............................................................................................................. 9

    A.   Plaintiffs Unduly Delayed in Attempting to Assert Thousands of Additional Works ................................................................................................. 9

    B.   Allowing Plaintiffs' Second Amended Complaint Would Unduly Prejudice Udio ..................................................................................................... 13

    C.   Allowing Amendment Would Not Promote Judicial Economy ........................... 20

V.   CONCLUSION.......................................................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*A.V.E.L.A., Inc. v. Est. of Monroe*,
34 F. Supp. 3d 311 (S.D.N.Y. 2014)................................................................................12

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
626 F.3d 699 (2d Cir. 2010)...............................................................................8, 13, 17

*After II Movie, LLC v. Grande Commc'ns Networks LLC*,
2023 WL 6367704 (W.D. Tex. Sept. 29, 2023), *report and recommendation adopted*, 2023 WL 6930739 (W.D. Tex. Oct. 19, 2023) ..........................................15

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ...........................................................1, 19

*Bartz v. Anthropic PBC*,
No. 24-cv-05417, Dkt. 85 (N.D. Cal. Feb. 19, 2025) ...................................................5

*Bilt-Rite Steel Buck Corp. v. Duncan's Welding & Corr. Equip., Inc.*,
1990 WL 129970 (E.D.N.Y. Aug. 24, 1990).................................................................20

*City of N.Y. v. Grp. Health Inc.*,
649 F.3d 151 (2d Cir. 2011).........................................................................................16

*Concord Music Grp. v. Anthropic PBC*,
No. 24-cv-3811, Dkt. 474 (N.D. Cal. Oct. 8, 2025) .......................................................1

*Epidemic Sound, AB v. Meta Platforms, Inc.*,
No. 22-cv-4223, Dkt. 177 (N.D. Cal. Oct. 10, 2024) .....................................................2

*Epidemic Sound, AB v. Meta Platforms*,
No. 25-cv-10355, Dkt. 1 (N.D. Cal. Dec. 2, 2025).......................................................21

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991).............................................................................................3, 8, 13

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*,
80 F. Supp. 3d 535 (S.D.N.Y. 2015)........................................................................8, 18

*Grace v. Rosenstock*,
228 F.3d 40 (2d Cir. 2000)..............................................................................................7

*Guadagno v. M.A. Mortenson Co.*,
2018 WL 4870693 (W.D.N.Y. Oct. 2, 2018) ...............................................................20

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
   112 F.R.D. 417 (S.D.N.Y. 1986) ..................................................................................20

*In re OpenAI, Inc. Copyright Infringement Litigation*,
   No. 25-md-03143, Dkt. 483 (S.D.N.Y. Aug. 25, 2025) ...........................................5

*Kadrey v. Meta Platforms, Inc.*,
   788 F. Supp. 3d 1026 (N.D. Cal. 2025) ...............................................................1, 19

*Kleeberg v. Eber*,
   331 F.R.D. 302 (S.D.N.Y. 2019) ...............................................................................20

*Kwan v. Schlein*,
   2009 WL 10678967 (S.D.N.Y. Apr. 23, 2009)..........................................................8

*Lesnik v. Lincoln Fin. Advisors Corp.*,
   2019 WL 6169971 (S.D.N.Y. Nov. 20, 2019)....................................................11, 17

*Margel v. E.G.L. Gem Lab Ltd.*,
   2010 WL 445192 (S.D.N.Y. Feb. 8, 2010)...............................................................17

*MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*,
   66 F.4th 77 (2d Cir. 2023) ..........................................................................................7

*Penobscot Nation v. Mills*,
   2014 WL 442429 (D. Me. Feb. 4, 2014) ..................................................................12

*Randolph-Rand Corp. of N.Y. v. Tidy Handbags, Inc.*,
   2001 WL 1286989 (S.D.N.Y. Oct. 24, 2001).........................................................20

*Ruotolo v. City of New York*,
   514 F.3d 184 (2d Cir. 2008) ........................................................................................7

*Sohk Sportswear, Inc. v. K.S. Trading Corp.*,
   2003 WL 22208352 (S.D.N.Y. Sept. 23, 2003)...........................................11, 17, 20

*Sullivan v. County of Suffolk*,
   2006 WL 2844205 (E.D.N.Y. June 1, 2006) ...........................................................20

*The New York Times Company v. Microsoft*,
   No. 23-cv-11195, Dkt. No. 254 (S.D.N.Y. Oct. 4, 2024)...........................................5

*TIG Ins. Co. v. Century Indem. Co.*,
   2009 WL 959653 (S.D.N.Y. Apr. 8, 2009)...............................................................17

*Tremblay v. OpenAI, Inc.*,
   No. 23-cv-03223, Dkt. No. 182 (N.D. Cal. Sept. 24, 2024) ......................................5

*Unique Sports Generation, Inc. v. LGH-III, LLC*,
2005 WL 2414452 (S.D.N.Y. Sept. 30, 2005)..................................................................17

*Urbont v. Sony Music Ent.*,
831 F.3d 80 (2nd Cir. 2016)...............................................................................................8

*Zubulake v. UBS Warburg LLC*,
231 F.R.D. 159 (S.D.N.Y. 2005) .......................................................................................17

## STATUTES

17 U.S.C. § 107................................................................................................................18

Copyright Act...................................................................................................................18

## RULES

Fed. R. Civ. P. 56(d) ........................................................................................................19

## TREATISES

4 William F. Patry, *Patry on Copyright* § 10:155.40 (2026)...........................................19

## I.    INTRODUCTION

Plaintiffs' motion—coming nearly two years into the litigation and on the eve of the close of document discovery—seeks to expand the list of asserted works *one hundredfold*, transforming an already complex case into an unmanageable one.  For each of the works asserted, Plaintiffs will have to produce, and Udio will have to review, discovery establishing their ownership and demonstrating whether Udio's product has had any effect at all on their market share.  And at the end of this process, Plaintiffs will ask the factfinder to make determinations on both infringement and fair use for 30,000 separate works.  This is why, as early as August 2024, the Court cautioned Plaintiffs that an amendment of exactly the type they now seek would "creat[e] a case that is impossible."  *See also* Aug. 21, 2024 Hr'g Tr. at 19:3-19 (questioning whether "any single judge could deal with" the litigation were it expanded to 10,000 works).  Plaintiffs' motion ignores that warning and any practical implication of what they seek.

It also deprives Udio of its right to have this Court timely determine the core question at the heart of this case:  whether using works to train a generative AI model is a transformative use—a question two other courts have already answered in the affirmative).  *See Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1060 (N.D. Cal. 2025); *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1033 (N.D. Cal. 2025).  This is a too-familiar page from the standard playbook of aggregate music rightsholders: file an action asserting "representative" works, let the litigation proceed through discovery for years, then attempt to expand the list of works exponentially at the close of fact discovery.  If permitted, Plaintiffs' gambit would necessitate substantial additional discovery and delay a potentially meritorious summary judgment decision on Udio's behalf.  Other courts have rightly rejected these attempts—including in other generative AI litigations—and this Court should too.  *See, e.g.*, *Concord Music Grp. v. Anthropic PBC*, No. 24-cv-3811, Dkt. 474 at 26:3-29:22 (N.D. Cal. Oct. 8, 2025) (denying motion to amend to assert additional works brought

by music publishers in a generative AI case where the publishers were not diligent in identifying those works and finding that the plaintiffs should proceed on "the complaint that they have"); *see also Epidemic Sound, AB v. Meta Platforms, Inc.*, No. 22-cv-4223, Dkt. 177 at 2 (N.D. Cal. Oct. 10, 2024) (rejecting possibility that the plaintiff could move to amend to assert additional works from its catalog because allowing amendment would require significant additional discovery and would "unduly delay [the] action even more").

Plaintiffs' late-coming motion has landed on the Court's desk just as the parties are endeavoring to close out document discovery.  Despite insisting, from the beginning of the case, that they would seek discovery to identify additional works in Udio's training data, Plaintiffs derailed any efforts to obtain it in a timely fashion.  From the negotiations of the parties' Training Data Inspection Protocol to the implementation of their third-party Audible Magic analysis, Plaintiffs obstructed Udio's attempts to impose basic confidentiality measures, demanded irrelevant discovery and premature concessions, and walked back processes they had previously agreed to.  The result was a discovery process that took considerably more time and resources than it needed to.  Then, once Plaintiffs had the discovery they sought, they waited four more months to attempt to amend their pleadings.  This pattern of conduct is not the hallmark of a party that exercised diligence.

Plaintiffs' proposed amendments would also exponentially expand the case and require substantial additional discovery, threatening to upend the litigation entirely.  Copyright claims are work-specific: for each asserted work, Plaintiffs bear the prima facie burden of establishing both ownership and copying.  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  To satisfy their burden to prove ownership, Plaintiffs must produce, at minimum, the work-for-hire agreements and/or title assignments between themselves and the thousands of artists whose works

they assert, many of which likely go back decades.  This volume of discovery cannot practicably be completed for 30,000 works without indefinitely derailing the litigation—if even possible at all. Plaintiffs offer no commitments to the Court with respect to when they can complete this discovery; they state only that they will "endeavor to produce the necessary ownership-related documentation on a reasonably expedited basis."  Dkt. 162-2 ("Br.") at 14.  And the alternative Plaintiffs offer to such indefinite delay—that the parties proceed to summary judgment on fair use without conducting discovery on the newly asserted works—would result in legal error.  That proposal relieves Plaintiffs of their prima facie burden to establish ownership and effectively asks the Court to render what would amount to an advisory opinion on whether Udio infringed works that Plaintiffs may not even own or have standing to assert.

The Court should reject Plaintiffs' attempt to expand this case beyond what can be manageably litigated, at least without undue and indeterminate delay.  To the extent Plaintiffs believe they have additional infringement claims to assert based on other works, the proper course is to file a separate action, not undertake a wholesale rewriting of this one.

## II.     BACKGROUND

### A.     Plaintiffs' Early Allegations of Widespread Infringement and the Litigation Concerning Their 333[1] Asserted Works

Udio launched its generative AI tool in April 2024.  On April 25, 2024, trade organization, the Recording Industry Association of America ("RIAA"), sent Udio a letter accusing Udio of infringing recordings "create[d], manufacture[d], and/or distribute[d]" by Plaintiffs and

---

[1] Plaintiffs' brief refers to the 1,670 sound recordings asserted in their original Complaint.  *See, e.g.*, Br. at 3-4; *see also* Dkt. 1-1.  However, as a number of the original Plaintiffs have since been dismissed from the case, *see* Dkts. 138, 140, the number of works currently in suit is 333: the works from the original Complaint asserted by Sony Music Entertainment, Arista Music, and Arista Records LLC.  *See* Dkt. 1-1.

3

demanding that Udio not just cease using those recordings, but also, *inter alia*, provide "a complete, detailed list of" *all* of the materials Udio ever used to develop its tool, including works not owned by Plaintiffs, and every copyright owner Udio ever contacted for permissions and turn over "an accounting of all revenue" Udio earned from its tool.  Lovejoy Decl. ¶¶ 2-3.

In the highly competitive field of generative AI, a company's training data reflects core strategic and technical judgments regarding how the company built its AI model; accordingly, Udio's training data is nonpublic, as a matter of policy.  *See* Dkt. 165 ("Sanchez Decl.") ¶¶ 5-7. Udio refused to depart from that policy to provide the entire corpus of training data the RIAA demanded.  *See* Lovejoy Decl. ¶ 5.  Notably, the RIAA made no representation that it would keep Udio's training data confidential, and nothing would have prevented it from sharing the information widely, including with Udio's competitors.  Lovejoy Decl. ¶ 4.

Plaintiffs filed suit two months later.  Despite Plaintiffs alleging that "it is obvious" that "Udio copied Plaintiffs' copyrighted sound recordings *en masse*," they asserted only 333 works from their catalogs, claiming that they would "amend the Complaint at an appropriate time to provide an expanded list of works."  Dkt. 1 ¶¶ 9, 30; Dkt. 1-1.

On March 21, 2025, Plaintiffs moved to extend the deadline to file an amended Complaint without leave of the Court; the Court denied their request, leaving the deadline over a year ago, at March 25, 2025.  *See* Dkts. 83, 85.

B.    **Plaintiffs' Delay in Identifying the Works in Udio's Training Data**

Despite their stated intent to amend their Complaint to assert additional works identified through discovery into Udio's training data, Plaintiffs repeatedly derailed the processes of both accessing and analyzing that information.

From the time that it filed its Answer, Udio has been clear that Plaintiffs would "have ample opportunity to comb through" its training data "once discovery commences."  Dkt. 26 at 10.

4

Indeed, Udio has never denied that training its generative AI model required showing the model many sound recordings, including works potentially owned by Plaintiffs given the size of their aggregated catalogs. *See id.* at 3, 8-9. However, Udio's training data is among its most commercially sensitive assets, and disclosure of its contents to third parties could put Udio at a significant and unfair competitive disadvantage. Sanchez Decl. ¶¶ 6-7. Accordingly, as is standard in generative AI copyright litigations, Udio sought a "Training Data Inspection Protocol" that would allow Plaintiffs access to the data while ensuring that it remained confidential and secure. Lovejoy Decl. ¶ 9; *see also, e.g.*, *In re OpenAI, Inc. Copyright Infringement Litigation*, No. 25-md-03143, Dkt. 483 (S.D.N.Y. Aug. 25, 2025); *Bartz v. Anthropic PBC*, No. 24-cv-05417, Dkt. 85 (N.D. Cal. Feb. 19, 2025); *The New York Times Company v. Microsoft*, No. 23-cv-11195, Dkt. 254 (S.D.N.Y. Oct. 4, 2024); *Tremblay v. OpenAI, Inc.*, No. 23-cv-03223, Dkt. 182 (N.D. Cal. Sept. 24, 2024).

Udio first sent a draft Training Data Inspection Protocol for Plaintiffs' review on December 13, 2024. Lovejoy Decl. ¶ 9. When Plaintiffs responded over two weeks later, they proposed edits removing the designation of training data as "Highly Confidential - Attorneys' Eyes Only" and demanding offsite access to the data, outside of the secured facilities provided by Udio. *Id.* The parties continued to negotiate the Protocol through January, including appearing before the Special Master. *Id.* ¶¶ 11, 13. Over the course of these negotiations, Plaintiffs' counsel repeatedly insisted that they needed to be able to share the sound recordings in Udio's training data that "may" belong to Plaintiffs broadly with their clients and with third-party Audible Magic—though they did not reveal their intention to use Audible Magic until a January 14 conference with the Special Master. *Id.* ¶¶ 11-13. Udio proposed multiple solutions short of blanket down-designation, including one that would allow certain Plaintiff employees access to sound recordings that Plaintiffs have a good

faith basis to believe they might own based on their review of the training data, for the specific purpose of confirming ownership. *Id.* ¶¶ 11-12. Plaintiffs repeatedly rejected these options. *Id.* ¶ 14.

Eventually, Plaintiffs revealed their concern that Udio's proposals could "preclude" them from publicly "identifying additional recordings in their amended complaint." *Id.* ¶ 14. On February 6, 2025, the parties submitted briefing on this issue to the Special Master. *Id.* ¶ 15. Udio explained that the dispute was premature, as Plaintiffs had not yet moved to amend their Complaint, much less identified what would be included in a hypothetical amended Complaint. The Special Master agreed and advised that the parties address the issue of what could be public in a potential amended Complaint when Plaintiffs actually proposed one. *Id.* The parties finalized the Protocol on March 6, 2025. *Id.* ¶ 16.

Plaintiffs sent an initial proposal for the Audible Magic inspection on March 7, 2025. *Id.* ¶ 17. In it, they confirmed that the results of the inspection **would be accessible to both Plaintiffs and Udio**. *Id.*; *see also id.* ¶ 19. The parties spent the following weeks ironing out the details of the process, and Plaintiffs began their inspection in May. *Id.* ¶¶ 17-21. After Plaintiffs finished the inspection, Udio requested the access to the results that Plaintiffs had agreed to. *Id.* ¶ 21. Plaintiffs responded by **reneging** on that agreement, claiming for the first time that the database in question was work product. *Id.* ¶ 22. Because Plaintiffs' reversal meant Udio would not know what of its confidential information had been transmitted outside of the secure environment, Udio informed Plaintiffs that they were not authorized to continue their analysis. *Id.* ¶ 23. Plaintiffs raised the issue with the Special Master, who recommended that Plaintiffs do as they said they would and grant Udio access to the results of the inspection. *Id.* ¶ 24.

Plaintiffs eventually agreed to do so. *Id.* ¶ 25. During the parties' appearance before the Special Master, however, Plaintiffs also indicated for the first time that they intended to use Audible Magic to attempt to match Udio's training data to works associated with other competitor rightsholders that are not parties to the case. *See id.* ¶ 25. That Plaintiffs had access to Udio's training data through the litigation did not entitle them to know the portion of the data that may be associated with other entities; this information is irrelevant to Plaintiffs and would provide them with an unearned competitive advantage. Udio raised these concerns and offered a proposed compromise on September 8. *Id.* Plaintiffs waited nearly a month, until October 1, to respond; when they did so, they insisted that they would raise the dispute to the Special Master. *Id.* ¶ 26. On October 21, in the context of preparing a dispute statement, Plaintiffs for the first time offered a solution that would remove the identifying information of nonparty rightsholders. *Id.* Udio agreed on October 24. *Id.*

Plaintiffs completed their Audible Magic inspection on January 3, 2026. Dkt. 162-8 ("Delorey Decl.") ¶ 5. Plaintiffs' expert delivered the results—which identified "recordings which Audible Magic indicated were submitted by a Sony affiliate," *id.* ¶ 6—to Plaintiffs on January 15, Dkt. 162-3 ("Trehan Decl.") ¶ 11. From there, **another four months** passed before Plaintiffs announced their intent to move to amend their Complaint. Trehan Decl. ¶ 13. The document discovery period, meanwhile, closes on June 26, 2026—just over a month from when Plaintiffs informed Udio of the present motion. *See* Dkt. 158.

## III.    LEGAL STANDARD

A court may deny leave to amend for good reason, including "futility, bad faith, undue delay, or undue prejudice to the opposing party." *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023); *see also Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) ("Leave to amend . . . may be properly denied for: undue delay, bad faith or dilatory

7

motive on the part of the movant . . . [and] undue prejudice to the opposing party by virtue of allowance of the amendment." (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962))); *Grace v. Rosenstock*, 228 F.3d 40, 53-54 (2d Cir. 2000) ("The court also has discretion to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice other parties . . . or where the belated motion would unduly delay the course of proceedings by, for example, introducing new issues for discovery." (citations omitted)).  "[P]rejudice to the opposing party resulting from a proposed amendment" is "among the most important reasons to deny leave to amend." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725-26 (2d Cir. 2010).

Courts have found proposed amendments to be unduly prejudicial when they would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *Id*.

Plaintiffs bear the prima facie burden of proving "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist*, 499 U.S. at 361.  And they bear this burden for *each one* of the asserted works; as this Court has recognized, in a copyright infringement action, "[e]ach copyright must be proven on its own."  Dkt. 89 at 3; *see also, e.g.*, *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 80 F. Supp. 3d 535, 543 (S.D.N.Y. 2015) ("A party alleging copyright infringement always has to prove that he owns the copyright he is asserting, it is an element of his claim!"); *Kwan v. Schlein*, 2009 WL 10678967, at *3 (S.D.N.Y. Apr. 23, 2009) ("Of course, an infringement claimant must first prove that she owns the copyright, that the defendant does not own the copyright, and that the defendant infringed on her copyright."); *see also Urbont v. Sony Music Ent.*, 831 F.3d 80, 88 n.6 (2d Cir. 2016) ("[P]laintiffs must prove

ownership not only as an element of a copyright infringement claim, but also to assert their standing to bring suit.").

## IV.   ARGUMENT

### A.   Plaintiffs Unduly Delayed in Attempting to Assert Thousands of Additional Works

Plaintiffs' late-coming motion is a result of their lack of diligence in conducting their inspection of Udio's training data.  Having repeatedly delayed and stalled that process, they cannot now demonstrate good cause to insert 30,000 new works into the litigation at the tail end of fact discovery.  Worse still, even after that investigation was complete, Plaintiffs delayed another four months before filing this motion.   That delay cannot be excused by Plaintiffs' purported investigation into whether they own the works identified by Audible Magic given Plaintiffs' prior representations to the Court (in order to avoid discovery requests) that they "systematically ensure" the works they distribute to Audible Magic for such matching functions "are the same sound recordings they deposited with the Copyright Office."  Dkt. 80 at 13.

*First*, despite planning from day one of the litigation to inspect Udio's training data to identify additional works, Plaintiffs derailed negotiations of a Training Data Inspection Protocol that would allow them to do so.  Udio explained early on that its training data is a highly sensitive trade secret and proposed a Protocol that would allow Plaintiffs access consistent with its confidential nature.  Lovejoy Decl. ¶ 9.  Training data protocols are standard in generative AI litigations for this very reason.  *See supra* at 3.  Yet Plaintiffs disputed the necessity of such a protocol, while also proposing a number of revisions to limit its protections.  *See* Lovejoy Decl. ¶ 9.  Plaintiffs then spent the following months rejecting compromises Udio proposed that would allow them to share with certain parties (including designated employees and Audible Magic) recordings they had a good faith basis to believe were actually theirs.  *Id.* ¶¶ 9-16.  Eventually,

Plaintiffs revealed another motivation for their obstinance: they wanted to ensure that Udio's training data would not be designated confidential so that they could eventually publicly file an amended Complaint listing additional works they allegedly identified in the training data. *Id.* ¶ 15. In other words, Plaintiffs held hostage negotiations of the Protocol they needed to conduct discovery over a premature and hypothetical concern about whether they could publicize additional infringement allegations. That concern was unfounded: when Plaintiffs filed the present motion, Udio did not seek sealing of the works they identified. *See* Dkt. 164. But their repeated, unreasonable proposals substantially delayed the discovery process.

*Second*, Plaintiffs upended their own proposed Audible Magic inspection process by reneging on their agreements and demanding irrelevant information to which they are not entitled. After *themselves* offering on March 7 to store the results of the inspection in a database that "both Plaintiffs and Udio can access," Plaintiffs went back on that commitment on June 27, after they had completed the first stage of the inspection. Lovejoy Decl. ¶¶ 17, 22. Remarkably, Plaintiffs then insisted on raising the issue with the Special Master, apparently hoping he would endorse their about-face. *Id.* ¶ 24. He did not, and Plaintiffs finally agreed in September to grant Udio the access they had promised. *Id.* ¶¶ 24-25. But the entire unnecessary process took several months.[2] And as soon as that dispute was resolved, Plaintiffs threw another wrench in the works, insisting on using Audible Magic to identify works associated with their competitors. *Id.* ¶ 25. These works have no relevance to Plaintiffs or to this litigation, and Plaintiffs eventually backed down. *See id*.

---

[2] Plaintiffs' accusation that Udio "abruptly rescinded consent" to allow Plaintiffs to continue their inspection, Br. at 6, rings hollow in light of the full record. Udio "rescinded consent" because Plaintiffs went back on one of the core aspects of their proposed process, which was a condition of Udio's agreement. See Lovejoy Decl. ¶¶ 17, 22-23.

¶ 26. But, again, their initial insistence and demand that the parties brief the issue needlessly slowed things down still further.

*Finally*, though Plaintiffs completed their inspection in January, they waited an additional **four months**, until the final month of document discovery, to move to amend their Complaint. *See* Trehan Decl. ¶¶ 10-11; *see also* Lovejoy Decl. ¶¶ 28-29. Though Plaintiffs attempt to defend this gap by claiming they were investigating whether they own the works identified by Audible Magic as belonging to them, *see* Br. at 7-8, this explanation is at odds with Plaintiffs' previous claims about how they use Audible Magic. Earlier in the litigation, in an attempt to resist discovery of the deposit copies they registered with the Copyright Office, Plaintiffs told this Court that they "***systematically ensure that the sound recordings they upload to Audible Magic's content database are the same sound recordings they deposited with the Copyright Office***" and that they claim to own. Dkt. 80 at 13 (emphasis added). Plaintiffs cannot ignore the assurances they made to avoid discovery to explain away their delay now. Assuming Plaintiffs' representations were accurate, there is no justification for why they took four months to "confirm[]" that the works identified with Audible Magic "correspond to . . . [an] applicable copyright registration," Dkt. 162-9 ("Castagna Decl.") ¶ 8, when they apparently "systematically ensure" that this is the case.

In sum, despite being aware for years that they intended to identify and additional works in Udio's training data and assert them in this case, Plaintiffs repeatedly obstructed the process that would allow them to do so. Plaintiffs' undue delay warrants denial of their motion. *See, e.g.*, *Lesnik v. Lincoln Fin. Advisors Corp.*, 2019 WL 6169971, at *2 (S.D.N.Y. Nov. 20, 2019) (finding plaintiff's explanations for delay "shifting" and "unsatisfactory" when plaintiff was "aware of the need to amend" his complaint and had already "expressed his intention" to amend his complaint throughout the "lengthy discovery period," but sought leave to amend eleven months after filing

11

his complaint); *Sohk Sportswear, Inc. v. K.S. Trading Corp.*, 2003 WL 22208352, at *3 (S.D.N.Y. Sept. 23, 2003) (finding evidence of undue delay even with newly obtained testimony because the "facts essential to Plaintiff's new claims of infringement were known to Plaintiff prior to filing the Complaint, no less the Amended Complaint").

Plaintiffs cannot avoid this result by attempting to shift the blame to Udio. Plaintiffs' primary argument appears to be that Udio "refused to answer Plaintiffs' *pre-suit inquiries*" about its training data and that Plaintiffs did not have access to the training data until discovery. *See* Br. at 10 (emphasis added). The makeup of Udio's training data is highly commercially sensitive. In an industry with many competitors (including AI companies Plaintiffs have partnered with), the composition of Udio's training data is a closely protected trade secret. *See* Sanchez Decl. ¶¶ 5-7. Plaintiffs cite no authority supporting their position that Udio should have been expected to produce its training data to adverse parties with absolutely no protections in place before this lawsuit was even filed—or that Udio not doing so excuses Plaintiffs' pattern of obstruction and delay once the parties were in litigation.

Plaintiffs likewise attempt to fault Udio for "insist[ing] on providing [its training data] for inspection" and seeking a protocol to govern that inspection. Br. at 10-11. But training data inspection protocols with strict confidentiality provisions are common in generative AI cases, where the plaintiff's desire for discovery must be balanced against the competitive sensitivity of each AI company's unique mix of training materials. *See supra* at 5; *cf.* Dec. 5, 2024 Hr'g Tr. at 6:10-16 (noting that "[n]o one is volunteering source code" without a protocol in place). Given their prevalence, Plaintiffs could not have been surprised that similar protocols would be necessary in this case. Moreover, as explained above, to the extent the negotiations of the Protocol took

time, that is largely due to Plaintiffs' attempts to introduce unrelated issues into the negotiations. *See supra* at 5-6.

Plaintiffs appear to suggest that the reason it took them two years to move to amend is because they needed discovery. *See* Br. at 10. The problem is that Plaintiffs failed to diligently *advance* that discovery—which distinguishes this case from the authorities Plaintiffs rely on. *See, e.g.*, *A.V.E.L.A., Inc. v. Est. of Monroe*, 34 F. Supp. 3d 311, 316 (S.D.N.Y. 2014) (allowing amendment after single four-month delay to confirm facts through discovery); *Penobscot Nation v. Mills*, 2014 WL 442429, at *3 (D. Me. Feb. 4, 2014) (allowing amendment sought one month after confirming information through discovery). Having so delayed, Plaintiffs cannot be permitted to drastically expand the scope of the litigation at the eleventh hour.

### B.     Allowing Plaintiffs' Second Amended Complaint Would Unduly Prejudice Udio

Plaintiffs' late motion to expand their list of asserted works by a factor of over one hundred will also unduly prejudice Udio, as it will require substantial additional discovery and delay resolution of the claims and defenses that the parties have spent two years adducing evidence for, including Udio's fair use defense. *See AEP*, 626 F.3d at 725-26 (noting that "prejudice to the opposing party resulting from a proposed amendment" is "among the most important reasons to deny leave to amend"). With just weeks left in a document discovery period that has already lasted nearly two years and consumed significant resources, Plaintiffs' Motion essentially presents this Court with two choices: 1) Let Plaintiffs prolong the litigation and forestall a fair use determination by an unspecified amount of time so they can complete the necessary discovery for tens of thousands of additional works; or 2) Allow Plaintiffs to proceed to summary judgment without establishing that they own those works—a proposal the Court already once considered and

rejected, *see* Aug. 21, 2024 Hr'g Tr. at 15:15-16.  *See* Br. at 14-15.  Either option would be significantly disruptive to the litigation and prejudicial to Udio.

Plaintiffs have only two prima facie legal obligations in this case, one of which is to prove, *for each work that they assert*, "ownership of a valid copyright[.]" *Feist*, 499 U.S. at 361.  As this Court has recognized, in a copyright infringement action, "[e]ach copyright must be proven on its own." Dkt. 89 at 3.  Thus, if Plaintiffs are going to claim infringement of 30,000 unique works, they must prove that they own each one of those works.  *See, e.g.*, *Epidemic Sound*, No. 22-cv-4223, Dkt. 490 at 26:12-14 (N.D. Cal. Mar. 9, 2026) (noting that the plaintiff's burden of proof "isn't lessened because" it "decided to bring mass infringement cases").  Making such a showing— either at summary judgment or at trial—requires discovery on a per-work basis.

In recognition of their discovery obligations, Plaintiffs offer that they will "endeavor to produce the necessary ownership-related documentation on a reasonably expedited basis." Br. at 14.  To be sure, Plaintiffs need to produce copyright registrations or indices and chains of title and/or work for hire agreements for each of the asserted works.  These productions are not a formality, though Plaintiffs have attempted to treat them as such.[3]  Plaintiffs did not create any of the 30,000 works they seek to assert; recording artists did.  Plaintiffs allegedly own these works through either work for hire agreements or assignments from other entities, which the Court already ordered must be produced into the case.  *See* Dkt. 89 (ordering Plaintiffs to "produce the artist-label agreements for all works made for hire").  Plaintiffs' list of proposed asserted works includes thousands of individual artists and many recordings that are decades old and/or that were

---

[3] Plaintiffs claim that because Udio acknowledged that Plaintiffs' recordings "probably were" in its training data, "there is no reason why Plaintiffs' ownership should seriously be in dispute." *See* Br. at 15.  This conflation is indicative of Plaintiffs' approach to their prima facie burdens: the fact that Plaintiffs claim ownership over works in Udio's training data does not make ownership undisputed.

14

likely not originally owned by Plaintiffs. Udio and the Court cannot be expected to merely take Plaintiffs' word for it on one of the two fundamental elements of their infringement claim. Despite this, Plaintiffs' motion makes no specific commitment about what ownership discovery they will produce. That Plaintiffs propose an indefinite extension of the discovery schedule so that they may "endeavor" to produce the materials that they have made a unilateral determination are "necessary" is reason alone to reject Plaintiffs' motion.[4]

Beyond that, there is no realistic prospect that Plaintiffs can produce the requisite ownership discovery for 30,000 additional works without blowing up the case schedule. Notably, although the discovery is solely in their hands, Plaintiffs have offered the Court only a noncommittal representation that they will produce ownership discovery on a "reasonably expedited basis." Br. at 14. Plaintiffs' vagueness is concerning, particularly since, with just three weeks left before the close of document discovery, there is still outstanding ownership discovery for the mere 333 works currently asserted. In particular, Plaintiffs *still* have not produced the representations the Court ordered "establishing that [Plaintiffs' produced copies of the asserted works] are identical to the deposit copies submitted for registration with the United States Copyright Office and identifying when the copy produced was made and from what source." *See see* Dkt. 95; *see also* Lovejoy Decl. ¶ 7. Moreover, Plaintiffs previously decried the difficulty of producing ownership discovery for the *much smaller* number of works currently in the litigation.

---

[4] In fact, Plaintiffs have previously indicated that they will refuse to provide full ownership discovery if the list of asserted works expands. *See* Dkt. 80-5 (reserving the right to object to "Plaintiffs' production obligations after the list of asserted works grows"); Lovejoy Decl. ¶ 7. Any proposal by Plaintiffs that would relieve them of their obligations to prove that they own the asserted works and deny Udio the opportunity to test their assertions—including a "sampling" proposal—would be both unsupportable and directly at odds with this Court's order that Plaintiffs "must prove ownership" of each copyrighted work "on its own." Dkt. 89 at 2-3 (rejecting Plaintiffs' sampling proposal). If Plaintiffs are permitted to assert 30,000 works, they are obligated to provide discovery for each of those works.

15

*See* Dkt. 80 at 16.  Having done so, Plaintiffs cannot now minimize the effort required for this discovery.  *See* Aug. 21, 2024 Hr'g Tr. at 18:5-11 (noting that proving ownership would take "a lot of effort").  There is no question that inserting 30,000 new works by thousands of different artists into the litigation will expand the fact discovery schedule and prolong the litigation.  *Cf. id.* at 19:3-10 (questioning whether "any single judge could deal with" the litigation were it expanded to even 10,000 works and that this expansion would "create a case that is impossible"); *see also Epidemic Sound*, No. 22-cv-4223, Dkt. 177 at 2 (N.D. Cal. Oct. 10, 2024) (noting that allowing amendment to assert additional works would require Plaintiffs to "produce all its evidence showing copyright registration, including chain of title evidence"); *After II Movie, LLC v. Grande Commc'ns Networks LLC*, 2023 WL 6367704, at *3-4 (W.D. Tex. Sept. 29, 2023), *report and recommendation adopted*, 2023 WL 6930739 (W.D. Tex. Oct. 19, 2023) (finding undue prejudice where the plaintiff "add[ed] new parties and new works-in-suit" two years into the litigation, which would  "bog down [the] litigation more than it already is" and require additional discovery, over the plaintiff's argument that the claims arose from "the same common nucleus of facts").

Moreover, the additional discovery necessitated by Plaintiffs' motion is not limited to ownership-related materials.  For instance, because Plaintiffs claim that Udio-created outputs compete with their asserted works and seek lost profits, *see, e.g.*, Dkt. 1 ¶¶ 4, 14, 84-85, royalty and consumption data for each of the asserted works—which will indicate whether the market for those works has been harmed—is both relevant and necessary.  *See also infra* at 19-20.  Plaintiffs have agreed to produce this information across eleven streaming services and social media platforms for the currently asserted works.  *See* Lovejoy Decl. ¶ 8.  Granting Plaintiffs' motion would require comparable discovery for the additional 30,000 works.  Particularly as Plaintiffs'

16

brief does not even address the necessity of collecting and producing this discovery, it is unlikely to happen on a "reasonably expedited basis."

Plaintiffs are wrong that the litigation delay caused by a proposed amendment cannot constitute undue prejudice—particularly where, as here, the delay is caused by the need to accommodate substantial additional discovery. *See* Br. at 14. In addition to the time required for production, expanding the works in suit will open the door to discovery disputes, balloon the record for summary judgment and trial, and increase the number of issues for the factfinder to resolve. That is why, in the context of motions to amend, courts in this Circuit regularly find that amendments that require significant additional discovery and prolong adjudication of the issues, especially those that come two years into the litigation and as the parties are completing document discovery, are unduly prejudicial to the opposing party. *See, e.g.*, *City of N.Y. v. Grp. Health Inc.*, 649 F.3d 151, 158 (2d Cir. 2011) (affirming denial of amendment where additional discovery would "delay proceedings and require substantial additional expense"); *Lesnik*, 2019 WL 6169971, at \*3 (finding undue prejudice where amendment filed near the end of fact discovery would "restart the clock on discovery," requiring "significant additional resources" and "significantly delaying the resolution of the dispute" (cleaned up)); *Sohk Sportswear*, 2003 WL 22208352, at \*3 (denying amendment where new claims would "require substantial additional discovery," there was "little reason to believe" such discovery would be completed "expeditiously," and the case was already "ripe for resolution," such that "any further delay would be prejudicial"); *see also Zubulake v. UBS Warburg LLC*, 231 F.R.D. 159, 162 (S.D.N.Y. 2005) (finding that movant's "attempt to trivialize the amount of additional discovery that will be required" if the proposed amendment is allowed is "disingenuous"). The same is true here, where Plaintiffs' proposed amendments would both delay

17

the litigation indefinitely and open discovery into thousands of additional works, "mak[ing] this complicated action even more unmanageable." *Epidemic Sound*, No. 22-cv-4223, Dkt. 177 at 2.[5]

Plaintiffs' alternative suggestion—that the Court "address[] fair use before [Plaintiffs] prov[e] their ownership of the tens of thousands of asserted works"—is not a serious proposal. Br. at 15. It is a highly improper request that Plaintiffs be relieved of their prima facie obligations altogether. Plaintiffs have tried this before: at the very start of the litigation, Plaintiffs sought a bifurcated schedule that would allow them to litigate Udio's fair use defense without establishing that they own the works allegedly infringed and without addressing any of Udio's other asserted defenses. *See* Dkt. 36 at 7-11. The Court rejected that proposal then, *see* Aug. 21, 2024 Hr'g Tr. at 15:15-16 (determining that bifurcation is "not efficient" and that, "[i]n order . . . to make any intelligent rulings," the Court will "need a longer perspective than just an abstract issue of fair use"), and should once more. If Plaintiffs cannot prove that they own the works they assert and that Udio copied those same works, Udio is not liable for infringing those works, regardless of whether any affirmative defense would apply. *See Flo & Eddie*, 80 F. Supp. 3d at 543 ("A party

---

[5] Plaintiffs' authorities address only the limited proposition that *some* additional discovery attendant to an amendment does not, standing alone, establish undue prejudice. *See TIG Ins. Co. v. Century Indem. Co.*, 2009 WL 959653, at *3-4 (S.D.N.Y. Apr. 8, 2009) (finding no prejudice where "discovery ha[d] barely commenced"); *Margel v. E.G.L. Gem Lab Ltd.*, 2010 WL 445192, at *12 (S.D.N.Y. Feb. 8, 2010) (finding no prejudice where the new claim would "not require much in the way of additional time or resources" and where the relevant documents "ha[d] already been exchanged through discovery . . . [and were] within the defendants' possession"); *Unique Sports Generation, Inc. v. LGH-III, LLC*, 2005 WL 2414452, at *12 (S.D.N.Y. Sept. 30, 2005) (finding no prejudice where "a single universe of witnesses" was relevant to both the existing claims and the proposed counterclaims, requiring no meaningful expansion of the case). None of these cases found that meaningful delay in the resolution of the litigation cannot constitute undue prejudice, and none involved the type of significant additional discovery burdens, like those here, that the Second Circuit has recognized as a basis for finding prejudice. *See, e.g.*, *AEP*, 626 F.3d at 725-26 (explaining that an amendment can be prejudicial when it would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial *or* significantly delay the resolution of the dispute" (cleaned up) (emphasis added)).

alleging copyright infringement always has to prove that he owns the copyright he is asserting, it is an element of his claim!").

It would also be legal error for the Court to assess fair use without considering evidence on the actual works in suit.  The fourth fair use factor  is "the effect of the use upon the potential market for or value *of the copyrighted work*" alleged to have been infringed.  17 U.S.C. § 107 (emphasis added).  One of the core arguments Plaintiffs intend to advance is that Factor Four favors them because Udio-created outputs will compete with and diminish the market for their asserted works—regardless of whether Udio's outputs sound like Plaintiffs' asserted works.[6]  *See, e.g.*, Dkt. 1 ¶¶ 4, 14, 84-86.  Putting aside the legal merits of this approach to Factor Four,[7] it requires discovery into whether Udio's outputs have or are likely to have an impact on the market for specific asserted works.  But, as discussed above, Plaintiffs have not committed to produce any discovery into that question with respect to the 30,000 additional works that they seek to add to the case.  Plaintiffs instead appear to propose that the Court make a fair use determination applicable to those 30,000 works based on the evidence they have produced for the 333 works in suit.  However, even assuming Plaintiffs could show that Udio-generated outputs impact the market for that specific set of works (and even assuming this approach to Factor Four were legally supported), it does not necessarily follow that those outputs necessarily affect the market for *other*

---

[6] As Plaintiffs acknowledge, they do not allege that any outputs (even those that allegedly sound like asserted sound recordings) infringe their works—nor could they, under the Copyright Act. *See* Dkt. 26 at 4-6.

[7] Plaintiffs' preferred theory of market harm (their "market dilution" theory) is legally infirm.  *See Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1031–32 (N.D. Cal. June 23, 2025) (holding that copying for purposes of training an AI model "did not and will not displace demand for copies of Authors' works" for purposes of the Factor Four analysis, "or not in the way that counts under the Copyright Act," because the harm alleged—an "explosion" of AI-generated works competing with the plaintiffs'' works—is "not the kind of competitive or creative displacement that concerns the Copyright Act"); *see also* 4 William F. Patry, *Patry on Copyright* § 10:155.40 (2026) (calling the "market dilution" theory "nuts").  But the Court need not decide that issue now.

19

works. The Court cannot decide fair use for all 30,000 works on an incomplete record, and at summary judgment Udio would be compelled to raise this issue and ask the Court to defer judgment. *See* Fed. R. Civ. P. 56(d) (allowing the court to defer judgment where a nonmovant "cannot present facts essential to justify its opposition"). Another court deciding summary judgment on fair use in a generative AI case has already cautioned of the pitfalls of deciding fair use, which is a "fact-specific doctrine that requires case-by-case analysis that is sensitive to new technologies and their potential consequences," on an underdeveloped record. *Kadrey*, 788 F. Supp. 3d at 1059; *see also id.* at 1060 (noting that, because the plaintiffs "fail[ed] to present meaningful evidence" of the effect of AI tool on *their* books, the court could not actually assess market harm). Yet Plaintiffs are asking the Court to do just that.

Plaintiffs' proposals to accommodate the obvious disruption caused by inserting 30,000 new works into a two-year-old litigation just as document discovery is about to close are inadequate. Plaintiffs would have Udio and this Court choose between protracted and costly additional discovery, which would delay resolution of the litigation for many months, and litigating an advisory opinion on fair use for 30,000 works before any discovery has been taken on them. Neither option addresses or prevents the undue prejudice to Udio caused by Plaintiffs' late-coming motion.

## C.    Allowing Amendment Would Not Promote Judicial Economy

For many of the same reasons that Plaintiffs' proposed amendment would prejudice Udio, it would also unnecessarily burden the Court. Granting the motion would require the Court to either let this case continue to sit on its docket while fact discovery is indeterminately delayed or

commit legal error by relieving Plaintiffs of their prima facie obligations.[8]  Far from promoting judicial economy, Plaintiffs' proposals add unnecessary complexity and delay to a case that has already gone on for two years.  *Cf.  H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 112 F.R.D. 417, 420 (S.D.N.Y. 1986) (finding that if plaintiffs' motion to amend was granted, the "resolution of this already protracted case would be further delayed [and] [s]uch further delay would not be in the interest of justice); *Sohk Sportswear*, 2003 WL 22208352, at *3-4 (explaining that, as opposed to an amendment asserting "additional acts of infringement of the designs which have been the subject of the litigation," an amendment "add[ing] claims of infringement regarding new copyrighted designs" would "require substantial additional discovery" and denying motion to supplement complaint).  To the extent Plaintiffs have a basis to bring new infringement claims for additional works, the solution is for them to file a new suit, just as other music rightsholder plaintiffs have done, which the Court can relate to the current litigation.  *See, e.g.*, *Epidemic Sound,*

---

[8] Plaintiffs' cited authorities all involved modest amendments that required little to no additional discovery and did not meaningfully expand the scope or complexity of the litigation.  *See, e.g.*, *Kleeberg v. Eber*, 331 F.R.D. 302, 315 (S.D.N.Y. 2019) (adding new claims arising from the same trust transactions where additional discovery would take "no longer than an additional one or two months"); *Guadagno v. M.A. Mortenson Co.*, 2018 WL 4870693, at *6-7 (W.D.N.Y. Oct. 2, 2018) (adding one party whose liability arose from the same single incident, where the court found no "significant additional resources" would be required); *Bilt-Rite Steel Buck Corp. v. Duncan's Welding & Corr. Equip., Inc.*, 1990 WL 129970, at *1 (E.D.N.Y. Aug. 24, 1990) (adding a single related breach of contract claim where the "action [wa]s still in its infancy and there can be no argument that amendment will result in delay"); *Randolph-Rand Corp. of N.Y. v. Tidy Handbags, Inc.*, 2001 WL 1286989, at *4 (S.D.N.Y. Oct. 24, 2001) (adding defendants potentially liable for the same claim where doing so would not "have any substantial impact in delaying the final disposition of the case").  The interests of judicial economy weigh entirely differently here, where Plaintiffs' proposed amendments will cause significant disruption to the litigation.  Indeed, *Sullivan v. Cnty. of Suffolk*, 2006 WL 2844205, at *7 (E.D.N.Y. June 1, 2006), the case Plaintiffs cite for the general proposition that courts consider judicial economy, recommended *denying* the motion to amend where amendment would require reopening discovery and significantly delay the action and the "original complaint . . . include[d] all of the defendants necessary to fairly adjudicate this case on the merits."  *Id.* at *7.

21

*AB v. Meta Platforms*, No. 25-cv-10355, Dkt. 1 (N.D. Cal. Dec. 2, 2025) (filing separate action

asserting works not brought in the first suit by the same rightsholder against the same defendant).

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' second Motion to Amend the

Complaint.

Dated: June 5, 2026                Respectfully submitted,

                                   */s/ Brittany S. Lovejoy*
                                   Andrew M. Gass (*pro hac vice*)
                                   Brittany N. Lovejoy (*pro hac vice*)
                                   LATHAM & WATKINS LLP
                                   505 Montgomery Street, Suite 2000
                                   San Francisco, CA 94111-6538
                                   Telephone: (415) 391-0600
                                   Facsimile: (415) 395-8095
                                   andrew.gass@lw.com
                                   brittany.lovejoy@lw.com

                                   Grace McLaughlin
                                   LATHAM & WATKINS LLP
                                   1271 Avenue of the Americas
                                   New York, NY 10020
                                   Telephone: (212) 906-2967
                                   Facsimile: (212) 751-4864
                                   grace.mclaughlin@lw.com

## CERTIFICATE OF COMPLIANCE

I, Brittany N. Lovejoy, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules") and the Individual Rules of the Honorable Alvin K. Hellerstein that the foregoing Memorandum of Law was prepared using Microsoft Word and contains 7,286 words in accordance with the Local Rules. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated: June 5, 2026
        Lafayette, California

/s/ *Brittany N. Lovejoy*
Brittany N. Lovejoy
LATHAM & WATKINS LLP
*Counsel for Defendant Uncharted
Labs, Inc., d/b/a Udio.com*